United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, et al., | Case No.  17-cv-04992-BLF |
| Plaintiffs, | **ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT;** *SUA SPONTE* **RECONSIDERING PRIOR ORDER DENYING MOTION TO TRANSFER ACTION TO SOUTHERN DISTRICT OF NEW YORK; AND GRANTING MOTION TO TRANSFER** |
| v. | |
| AMBAC ASSURANCE CORPORATION, et al., | |
| Defendants. | [Re:  ECF 223] |
| | **[CONDITIONALLY UNDER SEAL]** |

This action arises from alleged wide-scale fraud in the financing of military housing projects.  Plaintiffs are eighteen "project entities" that were authorized to construct housing on military bases in fifteen states.[1]  Plaintiffs claim that they were defrauded by the lenders financing the construction, the company insuring the loans, and others, in violation of RICO[2] and state common laws.

---

[1] Plaintiffs are:  Monterey Bay Military Housing, LLC; Monterey Bay Land, LLC; Fort Bliss/White Sands Missile Range Housing LP; Carlisle/Picatinny Family Housing LP; Stewart Hunter Housing LLC; Fort Leavenworth Frontier Heritage Communities, I, LLC; Fort Leavenworth Frontier Heritage Communities, II, LLC; Meade Communities LLC; Riley Communities LLC; Bragg Communities LLC; Fort Detrick/Walter Reed Army Medical Center LLC; Picerne Fort Polk Funding LLC; Rucker Communities LLC; Sill Housing, LLC; AETC Housing LP; AMC West Housing LP; Lackland Family Housing, LLC; and Vandenberg Housing LP.

[2] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq.

United States District Court
Northern District of California

Defendants are New York based companies and their employees:  Ambac Assurance Corporation ("Ambac"), the New York based company that insured the construction loans; Chetan Marfatia ("Marfatia"), a New York resident who served as Ambac's Managing Director; Jefferies Mortgage Finance, Inc., Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (collectively, "Jefferies"),[3] New York based companies that provided Project financing; and Danny Ray ("Ray"), a former Managing Director of Jefferies and of its predecessor, GMAC Commercial Mortgage Corporation ("GMAC").

Shortly after this lawsuit was filed, Defendants Ambac, Marfatia, and Jefferies moved for transfer to the United States District Court for the Southern District of New York ("SDNY Court") pursuant to 28 U.S.C. § 1404(a).  The moving parties argued that Plaintiffs had alleged a civil RICO conspiracy operated out of New York, by Defendants residing and/or working in New York, who negotiated the allegedly fraudulent agreements in New York.  The Court denied the § 1404(a) motion based largely on the significant weight it accorded Plaintiffs' choice of forum.

The parties thereafter engaged in substantial motion practice, culminating in Defendants' current motion to dismiss the operative second amended complaint ("SAC"), in which they argue first that the SAC fails to state a claim under Federal Rule of Civil Procedure 12(b)(6), and next that Plaintiffs cannot establish personal jurisdiction over most Defendants under Federal Rule of Civil Procedure 12(b)(2).  Taking those arguments in the order presented by the parties, the Rule 12(b)(6) motion is DENIED, as the claims are adequately pled.  The Rule 12(b)(2) motion is well-taken in part, as the Court has determined that it lacks personal jurisdiction over all Defendants except Ambac.  However, in light of the latter determination, the Court finds it appropriate to *sua sponte* reconsider its denial of Defendants' prior motions to transfer.  The Court concludes that the balance of the § 1404(a) factors has changed and the interests of justice now dictate transfer to the SDNY where most, if not all, Defendants are subject to personal jurisdiction.  The Rule 12(b)(2) motion therefore is DENIED and the action is TRANSFERRED to the SDNY Court.

---

[3] The Court treats the four Jefferies entities as a single defendant for ease of discussion.

## I.    BACKGROUND[4]

In 1996, Congress enacted the Military Housing Privatization Initiative ("MHPI"), authorizing the Department of Defense to enter agreements with private sector developers to improve housing for military families.  SAC ¶ 1, ECF 210-3.  The resulting MHPI "project entities," also referred to in the SAC as "Projects," collectively needed billions of dollars of long-term financing for the housing construction.  SAC ¶ 4.  Plaintiffs allege that GMAC and Ambac, through their respective managing directors Ray and Marfatia, formed a RICO enterprise (later joined by Jefferies) to illegally profit from that financing.  SAC ¶¶ 4, 7.

GMAC/Ray and Ambac/Marfatia began working with the Projects in 2002.  SAC ¶¶ 5-6.  Ray successfully pitched GMAC as a financial advisor to many of the Projects and he played a key role in structuring the construction financing, which ultimately ended up with GMAC acting not only as a financial advisor but also as the lender.  SAC ¶ 5.  Ray recommended that Ambac be selected to insure or "credit enhance" each loan, which allowed GMAC to syndicate the loan by selling bonds as AAA-rated.  SAC ¶ 6.  Although Ray told the Projects that GMAC and Ambac were acting at arms-length, in reality Ray and Marfatia operated GMAC and Ambac as a joint venture, pursuant to which GMAC gave Ambac the exclusive right to provide bond insurance.  *Id.*  Ray and Marfatia used this undisclosed relationship to charge the Projects hundreds of millions of dollars in inflated and undisclosed fees and profits.  *Id.*

GMAC was sold in a leveraged buyout in 2006 and it ultimately became Capmark.  SAC ¶ 4 & n.1.  In 2009, Capmark went into bankruptcy and its military housing servicing business was sold to Jefferies Mortgage Finance, Inc.  *Id.*  Plaintiffs refer to GMAC and Capmark collectively as "GMAC" in the SAC.  *Id.*  Ray moved to Jefferies with the housing servicing business.  *Id.*

*Inflated Interest Rates and Undisclosed Profits on Project Loans*

Plaintiffs allege that Ray, as Managing Director of GMAC, represented to each of the Projects that he and GMAC would serve as a "financial advisor" who would negotiate key

---

[4] The background section is drawn from the allegations of the SAC, which are accepted as true for purposes of Defendants' Rule 12(b)(6) motion.  *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).

United States District Court
Northern District of California

documents, advise on optimal financial structure, and obtain the best market rates for the Projects. SAC ¶ 9. Ray specifically stated that GMAC would act under his direction as a fiduciary and that he would use his "best efforts" to negotiate the most competitive market rate and efficient financial structure. *Id*. Starting in 2009, when Jefferies acquired the military housing servicing business and hired Ray, Ray assured the Projects that his role as financial advisor would remain the same. SAC ¶ 10. The Projects continued to view Ray and Jefferies as their trusted financial advisor and agent through 2012. *Id*. Defendant Jefferies Mortgage Finance, Inc., which served as a lender on the Sill and Bliss Projects, did disclaim a financial advisor or fiduciary relationship role, but that disclaimer by its express terms related only Jefferies Mortgage Finance, Inc. in its role as lender and not to Ray, his team, or the other Jefferies entities that interacted with the Projects and employed Ray. *Id*.

Beginning with the Meade Project that closed in 2002, and the Bragg Project that closed in 2003, Ray and GMAC began to use their position of trust and confidence to defraud, taking secret profits. SAC ¶ 11. "The scheme was not fully formed, however, until late 2002/2003 in connection with the Monterey Project, when Ray and GMAC first set the interest rate above market to include undisclosed profits in the form of an inflated 'credit spread' (the difference between a bond's coupon rate or yield and an underlying benchmark rate)." *Id*. "Ray and Marfatia continued this new element of the fraud, through a variety of changing artifices and misrepresentations, at subsequent Plaintiff Projects." *Id*. By making a minor and undetected inflation in the interest rate above market, Ray and GMAC (and later Jefferies) were able to reap substantial excess and immediate profits when they syndicated the loan by selling bonds. *Id*. This practice was contrary to Ray's representation that "that the credit spread was set based on the 'risk premium required by investors.'" SAC ¶ 12. Ray personally received approximately 40% of the bond profits, which he never disclosed to the Projects. The bond purchasers were not harmed by the scheme, as they received full and accurate disclosures. SAC ¶ 13. "The deception was only directed at the Projects themselves, who were misled about when the bonds were sold (or committed) and the supposed market basis that formed the credit spread." *Id*. Ray and GMAC concealed their fraud by assuring the Projects that they were not making a profit on the bond sales

4

to third-party investors.  SAC ¶ 14.  There was no available market data that would have allowed the Projects to detect the inflated credit spread, which made the Projects dependent on Ray's role as their financial advisor.  *Id*.

Ambac bought some of the bonds, directly or indirectly, at a premium to par.  SAC ¶ 15.  Ambac did so at the Monterey Project and, in return, Ray and GMAC used Ambac almost exclusively in subsequent Projects, allowing Ambac to avoid competition and charge inflated credit enhancement fees.  *Id*.

*Manipulation of Shadow Ratings from S&P*

Ray and Marfatia insisted on using "shadow" ratings, which are unofficial ratings given to a bond or an issuing party, rather than public ratings to determine the appropriate loan interest rates and the necessary amount of loan insurance/credit enhancement for each transaction.  SAC ¶ 16.  Ray and Marfatia specifically represented that they would attempt to obtain the highest or most favorable shadow rating.  SAC ¶ 17.  Ray and Marfatia "rigged the rating system" by instructing Standard & Poor's ("S&P") that none of the projects involving Ambac credit enhancement should receive a shadow rating higher than an "A."  SAC ¶ 17.  Many Projects not involving GMAC or Ambac received ratings above an "A" and therefore did not require credit enhancement.  *Id*.  With respect to the Projects subject to the artificial rating cap of "A," GMAC and Ambac were able to charge excessive fees, rates, and other charges.  *Id*.

*Inflated and Unnecessary Credit Enhancement*

Ray and Marfatia misrepresented to the Projects that the rating agencies required the Projects not only to purchase bond insurance in the full amount of the loan, but also to purchase a surety bond or cash fund a debt service reserve account in order to receive a AAA rating.  SAC ¶ 18.  "In truth, in or about 2002, at least S&P had made clear to Marfatia and Ray that it did not require a surety or cash funding of the debt service reserve on a credit enhanced transaction in order to rate the loan or bonds as AAA."  *Id*.  Through their misrepresentations regarding the rating agencies' requirements, Ray and Marfatia were able convince the Projects to purchase unnecessary sureties from Ambac at a hefty fee.  FAC ¶ 19.

United States District Court
Northern District of California

United States District Court
Northern District of California

*Inflated Deal Expenses*

The Projects agreed to pay GMAC and Ambac actual deal expenses, sometimes subject to a cap.  SAC ¶ 20.  GMAC and Ambac charged Plaintiffs inflated expenses that exceeded their actual expenses, by as much as hundreds of thousands of dollars.  *Id.*

*Concealment of Exclusive Relationship and Fraud*

Despite promising the Projects that he would use good faith and best efforts to negotiate credit enhancement fees, Ray did not engage in any meaningful negotiations with Ambac but returned to Ambac for credit enhancement over and over.  SAC ¶ 22.  In 2006, on the Riley transaction, Ray emailed Marfatia that he was secretly giving Ambac an "extra 4.5 bps" on the deal because it was "extra" and Ray did not want to give it back to the Project.  SAC ¶ 21.

In 2004, the Army's consultant, Jones Lang LaSalle ("JLL"), suggested that GMAC competitively bid out credit enhancement.  SAC ¶ 23.  In an email to his boss, Marfatia stated that there could be "no worse news."  *Id*.  Ray, Marfatia, and Ambac modified their scheme to convince the Projects that credit enhancement would not be necessary for forthcoming deals, and thus there was no need to open the bidding to Ambac's competitors.  *Id*.  Defendants developed a "stealth structure" to help conceal and maintain their fraud scheme.  *Id*.  First, Ray represented to the Projects that GMAC would close the loan and then later attempt to syndicate the loan post-closing, thereby taking market risk.  SAC ¶ 24.  Actually, Ray and GMAC set the Projects' loan interest rate above market and sold the bonds prior to close at premium to par, thus taking millions of dollars in undisclosed profits.  *Id*.  Second, Ray, Marfatia, and Ambac secretly built into the loan interest rate a monthly fee for Ambac credit enhancement, without disclosing the involvement of Ambac.  *Id*.  Third, GMAC convinced the Projects to purchase liquidity facility from GMAC in lieu of a surety bond, representing it was cheaper.  However, GMAC immediately assigned the liquidity facility to Ambac, which issued a surety bond in lieu of the liquidity facility at about half the price of the liquidity facility.  *Id*.  Ray and Marfatia then agreed to split the liquidity facility fee between GMAC and Ambac.  *Id*.

*Jefferies Entities*

In 2009, Jefferies bought Ray's MHPI business.  SAC ¶ 25.  In the due diligence, Ray

disclosed to Jefferies the fraudulent nature of the MHPI financings, including his role as a financial advisor, the pre-sale of bonds and secret trading profits generated by those sales.  *Id*. Jefferies brought Ray and his team on board and embraced the bond-related scheme.  *Id*.  In 2010, with respect to financing provided to the Fort Sill Project, Ray and Jefferies made more than $5 million in secret trade profits on the pre-sale of the underlying bonds, through the use of an Original Issue Discount ("OID") on the loan.  *Id*.  "[T]he OID allowed Ray to sell underlying MHPI bonds at a discount to par, yet still reap millions in undisclosed profits and convince the Project that Jefferies had sold the bonds after closing, thereby purportedly taking post-closing market and interest rate risk."  SAC ¶ 26.  The OID did not impact the price paid by investors who purchased the bonds and did not harm those investors.  *Id*.

By 2012, the opportunities to profit on the Projects were diminishing, because most of the housing had been privatized.  SAC ¶ 28.  In 2011 and 2012, when the Bliss Project needed an additional $140 million in debt, Ray and Jefferies saw one last opportunity to make outsized secret profits.  *Id*.  They told the Bliss Project that the 2012 loan from Jefferies Mortgage was at market rate, when "[i]n truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at 8% above par – reflecting a significantly inflated interest rate on the loan."  SAC ¶ 29. Ambac's consent was required on the transaction, because Ambac had been involved in the original 2005 Bliss transaction and had approval rights over the issuance of additional debt.  SAC ¶ 30.  Ambac consented to the transaction after Ray emailed to say he had pre-sold the bonds prior to closing and needed prompt consent for the transaction.  *Id*.

*2016 Events*

Plaintiffs assert that because Defendants went to extraordinary lengths to fraudulently conceal their scheme, Plaintiffs did not realize at the time that anything was amiss.  In 2010 and 2011, the Army's consultant JLL and developers on the Projects questioned Ray and Marfatia about the Projects' financial structure, including the OID and whether GMAC and Jefferies were making a profit on the bond sales.  SAC ¶ 31.  Ray and his team stated that they were not taking undisclosed profits on the MHPI deals and concealed key facts regarding the scheme.  *Id*.  JLL and the developers were satisfied with those assurances, "made by their trusted financial advisor and

1    agent in response to direct questioning." *Id.*

2        In 2015, Ambac sued several of the Projects.  SAC ¶ 32 & n.2.  During those lawsuits, it

3    came out that Ray and Jefferies misled a California state court about the existence of MHPI

4    transactional documents, and Ray tried to destroy more than 9,100 MHPI documents in the

5    custody of Jefferies.  SAC ¶ 32.  On April 8, 2016, Ray and Jefferies informed the Projects that

6    Ray had quit.  *Id.*  Plaintiffs claim that the facts unearthed in the state court litigation provided the

7    first notice to Plaintiffs of Defendants' wrongdoing.  SAC ¶¶ 32-33.

8        *The Present Lawsuit*

9        Plaintiffs filed this action in August 2017, asserting claims under RICO and California

10   state law against Ambac, Marfatia, Jefferies, Ray, and two companies in which Ray allegedly

11   invested proceeds of the RICO scheme, Annandale Plantation, LLC (Colorado) and Annandale

12   Plantation, LLC (South Carolina).  Compl., ECF 1.

13       *Prior Transfer Motions under 28 U.S.C. § 1404(a)*

14       Almost immediately, Ambac filed a motion to transfer the case to the SDNY Court under

15   28 U.S.C. § 1404(a), which was joined by Marfatia and Jefferies.  *See* Ambac's Motion to

16   Transfer, ECF 39; Marfatia's Joinder, ECF 47; Jefferies' Joinder, ECF 91.  Jefferies also filed a

17   motion to dismiss or, in the alternative, to transfer under § 1404(a).  *See* Jefferies' Motion to

18   Dismiss or Transfer, ECF 63.  Ambac, Marfatia, and Jefferies asserted that they would be subject

19   to general personal jurisdiction in New York, that the SDNY Court was a proper forum for the

20   action, and that the § 1404(a) factors favored transfer.  *See* Ambac's Motion to Transfer at 5, ECF

21   39; Jefferies' Motion to Dismiss or Transfer at 22-23, ECF 63.  Plaintiffs opposed transfer and

22   Ray did not take a position.  *See* Pls.' Opp. to Transfer, ECF 48.  The Court concluded that the

23   moving parties had failed to satisfy their burden of demonstrating that balancing the factors

24   "clearly favors transfer" to the SDNY Court.   Southern District.  *See* Prior Order Denying

25   Transfer at 19, ECF 108.

26       *Plaintiffs' Claims*

27       Plaintiffs filed a first amended complaint ("FAC") in October 2017, which was the subject

28   of motions to dismiss brought by all Defendants.  FAC, ECF 60; Prior Motions, ECF 62, 63, 64,

United States District Court
Northern District of California

8

66, 71.  The Court granted those motions with leave to amend.  *See* Prior Dismissal Order, ECF

147.  Among the issues addressed by the Court were the lack of allegations of wrongdoing by the

two Annandale Defendants, Plaintiffs' failure to establish personal jurisdiction over Defendants,

and potential bars raised by applicable statutes of limitation and the Private Securities Litigation

Reform Act ("PSLRA").

Plaintiffs timely filed the operative SAC, dropping the Annandale Defendants and

addressing the other deficiencies noted in the Prior Dismissal Order.  The SAC asserts seven

claims against the remaining Defendants, Ambac, Marfatia, Jefferies, and Ray:  (1) Civil RICO in

violation of 18 U.S.C. § 1962(c); (2) conspiracy to commit Civil RICO in violation of 18 U.S.C. §

1962(d); (3) breach of fiduciary duty; (4) aiding and abetting breach of fiduciary duty; (5) fraud by

intentional misrepresentation; (6) fraud by fraudulent concealment; and (7) conspiracy to commit

fraud.

*Pending Motions*

All remaining Defendants have filed a joint motion to dismiss for failure to state a claim

and lack of personal jurisdiction.  The Court addresses the issues in the order presented in the

briefing, first taking up the Rule 12(b)(6) arguments and then turning to the Rule 12(b)(2)

arguments.

## II.    RULE 12(b)(6) MOTION FOR FAILURE TO STATE A CLAIM

### A.    Legal Standard

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

claim upon which relief can be granted tests the legal sufficiency of a claim."  *Conservation Force*

*v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted).

While a complaint need not contain detailed factual allegations, it "must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A

claim is facially plausible when it "allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Id.*

United States District Court
Northern District of California

**B.     RICO Claims**

Claim 1 asserts civil RICO in violation of 18 U.S.C. § 1962(c), while Claim 2 asserts conspiracy to commit civil RICO in violation of 18 U.S.C. § 1962(d).  Defendants move to dismiss the RICO claims on the grounds that:  they are time-barred, they are subject to the bar to RICO claims effected by the Private Securities Litigation Reform Act ("PSLRA bar"), and they do not allege facts sufficient to state a claim for relief.  In opposition, Plaintiffs argue that their RICO claims are not time-barred, they are not subject to the PSLRA bar, and they are adequately pled. The Court addresses the asserted grounds for dismissal in turn.

**1.     Statute of Limitations**

Defendants assert that Plaintiffs' RICO claims are barred by the applicable four-year statute of limitations.  *See Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001) ("The statute of limitations for civil RICO actions is four years.").  Plaintiffs' claims are based on conduct which began in 2002.  *See* SAC ¶ 5.  Most of the projects giving rise to this suit closed by 2008, and the last project, Fort Sill, closed in 2010.  SAC ¶¶ 97-150 (listing projects and closing dates). Defendants Ray and Jefferies allegedly arranged additional financing for the Fort Bliss project in 2012.  SAC ¶¶ 233-35.  Plaintiffs did not file suit until August 2017, seven years after the last project closed and more than four years after the last financing transaction was completed.  *See* Compl., ECF 1.  However, Plaintiffs contend that their RICO claims are not time-barred because Defendants fraudulently concealed material facts through 2016 such that Plaintiffs reasonably believed they did not have a claim against Defendants.

Under the "injury discovery" rule followed in the Ninth Circuit, "the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action."  *Pincay*, 238 F.3d at 1109 (internal quotation marks and citation omitted). "Thus, the 'injury discovery' rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong."  *Id.*  "The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud."  *Id.* at 1110 (internal quotation marks and citation omitted).  "[C]onstructive notice begins to run the statute of

United States District Court
Northern District of California

1  limitations regardless of any fiduciary relationship between the injured and the injurer." *Id.* at

2  1109.

3       "Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases."

4  *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996). "The doctrine is properly invoked only if a

5  plaintiff establishes affirmative conduct upon the part of the defendant which would, under the

6  circumstances of the case, lead a reasonable person to believe that he did not have a claim for

7  relief." *Pincay*, 238 F.3d at 1110 (internal quotation marks and citation omitted).

8       In its Prior Dismissal Order, the Court found that Plaintiffs had not alleged facts sufficient

9  to show that they could not have discovered Defendants' alleged fraud, and thus their alleged

10 injury, until 2016 as they claimed. *See* Prior Dismissal Order at 19-21, ECF 147. The Court

11 indicated that Plaintiffs had not explained why they could not have discovered that their loan

12 interest rates were set above market in connection with the "bond fraud," since it was the Court's

13 understanding that market rates are transparent. *See id.* The Court also observed that Plaintiffs'

14 allegations that they had questioned Ray and Marfatia about transactional issues suggested that

15 Plaintiffs' suspicions had been raised, but they did not allege that they undertook any

16 investigation. *See id.* The Court found the failure to investigate particularly troubling in light of

17 Plaintiffs' allegations that in 2005 JLL noticed that GMAC was using Ambac for credit

18 enhancement on all the MHPI deals, and that the Fort Bliss Project had insisted that GMAC

19 competitively bid out credit enhancement. *See id.* Finally, with respect to Plaintiffs' allegations

20 that they were entitled to rely in the representations of Ray, GMAC, and Jefferies as Plaintiffs'

21 fiduciaries, the Court concluded that Plaintiffs had not alleged fiduciary status with sufficient

22 particularity. *See id.*

23      Defendants contend that Plaintiffs have not cured these defects. The Court disagrees.

24 Taking these defects in reverse order, Plaintiffs have added numerous facts in support of their

25 contention that Ray, GMAC, and later Jefferies, held themselves out, and acted, as Plaintiffs'

26 "trusted financial advisor." *See, e.g.,* SAC ¶¶ 5, 9, 111, 116, 140, 149, 150, 178. Moreover, the

27 SAC includes a flow chart disseminated by Ray and GMAC that differentiates between their roles

28 and lenders and as financial advisors. *See* SAC ¶ 94. The SAC also describes specific oral

representations of fiduciary relationship that Ray and GMAC allegedly made, promising to act as the Projects' agents in negotiating surety bonds, coordinating with rating agencies, negotiating term loans, and the like. *See* SAC ¶¶ 95-99, 102. In written correspondence with the Monterey Project in 2002 and 2003, Ray represented that GMAC would act as a "Financial Advisor" to the project and that GMAC would "use its best efforts to negotiate the most favorable rates." SAC ¶¶ 107-08. Ray made similar written and oral representations to the Army's consultant, JLL, prior to the October 2003 close at the Monterey Project. SAC ¶ 109. These allegations, and others of a similar nature, are sufficient to allege that Ray and GMAC acted not only as the Projects' lenders, but also as their trusted financial advisors.

Defendants contend that these allegations are insufficient, because "[u]nder California law, a lender does not owe a borrower or third party any duties beyond those expressed in the loan agreement, except those imposed due to special circumstance." *Sipe v. Countrywide Bank*, 690 F. Supp. 2d 1141, 1153 (E.D. Cal. 2010). Defendants ignore Plaintiffs' allegations of special circumstances, namely, specific representations by Ray and GMAC that they would act not only as Plaintiffs' lender but as their financial advisers. Defendants argue that a "financial advisor" is not synonymous with "fiduciary." However, numerous cases recognize that "trusted financial advisors" owe their clients fiduciary duties. *See, e.g., Primiani v. Fed. Ins. Co.*, 203 F. App'x 902, 904 (9th Cir. 2006) ("Appellants – as trusted financial advisers of myCFO's clients – owed a fiduciary duty towards the clients."); *Johnson v. Fujitsu Tech. & Bus. of Am., Inc.*, 250 F. Supp. 3d 460, 466 (N.D. Cal. 2017) (recognizing that in the ERISA context, a "fiduciary" is "someone acting in the capacity of manager, administrator, or financial adviser"); *Goldman, Sachs & Co. v. City of Reno*, No. 3:12-cv-00327-RCJ-WGC, 2016 WL 320120, at *4 (D. Nev. Jan. 25, 2016) ("The City has sufficiently alleged that GS acted as a financial advisor and breached its attendant fiduciary duties by failing to disclose facts material to the way the auctions were conducted, *i.e.*, its supporting-bid practices."); *Freeney v. Bank of Am. Corp.*, No. CV 15-02376 MMM (PJWx), 2015 WL 12535021, at *35 (C.D. Cal. Nov. 19, 2015) ("[A] broker or financial advisor is in a fiduciary relationship with his or her client.").

Defendants point to loan agreements defining the scope of the parties' "lending

United States District Court
Northern District of California

relationship[s]," which do not establish any fiduciary duties.  Plaintiffs' theory, however, is that Ray and GMAC were acting as their fiduciaries during the negotiation of those loan agreements, and parallel to those agreements.  Thus, the fact that the loan agreements themselves did not impose fiduciary duties on Defendants is not dispositive.  The Court concludes that Plaintiffs have alleged enough facts to render the precise nature of the roles Ray and GMAC played (and later Jefferies), and in particular whether they acted as Plaintiffs' fiduciaries, a factual question not appropriate for resolution at the motion to dismiss stage.  *See Fischer v. Ocwen Loan Servicing, LLC*, No. CV-14-94-BLG-SPW-CSO, 2014 WL 6685987, at *9 (D. Mont. Nov. 25, 2014), report and recommendation adopted, No. CV 14-94-BLG-SPW-CSO, 2014 WL 11498231 (D. Mont. Dec. 11, 2014) (finding that whether a fiduciary relationship existed between a loan servicer and mortgagee required a fact intensive inquiry which could not be resolved on a motion to dismiss); *Goodness Films, LLC v. TV One, LLC*, No. CV 12-8688-GW(JEMX), 2013 WL 12145508, at *11 (C.D. Cal. Feb. 28, 2013) ("In light of these allegations and the requirement that they be construed in the light most favorable to the plaintiff in deciding a motion to dismiss, the Court 'cannot say with certainty that plaintiffs can prove no set of facts entitling them to relief on a breach of fiduciary or aiding and abetting breach of fiduciary theory.'").

With respect to the Court's concern in the Prior Dismissal Order that Plaintiffs appeared to be on inquiry notice, Plaintiffs have omitted prior allegations that JLL observed GMAC's preference for using Ambac for credit enhancement in 2005.  Defendants contend that Plaintiffs may not simply eliminate factual allegations which give rise to a statute of limitations defense.  However, the law in the Ninth Circuit is clear that "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations."  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007).  Moreover, the SAC alleges that when JLL requested that Project credit enhancement be competitively bid starting in 2005, Defendants modified their scheme to convince the Projects that credit enhancement would not be necessary for forthcoming deals, and thus there was no need to open the bidding to Ambac's competitors.  SAC ¶ 23.  Defendants developed a "stealth structure" to help conceal and maintain their fraud scheme, under which a monthly fee for Ambac credit

1    enhancement was secretly built into the loan interest, without disclosure to Plaintiffs.  SAC ¶ 24.

2    Accordingly, the Court concludes that Plaintiffs' amendment to their allegations was permissible

3    and that in any event Plaintiffs adequately have explained that their failure to inquire further into

4    GMAC's preference for using Ambac by alleging that Defendants modified their scheme to make

5    it appear unnecessary to obtain (and thus bid out) credit enhancement.

6           With respect to the Court's question as to why Plaintiffs could not have discovered that

7    their loan rates were set above market in connection with the bond fraud, Plaintiffs argue that the

8    Court's prior ruling was based on a factual misunderstanding, and that unlike publicly reported

9    bond interest rates, the determination of market rate for the bonds at issue in this case was not

10   transparent.  Plaintiffs allege facts showing that there was no "available market data that would

11   have allowed the Projects to detect the inflated credit spread."  SAC ¶ 14; *see also* SAC ¶¶ 178-

12   180.  Plaintiffs also allege that they specifically relied on the representations of Ray as their

13   financial advisor.  *Id.*  Plaintiffs allege on that some occasions, the Army's consultant JLL and

14   developers on the Projects questioned Ray and Marfatia about the Projects' financial structure, and

15   specifically whether GMAC and Jefferies were making a profit on the bond sales.  SAC ¶ 31.  Ray

16   and his team stated affirmatively that they were not taking undisclosed profits on the MHPI deals

17   and concealed key facts regarding the scheme.  *Id.*  Plaintiffs allege that JLL and the developers

18   were satisfied with those assurances, "made by their trusted financial advisor and agent in

19   response to direct questioning."  *Id.*

20          While Defendants argue that Plaintiffs have not adequately explained their failure to do

21   more investigation, the Court is satisfied that Plaintiffs' detailed allegations regarding Defendants'

22   affirmative misrepresentations in the face of Plaintiffs' queries regarding Defendants' profits, the

23   existence of a fiduciary relationship, and the substantial steps Defendants undertook to conceal

24   their misconduct are sufficient to create a factual issue whether Plaintiffs are entitled to equitable

25   tolling of the statute of limitations.  That factual issue is not appropriate for resolution at this stage

26   of the proceedings.  *See Starr Indem. & Liab. Co. v. JT2, Inc.*, No. 1:17-cv-00213-DAD-BAM,

27   2018 WL 1142207, at *4 (E.D. Cal. Mar. 2, 2018) ("Regardless of when the evidence to be

28   presented in this case may ultimately show that JT2 was on inquiry notice of the alleged

United States District Court
Northern District of California

14

1   fraudulent concealment, the pleadings must be accepted as true and any dispute as to that factual

2   question can certainly not be resolved at this stage of the proceedings.").

3          Accordingly, Defendants' motion to dismiss the RICO claims as time-barred is DENIED.

4          **2.     PSLRA Bar**

5          Defendants assert that Plaintiffs' RICO claims are subject to dismissal based on an

6   amendment to the RICO statute effected by the PSLRA, providing that (with one exception not

7   relevant here) "'no person may rely upon any conduct that would have been actionable as fraud in

8   the purchase or sale of securities to establish a violation of section 1962.'" *Howard v. Am. Online*

9   *Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (quoting 18 U.S.C. § 1964(c)).  The PSLRA bar applies

10  even where the RICO plaintiff himself could not bring a securities fraud claim, as long as such

11  claim could be brought by *some* plaintiff with proper standing.  *Id.* (applying PSLRA bar where

12  "Plaintiffs do not dispute that their securities fraud claims could be brought by a plaintiff with

13  proper standing").

14         In its Prior Dismissal Order, the Court addressed Defendants' arguments that the RICO

15  claims were barred based on both the "bond fraud" and "GIC" aspects of the RICO scheme as

16  alleged in the FAC.  *See* Prior Dismissal Order at 15-18, ECF 147.  The Court held that the

17  PSLRA was not implicated by the bond fraud allegations.  However, the Court determined that the

18  GIC allegations did give rise to the PSLRA bar, and it dismissed Plaintiffs' RICO claims based on

19  that determination.  The SAC realleges the bond fraud scheme but it omits the GIC aspect of the

20  scheme.  Defendants once again seek dismissal of the RICO claims under the PSLRA bar based on

21  both the omitted GIC allegations and the bond fraud allegations.  The Court addresses the omitted

22  GIC allegations and the current bond fraud allegations in turn.

23         **a.     GICs**

24         As alleged in the FAC, a significant portion of the loan proceeds were not needed

25  immediately, and sometimes not until years after closing.  *See* FAC ¶ 16.  Ray recommended to

26  Plaintiffs that unused portions of the loans be invested in Guaranteed Investment Contracts

27  ("GICs").  *See id.*  Based on the allegations of the FAC, the Court determined that the GICs were

28  securities, and that Plaintiffs appeared to be relying on allegations of fraud related to the GICs as

United States District Court
Northern District of California

predicate acts under RICO.  *See* Prior Dismissal Order at 16-18.  The Court concluded that the alleged GIC-related fraud brought Defendants' conduct within the scope of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, triggering the PSLRA bar.  *See id.*  The Court dismissed Plaintiffs' RICO claims as barred by the PSLRA based on authorities holding that "where a plaintiff alleges a 'single scheme' and any predicate act is barred under the PSLRA, the entire RICO claim is precluded."  *Perkumpulan Inv'r Crisis Ctr. Dressel-WBG v. Wong*, No. C09-1786-JCC, 2014 WL 1047946, at *7 (W.D. Wash. Mar. 14, 2014).

The Court noted that Plaintiffs had requested leave to amend to either add facts showing that the GICs were not securities or omit the allegations regarding the GICs.  *See* Prior Dismissal Order at 18.  The Court indicated that the parties had not adequately briefed the question of whether a party may avoid the PSLRA bar by omitting prior allegations giving rise to the bar, and that Defendants could argue the point in the event Plaintiffs chose to omit the GICs from their amended pleading.  *See id.*  Plaintiffs have omitted almost all references to the GICs from the SAC and they no longer allege conduct related to the GICs as predicate acts under RICO.

Defendants contend that the law precludes Plaintiffs from sanitizing their RICO claims, and that Plaintiffs' prior allegations regarding the GICs gives rise to the PSLRA bar despite Plaintiffs' omission of GIC allegations from the SAC.  Plaintiffs assert that the law does not prevent them from omitting the GICs as predicate acts under RICO and that, once omitted, the GICs cannot be considered a basis for the PSLRA bar.

Defendants have cited no controlling authority, and the Court has found none, precluding a RICO plaintiff from amending the allegations of predicate acts to omit previously alleged conduct that would give rise to the PSLRA bar.  As discussed above in connection with Defendants' statute of limitations argument, "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *PAE Gov't Servs.*, 514 F.3d at 860.  Defendants cite *Walsh v. AMD Sacramento*, No. 2:13-CV-2077 MCE KJN, 2014 WL 4472752 (E.D. Cal. Sept. 11, 2014), report and recommendation adopted (Dec. 29, 2014), which did not involve RICO claims but rather a *pro se* suit brought by husband and wife following the wife's adverse reaction to medication.  In the cited portion of the

1   decision, the court stated that it was "troubled by plaintiffs' noticeable attempts in the second

2   amended complaint to omit, sanitize, or otherwise alter certain allegations that were made in

3   plaintiffs' first amended complaint which appeared unfavorable to the viability of their alleged

4   claims." *Id.* at *15.  It is not clear from the decision that the court held that such amendment was

5   precluded under the Federal Rules of Civil Procedure, but to the extent the *Walsh* court intended

6   such a holding, it would be contrary to the Ninth Circuit's holding in *PAE Gov't Servs.*

7   　　　　Defendants also cite *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007), for the

8   proposition that dismissal of a RICO claim without leave to amend is appropriate when "the

9   PSLRA bar would apply under any internally consistent set of facts."  *Swartz* did not address the

10   issue before this Court, whether a RICO plaintiff may omit from an amended pleading predicate

11   acts based on conduct that would trigger the PSLRA bar.  The Court does not view the SAC,

12   which omits predicate acts based on the GICs and alleges predicate acts based solely on the bond

13   fraud and related misconduct, as "internally [in]consistent" with the FAC, simply because the GIC

14   allegations have been omitted.  Defendants cite *Perkumpulan*, for the same language cited by the

15   Court in the Prior Dismissal Order, holding that "where a plaintiff alleges a 'single scheme' and

16   any predicate act is barred under the PSLRA, the entire RICO claim is precluded."  *Perkumpulan*,

17   2014 WL 1047946, at *7.  *Perkumpulan* no longer applies, because none of the predicate acts

18   Plaintiffs have alleged in the SAC are barred under the PSLRA.  *Perkumpulan*, like the other cases

19   relied on by Defendants, simply fails to address whether a plaintiff may amend a RICO claim to

20   allege only predicate acts which are not barred by the PSLRA.

21   　　　　Defendants argue that the GIC allegations are inextricably intertwined with RICO claims

22   because one of the twelve services that Ray and GMAC allegedly provided in their role as

23   financial advisor was to "Secure Guaranteed Investment Contract Bid."  SAC at p. 32 (flow chart).

24   The Court is not persuaded that a stray reference to the GICs triggers the PSLRA bar.  Similar

25   circumstances were presented to the district court in *Sussex Fin. Enterprises, Inc. v. Bayerische*

26   *Hypo-Und Vereinsbank AG*, No. 08-4791 SC, 2009 WL 3061976, at *4 (N.D. Cal. Sept. 24,

27   2009), cited by Plaintiffs.  In *Sussex*, the defendant argued that the PSLRA bar applied based on

28   the first amended complaint's reference to a "BLIPS" program which the Ninth Circuit had held in

United States District Court
Northern District of California

17

1    other contexts to be actionable as securities fraud.  The district court determined that the RICO

2    claim appeared to be based solely on a "CARDS" program, which did not implicate the PSLRA.

3    The court was not persuaded that mere reference to the "BLIPS" program in the pleading

4    implicated the PSLRA bar, stating that "the Court does not read the FAC to include BLIPS as a

5    predicate act, and thus Sussex is not 'relying' on BLIPS to establish a violation of RICO."  *Id.*

6    Under the same reasoning, this Court is not persuaded that the single reference to the GICs in the

7    SAC implicates the PSLRA bar where no GIC-related conduct is alleged to be a predicate act

8    under RICO.

9         Having considered the arguments and authorities presented by the parties, the Court

10   concludes that the PSLRA bar is not implicated by Plaintiffs' references to the GICs in the prior

11   iteration of their pleading, or by the single reference to the GICs in the SAC, where the operative

12   SAC does not rely on the GICs as predicate acts under RICO.

13        The motion to dismiss the RICO claims based on the PSLRA bar as related to the GICs is

14   DENIED.

15                          **b.    Bond Fraud**

16        As alleged in the FAC, the bond fraud aspect of the alleged RICO scheme stemmed from

17   Defendants' representations that the Project loan interest rates were set at market, and that

18   Defendants would syndicate the loans by selling bonds or certificates after the loans closed,

19   thereby taking any risks with respect to changes in the market.  FAC ¶ 102.  Plaintiffs alleged that

20   in reality, Ray and GMAC had pre-sold the bonds at a profit prior to close of the loans, necessarily

21   meaning that the loan interest rates were set above market, which allowed Defendants to reap

22   immediate and outsized profits when they securitized the loans.  FAC ¶¶ 103.  The Court

23   concluded that the PSLRA did not apply to the "bond fraud," because the facts alleged did not

24   give rise to a securities fraud claim by any potential private plaintiff.  *See* Prior Dismissal Order at

25   15-16.

26        In reaching that conclusion, the Court found that in order to trigger the PSLRA bar the

27   misrepresentations need not be regarding the value of the securities, and need not suggest that the

28   securities transaction itself was illegal.  *See* Prior Dismissal Order at 16.  The Court relied on *SEC*

United States District Court
Northern District of California

1    *v. Zandford*, 535 U.S. 813, 820 (2002), holding that Securities and Exchange Commission

2    ("SEC") had stated a § 10(b) claim where a broker sold his clients' securities and misappropriated

3    the proceeds, and *Swartz v. KPMG LLP*, 476 F.3d 756, 761 (9th Cir. 2007), holding that the

4    PSLRA bar applied where the plaintiff's otherwise lawful sale of Microsoft stock was the

5    "lynchpin" of defendants' fraudulent tax shelter scheme.  However, the Court concluded

6    Defendants' alleged conduct would have to be actionable by some plaintiff as securities fraud.  *See*

7    Prior Dismissal Order at 13, 15-16.  The Court found that the bond fraud would not have been

8    actionable by Plaintiffs as securities fraud, as Plaintiffs did not buy, sell, or assert an ownership

9    interest in, the bonds.  *See* Prior Dismissal Order at 16.  The Court also concluded that the alleged

10   conduct would not have been actionable by the bond holders, as the FAC did not allege any

11   misrepresentations or injuries to them.  *See id.*

12       Plaintiffs' bond fraud allegations have not changed materially from the FAC to the

13   operative SAC.  Defendants nonetheless ask the Court to reconsider its prior ruling that the

14   PSLRA bar is not implicated by the bond fraud allegations, asserting that even if the bond fraud

15   would not have been actionable as securities fraud by a private party, it would have been

16   actionable as securities fraud by the SEC.  Defendants correctly point out that the parties did not

17   address that issue in any depth in the briefing on the prior motions and therefore that the Court has

18   not yet had occasion to consider whether alleged conduct could be actionable by the SEC.  The

19   Court did not address the possibility of suit by the SEC in its Prior Dismissal Order.  *See* ECF 147.

20       Defendants have not cited, and the Court has not discovered, any Supreme Court or Ninth

21   Circuit cases holding that the PSLRA bar applies when the SEC – but not a private party – has

22   authority to bring a securities fraud suit.  However, some courts in this district have found that the

23   bar does apply where the SEC could bring action.  *See, e.g., Perkumpulan*, 2014 WL 1047946, at

24   *11-12 (holding that PSLRA bar applied because the plaintiff's claims "would be 'actionable' as

25   fraud in the purchase or sale of securities by the S.E.C.," and "whether the S.E.C. could prevail

26   [was] beside the point."); *Pritikin v. Comerica Bank*, No. C 09-03303 JF (RS), 2009 WL 3857455,

27   at *3 (N.D. Cal. Nov. 17, 2009) (applying PSLRA bar where the defendant's alleged aiding and

28   abetting securities violation did not give rise to private right of action).  This Court therefore

1   assumes for purposes of discussion that Plaintiffs' RICO claims would be barred if the SEC could

2   have brought a securities fraud suit based on the alleged predicate acts.

3         "Congress designated the SEC as the primary enforcement agency for the securities laws,"

4   and it authorized the SEC to bring suit in circumstances where no private right of action lies.  *SEC*

5   *v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).  For example, although "only an actual

6   purchaser or seller may maintain a private damage action under Rule 10b-5, the Supreme Court

7   took care to state that 'the purchaser-seller rule imposes no limitation on the standing of the SEC

8   to bring actions for injunctive relief under § 10(b) and Rule 10b-5.'"  *Id*. (quoting *Blue Chip*

9   *Stamps v. Manor Drug Stores*, 421 U.S. 723, 751 n.14 (1975)).  Moreover, the SEC need not

10   prove actual reliance on the alleged misrepresentations in any particular purchase or sale of

11   securities.  *See id*. at 136-64.  The SEC need show only that "the fraud alleged somehow touches

12   upon or has some nexus with any securities transaction."  *Id*. at 1362 (internal quotation marks and

13   citation omitted).

14         This "broad and flexible" view of the requirements for an SEC action "is necessary to

15   accomplish the statute's *purpose of protecting investors*."  *Rana*, 8 F.3d at 1362 (emphasis added).

16   Indeed, all of the cases cited by Defendants as examples of SEC-initiated suits were brought to

17   protect investors or the market.  In *Rana*, the SEC brought an action for injunctive relief against a

18   financial consultant who had issued a press release containing materially false and misleading

19   statements.  *See Rana*, 8 F.3d at 1360-61.  The Ninth Circuit rejected the defendants' argument

20   that the SEC could not establish a securities fraud violation absent proof of a purchase or sale of

21   securities in reliance on the statements in the press release.  *See id.* at 1361.  The Ninth Circuit

22   held that "*[w]here the fraud alleged involves public dissemination in a document* such as a press

23   release, annual report, investment prospectus or other such document *on which an investor would*

24   *presumably rely*, the 'in connection with' requirement is generally met by proof of the means of

25   dissemination and the materiality of the misrepresentation or omission."  *Id*. at 1362 (emphasis

26   added).

27         The present case does not involve dissemination of any misrepresentations to the public.

28   Plaintiffs specifically allege that "the purchasers of the bonds (including Ambac) were not harmed

United States District Court
Northern District of California

20

by the scheme in any way; they received full and accurate disclosures regarding the Projects and the interest rate being charged to the Projects, and continue to receive the full benefit of their bargain in the form of interest payments that are made by the Projects." SAC ¶ 13. This case therefore is distinguishable from *Rana*.

Defendants argue that this case is similar to *Zandford*, in which the SEC sued a securities broker who misappropriated proceeds from sales of securities in his customers' investment account. *Zandford*, 535 U.S. at 815. Defendants argue that "[h]ere, just as in *Zandford*, the core allegation is that some or all Defendants exploited an alleged duty of trust by promising to sell securities and pass along the benefits of these sales to Plaintiffs, while secretly retaining the proceeds for themselves." Defs.' Joint Motion at 12, ECF 223. However, in *Zandford*, the SEC brought suit to vindicate *the investors* who were bilked by the broker's misappropriation of profits from sales of securities. In the present case, Plaintiffs did not buy or sell securities, and there is no allegation that the bond sales were unlawful.

Plaintiffs' allegations are factually distinguishable from all of the SEC cases cited by Defendants, because all of those cases involved the SEC's exercise of its broad authority to protect securities investors or the securities market. *See, e.g., SEC v. Zouvas*, No. 3:16-cv-0998-CAB-(DHB), 2016 WL 6834028, at *1 (S.D. Cal. Nov. 21, 2016) (action against defendants who allegedly perpetrated a "pump-and-dump" scheme to manipulate the stock of a publicly traded company); *SEC. v. Cotton*, No. SACV 06-0905 AG (ANx), 2006 WL 6382128, at *1 (C.D. Cal. Dec. 21, 2006) (SEC alleged that chief financial officer and chief operating officer fraudulently recognized and reported revenue in order to meet the expectations of Wall Street analysts); *SEC v. Santos*, 355 F. Supp. 2d 917, 919 (N.D. Ill. 2003) (Chicago officials allegedly defrauded city and public by demanding bribes in return for selecting certain broker-dealers to invest city funds). Defendants have cited *no case* in which the SEC brought suit on facts similar to those alleged by Plaintiffs, that is, misrepresentations in the context of setting contractual interest rates on private loans.

Absent some authority for the proposition that the SEC could or would bring suit on facts such as those alleged here, the Court concludes that the PSLRA bar does not apply. The motion to

21

1    dismiss the RICO claims based on the PSLRA bar as related to the bond fraud is DENIED.

2                  **3.**        **Failure to Allege Sufficient Facts**

3        Finally, Defendants argue that Plaintiffs have not adequately pled their RICO claims.

4    Plaintiffs contend that their RICO claims are well-pled.

5        The RICO statute sets out four elements for a primary violation:  a defendant must

6    participate in (1) the conduct of (2) an enterprise that affects interstate commerce (3) through a

7    pattern (4) of racketeering activity or collection of unlawful debt." *Eclectic Properties E., LLC v.*

8    *Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014).  "In addition, the conduct must be (5)

9    the proximate cause of harm to the victim." *Id.*  "To show the existence of an enterprise under the

10    second element, plaintiffs must plead that the enterprise has (A) a common purpose, (B) a

11    structure or organization, and (C) longevity necessary to accomplish the purpose." *Id.*

12    "Racketeering activity, the fourth element, requires predicate acts," often – as here – mail and wire

13    fraud. *Id.*  "The mail and wire fraud statutes are identical except for the particular method used to

14    disseminate the fraud, and contain three elements:  (A) the formation of a scheme to defraud, (B)

15    the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud."

16    *Id.*

17        The Court previously dismissed Plaintiffs' RICO claims, noting that the predicate acts of

18    mail and wire fraud were alleged in only the most general of terms, with no specificity regarding

19    the identity of the parties who made the alleged misrepresentations using the mail or interstate

20    wires, the content of such misrepresentations, or the time and place of such misrepresentations.

21    *See* Prior Dismissal Order at 21, ECF 147.  At the hearing on the prior motions to dismiss,

22    Plaintiffs' counsel acknowledged the general nature of the predicate act allegations, explaining

23    that Plaintiffs could not provide the requisite specificity due to a protective order in another case.

24    Counsel indicated that they would resolve that issue, and that the amended pleading would provide

25    adequate details.  The Court also requested that Plaintiffs separate their primary RICO claim from

26    their RICO conspiracy claim.  *See id.*

27        Plaintiffs have cured these defects.  Plaintiffs allege that through the conduct described

28    above, Ray, Marfatia, Ambac, and now-defunct GMAC associated together in an enterprise in

United States District Court
Northern District of California

2002 for the purpose of defrauding Plaintiffs of money.  *See* SAC ¶¶ 253-58, 265-66.  Jefferies allegedly joined the enterprise in 2009.  *See* SAC ¶ 262.  Plaintiffs allege that each Defendant committed predicate acts of mail fraud and wire fraud and that the racketeering activity continued at least through 2012.  *See* SAC ¶¶ 259-65.  Plaintiffs allege that Defendants conduct violated 18 U.S.C. § 1962(c), and in a separate claim they also assert that Defendants conspired and agreed to the RICO violations in violation of 18 U.S.C. § 1962(d).  SAC ¶¶ 251-73.

Defendants contend that Plaintiffs have failed to allege that Ray and Marfatia did anything outside the scope of their employment, and therefore have failed to allege that Ray and Marfatia separately joined the RICO enterprise.  However, the Supreme Court has held that a corporate employee may be deemed a separate entity for purposes of RICO, because "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).  Defendants argue that Jefferies is not alleged to have done enough to join the enterprise.  However, Plaintiffs specifically allege that the Jefferies Defendants learned of the scheme during their 2009 due diligence, and took affirmative steps to conceal the ongoing fraud.  *See* SAC ¶¶ 157-62.  Plaintiffs also allege that the Jefferies Defendants took affirmative acts to wring the last available profits out of the scheme when the Bliss Project needed additional financing in 2011-2012.  *See* SAC 28.  Plaintiffs allege that Ray and the Jefferies Defendants told the Bliss Project that the 2012 loan from Jefferies Mortgage was at market rate, when "[i]n truth, Ray and Jefferies had secret pre-commitments from investors to buy the debt at 8% above par – reflecting a significantly inflated interest rate on the loan."  SAC ¶ 29.

Defendants argue that Plaintiffs describe only ordinary business activities on the part of Defendants.  That argument simply ignores all of Plaintiffs' allegations that Defendants defrauded Plaintiffs through inflated loan rates, unnecessary credit enhancement, and hidden fees.  Defendants' related argument that Plaintiffs have failed to allege an organization decision-making structure likewise ignores Plaintiffs' allegations that Defendants acted in concert, playing out the same fraud on each of the successive projects starting in 2002-2003.

United States District Court
Northern District of California

23

United States District Court
Northern District of California

Defendants contend that Plaintiffs' allegations of predicate acts are insufficient, arguing that they are not all alleged to be fraudulent.  However, "any mailing that is incident to an essential part of the scheme satisfies the mailing element, even if the mailing itself contains no false information."  *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 978 (N.D. Cal. 2018).  The overall fraudulent nature of the scheme is alleged, and Plaintiffs have identified specific wires and mailings by each Defendant and to each Plaintiff in furtherance of the scheme.  Defendants argue that Plaintiffs impermissibly "re-use" the same wirings for multiple Defendants, for example, for Marfatia and Ambac.  However, Defendants fail to cite any authority for the proposition that where the predicate acts are alleged to be done on behalf of both an individual corporate officer and the corporation, the predicate act can be "counted" only once.  Defendants similarly contend that a single mailing cannot constitute a predicate act against more than one Plaintiff.  However, the Court sees no difficulty with the notion that a single email may constitute a predicate act with respect to multiple Plaintiffs when it was sent to a developer who worked on several Projects. Defendants have not cited, and the Court has not discovered, any authority to the contrary.

With respect to Defendants' arguments that Plaintiffs have not alleged separate acts with respect to each of the Jefferies entities, Plaintiffs have alleged that the Jefferies entities in essence have operated as one entity.  While Defendants may be able to disprove that in an appropriate motion or at trial, for pleading purposes Plaintiffs' allegations are sufficient.  *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 990 (N.D. Cal. 2018) ("[A]t this early stage in the proceedings, Plaintiffs have essentially been forced to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific way.").

The Court concludes that Plaintiffs' complaint adequately alleges the elements of both the primary RICO violation and RICO conspiracy against each Defendant.  Accordingly, the motion to dismiss the RICO claims is DENIED.

### C.   State Law Claims

Defendants assert that, absent a viable federal claim under RICO, the Court should decline

24

to exercise supplemental jurisdiction over Plaintiffs' state law claims.  As discussed above, the Court finds that Plaintiffs have alleged viable RICO claims.

Defendants contend that Plaintiffs' state law claims should be dismissed as time-barred. Those arguments fail for the same reasons discussed above with respect to the RICO claims.

Marfatia contends that he cannot be liable for aiding and abetting breach of fiduciary duty (Claim 4), because no fiduciary duty existed.  As discussed above, the Court finds that Plaintiffs have alleged that Ray and GMAC were Plaintiffs' fiduciaries.

Ambac contends that Plaintiffs' allegations that it acted as a fiduciary are insufficient.  *See* SAC ¶¶ 166-72.  For the reasons discussed above with respect to Ray, the Court concludes that Plaintiffs have alleged a fiduciary relationship.  This ruling is without prejudice to a challenge to the fiduciary relationship claims by appropriate future motion for summary judgment or at trial.

The motion to dismiss the state law claims is DENIED.

Having addressed Defendants' first set of arguments, asserted under Rule 12(b)(6), the Court next turns to Defendants' second set of arguments, asserted under Rule 12(b)(2).

### III.   RULE 12(b)(2) MOTION FOR LACK OF PERSONAL JURISDICTION

#### A.   Legal Standard

A party may challenge the Court's personal jurisdiction over it by bringing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2).  When a defendant raises a challenge to personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).  The plaintiff may meet that burden by submitting affidavits and discovery materials.  *Id.*  "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss."  *Id.* (internal quotation marks and citation omitted).  "[T]he plaintiff cannot simply rest on the bare allegations of its complaint," but when evaluating the plaintiff's showing, the court must accept uncontroverted allegations in the complaint as true and resolve factual disputes created by conflicting affidavits in the plaintiff's favor.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks and citation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.     Discussion**

In the SAC, Plaintiffs allege that Defendants are subject to personal jurisdiction under 18

U.S.C. § 1965(a) and California's long-arm statute.  *See* SAC ¶¶ 64-68, 73-79.  Plaintiffs also

allege that Defendants are subject to personal jurisdiction under the "ends of justice" provision of

the RICO statute, 18 U.S.C. § 1965(b).  *See* SAC ¶¶ 62-63.

Defendants Marfatia, Jefferies, and Ray seek dismissal for lack of personal jurisdiction.

Ambac concedes personal jurisdiction with respect to the claims brought by the two Monterey

Plaintiffs.  Defendants contend that:  § 1965(a) is a venue statute that cannot give rise to personal

jurisdiction; Plaintiffs have not established sufficient minimum contacts to give rise to personal

jurisdiction under California's long-arm statute, excluding Ambac's limited concession; and

personal jurisdiction does not lie under § 1965(b).  Finally, Defendants argue that even if personal

jurisdiction could be established with respect to some claims, the majority of Plaintiffs' claims are

foreclosed by *Bristol-Myers Squibb Co. v. Superior Court,* 137 S. Ct. 1773 (2017).  The Court

addresses Defendants' arguments in turn.

### 1.     18 U.S.C. § 1965(a) and California's Long-Arm Statute

Plaintiffs allege that personal jurisdiction lies "under § 1965(a) and the California long-

arm statute."  SAC ¶¶ 64, 66, 67, 68.  Section 1965(a) provides that "[a]ny civil action or

proceeding under this chapter against any person may be instituted in the district court of the

United States for any district in which such person resides, is found, has an agent, or transacts his

affairs."  In its Prior Dismissal Order, the Court indicated that it is inclined to construe § 1965(a)

as a venue provision rather than as an independent basis for asserting personal jurisdiction.  *See*

Prior Dismissal Order at 7 n.6, ECF 147.  Plaintiffs do not argue to the contrary and, in fact, they

do not even mention § 1965(a) in their briefing on the present motion.  Instead, Plaintiffs argue

that each Defendant has sufficient minimum contacts with California to confer personal

jurisdiction under the state's long-arm statute.

Where no applicable federal statute governs personal jurisdiction, "the law of the state in

which the district court sits applies."  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements

Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003).  "California's long-arm statute allows courts to exercise

26

United States District Court
Northern District of California

1  personal jurisdiction over defendants to the extent permitted by the Due Process Clause of the

2  United States Constitution." *Id.* "[D]ue process requires that the defendant 'have certain

3  minimum contacts' with the forum state 'such that the maintenance of the suit does not offend

4  traditional notions of fair play and substantial justice.'" *Ranza*, 793 F.3d at 1068 (quoting *Int'l*

5  *Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation

6  omitted)).

7       A federal district court may exercise either general or specific personal jurisdiction over a

8  nonresident defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 127-28 (2014). General

9  jurisdiction exists when the defendant's contacts "are so continuous and systematic as to render

10 [it] essentially at home in the forum State." *Id.* at 139 (internal quotation marks and citation

11 omitted). In contrast, specific jurisdiction exists when the defendant's contacts with the forum

12 state are more limited, but the plaintiff's claims arise out of or relate to those contacts. *Id.* at 128.

13 Plaintiffs do not assert that general personal jurisdiction lies as to any of the Defendants; they

14 assert only the existence of specific personal jurisdiction.

15      The Ninth Circuit has established a three-prong test for whether a court can exercise

16 specific personal jurisdiction: (1) the defendant must have "either purposefully availed itself of

17 the privilege of conducting activities in California, or purposefully directed its activities toward

18 California," thereby "invoking the benefits and protections of its laws"; (2) the claim must arise

19 out of or relate to the defendant's forum-related activities; and (3) the exercise of jurisdiction must

20 be reasonable, *i.e.* it must comport with fair play and substantial justice. *Schwarzenegger*, 374

21 F.3d at 802. The plaintiff bears the burden on the first two prongs. *Id.* "If the plaintiff fails to

22 satisfy either of these prongs, personal jurisdiction is not established in the forum state." *Id.* "If

23 the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the

24 defendant to present a compelling case that the exercise of jurisdiction would not be reasonable."

25 *Id.* (internal quotation marks and citation omitted).

26      "[E]ach party's contacts with the forum state must be assessed individually." *In re Boon*

27 *Glob. Ltd.*, 923 F.3d 643, 651 (9th Cir. 2019) (internal quotation marks, citation, and alteration

28 omitted). As noted above, Ambac concedes personal jurisdiction with respect to the Monterey

1  Plaintiffs' claims.  The Court therefore limits its discussion regarding the state's long-arm statute

2  to Marfatia, Jefferies, and Ray.

3      Plaintiffs do not submit any affidavits or other evidence, relying exclusively on the

4  allegations of the SAC to satisfy their burden on the first two prongs.  Even accepting Plaintiffs'

5  uncontroverted allegations as true, *see Schwarzenegger*, 374 F.3d at 800, the Court finds that the

6  allegations identified by Plaintiffs are insufficient to make a *prima facie* showing of personal

7  jurisdiction as to Defendants Marfatia, Jefferies, or Ray.

8              **a.      Purposeful Availment / Purposeful Direction**

9      Purposeful availment and purposeful direction are two distinct concepts.  *Schwarzenegger*,

10  374 F.3d at 802.  A purposeful availment analysis generally is used in suits sounding in contract,

11  while a purposeful direction analysis generally is used in suits sounding in tort.  *Id*.  Plaintiffs

12  assert two RICO claims and five state law tort claims.  Plaintiffs do not assert any contract claims.

13  Accordingly, the Court finds a purposeful direction analysis to be most appropriate.

14      In the Ninth Circuit, purposeful direction analysis is governed by the three-part "effects"

15  test derived from *Calder v. Jones*, 465 U.S. 783 (1984).  *Picot v. Weston*, 780 F.3d 1206, 1213-14

16  (9th Cir. 2015).  "Under this test, a defendant purposefully directed his activities at the forum if

17  he: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that

18  the defendant knows is likely to be suffered in the forum state."  *Id*. (internal quotation marks and

19  citation omitted).  In applying this test, the court "must 'look[ ] to the defendant's contacts with

20  the forum State itself, not the defendant's contacts with persons who reside there."  *Id*. (quoting

21  *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).  "[A]n injury is jurisdictionally relevant only insofar

22  as it shows that the defendant has formed a contact with the forum State."  *Id*.  "The proper

23  question is not where the plaintiff experienced a particular injury or effect but whether the

24  defendant's conduct connects him to the forum in a meaningful way."  *Id*.

25                          **i.      Intentional Act**

26      The meaning of the term "intentional act" is essentially the same as in the context of

27  intentional torts, meaning that "the defendant must act with the intent to perform an actual,

28  physical act in the real world."  *Picot*, 780 F.3d at 1214.  Plaintiffs allege that each Defendant

United States District Court
Northern District of California

intentionally misrepresented material facts regarding rating agencies' requirements for loan sureties, the existence and amounts of fees, and the interest rates charged on the Project loans. *See* SAC ¶¶ 288-292. Accordingly, this requirement is satisfied.

### ii. Expressly Aimed

"The second prong of our test, express aiming, asks whether the defendant's allegedly tortious action was expressly aimed at the forum." *Picot*, 780 F.3d at 1214 (internal quotation marks and citation omitted). Plaintiffs allege that "Ray committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West Project (which includes Travis Air Force Base) in California." SAC ¶ 67. Plaintiffs make a nearly identical allegation regarding Marfatia, stating that "Marfatia committed intentional torts, including numerous instances of breach of fiduciary duty, fraud and violations of RICO, purposefully directed at and causing harm to the Monterey, Vandenberg, and AMC West (which includes Travis Air Force Base) Projects in California." SAC ¶ 68. Plaintiffs allege that Jefferies "continued the same pattern of racketeering activity" when it acquired the MHPI loan servicing business in 2009. SAC ¶ 66.

Those conclusory allegations do not explain how Defendants' torts were aimed "at" California. While Plaintiffs claim that Defendants aimed tortious conduct at the four Plaintiffs with projects in California – Monterey Bay Military Housing, LLC, Monterey Bay Land, LLC, AMC West Housing LP, and Vandenberg Housing LP – the SAC does not allege any harm to the *physical* housing developments in California. The SAC asserts business torts affecting the balance sheets of Plaintiffs, none of which appear to be California citizens. *See* SAC ¶¶ 37, 38, 52, 54. All four of the above Plaintiffs are alleged to be Delaware limited liability companies. *See id.* Plaintiff Monterey Bay Military Housing, LLC is alleged to have its principal place of business in Seaside, California. *See* SAC ¶ 37. However, unlike a corporation which takes its citizenship from the state of incorporation and the state where it maintains its principal place of business, "an LLC is a citizen of every state of which its owners/members are citizens." *Johnson v. Columbia Properties Anchorage, LP*, 437 F.3d 894, 899 (9th Cir. 2006). The SAC does not allege that any

owner/member of Monterey Bay Military Housing, LLC, Monterey Bay Land, LLC, AMC West Housing LP, or Vandenberg Housing LP is a citizen of California.  Plaintiffs have not cited, and the Court has not discovered, any case suggesting that loan transactions between non-citizens create the requisite connection to California if the loan proceeds were used to fund construction in California.

The Court has reviewed the portions of the SAC cited by Plaintiffs in their briefing to determine whether the SAC alleges facts connecting Ray, Marfatia, or Jefferies to California in a meaningful way.  *See Walden*, 571 U.S. at 284 (holding that the key inquiry with respect to personal jurisdiction is "whether the defendant's conduct connects him to the forum in a meaningful way").  The Court concludes it does not.

With respect to Ray, Plaintiffs direct the Court's attention to paragraph 107 of the SAC in support of their assertion that "Ray had numerous direct contacts with California, including submission of a written response to the Monterey Project's request for financing proposals, in which he made numerous representations that Plaintiffs have alleged were fraudulent."  Pls.' Opp. to Def. Ray's Suppl. Mem. at 1, ECF 231-4.  However, paragraph 107 alleges that Ray provided a written response to the request for financing proposals to the Monterey Project developer, Clark, which is headquartered in Virginia.  *See* SAC ¶¶ 2, 107.  Paragraph 107 does not allege any direct contacts with California.  Plaintiffs cite paragraph 87 of the SAC to show that Ray had discussions about the Monterey Project with Fran Coen, a resident of California.  *See* Pls.' Opp. to Def. Ray's Suppl. Mem. at 1, ECF 231-4.  Paragraph 87 identifies "Fran Coen, Greg Day, and Tad Guleserian" as "key principles" of the Monterey Project to whom misrepresentations were made, but paragraph 87 alleges neither that Fran Coen is a resident of California nor that Ray spoke to him.  Plaintiffs point to their allegation that Ray traveled to California once in 2003 "in connection with the scheme to defraud the Monterey Project."  SAC ¶ 67.  Plaintiffs do not provide any specifics regarding Ray's 2003 California trip.  *See id.*  They do not allege that Ray made any misrepresentations or signed any documents during the trip.  *See id.*

Plaintiffs argue that Marfatia traveled to California with Ray for the purpose of closing the fraudulent loan on the Monterey Project, citing paragraphs 67-68 of the SAC.  Paragraph 67

30

United States District Court
Northern District of California

1   contains the allegations regarding Ray discussed above, and paragraph 68 contains similar

2   conclusory allegations regarding Marfatia.  For example, paragraph 68 alleges that "in 2003,

3   Marfatia traveled to California in connection with the schemes to defraud the Projects and in an

4   effort to further the scheme to defraud the Monterey Project."  SAC ¶ 68.  Plaintiffs do not allege

5   that the loan on the Monterey Project was closed on the California trip, or that any particular

6   misrepresentations were made on the California trip.

7       Plaintiffs allege that Jefferies acted as the loan servicer for the Monterey Project starting in

8   2009.  SAC ¶ 66.  However, Plaintiffs do not identify any claims of wrongdoing arising out of

9   Jefferies' role as loan servicer.  Plaintiffs allege that Jefferies deleted documents relevant to a

10  litigation pending in the California state court.  SAC ¶ 66.  It appears from other paragraphs of the

11  complaint that the document deletion occurred in 2016, long after the last loan transaction at issue

12  closed in 2012.  *See* SAC ¶¶ 244-47.  It is entirely unclear how alleged document deletion in 2016

13  would have bearing on this Court's personal jurisdiction over Jefferies for conduct occurring in

14  2009-2012.

15      In summary, neither Plaintiffs' general allegations that Defendants "purposefully directed"

16  tortious conduct toward the Monterey, Vandenberg, and AMC West Projects in California, nor

17  their more specific allegations regarding Defendants' conduct are sufficient to show that Ray,

18  Marfatia, or Jefferies expressly aimed their alleged tortious conduct at California.

19          **iii.    Causing Harm Likely to be Suffered in Forum State**

20      The Ninth Circuit has "not decide[d] whether the effects test requires that the brunt of the

21  harm have occurred within the forum state, or merely that some significant amount of harm have

22  occurred there."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002).  Under either

23  standard, Plaintiffs have failed to show that Defendants knew their conduct was likely to cause

24  harm in California.  As noted above, the SAC asserts economic harm to non-citizen Plaintiffs

25  arising out of the *financing* of the military housing developments.  *See* SAC ¶¶ 37-54.  Plaintiffs

26  have not explained how that economic harm was suffered in California.  They have not alleged

27  that the California housing developments were harmed in any way by Defendants' alleged

28  misconduct, *e.g.*, that construction was slowed or halted, or that the California properties

1    otherwise were diminished.

2         Based on the foregoing, the Court concludes that under the effects test, Plaintiffs have

3    failed to show that the alleged tortious conduct of Defendants Marfatia, Jefferies, and Ray was

4    expressly aimed at California.

5                    **b.    Arising out of Forum Activities**

6         Because Plaintiffs have failed to satisfy the first prong of the *Schwarzenegger* test, the

7    Court need go no further before concluding that Plaintiffs have failed to meet their burden of

8    establishing personal jurisdiction over Defendants Marfatia, Jefferies, and Ray.  *See*

9    *Schwarzenegger*, 374 F.3d at 802 (If the plaintiff fails to satisfy *either* of the first two prongs,

10   "personal jurisdiction is not established in the forum state.").  However, even if Plaintiffs had

11   satisfied the first prong, the Court concludes that Plaintiffs have failed to satisfy the second prong

12   because they have not shown that their claims arise out of Defendants' forum-related activities.

13        In determining whether a plaintiff's claim arises out of the defendant's forum-related

14   activities, "the Ninth Circuit follows the 'but for' test."  *Menken v. Emm*, 503 F.3d 1050, 1058 (9th

15   Cir. 2007) (internal quotation marks and citation omitted).  Thus, Plaintiffs must show that they

16   would not have suffered an injury "but for" Defendants' forum-related conduct.  *See id.*

17        With respect to Ray and Marfatia, Plaintiffs allege that they took a single trip to California

18   in 2003.  *See* ECF ¶¶ 67-68.  Plaintiffs *argue* in their briefing that that the 2003 visit was

19   important to the Monterey Project.  *See* Pls.' Opp. to Ray's Suppl. Br. at 2, ECF 231-4.  However,

20   Plaintiffs do not cite any allegations or evidence in support of their assertion regarding the

21   significance of the California trip.  *See id.*

22        Plaintiffs cite two cases in support of their argument that the California trip is sufficient to

23   subject Ray and Marfatia to personal jurisdiction in California, *GEC US 1 LLC v. Frontier*

24   *Renewables, LLC*, No. 16-CV-1276 YGR, 2017 WL 605070 (N.D. Cal. Feb. 15, 2017), *Precision*

25   *Orthopedic Implants, Inc. v. Limacorporate S.P.A.*, No. 2:16-cv-02945-ODW (PLA), 2016 WL

26   7187299 (C.D. Cal. Dec. 9, 2016).  In both cases, the finding of personal jurisdiction depended on

27   facts that are not present here.  In the cited portion of *Frontier Renewables*, the district court found

28   that a counterclaim defendant who "spearheaded" the allegedly fraudulent transfer actually

United States District Court
Northern District of California

proposed the fraudulent transfer "at a meeting with Frontier in California in December 2015." *Frontier Renewables*, 2017 WL 605070, at *5. In *Precision*, the defendant signed a contract containing alleged misrepresentations that was "specifically designed to induce Plaintiffs to render distribution services *within a specific territory of the forum state*." *Precision*, 2016 WL 7187299, at *6.

In the present case, the SAC does not allege that Ray or Marfatia had any significant meetings during the single California trip, signed any documents in California, or made any fraudulent statements in California. *See* SAC ¶ 67. Ray cites to his prior declaration, in which he stated that the 2003 trip was his only travel to California during the relevant 2002-2012 time frame, the trip lasted less than 24 hours, and he spent a portion of the trip playing a round of golf. *See* Ray Decl. ¶¶ 13, 23, ECF 64-1. Ray also stated that all official correspondence and legal notice related to the loan transaction with Monterey Bay Military Housing, LLC went to "Monterey Bay Military Housing LLC, c/o Clark Realty Capital, L.L.C., 2 Bethesda Metro Center, Suite 250, Mezzanine Level, Bethesda, MD 20814." *Id.* ¶ 5. Ray indicated that he dealt with the Army through individuals located in Virginia and Maryland. *Id.* ¶ 6. The Monterey Project closing with the Army occurred in Colorado. *Id.* ¶ 12.

With respect to Jefferies, Plaintiffs allege that Jefferies acted as the loan servicer for the Monterey Project starting in 2009. *See* SAC ¶ 66. However, Plaintiffs do not allege that Jefferies had contacts with California as part of its servicing duties. *See id.* Nor do Plaintiffs allege that their injuries arose from Jefferies' servicing of the Monterey Project loan. *See id.*

Accordingly, the Court concludes that Plaintiffs have failed to meet their burden on the second prong of the *Schwarzenegger* test to show that they would not have suffered an injury "but for" Defendants' forum-related conduct. That failure constitutes an independent basis for finding that Plaintiffs have failed to make a *prima facie* showing of personal jurisdiction over Defendants, separate and apart from Plaintiffs' failure to satisfy the first prong of the *Schwarzenegger* test.

### c.    Reasonableness

Because Plaintiffs have failed to satisfy their burden with respect to the first two prongs, the burden does not shift to Defendants to satisfy the third prong. *See Schwarzenegger*, 374 F.3d

at 802 (burden shifts to the defendant to show that exercise of personal jurisdiction would not be reasonable only if the plaintiff satisfies both of the first two prongs).

### d.      Conclusion

The Court therefore concludes that Defendants Marfatia, Jefferies, and Ray are not subject to this Court's personal jurisdiction under California's long-arm statute.[5]

### 2.      18 U.S.C. § 1965(b)

Plaintiffs also allege that personal jurisdiction lies under 18 U.S.C. § 1965(b).  *See* SAC ¶¶ 62-63.  Under 18 U.S.C. § 1965(b), a district court may exercise personal jurisdiction over non-resident participants in an alleged RICO conspiracy, even if those parties otherwise would not be subject to the court's jurisdiction, if "the ends of justice" so require.  The "ends of justice" provision permits a court, consistent with the purpose of the RICO statute, to "enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial."  *Butcher's Union Local No. 498, United Food & Comm. Workers v. SDC Inv., Inc.*, 788 F.2d 535, 538 (9th Cir. 1986).  In order for a court to exercise personal jurisdiction through the "ends of justice" provision, "the court must have personal jurisdiction over at least one of the participants in the alleged multi-district conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged coconspirators."  *Id*. at 539.  Moreover, the plaintiff must allege facts showing the existence of "a single nationwide RICO conspiracy" involving the defendants as to whom personal jurisdiction is asserted.  *Id.*

### a.      Personal Jurisdiction over at Least One Alleged Conspirator and Allegation of a Single Nationwide RICO Conspiracy

The Court finds that Plaintiffs have satisfied the first and third requirements for application of § 1965(b).  With respect to the first requirement, Ambac concedes that this Court has personal jurisdiction over it with respect to the claims of the Monterey Plaintiffs.  *See* Defs.' Joint Motion

---

[5] While Ambac has conceded personal jurisdiction with respect to the Monterey Plaintiffs' claims, the Court has no information regarding the basis for that concession and cannot infer from it the existence of minimum contacts as to the other Defendants.  "A defendant may voluntarily consent or submit to the jurisdiction of a court which otherwise would not have jurisdiction over it."  *King v. Am. Family Mut. Ins. Co.*, 632 F.3d 570, 584 (9th Cir. 2011).

United States District Court
Northern District of California

at 24, ECF 223.  With respect to the third requirement, the Court concludes that that Plaintiffs have adequately alleged a single nationwide RICO conspiracy, as discussed above.

### b.  No Other District with Personal Jurisdiction over all Conspirators

Application of § 1965(b) therefore turns on the second requirement, which places the burden on Plaintiffs to "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." *See Butcher's Union*, 788 F.2d at 539.  In its Prior Dismissal Order, the Court found that Plaintiffs failed to meet that burden in opposition to the motions to dismiss the first amended complaint.  *See* Prior Dismissal Order at 9, ECF 147.

The Court now must determine whether Plaintiffs have made a better showing in opposition to the current motion to dismiss the operative SAC.  As noted above, Ambac, Marfatia, and Jefferies indicated in their prior motions to transfer that they would be subject to general personal jurisdiction in New York.  Plaintiffs concede as much, alleging in the SAC that Ambac has its principle place of business in New York, Marfatia is a resident of New York, and Jefferies maintains its principle place of business in New York.  *See* SAC ¶¶ 55-59.  However, Plaintiffs argue that the SDNY Court would not have personal jurisdiction over Ray and therefore would not have personal jurisdiction over *all* the alleged conspirators.  Plaintiffs rely primarily on the allegations of the SAC to establish that Ray would not be subject to personal jurisdiction in New York, alleging that Ray neither resided there nor worked on the Projects from there.  *See* SAC ¶¶ 69-72.

Plaintiffs allege that Ray did no work on the MHPI projects from New York, based on the following facts:  "[D]espite the production of hundreds of thousands of transactional documents and emails, not a single one reflects that Ray made a relevant communication to the Projects – much less a misrepresentation or omission – from New York."  SAC ¶ 70.  "[N]ot once did Plaintiffs meet with Ray in New York, close a transaction in New York, call Ray in New York, or receive a communication from Ray in New York."  SAC ¶ 70.  Plaintiffs allege that when Ray moved to Jefferies in 2009, he and his MHPI business had only two offices, located in Colorado and Chicago.  SAC ¶ 71.  Ray Resided in South Carolina and maintained an office in Colorado.

SAC ¶ 71.  All of Ray's team members listed direct and mobile telephone numbers beginning with a 303 area code specific to the area in and around Denver, Colorado.  SAC ¶ 71.

Moreover, Plaintiffs allege that Ray did not pay any taxes in New York during the years 2002-2012.  SAC ¶ 72.  That fact is admitted by Ray.  *See* Ray Decl. ¶ 10, ECF 224-1.  Under New York law, non-residents must pay income tax in the state with respect to any income "'derived from or connected with New York sources.'"  *Zelinsky v. Tax Appeals Tribunal of State*, 1 N.Y.3d 85, 90 (2003) (quoting Tax Law § 601 [e][1]; § 631[a][1] ).  "New York source income includes income attributable to a business, trade, profession or occupation carried on in [New York]."  *Id*. (citing Tax Law § 631[b][1][B]).  Thus, Plaintiffs argue, Ray's failure to pay any New York taxes during the period of the alleged RICO conspiracy suggests that Ray did no work on the Projects in New York during that period.

Defendants counter the cited allegations of the SAC with Ray's declaration dated February 15, 2019.  *See* Ray Decl., ECF 224-1.  Ray states that although he resided in Colorado and South Carolina during the period 1999-2012, and primarily worked in those states, he "traveled on occasion to New York City in connection with the Military Housing Privatization Initiative ('MHPI') work" that he performed for GMAC, Capmark, and JeffCo.  Ray Decl. ¶¶ 2-4.  Ray also states that he occasionally worked from the New York offices of GMAC, Capmark, and JeffCo. during the time period 1999-2012.  Ray Decl. ¶¶ 2-4.  During those New York trips, Ray met with the Projects' senior representatives and co-owners as well as the Projects' advisor, JLL.  Ray Decl. ¶ 5.  Ray also met more than two dozen representatives of large institutional investors in New York, to discuss marketing and sale of MHPI trust securities.  Ray Decl. ¶ 6.  During his trips to New York, Ray also met with Ambac employees, including Marfatia, to discuss issues related to the MHPI transactions.  Ray Decl. ¶ 7.  Ray had meetings in New York with individuals from Moodys Investor Service, Standard and Poor's Rating Service, and Fitch Rating Service to discuss the MHPI transactions.  Ray Decl. ¶ 8.  Ray met in New York with insurance companies interested in providing credit enhancement and Guaranteed Investment Contract services in connection with the Projects.  Ray Decl. ¶ 9.  With respect to the fact that he did not pay taxes in New York during the 2002-2012 period, Ray states that his W-2s received from GMAC, Capmark, and JeffCo.

36

United States District Court
Northern District of California

during those years did not list a New York corporate entity as his employer, and his employers did not withhold New York income taxes.  Ray Decl. ¶ 10.

Ray's declaration is sufficient to controvert Plaintiffs' allegations that Ray did no work on the Projects in New York.  Plaintiffs contend that Ray's declaration does not contain enough detail to controvert the SAC's allegations.  *See* Pls.' Opp. to Def. Ray's Suppl. Mem. at 4, ECF 231-4. The Court disagrees.  Ray's declaration provides the names of people and entities he met in New York to discuss various aspects of the MHPI Projects, such as marketing MHPI trust securities, credit ratings, and credit enhancement, as well as approximate dates of those meetings.  The Court finds that information sufficient to show Ray did significant work on the Projects in New York.

As stated above, Plaintiffs attempt to show that Ray would not be subject to personal jurisdiction in New York based on the SAC's allegations that he did no work on the Projects there. Because Ray has controverted those allegations, Plaintiffs may not rely on them to make a *prima facie* showing that Ray would not be subject to personal jurisdiction in New York (and thus that personal jurisdiction over all Defendants is proper under § 1965(b)).  Plaintiffs must present affidavits or other evidence sufficient to create a factual dispute as to whether Ray worked on the Projects in New York.  *See Schwarzenegger*, 374 F.3d at 800.

Plaintiffs attempt to create a factual dispute with the declaration of an expert on New York State tax litigation, Timothy P. Noonan.  *See* Noonan Decl., ECF 231-6.  Mr. Noonan states his opinion that an individual who worked in New York in the manner described by Ray's declaration would face potential exposure for New York tax, interest, and penalties in excess of $1 million. Noonan Decl. ¶ 32.  Mr. Noonan also opines that an individual who failed to pay such taxes could be sued under the New York False Claims Act for more than $3 million.  Noonan Decl. ¶ 33.  Mr. Noonan concludes by stating that "RAY's specific exposure for New York tax, interest, and penalties could be lower (or much higher) depending on his exact compensation amounts and the specific amount of workdays in and out of New York each year."  Noonan Decl. ¶ 34.

While Mr. Noonan's declaration may show that Ray failed to pay taxes in New York, Ray concedes that he did not pay taxes in New York.  Mr. Noonan's declaration therefore does not create any disputed facts.  The declaration does not controvert Ray's declaration describing the

work he did in New York on the Projects.  Moreover, Plaintiffs cite no authority equating the threshold required to incur New York tax liability with the minimum contacts required to establish personal jurisdiction.

Plaintiffs argue that the Court should not credit Ray's declaration because of his "past perjury and documented efforts to destroy evidence," as alleged in the SAC.  *See* Pls.' Opp. to Def. Ray's Suppl. Mem. at 5, ECF 231-4.  Plaintiffs' reliance on *Zamanov v. Holder*, 649 F.3d 969 (9th Cir. 2011), is misplaced.  *Zamanov* involved review of an Immigration Judge's credibility determination with respect to a non-citizen's asylum application.  The Ninth Circuit held that "[s]ubstantial evidence supported the immigration judge's conclusion that the additional incidents Zamanov described in his supplemental declaration materially altered his account of persecution and created inconsistencies in his testimony that cast doubt on his credibility."  *Id*. at 974. Nothing in the case supports the notion that this Court may simply disregard Ray's declaration.

It is not the Court's task to make credibility determinations when evaluating a challenge to personal jurisdiction, but rather to determine whether Plaintiffs have made a *prima facie* showing of personal jurisdiction, assuming that all conflicts in the evidence are resolved in Plaintiffs' favor. *See Schwarzenegger*, 374 F.3d at 800.  Here, there are no conflicts in the evidence because Ray's declaration statements regarding his work on the Projects in New York stands uncontradicted.

### c.    Conclusion

The Court concludes that Plaintiffs have failed to meet their burden to show that no other district that would have personal jurisdiction over all alleged conspirators.  Specifically, Plaintiffs concede that Defendants Marfatia, Jefferies, and Ambac would be subject to personal jurisdiction in New York, and they have failed to demonstrate that Ray would not also be subject to personal jurisdiction in New York.  As a result, Plaintiffs have not made the showing required to permit this Court to exercise personal jurisdiction over all Defendants under § 1965(b).

### 3.    Pendent Personal Jurisdiction

In response to Defendants' argument that the majority of Plaintiffs' claims are foreclosed by *Bristol-Myers Squibb,* 137 S. Ct. 1773, Plaintiffs argue that to the extent the Court finds the existence of personal jurisdiction with respect to any claims, the Court may exercise "pendent

United States District Court
Northern District of California

1   personal jurisdiction" with respect to all other claims in the suit.  Defendants argue that application

2   of the doctrine of pendent personal jurisdiction is not appropriate in this case.

3   "Personal jurisdiction must exist for each claim asserted against a defendant."  *Action*

4   *Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  However, under

5   the doctrine of pendent personal jurisdiction, "a court may assert pendent personal jurisdiction

6   over a defendant with respect to a claim for which there is no independent basis of personal

7   jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the

8   same suit over which the court does have personal jurisdiction."  *Id.*  "Pendent personal

9   jurisdiction is typically found where one or more federal claims for which there is nationwide

10  personal jurisdiction are combined in the same suit with one or more state or federal claims for

11  which there is not nationwide personal jurisdiction."  *Id.* at 1180-81.

12  In *Action Embroidery*, the Ninth Circuit applied the doctrine where the plaintiffs asserted

13  federal antitrust claims which were subject to the court's jurisdiction, and related state law claims,

14  which were not.  *Action Embroidery*, 368 F.3d at 1180.  The Ninth Circuit held that "[w]hen a

15  defendant must appear in a forum to defend against one claim, it is often reasonable to compel that

16  defendant to answer other claims in the same suit arising out of a common nucleus of operative

17  facts."  *Id.* at 1181.  The Ninth Circuit stated that "the actual exercise of personal pendent

18  jurisdiction in a particular case is within the discretion of the district court."  *Id.*  "The district

19  court may have discretion to dismiss the pendent claims where considerations of judicial

20  economy, convenience and fairness to litigants so dictate."  *Id.* (internal quotation marks, citation,

21  and alteration omitted).

22  While *Action Embroidery* involved claims asserted by the same plaintiffs against the same

23  defendant, at least two district courts within the Northern District of California have extended the

24  pendent personal jurisdiction doctrine to out-of-state plaintiffs in a putative nationwide class

25  action.  *See Allen v. ConAgra Foods, Inc.*, No. 3:13-CV-01279-WHO, 2018 WL 6460451, at *7-8

26  (N.D. Cal. Dec. 10, 2018); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 860 (N.D. Cal. 2018).

27  Those courts distinguished putative class actions from mass actions like that addressed in *Bristol-*

28  *Myers Squibb,* reasoning that where the defendant already was before the court to defend against

United States District Court
Northern District of California

some plaintiffs' claims, the additional burden of defending against out-of-state plaintiffs' claims was *de minimis*.  *See Allen*, 2018 WL 6460451, at *8 ("Further, ConAgra is already before this court to defend against Allen's claims, and the additional burden is *de minimis*."); *Sloan*, 287 F. Supp. 3d at 860 ("[T]he exercise of personal jurisdiction over the non-resident Plaintiffs' claims in this case will impose only a *de minimis* burden on GM. . . .  Those new claims overlap substantially with the claims (including federal claims) already before this Court, arising out of the same nucleus of operative facts.").

The only defendant subject to the Court's personal jurisdiction is Ambac.  Because Ambac has conceded personal jurisdiction with respect to the Monterey Plaintiffs' claims, the doctrine of pendent personal jurisdiction potentially could provide a basis for exercising jurisdiction over the other Plaintiffs' claims against Ambac as well.  However, the Court would have grave reservations about applying the doctrine on the facts of this case, in which each of the Plaintiffs engaged in separate and distinct transactions with Defendants.  In that sense, this case is more akin to the mass actions discussed in *Bristol-Myers Squibb* than the putative class actions discussed in *Sloan* and *Allen*.  Moreover, *Sloan* and *Allen* do not suggest that the Court's personal jurisdiction over Plaintiffs' claims against Ambac could confer personal jurisdiction over Plaintiffs' claims against other Defendants.  Thus, to the extent the Court may have discretion to exercise pendent personal jurisdiction in this case, it declines to do so given the multiplicity of Projects and parties.  *See Allen*, 2018 WL 6460451, at *7 ("[D]istrict courts have discretion to decide whether or not to exercise pendent jurisdiction."); *Sloan*, 287 F. Supp. 3d at 860 ("Whether to exercise pendent personal jurisdiction is afforded to the discretion of the district court.").

### 4.    Transfer in Lieu of Partial Dismissal

Given the Court's conclusions that it has personal jurisdiction over only one of the four Defendants,[6] and that all Plaintiffs may not be able to proceed in this forum even against Ambac, the Court *sua sponte* reconsiders its denial of the prior motion to transfer the case to the SDNY Court under 28 U.S.C. § 1404(a).  *See* Prior Order Denying Transfer, ECF 108.  A district court

---

[6] Again, the Court treats the four Jefferies entities as a single Defendant for ease of discussion.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    may transfer a case *sua sponte* under § 1404(a).  *See Pravetz v. Fed. Ret. Thrift Inv. Bd.*, No. ED

2    CV 18-1081 FMO (SKx), 2018 WL 8058843, at *2 (C.D. Cal. Dec. 28, 2018).  The Court

3    nonetheless ordinarily would obtain briefing from the parties prior to making a *sua sponte*

4    determination regarding transfer.  In this case, however, the parties submitted ample briefing and

5    supplemental briefing on the prior § 1404(a) motions.  *See* ECF 39, 40, 47, 48, 49, 50, 54, 63, 88,

6    89, 91, 92, 99.  The Court's purpose in reconsidering its denial of the prior transfer motion is to

7    determine whether the balance of factors is altered by the change in the procedural posture of the

8    case, namely, the Court's rulings on personal jurisdiction.  The Court concludes that additional

9    briefing from the parties would not aid the Court in revisiting the balance of factors.

10           Transfer may be ordered under 28 U.S.C. § 1404(a) where the transferor court lacks

11   personal jurisdiction over all the parties.  *See Quiroz v. Dickerson*, 714 F. App'x 646, 646 (9th Cir.

12   2017); *Microsoft Corp. v. Hagen*, No. CIV–F–09–2094 AWI GSA, 2010 WL 11527312, at *1

13   (E.D. Cal. Aug. 30, 2010).  The Ninth Circuit has expressly recognized that a case may be

14   transferred under § 1404(a) to cure a lack of personal jurisdiction in the transferor court.  *See*

15   *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 967 (9th Cir. 1993).

16           Section 1404(a) provides that:  "For the convenience of parties and witnesses, in the

17   interest of justice, a district court may transfer any civil action to any other district or division

18   where it might have been brought or to any district or division to which all parties have

19   consented."  28 U.S.C. § 1404(a).  A two-part test governs transfer under § 1404(a).  *See Ctr. For*

20   *Biological Diversity v. McCarthy*, No. 14-cv-5138, 2015 WL 1535594, at *2 (N.D. Cal. Apr. 6,

21   2015) (citing *Hatch v. Reliance Ins. Co.*, 758 F.2d 409 (9th Cir. 1985)).  First, the court considers

22   whether the case could have been brought in the proposed transferee district.  *Id.*  Second, if the

23   case could have been brought in the transferee district, the court considers whether the case should

24   be moved "for convenience of parties and witnesses [and] in the interest of justice."  *Id.*  "[T]he

25   district court has discretion to adjudicate motions for transfer according to an individualized, case-

26   by-case consideration of convenience and fairness."  *Jones v. GNC Franchising, Inc.*, 211 F.3d

27   495, 498 (9th Cir. 2000) (internal quotation marks and citation omitted).

28

1

### a.      The Action Could have Been Brought in the SDNY

2      When addressing the prior motions to transfer, the Court determined that the action could

3   have been brought in the SDNY based in part on the agreement of the moving parties and

4   Plaintiffs that the SDNY Court could exercise personal jurisdiction over all Defendants pursuant

5   to the RICO "ends of justice provision," 18 U.S.C. § 1965(b).  *See* Prior Order Denying Transfer

6   at 5-6, ECF 108.  The Court accepted the parties' characterization of the SDNY Court as a proper

7   forum for the action based on the allegations of the then-operative pleading.  *See* Prior Order

8   Denying Transfer at 6.  Although the Court acknowledged that Defendants had filed motions to

9   dismiss for lack of personal jurisdiction, and had specifically challenged Plaintiffs' reliance on

10   § 1965(b) to confer personal jurisdiction here, the Court found that those arguments were not yet

11   properly before it.  *See id.* at 6 n.2.

12      In light of the subsequent evolution of the case, and in particular Plaintiffs' current position

13   that Ray would not be subject to personal jurisdiction in the SDNY, the Court finds it prudent to

14   satisfy itself that the action could have been brought in the SDNY Court.  The Supreme Court has

15   interpreted the "might have been brought" language of § 1404(a) to refer to "forums . . . permitted

16   by federal venue statutes." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571

17   U.S. 49, 57 (2013) (internal quotation marks and citation omitted).  "The structure of the federal

18   venue provisions confirms that they alone define whether venue exists in a given forum." *Id.* at

19   56.

20      Under the general venue statute, 28 U.S.C. § 1391, "[a] civil action may be brought in –

21   (1) a judicial district in which any defendant resides, if all defendants are residents of the State in

22   which the district is located; (2) a judicial district in which a substantial part of the events or

23   omissions giving rise to the claim occurred, or a substantial part of property that is the subject of

24   the action is situated; or (3) if there is no district in which an action may otherwise be brought as

25   provided in this section, any judicial district in which any defendant is subject to the court's

26   personal jurisdiction with respect to such action."  28 U.S.C. § 1391(b).  If a case falls within one

27   of those three categories, "venue is proper." *Atl. Marine*, 571 U.S. at 56; *see also In re Bozic*, 888

28   F.3d 1048, 1053 (9th Cir. 2018) (applying 28 U.S.C. § 1391(b) to determine whether an action

United States District Court
Northern District of California

1    "might have been brought" in the proposed transferee forum as required under § 1404(a).

2           The first category clearly does not apply, because Ray is not a resident of the state of New

3    York.  However, the Court finds that the second category does apply, as a substantial part of the

4    events or omissions giving rise to Plaintiffs' claims occurred in the SDNY.  Ambac and Jefferies

5    maintain their principle places of business in New York City (within the SDNY) and thus are

6    subject to general personal jurisdiction there.  *See* SAC ¶¶ 55-59.  Marfatia is a resident of New

7    York.  *See* SAC ¶ 61.  Marfatia, who was the primary person at Ambac responsible for the

8    Projects, worked in Ambac's office in New York City.  *See* Mayer Decl. at 5, ECF 40.  Ray, who

9    resided in Colorado and South Carolina during the events giving rise to this suit, performed

10   substantial work on the Projects in New York City.  *See* Ray Decl. ¶¶ 2-9, ECF 224-1.  Thus it

11   appears that the alleged RICO conspiracy was operated at least in part from the SDNY.  Even if

12   the second category did not apply, the third category would, as there is no other district falling

13   within the first or second categories, and at least one defendant is subject to personal jurisdiction

14   in the SDNY.

15          Accordingly, the Court is satisfied that the action could have been brought in the SDNY.

16   In reaching that conclusion, the Court need not and does not determine whether Ray would be

17   subject to personal jurisdiction in the SDNY.  As discussed above, category 2 makes no reference

18   to personal jurisdiction over defendants, and category 3 requires personal jurisdiction in the

19   transferee forum as to only one defendant.  Nothing in this order is intended to preclude Ray from

20   challenging personal jurisdiction under New York's long arm statute in a future motion, if

21   appropriate.

22                    **b.       Convenience and Interests of Justice**

23          The Court next turns to part two of the test, which requires a balancing of the convenience

24   of the parties, the convenience of the witnesses, and the interests of justice.   In determining the

25   interest of justice, courts consider a wide variety of factors.  *See Dillon v. Murphy & Hourihane,*

26   *LLP,* No. 14-CV-01908, 2014 WL 5409040, at *13 (N.D. Cal. Oct. 22, 2014).  In particular, courts

27   may consider: (1) the location where the relevant agreements were negotiated and executed,

28   (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the

United States District Court
Northern District of California

43

respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof. *Id.* (quoting *Jones*, 211 F.3d at 498).

The Court addressed those factors at length when ruling on the prior motions to transfer. *See* Prior Order Denying Transfer at 6-19, ECF 108. Based on the parties' submissions, the Court weighed these factors as follows:

> For the foregoing reasons, the Court finds that Plaintiffs' choice of forum is entitled to great weight and disfavors transfer. On the other hand, the presence of the 22 witnesses identified by Ambac and the availability of compulsory process to compel unwilling non-party witnesses slightly favor transfer. Other factors are neutral. The Court concludes that balancing of the factors does not warrant transfer to the Southern District of New York because Plaintiffs' choice of forum is entitled to deference that outweighs other factors. Ambac has failed to satisfy its burden to demonstrate that balancing the factors "clearly favors transfer" to the Southern District of New York.

Prior Order Denying Transfer at 19.

The briefing on the current motion does not suggest any reason to reconsider the Court's determinations regarding the weight to be accorded the convenience of witnesses or the availability of compulsory process. However, the Court does reconsider its previous finding that the convenience of the parties was neutral. When it made that finding, the Court had not yet evaluated Defendants' challenges to personal jurisdiction, and it evaluated the convenience of the parties based on an assumption that the entire action could be litigated against all Defendants in either the Northern District of California or the SDNY. *See* Prior Order Denying Transfer at 15. The Court found that because only some Defendants resided in New York, and Plaintiffs are dispersed throughout the country, "transferring the case would merely shift the inconvenience between some defendants and plaintiffs." *Id.*

The Court's current rulings with respect to personal jurisdiction change that analysis significantly. Now, denying transfer would require piecemeal litigation of the action in multiple fora. In contrast, the majority – and potentially all – of the Defendants would be subject to suit in the SDNY. While this Court has not made an affirmative determination that Ray would be subject to personal jurisdiction in New York, he may well be based on the work he performed on the

Projects there, as described in his declaration. Because New York is now the only potential forum where the action could be litigated against all, or a majority, of Defendants, the Court now concludes that the convenience of the parties favors transfer.

For similar reasons, the Court's rulings regarding personal jurisdiction change the weight accorded to Plaintiffs' choice of forum. The Court previously found that Plaintiffs had demonstrated that this forum had a substantial connection with the case. *See* Prior Order Denying Transfer at 10. However, that finding is not supported by the current record, discussed above, which is virtually devoid of any connections between Defendants and California. Plaintiffs' choice of forum cannot be effectuated with respect to the bulk of the action, because most Defendants are not subject to personal jurisdiction here. Additionally, it is far from clear that all Plaintiffs could pursue their claims here even as to Ambac. Under these changed circumstances, the Court finds that Plaintiffs' choice of forum no longer can be given substantial weight. This is particularly true given that considerations of judicial economy strongly favor transfer. "A plaintiff's choice of forum is entitled to deference, but where the interest of justice and convenience strongly favor venue elsewhere, a transfer is appropriate." *Friedman v. PopSugar, Inc.*, No. 2:18-cv-05888-CAS(MAAx), 2018 WL 6016963, at *11 (C.D. Cal. Oct. 29, 2018).

Having reconsidered its prior denial of the motions to transfer in light of the change in the case's procedural posture, the Court concludes that transfer of the action to the SDNY under § 1404(a) is warranted based on the convenience of the witnesses, the convenience of the parties, judicial economy, and the interests of justice.

### 5.   Conclusion

The Rule 12(b)(2) motion is DENIED and the action is TRANSFERRED to the District Court for the SDNY under 28 U.S.C. § 1404(a).

//

//

//

//

//

**IV.  ORDER**

    (1)    Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is DENIED.

    (2)    Defendants' motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) is DENIED.  While Defendants' motion is well-taken with respect to Defendants Marfatia, Jefferies, and Ray, the Court finds it appropriate to transfer the entire action to the District Court for the SDNY rather than grant the Rule 12(b)(2) motion in part.

    (3)    The Court *sua sponte* reconsiders its denial of the prior motions to transfer under 28 U.S.C. § 1404(a), and in light of changed circumstances the motion to transfer is GRANTED.  The action is hereby TRANSFERRED to the District Court for the Southern District of New York.

    (4)    Defendants shall file answers to the SAC no later than 30 days after the transfer is effected and the case is docketed in the District Court for the Southern District of New York.

Dated:  September 26, 2019

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

46