UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONTEREY BAY MILITARY HOUSING,
LLC, MONTEREY BAY LAND, LLC,
MEADE COMMUNITIES LLC, FORT
BLISS/WHITE SANDS MISSILE RANGE
HOUSING LP, RILEY COMMUNITIES
LLC, FORT LEAVENWORTH FRONTIER
HERITAGE COMMUNITIES, I, LLC, FORT
LEAVENWORTH FRONTIER HERITAGE
COMMUNITIES, II, LLC, CARLISLE/
PICATINNY FAMILY HOUSING LP,
BRAGG COMMUNITIES LLC, FORT
DETRICK/WALTER REED ARMY
MEDICAL CENTER LLC, PICERNE-FORT
POLK FUNDING, LLC, RUCKER
COMMUNITIES LLC, STEWART
HUNTER HOUSING LLC, SILL HOUSING,
LLC, AETC HOUSING LP, AMC WEST
HOUSING LP, LACKLAND FAMILY
HOUSING, LLC, and VANDENBERG
HOUSING LP,

                              Plaintiffs,

        - against -

AMBAC ASSURANCE CORPORATION,
JEFFERIES MORTGAGE FINANCE, INC.,
JEFFERIES & COMPANY, INC.,
JEFFERIES LLC, JEFFERIES GROUP LLC,
DANNY RAY, and CHETAN MARFATIA,

                    Defendants.

**MEMORANDUM
OPINION & ORDER**

19 Civ. 9193 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

               This civil RICO action was filed in the Northern District of California in 2017.

Plaintiffs are eighteen entities engaged in housing construction at military bases nationwide.

Plaintiffs allege that Defendants – lenders, loan servicers, and insurers for Plaintiffs' military

housing projects – "formed a RICO enterprise to illegally profit on the financing" of these

projects, and assert substantive RICO and RICO conspiracy claims, as well as state law claims, against them.  (See Second Amended Complaint ("SAC") (Dkt. No. 256) ¶¶ 4, 251-307)

In September 2019, after two years of litigation, the district court in the Northern District of California (the "California Court") denied Defendants' motions to dismiss the SAC for failure to state a claim, but determined that it lacked personal jurisdiction over all but one Defendant.  Accordingly, the court sua sponte transferred the case to the Southern District of New York, where it was assigned to this Court.

Defendants have moved for reconsideration of the California Court's order denying their motions to dismiss.  For the reasons stated below, this Court concludes that (1) the California Court improperly ruled on the merits of Defendants' motions to dismiss for failure to state a claim, despite determining that it lacked personal jurisdiction over all but one of the Defendants; but (2) Defendants were not prejudiced by the California Court's ruling, except to the extent that the California Court determined that (a) the SAC sufficiently pleads that Defendants Ambac Assurance Corporation ("Ambac") and its managing director, Chetan Marfatia, were Plaintiffs' fiduciaries; and (b) that Plaintiffs Sill Housing, LLC and Lackland Family Housing, LLC adequately plead predicate acts of mail and wire fraud against Defendants Ambac and Marfatia.  This Court will thus grant Defendants' motions to reconsider and vacate those portions of the California Court's order denying dismissal of (a) Plaintiffs' breach of fiduciary duty claims against Ambac and Marfatia; and (b) the RICO claims brought by Sill Housing, LLC and Lackland Family Housing, LLC against Ambac and Marfatia.  Those claims will be dismissed.[1]  Defendants' motions for reconsideration will otherwise be denied.

_____

[1]  Because the breach of fiduciary duty claims against Defendants Ambac and Marfatia will be dismissed, any claim for aiding and abetting their breach of fiduciary duty will likewise be dismissed.

## BACKGROUND

I.   FACTS[2]

      The United States Armed Forces are authorized, pursuant to the Military Housing

Privatization Initiative of 1996 (the "MHPI"), to contract with private developers for the

development and construction of housing for military families on military bases.  (See SAC (Dkt.

No. 256) ¶ 1)  The purpose of these public-private partnerships is "to attract private sector

financing, expertise and innovation to provide necessary housing faster and more efficiently than

traditional [m]ilitary [c]onstruction processes would allow."  (Id. ¶ 85).

      Plaintiffs are eighteen "MHPI project entities" (id. ¶ 1) that operate sixteen

privatized military housing projects (collectively, the "Projects") at twenty military bases in

fifteen states across the United States.[3]  In twelve of the Projects, the U.S. Army entered into a

---

[2]  The Court's factual statement is drawn from the SAC.  The facts pled are presumed true for purposes of resolving Defendants' motions.  See Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

[3]  Plaintiffs, and the respective military housing projects with which they are affiliated, are as follows:  Monterey Bay Military Housing, LLC and Monterey Bay Land, LLC (operators of the "Monterey Bay Project" in California); Fort Bliss/White Sands Missile Range Housing LP (operator of the "Fort Bliss Project" in Texas and New Mexico); Carlisle/Picatinny Family Housing LP (operator of the "Carlisle Project" in Pennsylvania and New Jersey); Stewart Hunter Housing LLC (operator of the "Fort Stewart Project" in Georgia); Fort Leavenworth Frontier Heritage Communities, I, LLC and Fort Leavenworth Frontier Heritage Communities, II, LLC (operators of the "Fort Leavenworth Project" in Kansas); Meade Communities LLC (operator of the "Fort Meade Project" in Maryland); Riley Communities LLC (operator of the "Fort Riley Project" in Kansas); Bragg Communities LLC (operator of the "Fort Bragg Project" in North Carolina); Fort Detrick/Walter Reed Army Medical Center LLC (operator of the "Fort Detrick Project" in Maryland); Picerne Fort Polk Funding LLC (operator of the "Fort Polk Project" in Louisiana); Rucker Communities LLC (operator of the "Fort Rucker Project" in Alabama); Sill Housing, LLC (operator of the "Fort Sill Project" in Oklahoma); AETC Housing LP (operator of the "AETC I Project" in Oklahoma, Arizona, Texas, and Florida); AMC West Housing LP (operator of the "AMC West Project" in Washington, Oklahoma, and California); Lackland Family Housing, LLC (operator of the "Lackland II Air Force Project" in Texas); and Vandenberg Housing LP (operator of the "Vandenberg Project" in California).  (See SAC (Dkt. No. 256) ¶¶ 37-54)

partnership with a private developer, whereby the Army leased land and housing to the developer
for 50 years, and the developer provides day-to-day management of the Project.  (Id. ¶ 2)  In the
four remaining Projects, the U.S. Air Force contracted with a private developer, providing land
and housing pursuant to a 50-year lease, while the developer provides day-to-day management of
the Projects.  (Id. ¶ 3)  The private developers for the Projects are Balfour Beatty Communities,
LLC ("BBC"); Corvias Group, LLC ("Corvias"); Clark Realty Capital, L.L.C. ("Clark"); and
Michaels Military Housing, LLC ("Michaels").  (Id. ¶¶ 2-3)

> **A.      Ray, GMAC, and Ambac's Initial Dealings with the Projects**

In the years immediately following the enactment of the MHPI, the Projects
"collectively needed billions of dollars of long-term financing" for development and
construction.  (Id. ¶ 4)  A number of financial institutions competed to provide loan origination
services for the Projects.  (Id. ¶ 93)  GMAC Commercial Mortgage Corporation ("GMAC") was
one such entity.  "In order to set himself apart from the competition[,] . . . [Defendant Danny
Ray, GMAC's managing director,] expressly solicited in writing" that, if selected, he and his
GMAC team would not only provide the services offered by a traditional lender, but would also
provide financial advisory services.  Due in part to Ray's unique promise to "assume the trusted
role of Financial Advisor," a promise he made both to Corvias and to the Army's consultant for
the Projects – Jones Lang LaSalle ("LaSalle") – Ray and GMAC were hired to finance
construction for the Fort Meade Project, the first of the Projects.  (Id. ¶¶ 93, 97-98, 100)  As
discussed below, Ray made the same promise in connection with subsequent Projects.  "Ray
specifically represented to the developers associated with each Project and to the Army that
GMAC would act under his direction as a fiduciary and that he would . . . negotiate the most
competitive market rate and efficient financial structure."  (Id. ¶ 9; see also id. ¶ 96)  He likewise

4

represented "that the fiduciary services provided by GMAC were distinct and separate from the more traditional investment banker services [GMAC] provided 'as lender.'"[4]  (Id. ¶ 95)

Ray chose Defendant Ambac, an AAA-rated insurance company, to insure, or "credit enhance," the loan for the Fort Meade Project, thereby permitting GMAC to syndicate the loan by selling AAA-rated bonds.  (Id. ¶¶ 6, 15)  Ray promised Corvias and LaSalle that he "would use good faith and best efforts to negotiate credit enhancement fees with Ambac," but Ray did not engage in meaningful negotiations with Ambac concerning its fees.  (Id. ¶ 22-23)  Ambac's managing director Chetan Marfatia, for his part, "represented that Ambac would operate as [the Fort Meade Project's] fiduciary and agent."  (Id. ¶ 166)

Marfatia told "Corvias and . . . [LaSalle] that he and Ambac would act in the [Fort] Meade Project's best interests to obtain the highest possible rating from the ratings agencies."  (Id. ¶ 167)  A high rating would minimize both "the interest rate charged for the underlying loan" and "the need for, and cost of, . . . credit enhancement" for the Project's financing.  (Id.)

Ray and Marfatia both maintained that a rating from a third-party rating agency was necessary for Ambac to provide credit enhancement services for the Fort Meade Project.  At Ray's and Marfatia's insistence, however, the rating obtained from the third-party rating agency would be a "'shadow rating[],' rather than a public rating . . . subject to public scrutiny."  (Id. ¶ 16)  After the Fort Meade Project closed in 2002 (id. ¶ 11), Ray and Marfatia made the same

_____

[4] In 2006, GMAC was sold in a leveraged buyout and became Capmark, which is not a defendant in this action.  As discussed below, in 2009, Defendant Jefferies Mortgage Finance, Inc., purchased Capmark's military housing servicing business, after Capmark filed a bankruptcy petition.  Ray moved from GMAC to Capmark to Defendant Jefferies & Co., Inc.  (See SAC (Dkt. No. 256) ¶¶ 4 n.1, 57)  The SAC generally refers to GMAC and Capmark collectively as "GMAC."  Unless otherwise noted, this Opinion does the same.

representations to LaSalle and the private developers for the Projects on which they worked, and sought the same "shadow ratings," over the next three years.  (Id. ¶¶ 168 (Bragg Project), 169 (Monterey Project), 170 (Fort Stewart Project), 171 (Fort Detrick Project), 172 (Fort Polk Project))

GMAC and Ray "convinced the private developers and [LaSalle] . . . and, through them, each of the specific Projects[,] that they operated at arm's length with Ambac."  (Id. ¶ 173)  For example, "Ray repeatedly represented during the time period from 2002-2005 that GMAC would negotiate the most favorable terms possible with credit enhancers, including Ambac . . . , and . . . touted GMAC's credibility with credit enhancers and ratings agencies as a reason GMAC could negotiate such favorable terms."  (Id. ¶ 175)  Ray and GMAC never conducted a competitive process for selecting a credit enhancer, however.  Instead, "GMAC, Ray, Marfatia, and Ambac had predetermined that Ambac would provide credit enhancement at rates designed to benefit Ambac and, in turn, the rest of the [RICO] enterprise," at the Projects' expense.  (Id. ¶ 176; see also id. (describing internal Ambac documents that variously refer to the relationship between Ambac and GMAC as "exclusive" and as a "joint venture" that would yield "above market rates"))

### B.    "Credit Spread" Misrepresentations

Although Defendants "engaged in multiple misrepresentations and took hidden fees and profits with respect to the [Fort] Meade and [Fort] Bragg Projects,"[5] their fraudulent "scheme was not fully formed" at that time.  (Id. ¶¶ 4, 11, 65)  Defendants' fraudulent scheme

---

[5]  The Fort Bragg Project, which closed in 2003, was the second of the Projects.  (See SAC (Dkt. No. 256) ¶ 105)

crystallized in connection with the Monterey Bay Project, which was managed by Clark, a different private developer, with LaSalle serving as the Army's consultant.

Ray secured the financing role for the Monterey Bay Project by promising Clark's representatives and LaSalle, as in connection with earlier Projects, that he and GMAC would hold "a position of trust as an agent and financial advisor," and that GMAC would "use its best efforts to negotiate the most favorable rates" for, inter alia, credit enhancement, loan credit spread, and lockbox and servicing fees.[6] (Id. ¶ 108)  Ray further represented that the credit enhancement and loan credit spread rates he had provided to Clark in a loan commitment letter were "not-to-exceed rates"; if the actual rates for these services were lower than the rates listed in the loan commitment letter, "the lower actual rates will be provided to" the Monterey Bay Project.  (Id.; see also id. ¶ 186)

In September 2003, Ray and GMAC "purported to have set the credit spread and interest rate on the Monterey loan at market," and induced Clark to pay a $950,000 "rate-lock fee" to GMAC "in consideration for GMAC appearing to bear the risk of market fluctuation on the interest rate" until the bond sale took place.  (Id. ¶ 186)  According to Ray, this interest rate had been "set by an 'open book' process" whereby the rate was based on what investors bidding for bonds were willing to pay.[7] (Id. ¶ 182)  Ray also represented to Clark that, as the Monterey Bay Project's financial advisor, he and GMAC would pass on to the Monterey Bay Project any savings realized in connection with the Monterey Bay loan.  (Id. ¶ 186)

---

[6]  The "credit spread" is "the difference between a bond's coupon rate or yield rate and an underlying benchmark rate."  (SAC (Dkt. No. 256) ¶ 11); see U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC, No. 16-CV-8507 (AJN), 2019 WL 9511402, at *4 (S.D.N.Y. Sept. 16, 2019) ("The concept of a 'credit spread' refers to the 'spread' between the interest rate on a security and a reference rate.").

[7]  The SAC alleges that this "open book" process had taken place in connection with the Fort Meade and Fort Bragg Projects.  (SAC (Dkt. No. 256) ¶ 184)

Shortly after Clark paid the $950,000 rate-lock fee, however, GMAC sold bonds on the Monterey Bay loan at above the par value of the loan. By selling the bonds immediately, GMAC transferred any risk of market fluctuation, which Ray had told Clark was "significant," and which he used to justify the $950,000 fee.[8] Moreover, "by selling the bonds . . . above the par value of the loan . . . , GMAC was able to reap millions of dollars in immediate profits. . . . , none of [which] were disclosed or passed along to the Monterey Project." (Id. ¶¶ 186-87) The fact that GMAC was able to quickly sell bonds at above the par value of the loan indicated that GMAC had set the loan interest rate at above the market rate.[9] (Id. ¶ 179)

Ambac purchased some of the Monterey Bay bonds that GMAC was selling at a premium to par. In return for Ambac "putting money directly in Ray's pocket, Ray and GMAC used Ambac almost exclusively in subsequent Projects, allowing Ambac to avoid competition and [to] charge inflated credit enhancement fees." (Id. ¶ 15)

Defendants' practice of setting an above-market credit spread on Project loans and realizing secret profits based on that above-market interest rate became "the centerpiece" of Defendants' fraudulent scheme. (See id. ¶¶ 67, 68, 81)[10] "GMAC and later [the] Jefferies

---

[8]  The SAC alleges that the rate-lock fees Ray and GMAC obtained in connection with several other Projects – including the Fort Bragg, Fort Polk, Fort Rucker, Fort Riley, and Fort Sill Projects – were "fraudulent[ly] charg[ed]." (Id. ¶¶ 205-12) The SAC does not include the rate-lock fee for the Monterey Bay Project in this list, however.

[9]  The SAC asserts that "the 'market' rate for new issue bonds" – "[u]nlike publicly reported Treasury bond interest rates" – "was not transparent to the Plaintiffs." (Id. ¶ 180) Indeed, "[t]he Projects . . . specifically retained a financial advisor" – Ray – "to act as their agent in determining and negotiating a market interest rate." (Id.)

[10] The SAC summarizes this aspect of Defendants' alleged fraudulent scheme as follows:

A central part of Defendants' scheme allowed GMAC, and later Jefferies, to make undisclosed and outsized profits . . . on the sale of the bonds or certificates that were syndicated from the Projects' loans. In general, GMAC and later Jefferies would originate a Project loan and misrepresent to the private developer and [LaSalle] . . . that they had set the credit spread . . . and, therefore, the coupon interest rate on the

[Defendants], through Ray, employed the scheme developed at the Monterey [Bay] Project with respect to subsequent Projects sponsored by the other developers."  (Id. ¶ 188; see also id. ¶¶ 188-91 (alleging that at each of the Fort Stewart, Fort Detrick, Fort Bliss, Fort Carlisle, AETC I, Vandenberg, AMC West, and Lackland II Projects, "GMAC, and later Jefferies, failed to set the interest rate on the Project loan at market, and profited from either or both the pre-closing sale of bonds on the loans and collection of rate-lock fees while bearing no actual risk of market fluctuation"))

C.   **Manipulation of "Shadow Ratings"**

In addition to obtaining secret profits as the result of setting the Project loan interest above the expected yield in the marketplace, Ray, GMAC, Ambac, and Marfatia also manipulated the "shadow ratings" these Defendants claimed were necessary for the Projects' credit enhancement.  By October 2003, Marfatia and his Ambac supervisor instructed Standard & Poor's – the ratings agency – "that none of the MHPI Projects involving Ambac credit enhancement should receive a shadow rating higher than an 'A.'"  (Id. ¶ 17)  Accordingly, "after 2003 and at least before S&P's ratings criteria changed in August 2006, no joint GMAC/Ambac

---

loan, at market. . . . Often a few days or weeks before a loan would close, Ray would lock-in the interest rate on the loan, and in many instances charge the Projects a fee for this process, claiming that GMAC, and later Jefferies, were bearing risk by guaranteeing the stated interest rate on the loan.  Contrary to their representation, GMAC or Jefferies would set the Project loan interest rate above the expected yield of the marketplace.  With the inflated interest rates on the loans locked in, GMAC, and later Jefferies, would then sell bonds or certificates on the loans prior to closing and at a premium to par, given the above market interest rate on the underlying loans, immediately reaping profits while simultaneously assuring it would bear no risk on the loans it was going to issue.

(SAC (Dkt. No. 256) ¶¶ 178-79)  As a result, the Projects were "saddle[d] . . . with loans at above-market interest rates that the Projects have paid and will continue to pay for decades to come on a monthly basis from the soldiers' rent payments."  (Id. ¶ 181)

Project received a shadow or public rating above an 'A,'" even though many MHPI Projects involving other lenders and insurers "received ratings above an 'A' and therefore did not require credit enhancement."  By artificially capping the Projects' ratings, GMAC and Ambac were able to charge excessive fees and rates in connection with the Projects' apparent need for credit enhancement.  (Id.)  To facilitate their fraudulent scheme, "Marfatia and Ambac instructed the ratings agencies . . . that they could not directly communicate with the Projects' representatives without the presence of Ambac or GMAC, and demanded that any questions be funneled directly though Ambac or GMAC[,] . . . effectively fenc[ing] off [the Projects] from the ratings agencies" and "[en]abl[ing] [Ambac and GMAC] to exercise significant influence over the rating process."[11]   (Id. ¶ 165)

> ### D.     Unnecessary Purchases of Surety Bonds and the Funding of Debt Service Reserve Accounts

Defendants told the private developers and LaSalle, with respect to all but two Projects on which they worked, that the ratings agencies required – in order to issue a AAA rating – that a Project purchase (1) "bond insurance on the full amount of [GMAC's] loan"; and (2) "a surety bond[,] or cash fund a debt service reserve account in the amount of one year's principal and interest."  GMAC and Ambac received fees in connection with the Projects' purchase of a surety bond or funding of a debt service reserve account.[12]  GMAC and Ambac

---

[11]  In October 2003, for example – after Ambac learned that S&P had communicated directly with the Monterey Bay Project – Marfatia informed S&P that he was "disturbed to hear that Ambac's AAA rating letter was sent to Clark Construction directly. . . . The underlying shadow is . . . a private rating and is only for Ambac."  (SAC (Dkt. No. 256) ¶ 165 (bracketed language omitted))

[12]  The SAC alleges that GMAC and Ambac charged inflated fees in connection with Project expenses.  According to Plaintiffs, Marfatia admitted in internal Ambac documents and in correspondence with GMAC that Ambac and GMAC had "fudge[d]" Project expenses.  (Id. ¶ 20; see id. ¶¶ 237-39)

made these representations to the private developers and LaSalle even though "S&P had made

clear to Marfatia and Ray that it did not require a surety bond or cash funding of the debt service

reserve on a credit enhanced transaction in order to rate the loan . . . as AAA." (Id. ¶¶ 18–19)

        **E.**        **Development of the "Stealth Structure"**

        Because Ray recognized Ambac's critical role in Defendants obtaining "out-sized

and illicit profits" from the Projects, he "protected Ambac from competition from other . . . bond

insurers." (Id. ¶ 21)  As discussed above, although Ray had "promised the developers for each of

the Projects and [LaSalle] that he would use good faith and best efforts to negotiate credit

enhancement fees with Ambac," he "engaged in no meaningful negotiation with Ambac"

concerning credit enhancement fees.  (Id. ¶ 22)  Instead, Ray "gave Ambac an 'exclusive right'

to provide [credit enhancement services to the Projects,]" and allowed Ambac to charge above-

market rates for the credit enhancement – an enhancement that was sometimes unnecessary to

obtain an AAA rating.  (Id.; see also id. ¶ 18)

        In 2004 or 2005, LaSalle requested that GMAC seek competitive bids for credit

enhancement.  (Id. ¶¶ 23, 215)  This request threatened GMAC's and Ambac's fraudulent

scheme:  competitive bidding would diminish "Ambac's ability to charge inflated credit

enhancement fees," and a new insurer might not cooperate with GMAC in perpetrating the fraud

on Plaintiffs.  (Id. ¶ 216)  "In response [to LaSalle's request], Ray, Marfatia, and Ambac . . .

retooled the scheme to convince the Projects that no credit enhancement was going to be

involved in forthcoming deals."  Defendants then "developed . . . a 'stealth structure' to help

conceal and maintain" their fraudulent scheme.  (Id. ¶ 23)

        Beginning with the Fort Bliss Project, which closed in 2005, Ray represented to

private developers and to LaSalle that GMAC's loan commitments were "not contingent on

agency ratings or credit enhancement." (Id. ¶¶ 125 (Fort Bliss Project), 131 (Fort Leavenworth

Project), 136 (Fort Rucker Project), 141 (Fort Riley Project), 232 (Fort Carlisle, AETC, AMC

West, and Vandenberg Projects))  Consistent with this representation, the loan agreements for

each of these Projects "clearly indicated that there would be no credit enhancement at closing,

and that any future credit enhancement obtained by the lender would be at the lender's expense."

(Id. ¶ 218 (internal quotation marks omitted))

                    In connection with each of these Projects, however, "Ambac secretly provided

(and was secretly paid for) two . . . types of credit enhancement."  (Id. ¶ 220)  As to each Project,

GMAC – later Jefferies – entered into a credit enhancement agreement with Ambac.  These

agreements with Ambac were "expressly concealed from the Borrower and the Army."  Pursuant

to these undisclosed agreements, GMAC or Jefferies paid Ambac an "undisclosed monthly

premium for insuring the principal balance of the [Project] loan."  (Id.)  GMAC, and later

Jefferies, also entered into a "liquidity facility guarantee" with each of these Projects, in which it

"guaranteed one year's debt service."  (Id. ¶ 221)  After providing these guarantees, and without

informing the Projects, GMAC and Jefferies assigned the guarantees to Ambac.  (Id. ¶ 222)

Ambac agreed to split the premiums for the debt service guarantee with GMAC and Jefferies; the

portion of the premiums that GMAC and Jefferies received was "a pure kickback."  (Id.)  "This

self-described stealth structure allowed Defendants . . . to avoid the competitive bidding process,

provided GMAC [and later Jefferies] with an unearned profit in the form of the liquidity facility

fee split, and ensured that no third-party credit enhancer would be placed at the MHPI Projects."

(Id. ¶ 223)

F.    **"Original Issue Discount" Misrepresentations**

      In 2006, Ray and GMAC "modified" their fraudulent scheme by requesting that the Projects accept an "Original Issue Discount," or "OID," on the Project loans.  (Id. ¶ 192)  "In general, an OID occurs when a financial instrument sells for a price less than its stated redemption price at maturity" (id.) – the "discount" is the difference between the financial instrument's issue price and its face value.  Ray "affirmatively misled the Projects regarding the need for, and purpose of, an OID."  (Id. ¶ 193)  He purported to generate the interest rate for the Projects' loans at market, and then used an OID both to reduce the loan interest rate and to decrease the actual loan proceeds the Projects received by an equivalent amount.  (Id.)

      According to Ray, OIDs were "financially neutral" for the Projects but necessary, because prospective bond buyers were not willing to purchase bonds at fair value above par.  The OID would allow GMAC (and, later, Jefferies) to sell the bonds after the Projects' loan closings at a discount to par.  (Id.)  In reality, Ray continued to set the loan interest rates above market level and to sell the bonds prior to the loan closings.  He "used the OID as a tool to conceal that he was selling the bonds prior to closing at a substantial and secret profit."  (Id. ¶ 194)

      Ray and GMAC first employed this OID fraud in connection with the Fort Leavenworth Project.  They charged a 0.7-to-1.0% OID on the Leavenworth bonds, even though there was no economic purpose for an OID, given that the bonds were sold well in advance of the closing.  The OID device enabled Ray and GMAC to make millions in profits on these pre-closing bond sales.  (Id. ¶ 196)  Ray and GMAC went on to use unnecessary OIDs in the Fort Rucker and Fort Carlisle Army Projects, and the AETC I, Vanderberg, AMC West, and Lackland II Air Force Projects.  (Id. ¶¶ 192, 198, 200-203)  Later, when Ray was working for Jefferies,

Ray and Jefferies used the same OID device in connection with the Fort Sill Project and the follow-on financing for the Fort Bliss Project.  (Id. ¶ 192, 204)

### G.    The Jefferies Entities' Involvement in the Alleged Fraud Scheme

In late 2009, Defendant Jefferies Mortgage Finance, Inc. ("Jefferies Mortgage") purchased Ray's military housing business from GMAC's successor, Capmark, and Defendant Jefferies & Co., Inc. ("Jefferies & Co.") hired Ray and Ray's GMAC/Capmark team to continue this line of business.[13]  (See id. ¶¶ 4 n.1, 25, 57, 157)  "[A]s part of due diligence Jefferies performed leading up to its acquisition . . . and its hiring of Ray and Ray's team[,] . . . Jefferies communicated with Ray and learned of the manner in which Ray had manipulated the financings of past MHPI Projects to reap substantial, undisclosed profits from the Projects."  (Id. ¶ 157; see also id. ¶ 25)  "Jefferies internally recognized that these MHPI transactions as constructed by Ray – involving the pre-sale of bonds and secret trading profits generated by these sales – created an essentially riskless business."  (Id. ¶ 25)  "With knowledge of the ongoing scheme, Jefferies elected to go forward with the acquisition and hired Ray and his team, . . . so Jefferies could benefit from this . . .  business."[14]  (Id. ¶ 158)  "With the knowledge and consent of those at Jefferies to whom Ray reported," he "continued his trusted role as financial advisor with the Projects and almost immediately began using Jefferies to perpetuate and continue the pattern of racketeering that he had previously directed."  (Id. ¶ 25)

---

[13]  Following a 2013 merger, Jefferies & Co. became Defendant Jefferies LLC.  From that point on, Jefferies LLC employed Ray.  (SAC (Dkt. No. 256) ¶¶ 57, 59)

[14]  "[A]fter various criminal investigations that involved the very Jefferies executives who diligenced and approved of Ray's MHPI transactional practices," Jefferies entered into a non-prosecution agreement with the United States Attorney's Office for the District of Connecticut regarding its manipulative bond sale practices.  The SAC asserts that Jefferies "embraced Ray's bond-related scheme because it too accepted, practiced, and operated based on misleading bond trading practices."  (SAC (Dkt. No. 256) ¶ 25)

After Jefferies purchased the military housing business and hired Ray, Jefferies took part in the Fort Sill Project, which closed in June 2010, and provided additional financing for the Fort Bliss Project in 2012.[15]   In connection with these transactions, Jefferies Mortgage – which served as lender – entered into agreements with the Projects in which it disclaimed any fiduciary duty as to the Projects.  (Id. ¶¶ 159-60)  According to Plaintiffs, Jefferies Mortgage sought to include these disclaimers because it "determined . . . that . . . Ray would continue his manipulation of MHPI Project financings while at Jefferies," and wanted "to insulate itself from liability."  (Id. ¶ 159)  Jefferies Mortgage was able to obtain the disclaimers only by concealing Ray's previous fraudulent conduct and by relying on "Ray's and other Jefferies employees' relationships with the Projects," as these individuals "still held themselves out as financial advisors to the Projects, actively advised [them], and made no disclaimer of fiduciary duty."  (Id. ¶ 160)

With respect to the Fort Sill Project, Ray informed the private developer – both before and after Jefferies' purchase of the military housing business – that he would act as financial advisor, that the Project loan would be set at market rates, and that any savings would be passed on to the Project.  (See id. ¶¶ 152, 209)  Jefferies did not set the interest rate at the market rate, however, and six days before the loan closing, Jefferies sold the bonds at a price above the stated par value of the loan, thus earning millions in profits that were not disclosed or

_____

[15]  In 2008, Ambac's credit rating was downgraded.  "[T]he Army Projects, the Army, and [LaSalle] . . . turn[ed] to Ray, GMAC and Jefferies as their financial advisors for consultation and advice regarding the impact of Ambac's rating[] . . . on the Projects" after the downgrade. (SAC (Dkt. No. 256) ¶ 156)  Ambac did not participate in the Projects that closed after its downgrade, including the Fort Sill Project, the Lackland II Air Force Project, and the Fort Bliss additional financing.  Because Ambac had participated in the initial Fort Bliss Project, however, Ambac's consent was required, and was obtained, for the Fort Bliss additional financing.  (See id. ¶ 234-36)

passed on to the Fort Sill Project.  (Id. ¶¶ 209, 212-13)  Moreover, Ray and Jefferies insisted that an OID be used on the Fort Sill Project.  On the same day that Jefferies sold the bonds related to the Fort Sill loan, a Jefferies employee – who was well aware of the profits Jefferies would realize on the pre-closing sale of bonds – emailed the private developer, the Army, and LaSalle to explain why the unnecessary OID was necessary.  (Id. ¶¶ 212-13, 262)  Corvias and LaSalle subsequently "inquired specifically about how Ray, now on behalf of . . . Jefferies, was pricing and marketing the bonds and whether Jefferies was making a profit on the bonds at the expense of the Sill Project."  (Id. ¶ 213)  Ray – on behalf of Jefferies – denied that Jefferies was making any hidden profits.  (Id. ¶¶ 213, 262)

        With respect to the Fort Bliss additional financing, in which the Fort Bliss Project sought an additional $140 million loan, "Ray and Jefferies reaped greater secret profits . . . than on any of the [previous Projects]."  (Id. ¶ 233)  They did so by again assuring the Fort Bliss Project that the loan offered by Jefferies Mortgage was at market rate, even though "Ray and Jefferies had secret pre-commitments from investors to buy the debt at a staggering 8% above par[,] reflecting a highly inflated interest rate on the loan."  (Id. ¶ 234)  Indeed, "the excess interest rate that Jefferies Mortgage charged the Fort Bliss Project was so significant that Ray and Jefferies Mortgage carved out a separate Interest Only strip at 0.567% and securitized it in the form of a bond."[16]  (Id.)  Within a week of the closing, Jefferies sold bonds on this additional financing at the previously agreed upon above-par price, and neither disclosed these profits nor passed them on to the Fort Bliss Project.[17]  (Id. ¶ 204)

---

[16]  "An 'interest-only strip' is a security based solely on the interest payments from a pool of . . . bonds."  S.E.C. v. Goldstone, 300 F.R.D. 505, 507 n.2 (D.N.M. 2014) (internal quotation marks and citation omitted).

[17]  The Court assumes that the reference to GMAC in the SAC, ¶ 204, is a typographical error, given that GMAC no longer existed at this time.

In addition to participating in financing for the Fort Sill and Fort Bliss Projects, Jefferies – through its purchase of the GMAC/Capmark business – made the previous Projects part of its servicing portfolio.  By servicing these loans, Jefferies "effectuated the continued payments of inflated interest and fees" caused by Ray, GMAC, and Ambac, and "ensured that an objective third party would not have reason to examine the terms of the Projects' loans, [thereby] threatening the discovery of the ongoing scheme."  (Id. ¶ 262)

        **H.**      **State Court Litigation and Discovery of the Fraud**

"In late 2015, Ambac initiated multiple lawsuits against the MHPI Projects . . . ." In these lawsuits, Ambac claimed that the Projects had failed to cash fund debt service reserve accounts (the "Debt Service Reserve Litigation").  (Id. ¶¶ 32 n.2, 244)  "[I]n late 2016 and early 2017, [Defendants'] multi-faceted scheme began to surface" as a result of discovery in the Debt Service Reserve Litigation, notwithstanding the "extraordinary lengths" to which Jefferies and Ray went to avoid discovery."  (Id. ¶¶ 245-46)

In response to Ambac's lawsuit, Monterey Bay Military Housing LLC and Monterey Bay Land LLC commenced an action for declaratory relief in California Superior Court.  (See Superior Ct. Cmplt. (Dkt. No. 18-1) at 18-31)[18]  In that action, the state court issued orders compelling Jefferies Mortgage to produce certain documents, including documents related to Ray and GMAC.  Within hours of receiving subpoenas in March 2016, Ray – "after consulting with Jefferies['] in-house counsel" – "began to delete thousands of responsive MHPI documents on the Jefferies document system."  (SAC (Dkt. No. 256) ¶ 247; Pltf. Mot. for Preservation Order (Dkt. No. 17) at 6)

---

[18]  All page numbers in this Order are as reflected in this District's Electronic Case Filing ("ECF") system.

On February 6, 2017, the state court ordered Jefferies Mortgage to produce access logs, which would reflect Ray's deletions.  Two days later, the Jefferies Entities dissolved Jefferies Mortgage.  (SAC (Dkt. No. 256) ¶ 247)  After Jefferies Mortgage was dissolved, Defendant Jefferies Group LLC – the parent company of all the Jefferies Entities – received a distribution of Jefferies Mortgage's assets.  (Id. ¶ 58)

In 2017, the Monterey Bay plaintiffs prevailed in their action for declaratory relief.  After Ambac withdrew certain defenses, the court granted the Monterey Bay plaintiffs summary judgment.  (See Kurtz Decl. (Dkt. No. 18) at 2)  As to the Debt Service Reserve Litigation, Ambac agreed to the dismissal of its claims with prejudice.  (SAC (Dkt. No. 256) ¶ 32 n.2)

## II.    PROCEDURAL HISTORY

### A.    The Complaint

The Complaint in the instant action was filed on August 28, 2017, in the Northern District of California.  (See Cmplt. (Dkt. No. 1))  Ambac, the Jefferies Entities, Ray, Marfatia, and Annandale Plantation, LLC – in which Ray allegedly invested his ill-gotten gains – are named as defendants.  The Complaint alleges that defendants were members of a racketeering enterprise, and pleads claims for violations of the RICO statute as well as state law claims.  (Id. ¶¶ 143-184)

The alleged fraudulent conduct described in the SAC – the inflated credit-spread scheme; the manipulation of "shadow ratings"; misrepresentations as to the need for surety bonds and cash fund reserves; the use of a "stealth structure"; the unnecessary use of OIDs; and the submission of inflated expenses to the Projects – is also set forth in the Complaint, albeit in less detail.  (See, e.g., id. ¶¶ 7, 9, 11, 16, 19-23, 89-101, 103-05)

18

The Complaint also contains certain allegations of fraud not set forth in the SAC. For example, the Complaint asserts that GMAC and Ray purported to assist Plaintiffs in placing portions of the Project loan proceeds in "secure, long term investments" pursuant to "Guaranteed Investment Contracts" ("GICs").  GMAC and Ambac rigged the GIC bidding process to favor Ambac (which offered GICs), and Ray and GMAC received undisclosed fees from GIC providers.  (Id. ¶¶ 13-15, 118-121)  The Complaint also asserts that by early 2005, LaSalle "began to observe that GMAC seemed partial to using Ambac for credit enhancement on its MHPI deals."  As a result, LaSalle "insisted that GMAC competitively bid out credit enhancement."  (Id. ¶ 19)  While the SAC also alleges that LaSalle asked GMAC to conduct competitive bidding for credit enhancement in or around 2005, the SAC does not allege that LaSalle "observe[d]" that GMAC was "partial to using Ambac."

As discussed below, Plaintiffs did not include these allegations in the SAC as a result of the California Court's ruling on Defendants' motions to dismiss.

### B.   Motion to Transfer and Motions to Dismiss the FAC

Three weeks after the Complaint was filed, Ambac moved – pursuant to 28 U.S.C. § 1404(a)[19] – to transfer venue to the Southern District of New York.  (See Transfer Br. (Dkt. No. 39))  Ambac contended that "the Southern District of New York is clearly the most appropriate venue for this case," because "New York is the domicile of the plurality of the parties and likely the majority of material witnesses, and is the locus of the greatest number of contacts relating to plaintiffs' claims," while "only one of the 28 parties . . . has an address in

---

[19]  Section 1404(a) provides:  "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

[the Northern District of California], virtually no witnesses reside [t]here, and the activities . . .

that supposedly occurred [there] are de minimis."[20]  (Id. at 3 (emphasis removed))  Marfatia and

the Jefferies Defendants joined in Ambac's motion to transfer.  (See Dkt. Nos. 47, 91)

       While the transfer motion was pending, Plaintiffs filed an amended complaint (the

"FAC") which is not significantly different from the Complaint.[21]  (See FAC (Dkt. No. 60))

Defendants all filed motions to dismiss the FAC, arguing, inter alia, that the California Court

lacks personal jurisdiction over them; that Plaintiffs' claims are time-barred; that Plaintiffs'

claims are barred by the Private Securities Litigation Reform Act (the "PSLRA"); and that the

FAC fails to state a claim.  (See Mots. (Dkt. Nos. 62, 63, 64, 66, 71))

       On January 2, 2018, the California Court denied the motion to transfer.  (See

Order (Dkt. No. 108))  While concluding that the Southern District of New York would be a

proper venue and would have jurisdiction over all the Defendants, the California court gave

"great weight" to Plaintiffs' choice of forum, and concluded that it "outweighs other factors"

relevant to the transfer analysis.  (See id. at 6, 11, 19)

---

[20]  Although Ambac moved to transfer, it did not contend that the California Court lacked
personal jurisdiction over it or any other specific party.  Instead, Ambac asserted that no judicial
district other than the Southern District of New York could exercise personal jurisdiction over all
the defendants named in the Complaint, excluding the Annandale Defendants.  The California
Court heard oral argument concerning Ambac's transfer motion.  At the hearing, Ambac's
counsel "concede[d] [that] there would be [personal] jurisdiction" as to Ambac.  (Nov. 30, 2017
Tr. (Dkt. No. 86) at 9)  The California Court expressed the view that – given that this case had
been brought as a RICO action – "personal jurisdiction[] is [not] really an issue," and made clear
that personal jurisdiction would not be a factor in deciding the transfer motion.  (Id. at 9, 16)
[21]  The FAC includes new allegations that were relevant to the then pending transfer motion,
including that Monterey Bay Military Housing LLC has its principal place of business in
Seaside, California, within the Northern District of California.  (See FAC (Dkt. No. 60) ¶ 33)
The California Court relied on this allegation in denying Ambac's motion to transfer.  (Order
(Dkt. No. 108) at 7)

In a July 17, 2018 order, the California Court granted Defendants' motions to dismiss for lack of personal jurisdiction, except as to the Monterey Bay Plaintiffs' claims against Ambac.[22]  (See Order (Dkt. No. 147) at 6-11)  Despite this finding, the California Court went on to address Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  The California Court concluded that (1) the PSLRA bars Plaintiffs' RICO claims,[23] because the predicate racketeering acts implicate GICs, which are securities (id. at 13-18);[24] (2) Plaintiffs' RICO claims are barred by the RICO statute's four-year statute of limitations, given that Plaintiffs filed suit more than seven years after the last Project closed and more than four years after the last financing transaction relating to the Projects was completed, and Plaintiffs had not alleged sufficient facts to demonstrate that they could not have discovered the fraud and resulting injury earlier (id. at 19-21);[25] and (3) Plaintiffs had not alleged the elements

---

[22]  In arguing that the California Court had personal jurisdiction over the Defendants, Plaintiffs' relied primarily on 18 U.S.C. § 1965(b), which provides as follows:  "In any action under [the RICO statute] in any district court . . . in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by a marshal thereof."  18 U.S.C. § 1965(b).  In finding that it lacked personal jurisdiction over the Defendants other than as to the Monterey Bay Plaintiffs' claims against Ambac, the California Court's relied primarily on its conclusion that Plaintiffs failed to state a claim under the RICO statute.  (See Order (Dkt. No. 147) at 7 ("Unless and until a viable RICO claim is stated, § 1965(b) cannot provide a basis for this Court's exercise of personal jurisdiction over Defendants."))

[23]  As discussed below, the PSLRA amended the RICO statute to bar RICO claims predicated on conduct actionable as securities fraud.  See 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [of Title 18 of the United States Code].").

[24]  The California Court rejected Defendants' contention that the FAC's allegations as to the credit spread aspect of the scheme – which the court referred to as the "bond fraud" – provided a separate basis for applying the PSLRA bar.  (See Order (Dkt. No. 147) at 15-16)

[25]  As to Plaintiffs' lack of diligence in discovering the fraud, the California Court cited:  (1) the transparency of market interest rates; (2) allegations in the FAC that LaSalle had "observe[d] that GMAC seemed partial to using Ambac for credit enhancement" and, more generally, that Plaintiffs "felt the need to question Defendants" about the interest rates; and (3) Plaintiffs' failure

of their RICO claim with the heightened particularity required by Fed. R. Civ. P. 9(b).[26]  (Id. at

21-22)  In connection with the final ground for dismissal, the California Court explained "that

two predicate acts must be alleged by each Plaintiff as to each Defendant."  (Id. at 22)

   The California Court granted Plaintiffs leave to amend.  (Id. at 24)

  **C.** **The SAC and the Motions to Dismiss the SAC**

   Plaintiffs filed the SAC on January 16, 2019.[27]  (Dkt. No. 220)  The SAC includes

no claims against the Annandale Plantation LLCs; the parties are otherwise the same.  Plaintiffs'

claims for a substantive RICO violation and RICO conspiracy – previously pled as a single cause

of action – are pled in the SAC as two causes of action.  The SAC otherwise asserts the same

claims for relief as the SAC.  (See generally SAC (Dkt. No. 256))

   The differences between the SAC and the FAC include the following:

(1) as relevant to the PSLRA bar, the SAC (a) omits any reference to GICs; and (b)
repeatedly alleges that the bond purchasers "received full and accurate disclosures
regarding the Projects and the interest rate being charged to the Projects," such that "[t]he
deception was only directed at the Projects themselves" (SAC (Dkt. No. 256) ¶ 13; see
also id. ¶¶ 181, 214);

(2) as relevant to the statute of limitations, the SAC (a) omits the allegations that LaSalle
"observe[d] that GMAC seemed partial to using Ambac for credit enhancement" in 2005,
and thus "insisted that GMAC competitively bid out credit enhancement" (FAC (Dkt. No.
60) ¶ 21), and instead states only that LaSalle requested "that GMAC competitively bid
out credit enhancement" (see SAC (Dkt. No. 256) ¶¶ 23, 215); (b) alleges, in a detailed
fashion, the ways in which Ray and GMAC represented to the Projects that they were
fiduciaries (see, e.g., id. ¶¶ 93-156); and (c) clarifies that "[u]nlike publicly reported
treasury bond interest rates, the 'market' rate for new issue bonds for the MHPI Projects

---

to plead facts demonstrating a fiduciary relationship, which might explain their delay in bringing
suit.  (See Order (Dkt. No. 147) at 20 (internal quotation marks and citations omitted))

[26]  The California Court also ruled that it would not exercise supplemental jurisdiction over
Plaintiffs' state law claims, given the absence of a viable federal claim.  (See Order (Dkt. No.
147) at 22)  The court also cited "a number of defects" in Plaintiffs' state law claims, including
"[m]ost fundamentally" that "Plaintiffs do not allege which state laws apply" to them.  (Id. at 22-
23)

[27]  The SAC was re-filed on July 22, 2019 (see SAC (Dkt. No. 256)), after the California Court
ruled on various redaction requests.  Citations to the SAC are to Dkt. No. 256.

was not transparent to . . . Plaintiffs," who "had no visibility or transparency into when the investors committed to purchase the bonds or the amounts investors paid for the bonds," such that "Plaintiffs had no way of knowing that Ray and his employers had charged MHPI borrowers a substantial premium[] attributable to the above-market interest rate" (id. ¶ 180);

(3) as relevant to the particularity of the RICO claims, the SAC provides considerably more specific allegations and lists, as to each Defendant, the predicate acts of mail or wire fraud that that Defendant committed (see, e.g., id. ¶¶ 259-65);

(4) as to the state law claims, the SAC alleges that each such claim is brought under California law (see id. ¶¶ 275, 281, 287, 295, 304); and

(5) the SAC pleads additional facts intended to address personal jurisdiction.

Defendants all moved to dismiss the SAC.  (See Jt. Mot. (Dkt. No. 223); see also Supp. Brs. (Dkt. Nos. 224, 225, 227, 228))  In their joint brief, Defendants repeat most of the arguments they made in moving to dismiss the FAC.  For example, they contend that Plaintiffs' RICO claims are time-barred, and that Plaintiffs cannot cure this defect simply by removing allegations pled in the FAC.  Defendants further contend that the SAC demonstrates that Plaintiffs were on inquiry notice of their claims long before they filed suit.  (Jt. Mot. (Dkt. No. 223) at 14-18)

Defendants also repeat their PSLRA arguments, maintaining both that Plaintiffs cannot "sanitize" the SAC by removing allegations concerning GICs, and that the alleged "bond fraud" scheme also triggers the PSLRA bar.  Acknowledging that the California Court had rejected the latter argument, Defendants state that the court "ha[d] not . . . consider[ed] whether the conduct underlying the bond transactions alleged could be actionable as fraud by the SEC." (Id. at 18-23)

As to the SAC's RICO claims, Defendants argue that Plaintiffs fail to state a claim, because the SAC does not (1) sufficiently plead the existence of a RICO enterprise or a

scheme to defraud; (2) plead two predicate acts as to each Defendant; and (3) adequately allege a

conspiracy.  (Id. at 24-31)

Finally, Defendants repeat their arguments that the California Court lacks

personal jurisdiction over them.[28]  (Id. at 31-35)

### D. The California Court's Order Denying Defendants' Motion to Dismiss the SAC and Transferring the Case

In a September 26, 2019 order, the California Court denied Defendants' joint

motion to dismiss and transferred this action to the Southern District of New York (the

"September 26, 2019 Order").  (See September 26, 2019 Order (Dkt. No. 261))

Before ruling on Defendants' claim that the California Court lacks personal

jurisdiction over them, the court addresses Defendants' Rule 12(b)(6) arguments that the SAC

fails to state a claim.

The California Court concludes that Plaintiffs' RICO claims are not time-barred,

reasoning that Plaintiffs are permitted to delete the FAC's allegations suggesting that they were

on inquiry notice, and finding that the SAC sufficiently explains why Plaintiffs did not inquire

further into GMAC's preference for working with Ambac.  (Id. at 11-15)

---

[28]  Defendants' joint brief does not discuss the merits of Plaintiffs' state law claims, except to say that the SAC does not allege a fiduciary relationship between them and Plaintiffs.  Defendants' primary argument in the joint brief, as to the state law claims, is that the California Court should decline to exercise supplemental jurisdiction over them if the RICO claims are dismissed.  (See Jt. Mot. (Dkt. No. 223) at 35)  Only two Defendants address the merits of Plaintiffs' state law claims in their supplemental briefs.  Marfatia adds that the SAC has not alleged that he had actual knowledge of the fiduciary obligation sufficient to support a finding of liability on Plaintiffs' claim for aiding and abetting a breach of fiduciary duty.  (Marfatia Br. (Dkt. No. 225) at 6)  Ambac argues that Plaintiffs do not "allege a contractual fiduciary undertaking," or any other statements "[]sufficient to create a fiduciary relationship" with Ambac.  (Ambac Br. (Dkt. No. 228) at 8)

The California Court likewise concludes that the PSLRA does not preclude Plaintiffs' RICO claims, explaining that Plaintiffs were permitted to omit the FAC's GICs-related allegations that had triggered the PSLRA bar.  (Id. at 15-18)  As to the "bond fraud," the California Court assumes arguendo that the PSLRA would preclude Plaintiffs' claims if the SEC could have brought a securities fraud suit based on the SAC's allegations.  But the California Court finds that the PSLRA bar is not triggered here, because Defendants had not presented "authority for the proposition that the SEC could or would bring suit" on such facts.  (Id. at 19-21)  Finally, the California Court ruled that Plaintiffs had cured the pleading defects in their RICO claims.  (Id. at 22-24)

The California Court then turned to Defendants' personal jurisdiction arguments. The California Court again concluded that Ambac was the only Defendant over which it had personal jurisdiction, and then only as to the Monterey Bay Plaintiffs' claims.  (Id. at 40)  Rather than dismissing all other claims against Defendants on Rule 12(b)(2) grounds, however, the California Court "sua sponte reconsider[ed] its denial of the prior motion to transfer the case to the SDNY Court under 28 U.S.C. § 1404(a),"[29] and determined that transfer was warranted.  (Id. at 40-45)  Accordingly, the California Court transferred this action to the Southern District of New York, and ordered Defendants to file answers to the SAC within 30 days following transfer. (Id. at 46)

---

[29]  In deciding to transfer this action, the California Court cited Ninth Circuit law "expressly recogniz[ing] that a case may be transferred under § 1404(a) to cure a lack of personal jurisdiction in the transferor court."  (September 26, 2019 Order (Dkt. No. 261) at 41 (citing Muldoon v. Tropitone Furniture Co., 1 F.3d 964, 967 (9th Cir. 1993)))

E.     **Motions for Reconsideration**

Transfer to the Southern District of New York was effected on October 4, 2019,

and the case was assigned to this Court that same day.  After the transfer, all Defendants moved

for reconsideration of the California Court's September 26, 2019 Order.  (See Marfatia Mot.

(Dkt. No. 268); Jefferies Mot. (Dkt. No. 269); Ray Mot. (Dkt. No. 271); Ambac Mot. (Dkt. No.

273))

**DISCUSSION**

All Defendants argue that – given the absence of personal jurisdiction – the

California Court erred in ruling on the merits of their Rule 12(b)(6) motions to dismiss, and in

applying Ninth Circuit and California law to those motions.  According to Defendants, the law of

the transferee court should have been applied, and under Second Circuit and New York law,

Plaintiffs' claims must be dismissed.  (See id.)

I.     **STANDARD FOR GRANTING RECONSIDERATION**

"Reconsideration is an 'extraordinary remedy to be employed sparingly in the

interests of finality and conservation of scarce judicial resources,'" In re Initial Pub. Offering

Sec. Litig., 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005) (quoting In re Health Mgmt. Sys., Inc.

Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)), and may be granted only where a court

has "'overlooked controlling decisions or factual matters that were put before it on the

underlying motion'" and which, if examined, might reasonably have led to a different result.

Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000) (quoting Shamis v. Ambassador

Factors Corp., 187 F.R.D. 148, 151 (S.D.N.Y. 1999)); see In re BDC 56 LLC, 330 F.3d 111, 123

(2d Cir. 2003) ("Generally, motions for reconsideration are not granted unless the moving party

can point to controlling decisions or data that the court overlooked – matters, in other words, that

26

might reasonably be expected to alter the conclusion reached by the court." (internal quotation marks and citation omitted)).

## II.   ANALYSIS

### A.   Whether the California Court Erred in Addressing the Merits of Defendants' Rule 12(b)(6) Motions

According to Defendants, given that the California Court determined that it lacked personal jurisdiction over them – except as to Ambac, and then only as to the Monterey Bay Plaintiffs' claims – it was not authorized to adjudicate their Rule 12(b)(6) motions.  (See Marfatia Br. (Dkt. No. 268) at 5-6; Jefferies Br. (Dkt. No. 270) at 14; Ray Br. (Dkt. No. 272) at 12-13; Ambac Br. (Dkt. No. 274) at 18)

"Personal jurisdiction . . . 'represents a restriction on judicial power . . . as a matter of individual liberty.'"  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) (quoting Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) ("The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 319 (1945)).  While personal jurisdiction differs from subject matter jurisdiction in that courts need not "police[]" the former "on their own initiative," Ruhrgas AG, 526 U.S. at 583, the Supreme Court has made clear that personal jurisdiction "is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'"  Id. at 584 (quoting Emp. Reinsurance Corp. v. Bryant, 299 U.S. 374, 382 (1937)); see also Sinochem Int'l. Co. Ltd. v. Malay. Int'l. Shipping Corp., 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without

first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).").

        As discussed above, however, the California Court concluded that it had personal jurisdiction over Defendant Ambac in connection with the Monterey Bay Plaintiffs' claims.  (See September 26, 2019 Order (Dkt. No. 261) at 26)  Plaintiffs seize on this circumstance to argue that – in a multi-defendant case – a court may adjudicate the merits of a Rule 12(b)(6) motion where it has personal jurisdiction over at least one of the defendants.  (Pltf. Opp. (Dkt. No. 286) at 17-19)

        The Second Circuit has explained that while it "traditionally treat[s] personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues."  ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013) (internal citation omitted).  Thus, "[i]n cases involving 'multiple defendants – over some of whom the court indisputably has personal jurisdiction – in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action,' [the Second Circuit] ha[s] proceeded directly to the merits of a motion to dismiss."  Id. (quoting Chevron Corp. v. Naranjo, 667 F.3d 232, 246 n.17 (2d Cir. 2012)); see also SPV Osus Ltd. v. UBS AG, 882 F.3d 333, 346-47 (2d Cir. 2018) (Calabresi, J., concurring) (emphasizing that personal jurisdiction, unlike subject matter jurisdiction, is not "concerned with the judiciary's powers under Article III" of the Constitution, and encouraging court to "assume jurisdiction" where doing so is not "a device for reaching a question of law that would otherwise have gone unaddressed but instead [is] a means of preventing waste of judicial resources" (internal quotation marks and citation omitted)).

Numerous courts in this Circuit have relied on <u>ONY, Inc.</u> and <u>Chevron Corp.</u> in adjudicating Rule 12(b)(6) motions despite the absence, or possible absence, of personal jurisdiction over some of the moving parties.  <u>See, e.g.</u>, <u>LLM Bar Exam, LLC v. Barbri, Inc.</u>, 271 F. Supp. 3d 547, 574 n.8 (S.D.N.Y. 2017) (explaining that court would adjudicate Rule 12(b)(6) motion of law schools located outside of New York, because "even if the Court were to hold it lacks personal jurisdiction over the Non-New York Law Schools," the court "plainly has jurisdiction over . . . the New York Law Schools," and accordingly "would have to consider their merits arguments about the First Amended Complaint, which arguments are identical to those of the New York Law Schools"), <u>aff'd</u>, 922 F.3d 136 (2d Cir. 2019); <u>Sullivan v. Barclays PLC</u>, No. 13 Civ. 2811 (PKC), 2017 WL 685570, at *11 (S.D.N.Y. Feb. 21, 2017) ("[B]ecause the J.P. Morgan and Citigroup Defendants do not dispute this Court's personal jurisdiction, it ultimately is necessary to rule on the remaining defendants' Rule 12(b)(6) arguments regardless of the Court's personal jurisdiction over the remaining defendants."); <u>In re Libor-Based Fin. Instruments Antitrust Litig.</u>, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *16 (S.D.N.Y. Aug. 4, 2015) (citing <u>Chevron Corp.</u> and <u>ONY, Inc.</u> and determining that merits of Rule 12(b)(6) motions could be addressed where "defendants expressly invite us to consider the merits of some claims . . . before addressing personal jurisdiction, and defendants raise largely overlapping legal issues in their remaining merits challenges").

This authority is not persuasive here, however.  Where courts "have proceeded directly to the merits" of Rule 12(b)(6) arguments despite a lack of personal jurisdiction over certain defendants, <u>ONY, Inc.</u>, 720 F.3d at 498 n.6; <u>see</u> <u>Chevron Corp.</u>, 667 F.3d at 246 n.17, generally the ruling on the Rule 12(b)(6) arguments is in favor of the defendants asserting a lack of personal jurisdiction.  <u>See</u> <u>ONY, Inc.</u>, 720 F.3d at 498 (where tort claims premised on

statements in article failed, because the statements were "non-actionable scientific conclusions," the court "need not reach the district court's independent holding that it lacked personal jurisdiction over . . . defendants"); Chevron Corp., 667 F.3d at 245-46 & 246 n.17 (a court may "address first the facial challenge to the underlying cause of action and, if [the court] dismiss[es] the claim in its entirety, decline to address the personal jurisdiction claims made by some defendants" (citing, inter alia, 4 C. Wright & A. Miller, Fed. Prac. and Proc. § 1067.6 (3d edition 2011) ("Alternatively, when the jurisdictional question is complex or difficult, a court may simply avoid the issue by resolving the suit on the merits when they clearly must be decided in favor of the party challenging jurisdiction, thereby obviating any need to decide the question.")); declining to address personal jurisdiction arguments because it was "apparent that Chevron's argument for declaratory relief must fail"); LLM Bar Exam, 271 F. Supp. 3d at 574 n.8 (citing ONY, Inc. and Chevron Corp. and "dismiss[ing] the First Amended Complaint as to all Defendants under Rule 12(b)(6)" instead of "adopting . . . piecemeal approach" of addressing some defendants' personal jurisdiction arguments and others' Rule 12(b)(6) arguments); In re Libor-Based Fin. Instruments Antitrust Litig., 2015 WL 4634541, at *16 ("[A]pply[ing] merits determinations where appropriate . . . avoids the need to exhaustively treat the numerous personal jurisdiction issues that would arise if it were assumed that . . . plaintiffs' substantive theories were meritorious.").[30]   In sum, this Court will not extend the logic of ONY, Inc.  and

---

[30]  See also, e.g., O'Donoghue v. U.S. Soc. Sec. Admin., 828 F. App'x 784, 787 n.3 (2d Cir. 2020) (affirming district court's dismissal for failure to state a claim and declining to address certain defendants' challenge to personal jurisdiction where plaintiff's claims failed on the merits, relying on Chevron Corp.); Brandon v. NPG Records, Inc., No. 1:19-CV-01923-GHW, 2020 WL 2086008, at *5 n.4  (S.D.N.Y. Apr. 30, 2020) (citing Chevron Corp. and holding that "[t]he claims against all defendants are dismissed for failure to state a claim . . . . Therefore, the Court need not decide whether it has personal jurisdiction over [some of the] Defendants."); Glaser v. Upright Citizens Brigade, LLC, 377 F. Supp. 3d 387, 400-01 (S.D.N.Y. 2019) (citing Chevron Corp. and dismissing all claims pursuant to Rule 12(b)(6); "the Court would have been

Chevron Corp. to include circumstances in which a court has rejected the Rule 12(b)(6)

arguments of defendants over whom it lacks personal jurisdiction.[31]

        This Court concludes that the California Court erred in "rul[ing] on the merits of

[this] case without . . . personal jurisdiction[] [over most of the Defendants]."  Sinochem Int'l.

Co. Ltd, 549 U.S. at 430-31.  That determination does not resolve Defendants' motions for

reconsideration, however.  Reconsideration and vacatur of the California Court's September 26,

2019 Order is warranted only if, inter alia, the court's error, if examined, "might reasonably be

expected to alter the conclusion" this court would reach.  In re BDC 56 LLC, 330 F.3d at 123.

**B.**      **Whether Defendants Have Demonstrated Prejudice Resulting from the**
         **California Court's Ruling on the Merits of their Rule 12(b)(6) Motions**

        Defendants argue that they were prejudiced by the California Court's September

26, 2019 Order because – had their motions been decided by this Court – Second Circuit and

New York law would have been applied, and under Second Circuit and New York law, their

motions to dismiss must be granted.  (See Ray Br. (Dkt. No. 272) at 16-18; Ambac Br. (Dkt. No.

274) at 22-25; Jefferies Br. (Dkt. No. 270) at 16-17; Marfatia Br. (Dkt. No. 268-1) at 10 n.4)

---

required [to] address those merits-based challenges in any event because they were raised by
other . . . parties over whom the Court indisputably has personal jurisdiction.  Accordingly, the
Court need not address [the other defendants'] Rule 12(b)(2) . . . motions.").

[31]  There is some tension between ONY, Inc. and Chevron Corp. on the one hand, and Supreme
Court precedent on the other.  As discussed above, the Supreme Court has unambiguously
instructed that a district court "is powerless to proceed to an adjudication" absent personal
jurisdiction, Ruhrgas AG, 526 U.S. at 584 (internal quotations and citation omitted), and
"generally may not rule on the merits of a case without first determining that it has . . . personal
jurisdiction[]."  Sinochem Int'l Co. Ltd., 549 U.S. at 430-31.  While the Supreme Court has
authorized lower courts to "take[] the less burdensome course" and dismiss a suit on, for
example, forum non conveniens grounds, "where  . . . personal jurisdiction is difficult to
determine," (id. at 436), it has done so only where the ground for dismissal is a "non-merits
ground."  Id. at 432 (internal quotation marks omitted); see also id. at 341 ("'[J]urisdiction is
vital only if the court proposes to issue a judgment on the merits.'" (quoting with approval Intec,
USA, LLC v. Engle, 467 F.3d 1038, 1041 (7th Cir. 2006))).  In any event, Plaintiffs' arguments
are plainly inconsistent with Supreme Court precedent.

Defendants' briefs raise the following issues under Second Circuit and New York law:  whether (1) they owed a fiduciary duty to Plaintiffs; (2) Plaintiffs' RICO claims are time-barred; (3) the PSLRA bars Plaintiffs' RICO claims; (4) Plaintiffs' RICO claims are adequately pled; and (5) the SAC engages in impermissible group pleading.

### 1.     Whether Defendants Owed Plaintiffs a Fiduciary Duty

#### a.     Fiduciary Duty Allegations and Plaintiffs' RICO Claims

Defendant Ray contends that the California Court erred in finding that the SAC sufficiently pleads a fiduciary relationship between Ray and the Projects.  (See Ray Br. (Dkt. No. 272) at 24-26 & 26 n.8 (asserting that under Second Circuit authority and New York law, "a fiduciary duty may not be implied in a commercial lending context absent an express agreement or an imbalance of power"))  Ray further argues that, because he did not owe Plaintiffs a fiduciary duty, their RICO claims likewise fail:  "[b]ecause Plaintiffs' theory of fraud is premised on omissions, Plaintiffs' [RICO] claims depend on their allegation that Defendants owed them a fiduciary duty."  (Id. at 24)

Defendants Ambac and the Jefferies Entities raise similar arguments.  Ambac asserts that "the RICO fraudulent scheme alleged as to the rating agencies turns on Ambac's alleged status as a fiduciary, . . . and the SAC fails to plead any theory under which Ambac had a fiduciary duty to disclose conversations with rating agencies (or to act in the projects' best interests when dealing with rating agencies) absent a fiduciary duty."  (Ambac Br. (Dkt. No. 274) at 28 (emphasis in original))  The Jefferies Entities maintain that, "[a]bsent a fiduciary duty running from any of the Jefferies Entities to a Plaintiff, the Plaintiffs cannot sustain a claim for fraud based upon the alleged failure to disclose . . . 'secret trading profits.'"  (Jefferies Br. (Dkt. No. 270) at 20)

The Court acknowledges, at the outset, that where a "case of fraud rest[s] on an alleged omission, plaintiff must allege facts giving rise to a duty to disclose." Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000), aff'd, 2 F. App'x 109 (2d Cir. 2001); see United States v. Szur, 289 F.3d 200, 211 (2d Cir. 2002) ("[W]hen dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose 'arises [only] when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" (quoting Chiarella v. United States, 445 U.S. 222, 228 (1980) (second and third alternations in Szur))).

Here, however, Plaintiffs do not proceed on a "theory of fraud premised on omissions" (see Ray Br. (Dkt. No. 272) at 25), at least insofar as Ray's conduct is concerned. The SAC instead pleads affirmative misrepresentations Ray and GMAC made to the private developers and to LaSalle. These alleged misrepresentations include that (1) Ray would use best efforts and act in good faith to negotiate credit enhancement with potential credit enhancers, and that Ray and GMAC had an arms' length relationship with Ambac; (2) there would be no credit enhancement at closing for those Projects at which the "stealth structure' was employed; (3) Ray and GMAC would syndicate loans post-closing; (4) interest rates on the Project loans would be set at market rate; (5) any savings from bond sales would be passed on to the Projects; and (6) OIDs were necessary for some of the Projects. (See, e.g., SAC (Dkt. No. 256) ¶¶ 22, 24, 28, 173-75, 179, 183, 185-86, 189-90, 193, 197, 199, 205, 207, 209, 213, 218) While the SAC also alleges a number of instances in which Defendants failed to disclose relevant information to the Projects, many of these allegations serve to demonstrate the falsity of representations Ray affirmatively made. In any event, where – as here – a plaintiff's "theory of fraud" is premised on

both affirmative misrepresentations and material omissions, a plaintiff need not plead or prove the existence of a fiduciary duty.[32]  See Szur, 289 F.3d at 211, 212 (defendants challenged their wire fraud convictions to the extent they were premised on a theory of material omissions; court concluded that while the Government had established a duty to disclose, the Government had also alleged and proven affirmative material misrepresentations, which was sufficient standing alone to sustain defendants' fraud conviction).

As to Ambac, it contends that "the RICO fraudulent scheme alleged as to the rating agencies turns on Ambac's alleged status as a fiduciary."  (See Ambac Br. (Dkt. No. 274) at 28)  The SAC alleges, however, that Ambac affirmatively misrepresented to private developers and to LaSalle that Marfatia and Ambac would act in the "Project[s'] best interests to obtain the highest possible rating from the rating agencies."  (See SAC (Dkt. No. 256) ¶¶ 166-72) While the SAC also alleges that Marfatia and Ambac failed to disclose material information to the Projects (see, e.g., id. ¶¶ 220-32 (describing "stealth structure" and Ambac's efforts to conceal its role in the Projects at which the alleged "stealth structure" was utilized)), this Court cannot ignore the SAC's allegations regarding affirmative misrepresentations.

The SAC also pleads that the Jefferies Entities made affirmative misrepresentations (see id. ¶¶ 213, 234), if only in connection with the post-2009 Projects in which Jefferies took part.

---

[32]  Where a fraud claim rests primarily on alleged omissions, a court might, of course, properly focus on the sufficiency of the omissions-based allegations in ruling on a motion to dismiss.  See Miller v. Hyundai Motor America, No. 15 Civ. 4722 (TPG), 2017 WL 4382339, at *7 (S.D.N.Y. Sept. 29, 2017) ("While the FAC alleges both affirmative misrepresentations and material omissions, plaintiffs are correct to point out that their allegations are largely omission-based. Indeed, the heart of the plaintiffs' allegations is [Defendant's] active and intentional concealment of [a] claimed defect." (internal citation omitted)).  This is not such a case, however.

In any event, to plead sufficiently the predicate racketeering acts of mail and wire fraud, "plaintiffs need not allege that each defendant itself made a misrepresentation as long as they allege sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud." Williams v. Equitable Acceptance Corp., 443 F. Supp. 3d 480, 492 (S.D.N.Y. 2020); see id. ("The mail and wire fraud statutes only require that the scheme, in which [a defendant] allegedly participated with knowledge or intent, contain a material misrepresentation, not that [each defendant] made [a] misrepresentation by itself."); Shapo v. O'Shaughnessy, 246 F. Supp. 2d 935, 969 (N.D. Ill. 2002) ("It is irrelevant that [a defendant] may have made no misrepresentations himself. '[U]nder the mail fraud statute, . . . [a] defendant need only participate in a scheme to defraud.'" (quoting Taylor v. Bob O'Connor Ford, Inc., No. 97 C 0720, 1998 WL 177689, at *16 (N.D. Ill. Apr. 13, 1998))); Taylor, 1998 WL 177689, at *16 ("[A] defendant does not have to make a misrepresentation or omission himself in order to be liable. . . . The question is whether the complaint permits an inference that [a defendant] participated in the scheme to defraud with knowledge of the scheme's fraudulent intent and with the intent that its illicit objectives be achieved.").

Here, the SAC "allege[s] sufficient facts [to] show[] each [of these] defendant[s'] knowing or intentional participation in the scheme to defraud," Equitable Acceptance Corp., 443 F. Supp. 3d at 492, even absent affirmative misrepresentations on their part. (See, e.g., SAC (Dkt. No. 256) ¶¶ 25, 157, 233-36) Accordingly, Plaintiff's RICO claims do not turn on whether one or more of the Defendants owed Plaintiffs a fiduciary duty.

### b.    Fiduciary Duty Allegations and Plaintiffs' State Law Claims

Several of Plaintiffs' state law claims – including breach of fiduciary duty and aiding and abetting breach of fiduciary duty – require proof of a fiduciary relationship.

Defendants Ray, Ambac, and the Jefferies Entities contend that the California Court erred in determining that the SAC sufficiently pleads that a fiduciary relationship existed between them and Plaintiffs.

Some of Defendants' arguments turn on the application of New York law, and on alleged differences between California law and New York law in pleading the existence of a fiduciary duty. (See Ray Reply Br. (Dkt. No. 297) at 11 (arguing that "Plaintiffs' fiduciary-duty claims fail" because they do not plausibly allege a fiduciary relationship between Ray and the Projects under New York law)) Defendants do not explain why New York law applies to Plaintiffs' state law claims. Instead, they appear to assume that because this action was transferred to the Southern District of New York, New York law automatically applies to Plaintiffs' state law claims.[33]

While it is true that "[w]hen [an] action [that] could not have been maintained in the transferor court [is transferred], the applicable law, including choice of law rules, is the state law of the transferee court," Cohain v. Klimley, No. 08 CIV 5047 PGG, 2010 WL 3701362, at *13 (S.D.N.Y. Sept. 20, 2010) (internal quotation marks and citations omitted), aff'd sub nom. Sissel v. Rehwaldt, 519 F. App'x 13 (2d Cir. 2013), it does not follow that application of New York's choice of law rules will invariably lead to the application of New York substantive law to the parties' dispute. "New York courts have adopted a flexible choice of law approach and 'seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.'" White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir. 2006)

---

[33]  As to this point, the Jefferies Entities and the remaining Defendants are not similarly situated. The Jefferies Entities argued before the California Court that New York law applied to Plaintiffs' claims against them, because the contracts governing their relationship with Plaintiffs contain New York choice of law provisions. (See Jefferies Mot. to Dismiss FAC (Dkt. No. 63) at 37-38)

(quoting Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997)).

Defendants do not explain why New York has "the most significant interest in, or relationship

to," the disputes at issue in this case.[34]

        Despite these circumstances, this Court will apply New York law to Plaintiffs'

fiduciary duty claims, because both sides cite to New York law,[35] and because Plaintiffs have not

meaningfully contested the applicability of New York law.[36]

---

[34]  While this case was proceeding in the Northern District of California and was governed by
California choice of law rules – which "are similar to those of . . . New York" in that they
require, "in tort cases[,] appl[ication of] the law of the state whose interests would be more
impaired if not applied," In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139,
150 (S.D.N.Y. 2008) (citing Tucci v. Club Mediterranee, S.A., 107 Cal. Rptr. 2d 401, 407
(2001) – Defendants questioned whether California law governed Plaintiffs' state law claims,
but ultimately – save the Jefferies Entities – did not dispute the application of California law.
(See, e.g., Marfatia Mot. to Dismiss FAC (Dkt. No. 62) at 15 (noting that there were "18 states
whose laws might conceivably apply to Plaintiffs' common-law claims," but assuming that
California law applied); Jefferies Mot. to Dismiss FAC (Dkt. No. 63) at 22-23 (asserting that
"Plaintiffs' state law claims implicate at least twelve states' laws because each Plaintiff's claim
is likely governed by the law of the state where its associated Project is situated," but assuming
application of California law except as to breach of fiduciary duty claims contractually governed
by New York law); Jt. Mot. (Dkt. No. 223) at 28 (asserting that Plaintiffs "fail to explain why
California law should apply to their claims against the Defendants notwithstanding contrary
choice of law provisions in many of the operative contracts," but assuming application of
California law))  Having chosen not to ask the California Court to conduct a choice of law
analysis – even after the California Court flagged the choice of law issue (April 12, 2018
Hearing Tr. (Dkt. No. 143) at 9) – and having chosen not to dispute the application of California
law to Plaintiffs' state law claims, Defendants cannot plausibly complain that they were unfairly
prejudiced by the California Court's application of California law rather than New York law.
[35]  Where "[t]he parties' briefs assume that New York substantive law governs the issues . . .
presented[,] . . . such implied consent is, of course, sufficient to establish the applicable choice of
law."  Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 514 n.4 (2d Cir. 2001); see DeBlasio v.
Merrill Lynch & Co., Inc., No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *19 n.14 (S.D.N.Y.
July 27, 2009) (applying New York law to common-law fraud claims based on the parties'
reliance on New York law); Corbett v. Firstline Sec., Inc., 687 F. Supp. 2d 124, 128 (E.D.N.Y.
2009) (applying New York law where "both parties cite exclusively to New York . . . law in their
argument").
[36]  Plaintiffs observe that "Defendants cite a host of New York law cases, without any analysis of
why New York fiduciary duty law (as opposed to the law of the states where the Plaintiff
Projects are located) should apply."  (Pltf. Opp. (Dkt. No. 286) at 31)  Plaintiffs' opposition brief

i.      **Defendant Ray**

Defendant Ray contends that the California Court erred in concluding that the

SAC sufficiently pleads a fiduciary relationship between himself and Plaintiffs, because "'[a]s a

general matter, a lender is not a fiduciary of its borrower under New York law.'"  (Ray Br. (Dkt.

No. 272) at 24 (quoting CIT Bank, N.A. v. Nwanganga, 328 F. Supp. 3d 189, 200 (S.D.N.Y.

2018)))  According to Ray, "courts in the Second Circuit have held that a fiduciary duty may not

be implied in a commercial lending context absent an express agreement or an imbalance of

power – neither of which Plaintiffs have, or could have, alleged here."  (Id. at 25)[37]

Under New York law, "[a] fiduciary relationship arises between two persons [or

entities] when one of them is under a duty to act for or to give advice for the benefit of another

upon matters within the scope of the relation. . . . Put differently, '[a] fiduciary relation exists

when confidence is reposed on one side and there is resulting superiority and influence on the

other.'"  Roni LLC v. Arfa, 18 N.Y.3d 846, 848 (2011) (quoting AG Cap. Funding Partners, L.P.

v. State St. Bank & Trust Co., 11 N.Y.3d 146, 158 (2008)) (internal quotation marks omitted).

Because "'[t]he core of a fiduciary relationship is a higher level of trust than [is] normally

present in the marketplace between those involved in arms' length business transactions,'"

Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A., 14 F. Supp. 3d 191, 206 (S.D.N.Y. 2014)

(quoting Faith Assembly v. Titledge of N.Y. Abstract, LLC, 106 A.D.3d 47, 62 (2d Dept. 2013)),

"[a]s a general matter, a lender is not a fiduciary of its borrower under New York law."  Iannuzzi

_____

cites to New York law, however, and Plaintiffs do not set forth or analyze the law of any other
state.  (See id. at 31-32)

[37]  To the extent Ray suggests he was unfairly prejudiced by the California Court's application of
California law instead of New York law (see Ray Br. (Dkt. No. 272) at 10-11), as noted above,
that argument is not persuasive in light of Ray's failure to challenge application of California law
before the California Court.

v. Am. Mortg. Network, Inc., 727 F. Supp. 2d 125, 138 (E.D.N.Y. 2010); see Mfrs. Hanover Tr.

Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993) ("Under New York law, the usual relationship of

bank and customer is that of debtor and creditor and does not create a fiduciary relationship

between the bank and its borrowers. . . ." (internal quotation marks and citations omitted)).

        That "general" rule is subject to exceptions, however, and "a plaintiff may

successfully allege a fiduciary duty between such parties if it 'show[s] special circumstances that

transformed the parties' business relationship to a fiduciary one.'"  Mosdos Chofetz Chaim, Inc.,

14 F. Supp. 3d at 207 (quoting Legend Autorama, Ltd. v. Audi of Am., Inc., 100 A.D.3d 714,

717 (2d Dept. 2012)); see also Delgado v. Ocwen Loan Servicing, LLC, No. 13-CV-4427 NGG

RML, 2014 WL 4773991, at *24 (E.D.N.Y. Sept. 24, 2014) ("Facts demonstrating a closer than

arms-length relationship . . . may be sufficient to create a fiduciary duty." (citing, inter alia,

Universal-MCA Music Publ'g v. Bad Boy Entm't, Inc., No. 601935/02, 2003 WL 21497318, at

*5 (N.Y. County Sup. Ct. June 18, 2003) ("Plaintiffs point out that [defendant] was acting in

several capacities in the transactions between the parties. . . . That [he] occupied several

positions . . . presents features of 'special circumstances' and 'peculiar facts' that sufficiently

gives rise to the allegation that the parties' relations were transformed from an ordinary business

relationship into a fiduciary relationship.")))).

        Moreover, "a claim alleging the existence of a fiduciary duty usually is not

subject to dismissal under Rule 12(b)(6)," Abercrombie v. Andrew Coll., 438 F. Supp. 2d 243,

274 (S.D.N.Y. 2006), because "ascertaining the existence of a fiduciary relationship inevitably

requires a fact-specific inquiry."  Mosdos Chofetz Chaim, Inc., 14 F. Supp. 3d at 208 (internal

quotation marks, alteration, and citation omitted); see also Musalli Factory For Gold & Jewellry

v. JPMorgan Chase Bank, N.A., 261 F.R.D. 13, 26 (S.D.N.Y. 2009) ("New York courts

generally avoid dismissing a claim of breach of fiduciary duty under Rule 12(b)(6) because it usually involves a question of fact:  whether someone reposed trust and confidence in another who thereby gains a resulting superiority or influence."), aff'd sub nom. Musalli Factory for Gold & Jewelry Co. v. JPMorgan Chase Bank, N.A., 382 F. App'x 107 (2d Cir. 2010).

Here, the SAC alleges that Ray, "[i]n order to set himself [and GMAC] apart from" other financial institutions seeking to act as loan originators for military housing projects, "expressly solicited in writing" that he and GMAC would provide "fiduciary services . . . distinct and separate from the more traditional investment banker services they [would] provide[] as lender."  (SAC (Dkt. No. 256) ¶¶ 93-95 (internal quotation marks omitted))  "As financial advisor," rather than merely as lender, "Ray and GMAC agreed to act as the Projects' agent in providing 12 broad categories of services, including negotiation of surety bonds and [debt-service reserve] requirements, rating agency coordination, legal counsel with respect to key documents, negotiating term loans, and . . . run[ning] an 'open book auction' to determine the market credit spread."  (Id. ¶ 95 (emphasis removed and capitalizations altered))  Moreover, "Ray rep[ea]ted these same financial advisor fiduciary duty representations at each of the MHPI Projects."  (Id. ¶ 96; see also ¶¶ 102-06, 107-09, 111-14, 116-19, 121-23, 125-28, 130-33, 135, 137-38, 140, 142-43, 149, 152-54, 156 (describing Ray's representations to the Projects)), and the Projects relied on these representations in agreeing to work with Ray.  (See id. ¶¶ 101, 106, 110, 115, 120, 124, 129, 134, 139, 144, 148, 151, 155, 162; see also id. ¶ 126 (alleging that one private developer – associated with eight of the Projects – "developed spreadsheets that evaluated Ray and GMAC against their investment bank competitors," and recorded "a value-add to selecting Ray and GMAC over other competitors," because Ray and GMAC would "serve as a 'Financial Advisor,'" while "[n]o other competitor offered to serve in this . . . role"))

These allegations are sufficient to plead "special circumstances" that may give rise to a fiduciary relationship.  See Iannuzzi v. Wash. Mut. Bank, No. 07-CV-964 (JFB) (WDW), 2008 WL 3978189, at *8-9 (E.D.N.Y. Aug. 21, 2008) (acknowledging that "New York courts have generally held that a fiduciary duty does not exist between mortgage brokers and borrowers," but holding that "at the motion to dismiss stage, [plaintiff's breach of fiduciary duty] claim cannot be dismissed [in light of] allegations . . . that [the defendant] acted beyond the scope of a mortgage broker").

Ray's arguments to the contrary are not persuasive.  Ray argues that because the loan agreements for the Projects do not mention or purport to create a fiduciary relationship, no such relationship can be asserted.  (See Ray Br. (Dkt. No. 272) at 24 n.7)  While it is true that "[g]enerally, where parties have entered into a contract, courts look to that agreement to discover the nexus of the parties' relationship," EBC I, Inc. v. Goldman, Sachs & Co. 5 N.Y.3d 11, 19-20 (2005) (internal quotation marks, citation, and alterations removed), it nevertheless "is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation[ship]."  Id. at 20 (internal quotation marks and citation omitted); Mosdos Chofetz Chaim, Inc., 14 F. Supp. 3d at 207 (same); see also Conte v. U.S. All. Fed. Credit Union, 303 F. Supp. 2d 220, 228 (D. Conn. 2004) ("New York courts have made clear that 'it is not mandatory that a fiduciary relationship be formalized in writing,' and 'the ongoing conduct between the parties may give rise to a fiduciary relationship that will be recognized by the courts,' regardless of the contractual relationship." (quoting Wiener v. Lazard Freres & Co., 241 A.D.2d 114, 122 (1st Dept. 1998))) Moreover, as the California Court noted, "Plaintiffs' theory . . . is that Ray and GMAC were acting as their fiduciaries during the negotiation of th[e] loan agreements, and parallel to those

41

agreements.  Thus, the fact that the loan agreements themselves did not impose fiduciary duties on Defendants is not dispositive."  (September 26, 2019 Order (Dkt. No. 261) at 13)

Ray also contends that "special circumstances" can only exist in "limited circumstances where there is an imbalance of power or information," such as where there is "control by one party for the good of the other"; an agency relationship; or "circumstances that render the client dependent," such as impaired faculties or a lack of sophistication.  (Ray Br. (Dkt. No. 272) at 26 (internal quotation marks and citations omitted)).  But courts have made clear that "the 'exact limits' of what constitutes a fiduciary relationship are impossible of statement,'" and that "a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'"  United Features Syndicate, Inc. v. Miller Features Syndicate, Inc., 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting Penato v. George, 52 A.D.2d 939, 942 (2d Dept. 1976)); see also Iannuzzi, 727 F. Supp. 2d at 137 ("The determination whether a fiduciary duty exists cannot be determined 'by recourse to rigid formulas.'" (quoting Scott v. Dime Sav. Bank, 886 F. Supp. 1073, 1078 (S.D.N.Y. 1995)).  Here, the SAC's allegations give rise to an inference that "influence [was] acquired and abused" by Ray, and that the "confidence . . . reposed [in him was] betrayed." United Features Syndicate, Inc. 216 F. Supp. 2d at 218 (internal quotation marks and citation omitted).

Accordingly, this Court finds no basis to disturb the California Court's determination that the SAC adequately pleads a fiduciary relationship between Ray and the Projects.

ii.     **Defendant Ambac**

Ambac argues that the SAC does not plead a fiduciary relationship between
Ambac and the Projects, and that the California Court erred in denying its motion to dismiss
Plaintiff's breach of fiduciary claim.  According to Ambac, in making this determination, the
California Court relied exclusively on "the actions and representations of . . . Ray, GMAC, and
Jefferies."  (Ambac Br. (Dkt. No. 274) at 28; see also Ambac Reply Br. (Dkt. No. 296) at 14)

In asserting that a fiduciary relationship existed between Ambac and the Projects,
the SAC pleads that Ambac, through Marfatia, orally represented to the private developers and
LaSalle – as to each of the six Projects that closed prior to 2005 – that Ambac "would act in [the
Projects'] best interest to obtain the highest possible rating from the ratings agencies," and would
"operate as [the Projects'] fiduciary and agent."  The SAC also alleges that it was in each
Project's best interest to obtain the highest possible rating, because that would minimize the
interest costs and the need for credit enhancement.  (See SAC (Dkt. No. 256) ¶¶ 163, 166-72)
These bare allegations, repeated largely in haec verba through six paragraphs of the SAC, lack
any detail or substance regarding the oral representations Marfatia and Ambac allegedly made to
the Projects, and the basis for the Projects' allegedly reasonable reliance on these unspecified
oral representations.  These allegations are not sufficient to plausibly allege a fiduciary
relationship.  See DeBlasio, 2009 WL 2242605, at *30 (holding that plaintiff customers had not
sufficiently pled a fiduciary relationship between themselves and various financial institutions
that had represented that they would act in customers' "best interests"; "fiduciary relationships . .
. are personal and context-specific.  In order to survive a motion to dismiss a claim for breach of
fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with
sufficient particularity to enable the court to determine whether, if true, such facts could give rise

1 Case 1:19-cv-09193-PGG-SLC   Document 311   Filed 03/31/21   Page 44 of 84

to a fiduciary relationship." (internal quotation marks, citations, and brackets omitted)); see also
Holloway v. King, 361 F. Supp. 2d 351, 361 (S.D.N.Y. 2005) (dismissing breach of fiduciary
duty claim where plaintiffs made "conclusory allegations of a 'special relationship,' 'complete
trust and confidence,' and a belief by the plaintiffs that [defendant] 'would look solely to
advance and protect the financial interests of all [other parties to a revenue sharing agreement
involving a professional boxer's promotional and management team]'"), aff'd, 161 F. App'x 122
(2d Cir. 2005); La. Mun. Police Emp. Ret. Sys. v. JPMorgan Chase & Co., No. 12 CIV. 6659
DLC, 2013 WL 3357173, at *15 (S.D.N.Y. July 3, 2013) ("defendant's representations that they
would execute certain transactions in a manner designed to ensure the best possible results for
their clients is insufficient to create a fiduciary relationship between the parties"); Abercrombie,
438 F. Supp. 2d at 275 ("conclusory allegations of a 'special relationship,' [and] 'complete trust
and confidence' are insufficient to state a claim of a fiduciary duty" (collecting cases) (quotation
marks and citation omitted)).

       Moreover, the SAC's allegations are irrelevant to the nine Projects that closed in
2005 or later, as the SAC pleads that – by 2005 – Ray, GMAC, and Ambac sought to conceal
Ambac's role in the Projects.  (See SAC (Dkt. No. 256) ¶ 23; see also id. ¶ 166 (alleging that
Ambac's representations that it would work to obtain the highest possible rating from the rating
agencies was made to Projects "which closed prior to the development of the 'stealth
structure'"))

       Because the SAC does not plead sufficient facts to plausibly demonstrate that a
fiduciary relationship existed between the Projects and Ambac/Marfatia, the breach of fiduciary
duty claim against Ambac and Marfatia will be dismissed.  Any aiding and abetting claim
premised on Ambac and Marfatia's alleged breach of fiduciary duty will likewise be dismissed.

### iii.    **Jefferies Entities**

The Jefferies Entities argue that the California Court, in denying their motion to dismiss Plaintiffs' breach of fiduciary duty claim, "ignor[ed] the express fiduciary disclaimers to which the only conceivably relevant Plaintiffs agreed."  (Jefferies Br. (Dkt. No. 270) at 18)  The SAC acknowledges that Jefferies Mortgage entered into agreements, in connection with the Fort Sill Project and Fort Bliss Project additional financing, in which Jefferies Mortgage "disclaim[ed] a financial advisor or fiduciary relationship role [in relation] to Plaintiffs Sill Housing LLC in 2010 and Fort Bliss/White Sands Missile Range Housing LP."  (SAC (Dkt. No. 256) ¶¶ 10, 160)[38]  The Jefferies Entities maintain that these disclaimers preclude Plaintiffs from now pleading that any of the Jefferies Entities owed Plaintiffs a fiduciary duty.

As an initial matter, the disclaimers as written apply only to Jefferies Mortgage, and not to the three other Jefferies Entities.  That fact is significant, because Ray was employed by Jefferies & Co., Inc. – and not Jefferies Mortgage – at the time of the Fort Sill Project and Fort Bliss Project additional financing.  (See id. ¶ 57)  As discussed above, the SAC sufficiently pleads that Ray owed a fiduciary duty to Plaintiffs.  Moreover, the SAC alleges that when one of the Jefferies Entities purchased Ray's military housing business, Ray was hired by Jefferies & Co., and "Ray and Jefferies, at [Ray's] direction, continued to act as a financial advisor, and to

---

[38]  The Jefferies Entities represent that the disclaimers read as follows:

> (i) "[Jefferies Mortgage] will not be the agent or fiduciary of the Company or the Borrower or their respective members, stockholders, creditors, employees, or any other party"; (ii) "[Jefferies Mortgage] shall not assume an advisory or fiduciary responsibility in favor of the Company or the Borrower (irrespective of whether Jefferies has advised or is currently advising the Company or the Borrower on other matters)"; and (iii) "[Jefferies Mortgage] and its affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company or the Borrower."

(Jefferies Br. (Dkt. No. 270) at 18)

assure the developers and the Army that his role . . . remained the same." (Id. ¶ 10)  After

joining Jefferies, "Ray continued his trusted role as financial advisor with the Projects," and did

so "[w]ith the knowledge and consent of those at Jefferies to whom Ray reported." (Id. ¶ 25)

Based on these facts, the SAC pleads that "Jefferies . . . [is] liable for the tortious and fraudulent

conduct of Ray . . . ." (Id. ¶ 243)  In sum, there is no basis at this stage of the proceedings to

extend the disclaimers cited by the Jefferies Entities beyond Jefferies Mortgage.

           As to Jefferies Mortgage, the Court acknowledges that ordinarily "no fiduciary

duty is owed" under New York law "where explicit contractual disclaimers of fiduciary duty

apply." LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC, 10 F. Supp. 3d 504, 523 (S.D.N.Y.

2014).  As discussed below, however, the SAC pleads facts suggesting that Ray acted as an

agent not only of the Jefferies Entity that formally employed him – Jefferies & Co., Inc. – but

also of Jefferies Mortgage. (See SAC (Dkt. No. 256) ¶¶ 159, 213; August 6, 2010 email (Dkt.

No. 229-2))  Given that the SAC adequately pleads that Ray owed and breached fiduciary

obligations to Plaintiffs, it is plausible that Jefferies Mortgage could be vicariously liable for

Ray's alleged breach of his fiduciary obligations.  The SAC explicitly pleads vicarious liability

as to the Jefferies Entities. (SAC (Dkt. No. 256) ¶¶ 240, 242-43)  And "[i]n New York, 'an

employer may be vicariously liable for the tortious acts of its employees . . . if those acts were

committed in furtherance of the employer's business and within the scope of employment.'"

A.W. by E.W. v. New York Dep't of Educ., No. 19-CV-7011 (MKB), 2021 WL 611409, at *7

(E.D.N.Y. Feb. 16, 2021) (citations omitted); see also In re Ivan F. Boesky Sec. Litig., 36 F.3d

255, 265 (2d Cir. 1994) (discussing New York respondeat superior doctrine in the context of

breach of fiduciary duty claims; noting that "[a]n employer may be liable for [tortious] acts

committed by its employee, [so long as] those acts . . . in some way further the interests of the

employer, and not solely benefit the employee").  Although Defendants cite cases for the proposition that fiduciary disclaimers bar breach of fiduciary duty claims, they do not address the SAC's allegations that the Jefferies Entities may be vicariously liable for Ray's alleged misconduct.

Finally, the SAC pleads that Jefferies Mortgage and Ray procured the Projects' agreement to the disclaimers of fiduciary duty by fraud.  (SAC (Dkt. No. 256) ¶ 160)  The Jefferies Entities have not meaningfully addressed the effect of that allegation on the enforceability of the disclaimers.

For all these reasons, the Jefferies Entities have not shown that the California Court erred in denying their motion to dismiss Plaintiffs' breach of fiduciary claim against them.

### 2.    Statute of Limitations

Defendants contend that the SAC's RICO claims – when analyzed under Second Circuit precedent – are time-barred.  (See Ray Br. (Dkt. No. 272) at 18-20)

"The statute of limitations for a civil RICO claim is four years."  Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (citations omitted).  The Second Circuit "applie[s] a discovery accrual rule" in RICO cases, "under which the limitations period begins to run 'when the plaintiff discovers or should have discovered the RICO injury'" – that is, when "'the plaintiff has actual or inquiry notice of the injury.'"  Id. (brackets omitted) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 58, 60 (2d Cir. 1998)).

"[A] duty to inquire is triggered by information that 'relates directly to the misrepresentations and omissions the [p]laintiffs later allege in their action against the defendants.'"  Id. (quoting Newman v. Warnaco Grp., 335 F.3d 187, 193 (2d Cir. 2003)).  "The duty of inquiry results in the imputation of knowledge . . . in two different ways, depending on

whether the [plaintiff] undertakes some inquiry." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003). If a plaintiff makes "some inquiry," a court "will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud." Cohen, 711 F.3d at 362 (internal quotation marks and brackets omitted) (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)). Where "the plaintiff makes no inquiry once the duty to inquire arises, 'knowledge will be imputed as of the date the duty arose.'" Id. at 361-62 (quoting Lentell, 396 F.3d at 168).

"'[D]etermining whether a plaintiff had sufficient facts to [be] . . . on inquiry notice is often inappropriate for resolution on a motion to dismiss.'" De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 296 (S.D.N.Y. 2013) (quoting Cohen, 711 F.3d at 362). Nevertheless, "'the Second Circuit has found dismissal appropriate where the facts needed for determination of when a reasonable plaintiff of ordinary intelligence would have been aware of the existence of a fraud can be gleaned from the papers integral to the complaint.'" Id. (brackets omitted) (quoting Cohen, 711 F.3d at 362).

The standards applicable in the Second Circuit are similar to those applied in the Ninth Circuit. See Pincay v. Andrews, 238 F.3d 1106, 1108-09 (9th Cir. 2001) (acknowledging that "[t]he statute of limitations for civil RICO actions is four years" and stating that the Ninth Circuit "ha[s] continuously followed the 'injury discovery' statute of limitations rule for civil RICO claims. Under this rule, 'the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action'" (internal citation omitted) (quoting Grimmett v. Brown, 75 F.3d 506, 510 (9th Cir. 1996))); Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 365 (9th Cir. 2005) ("RICO claims accrue[] when

Plaintiffs had actual or constructive knowledge of [a defendant's] fraud . . . . 'The plaintiff is deemed to have had constructive knowledge if it had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud.'" (quoting <u>Pincay</u>, 238 F.3d at 1110)); <u>see</u> <u>also</u> September 26, 2019 Order (Dkt. No. 261) at 10-11 (same).[39]

       Defendants point to two aspects of the California Court's statute of limitations analysis that "would [not] pass muster in the Second Circuit."  (Ray Br. (Dkt. No. 272) at 19)  The first concerns the California's conclusion that Plaintiffs are permitted to "omit[] [their] prior allegations that [LaSalle] observed GMAC's preference for using Ambac for credit enhancement in 2005." (September 26, 2019 Order (Dkt. No. 261) at 13)  The second concerns the California Court's conclusion that Plaintiffs sufficiently plead fraudulent concealment.  (<u>Id.</u> at 14-15)

       As to the omission of the FAC's allegation that LaSalle had noticed GMAC's preference for using Ambac, Defendants maintain that "in this Circuit a plaintiff may not wholesale omit facts in a successive pleading that would act as a bar to their claims."  (Ray Br. (Dkt. No. 272) at 19)  There is no such clear rule in this Circuit, however.  Indeed, some courts have ruled that "a prior inconsistent pleading should not trump a Court's obligation under Rule

---

[39]  Marfatia argues that the two Circuits employ different standards for inquiry notice.  (<u>See</u> Marfatia Reply (Dkt. No. 293) at 12)  This Court acknowledges that the standards are not identical.  For example, the Second Circuit, unlike the Ninth Circuit, imputes knowledge to plaintiffs who are put on inquiry notice – but who make no inquiry – as of the date the duty to inquire arose, even if inquiry at that point may not have led to discovery of the full extent of the fraud.  <u>See</u> <u>Cohen</u>, 711 F.3d at 361-62; <u>McNeil-Coward v. Palterovich</u>, 416 F. Supp. 3d 236, 242 n.3 (E.D.N.Y. 2018) (citing <u>Cohen</u> and noting that the statute of limitations on a RICO claim begins to run where events "arguably should have alerted Plaintiffs that something was afoot," "even where the full extent of the RICO scheme is not discovered until a later date" (internal quotation marks and citations omitted)).

The differences between the standards applied in the two circuits are not material for purposes of the statute of limitations analysis here, however, both because the SAC alleges that Plaintiffs undertook "some inquiry," and because – as discussed below – the California Court's ruling does not violate Second Circuit standards.

12(b)(6) to accept a complaint's allegations as true."  Palm Beach Strategic Income, LP v. Salzman, No. 10 Civ. 261 JS AKT, 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011), aff'd, 457 F. App'x 40 (2d Cir. 2012); see Phillips v. City of Middletown, No. 17 Civ. 5307 (CS), 2018 WL 4572971, at *4 (S.D.N.Y. Sept. 24, 2018) (noting that amended complaint omitted allegations in original complaint that undermined excessive force claim; concluding that "because Plaintiff has filed the Amended Complaint, the Court will not import information from the original Complaint"); Xie v. JPMorgan Chase Short-Term Disability Plan, No. 15 Civ. 4546 (LGS), 2016 WL 3963113, at *3 (S.D.N.Y. July 20, 2016) ("[a]lthough the change in the Complaint – to a date by which Plaintiff would have completed ninety days of work before taking leave [and thus would have been eligible for certain benefits] – raises doubt, at the motion to dismiss stage the truthfulness of the allegations is assumed, and any attempt to use Plaintiff's prior pleadings against her as an admission is premature"); see also Tho Dinh Tran v. Alphonse Hotel Corp., 281 F.3d 23, 32 (2d Cir. 2002) ("The defendants argue that the district court's findings with respect to the plaintiff's hours are contradicted by earlier statements the plaintiff made in his pleadings. . . . However, the plaintiff's first amended complaint was withdrawn prior to the trial and replaced with a second amended complaint that did not specify the number of hours the plaintiff worked. . . . A statement in a withdrawn complaint that is superseded by an amended complaint without the statement is no longer a conclusive judicial admission."), overruled on other grounds by Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006).

In sum, "[c]ourts in this circuit have taken various approaches to dealing with allegations in an amended complaint that directly contradict allegations set forth in a prior version of the complaint."  Robles v. Medisys Health Network, Inc., No. 19 Civ. 6651 (ARR) (RML), 2020 WL 3403191, at *4 (E.D.N.Y. June 19, 2020); compare Phillips, 2018 WL 452971,

at *4 with Colliton v. Cravath, Swaine & Moore LLP, No. 08 CIV 0400 (NRB), 2008 WL

4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (relying on facts alleged in original complaint rather

than in amended pleading, because "[w]here a 'plaintiff blatantly changes his statement of the

facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the

facts set forth in his original complaint,' a court is authorized 'to accept the facts described in the

original complaint as true'" (quoting Wallace v. New York City Dep't of Corr., No. 95 Civ.

4404, 1996 WL 586797 (SJ), at *2 (E.D.N.Y. Oct. 9, 1996))), aff'd, 356 F. App'x 535 (2d Cir.

2009).

        The case law cited by Defendants (see Ray Br. (Dkt. No. 272) at 19) does not

demonstrate any absolute prohibition on omitting facts in a subsequent pleading that were pled in

an earlier pleading, even where the omission is in response to a dismissal argument.

        Wallace v. New York City Department of Corrections, No. 95 Civ. 4404, 1996

WL 586797 (SJ), at *2 (E.D.N.Y. Oct. 9, 1996), simply evinces one of the "various approaches"

district courts have taken to addressing inconsistent pleadings.  See Robles, 2020 WL 3403191,

at *4.  In any event, Wallace involves a "direct[] contradict[ion of] the facts set forth in [the]

original complaint."  Wallace, 1996 WL 586797, at *1-2 (complaint pled that it was "not the

standard practice" of jail, and an "aberration from the usual routine," to have housing unit

secured by one guard rotating between two units; amended complaint pled that the rotation of

one guard between two units was the jail's policy).  Plaintiffs' omission does not involve a

similar direct contradiction.

        Intellivision v. Microsoft Corp. 484 F. App'x 616 (2d Cir. 2012), is not

precedential authority, see Hoefer v. Bd. of Educ. of the Enlarged City Sch. Dist. of Middletown,

820 F.3d 58, 65 (2d Cir. 2016) ("[A]n unpublished summary order[] is not precedential."), and

cannot justify reconsideration.  Hastings Dev., LLC v. Evanston Ins. Co., No.

14CV6203ADSAKT, 2016 WL 3632708, at *4 (E.D.N.Y. June 29, 2016) ("[C]ourts in this

Circuit have repeatedly denied motions for reconsideration that are based on unpublished

summary orders.").  In any event, Intellivision does not involve a mere omission of an allegation

in a subsequent pleading.  In that case, "[f]rom the filing of the complaint until two months after

Microsoft filed its summary judgment motion, plaintiffs represented that the real party in interest

was Intellivision."  In opposing Microsoft's motion for summary judgment, however, plaintiffs

argued the opposite.  Intellivision, 484 F. App'x at 619-20.

   And in Austin v. Ford Models, Inc., 149 F.3d 148, 155 (2d Cir. 1998), abrogated

on other grounds by Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002), the Second Circuit

held that a district court did not abuse its discretion in denying a motion for leave to file a second

amended complaint that omitted admissions in the prior pleading, "on the basis that [plaintiff]

could not by th[o]se omissions 'erase[]' the admissions in her first amended complaint."  Id.

While "a court may deny leave to amend a complaint when a plaintiff seeks to omit certain

allegations or raise allegations that directly contradict those in a prior version of the complaint,"

this is a "distinct[ ]matter" from whether a court can ignore statements omitted from an amended

pleading once that pleading is filed.  See Robles, 2020 WL 3403191, at *4; Phillips, 2018 WL

4572971, at *4 ("'While courts are free to deny leave to amend a complaint if the proposed

amended complaint attempts to omit certain previously alleged facts without adequate

explanation or in bad faith, once an amended pleading is filed, a court may not import

information that was contained in the prior pleading but omitted from the amended pleading.'"

(quoting Kilkenny v. Law Office of Cushner & Garvey, L.L.P., No. 08 Civ. 588 (KMK), 2012

WL 1638326, at *5 (S.D.N.Y. May 8, 2012))).[40]  In sum, Defendants have not demonstrated that the California Court, in analyzing their statute of limitations arguments without reference to the FAC's allegations concerning LaSalle's 2005 observations, violated Second Circuit precedent.

        In any event, even if the omitted allegations were considered, they are not sufficient to demonstrate – at this stage of the proceedings – that Plaintiffs were on inquiry notice so as to commence the running of the limitations period.  Assuming arguendo that LaSalle's "observ[ation] [in 2005] that GMAC seemed partial to using Ambac for credit enhancement" (FAC (Dkt. No. 60) ¶ 21) triggered Plaintiffs' "duty to inquire," see Cohen, 711 F.3d at 361, Plaintiffs' allegation that LaSalle then "insisted that GMAC competitively bid out credit enhancement" (see FAC (Dkt. No. 60) ¶ 21) suggests that Plaintiffs "undert[ook] some inquiry" into GMAC's and Ambac's conduct.  Moreover, given that Defendants' alleged reaction to Plaintiffs' inquiry was to develop the "stealth structure" that concealed Ambac's role in the Projects and to misrepresent the use of credit enhancement in those Projects, it is not clear as a matter of law that Plaintiffs' inquiry was lacking, and that a reasonably diligent inquiry should have uncovered the fraud at that time.  See Cohen, 711 F.3d at 362 ("[I]f some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from

---

[40]  The cases Marfatia cites in his reply brief do not establish any absolute prohibition on omitting facts in a subsequent pleading.  (See Marfatia Reply (Dkt. No. 293) at 13-14)  These cases merely provide that courts have discretion to consider omitted facts in ruling on a motion to dismiss an amended complaint.  See Poindexter v. EMI Record Grp. Inc., No. 11 CIV. 559 LTS JLC, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) (district court "may still credit admissions in the original complaint" when an amended pleading is filed); Sulton v. Wright, 265 F. Supp. 2d 292, 295 (S.D.N.Y. 2003) (court "may consider [admissions in a prior pleading] on a motion to dismiss under Rule 12(b)(6)"); Colliton, 2008 WL 4386764, at *6.

the date such inquiry should have revealed the fraud." (internal quotation marks, citation, and brackets omitted)).

And the circumstances here are a far cry from those in which courts in this Circuit have found – on a motion to dismiss – that plaintiffs were on inquiry notice.  See, e.g., Koch v. Christie's Int'l PLC, 699 F.3d 141, 155 (2d Cir. 2012) (finding as a matter of law that plaintiff, who brought suit in 2010, was on inquiry notice many years earlier that the provenance of the wine plaintiff had purchased was misrepresented; "in October 2000, . . . he learned that there was a high probability that the wine . . . was in fact counterfeit, and . . . by 2005, . . . [plaintiff] came into possession of the Monticello Report[, which stated that no solid evidence connected the wine to its purported provenance]"); In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d at 60 (holding that plaintiffs were on inquiry notice as a matter of law where "disclosures in . . . prospectuses and annual reports should have alerted . . . investors that they had been misled"); Rosenshein v. Kushner, No. 15CV7397 DLC, 2016 WL 4508756, at *5 (S.D.N.Y. Aug. 26, 2016) (holding that plaintiff – who contended that defendants had misrepresented the risk associated with real estate investments – was on inquiry notice of such misrepresentations by 2009, where the complaint alleged that by that time he knew that "most of the investments at issue [had] experienced defaults . . . affecting over $3.8 million of [plaintiff's] investment").

Here, by contrast, the allegation that LaSalle noticed that GMAC was "partial" to Ambac for credit enhancement does not, standing alone, show that "a reasonable plaintiff" with this knowledge "would have been aware of the existence of a fraud."  Cohen, 711 F.3d at 362; see Liberty Ins. Corp. v. Leonid (Lenny) Brenman, No. 14CV5892(CBA)(LB), 2016 WL 880170, at *4 (E.D.N.Y. Mar. 1, 2016) ("When Liberty Mutual became aware of the fraud, when their investigation commenced and concluded, and whether and to what extent defendants'

conduct may have frustrated these efforts are factual questions that cannot be determined from the face of the complaint and can only be ascertained through the discovery process."); cf. Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 427 (2d Cir. 2008) ("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.").

        In sum, this Court finds no error in the California Court's treatment of the omitted allegations for purpose of its statute of limitations analysis.

        The California Court also concluded that Plaintiffs were entitled to equitable tolling based on Defendants' fraudulent concealment.  Applying Ninth Circuit standards,[41] the California Court reasoned that when LaSalle requested that Defendants competitively bid out credit enhancement, "Defendants modified their scheme to convince the Projects that credit

---

[41]  Under Ninth Circuit law, "[t]he doctrine of fraudulent concealment is invoked only if the plaintiff both pleads and proves that the defendant actively misled her, and that she had neither actual nor constructive knowledge of the facts constituting h[er] cause of action despite her due diligence." Grimmett, 75 F.3d at 514 (emphasis omitted); see Pincay, 238 F.3d at 1110 ("'The doctrine is properly invoked only if a plaintiff establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief.'" (quoting Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1415 (9th Cir. 1987)); id. (holding that plaintiffs "cannot prevail on their fraudulent concealment claim" because they "had constructive notice of their injuries [more than four years before they filed suit] as a matter of law").

Second Circuit standards for fraudulent concealment are similar, but not identical.  See Tho Dinh Tran, 281 F.3d at 36-37 ("[A] statute of limitations may be tolled due to the defendant's fraudulent concealment" where:  "(1) the defendant wrongfully concealed material facts relating to the defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) the plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." (internal quotation marks and citation omitted); see 421-A Tenants Ass'n Inc. v. 125 Court St. LLC, No. 17CIV563(AMD)(JO), 2017 WL 6612933, at *6 (E.D.N.Y. Nov. 2, 2017) ("A RICO plaintiff may show fraudulent concealment sufficient to toll the running of the statute of limitations if []he establishes 'either that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.'" (quoting Greenwald v. Manko, 840 F. Supp. 198, 202 (E.D.N.Y. 1993))).

enhancement would not be necessary for forthcoming deals, and thus there was no need to open the bidding to Ambac's competitors," and "developed [the] 'stealth structure' to help conceal and maintain their fraud scheme." (September 26, 2019 Order (Dkt. No. 261) at 11, 13) The California Court further determined that, given Ray's role as financial advisor and fiduciary to Plaintiffs, they and LaSalle reasonably relied on Ray's misrepresentations about credit enhancement. (Id. at 14)

Defendants maintain that, "in this Circuit, '[t]he doctrine of fraudulent concealment does not come into play' where . . . 'a plaintiff is on notice of a potential claim,'" and thus the California Court erred in "accept[ing] Plaintiffs' argument that their allegations of fraudulent concealment excused them from investigating the concerns they had prior to the statutory period." (Ray Br. (Dkt. No. 287) at 20 (quoting 131 Maine St. Assocs. v. Manko, 179 F. Supp. 2d 339, 348 (S.D.N.Y.), aff'd, 54 F. App'x 507 (2d Cir. 2002))) But Defendants do not explain how this principle departs from Ninth Circuit law. See Pincay, 238 F.3d at 1110 (holding that plaintiffs "cannot prevail on their fraudulent concealment claim" because they "had constructive notice of their injuries [more than four years before they filed suit] as a matter of law"). In any event, the "concerns" pled in the SAC do not establish that Plaintiffs were "on notice of a potential claim."[42]

---

[42] The SAC pleads that the private developers BBC and Corvias, as well as LaSalle, "questioned Ray and [Jefferies] directly about the financial structure of the Projects, including about the OID and whether GMAC/Jefferies were making a profit on the sale of bonds," and that Ray and Jefferies lied to the Projects about these matters. (SAC (Dkt. No. 256) ¶ 31; see id. ¶ 213) Absent information concerning the circumstances that prompted these entities to "question[]" Ray and Jefferies, these allegations do not establish that Plaintiffs were "on notice" of the fraud.

The SAC also pleads that after Ambac's AAA rating was downgraded, the Projects, the Army, and LaSalle consulted with Ray and Jefferies about the effect of this downgrade on the Projects. (Id. ¶ 156) Contrary to Defendants' argument (see Ambac Br. (Dkt. No. 274) at 29), this allegation does not suggest that Plaintiffs were aware of Ambac's participation in the "stealth

In sum, Defendants have not demonstrated that Plaintiffs were on inquiry notice of their RICO claims prior to the Debt Service Reserve Litigation. Accordingly, Plaintiffs' RICO claims are not barred by the applicable four-year statute of limitations.

### 3. The PSLRA's "RICO Amendment"

Defendants contend that the California Court erred in concluding that the PSLRA does not bar Plaintiffs' RICO claims.

Prior to 1995, "a plaintiff could allege a private civil RICO claim for securities laws violations sounding in fraud[,] because 'fraud in the sale of securities' was listed as a predicate offense." MLSMK Inv. Co. v. JP Morgan Chase & Co., 651 F.3d 268, 274 (2d Cir. 2011) (internal quotation marks omitted) (quoting In re Enron Corp. Sec., Derivative & ERISA Litig., 284 F. Supp. 2d 511, 618 (S.D. Tex. 2003)). Plaintiffs "regularly elevated fraud to RICO violations because RICO offered the potential bonanza of recovering treble damages." Id. (internal quotation marks and citation omitted).

In 1995, however, Congress enacted Section 107 of the PSLRA as an amendment to the RICO statute (the "RICO Amendment"). The RICO Amendment provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [of Title 18 of the United States Code]." 18 U.S.C. § 1964(c). This amendment "was intended not simply 'to eliminate securities fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud.'" Bald Eagle Area

_____

structure" Projects. It would have been reasonable for the Projects, the Army, and LaSalle to have concerns about the Ambac downgrade in connection with the pre-stealth structure Projects for which Ambac had provided credit enhancement.

Sch. Dist. v. Keystone Fin., Inc., 189 F.3d 321, 327 (3d Cir. 1995) (quoting H.R. Rep. No. 104-368, at 47 (1995) (Conf. Rep.)).

The RICO Amendment "bars civil RICO claims alleging predicate acts of securities fraud, even where a plaintiff cannot itself pursue a securities fraud action against the defendant."  MLSMK Inv. Co., 651 F.3d at 277; see also Howard v. Am. Online Inc., 208 F.3d 741, 749 (9th Cir. 2000) (rejecting plaintiffs' contention that the RICO Amendment "does not apply because they lack standing to bring securities fraud claims," given that "[p]laintiffs do not dispute that their securities fraud claims could be brought by a plaintiff with proper standing"). And "a plaintiff is prohibited from bringing a RICO claim not only when she, herself, could have brought a securities fraud claim based on the RICO predicate acts, but also when the SEC could have brought such a claim."  In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 726 (S.D.N.Y. 2013), vacated on other grounds and remanded sub nom. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016) (citing Eagletech Comm'cns Inc. v. Citigroup, Inc., 2008 WL 3166533, at *14 (S.D. Fla. June 27, 2008) (applying RICO Amendment where "the predicate acts . . . may be prosecuted by the SEC")); cf. Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC, 286 F. Supp. 3d 634, 646 (S.D.N.Y. 2017) ("[A] civil RICO claim derived from the same allegations as an SEC enforcement action is vulnerable to dismissal under the RICO Amendment [because] the SEC is the regulatory agency principally tasked with rooting out securities fraud.").

Here, as discussed above, the Complaint and the FAC allege that GMAC and Ray reaped additional undisclosed profits by recommending that the Projects invest their loan proceeds from GMAC in GICs, promising to obtain the best GICs for the Projects through competitive bidding.  GMAC and Ray instead rigged the bidding process and demanded fees

from prospective GIC providers.  (See FAC (Dkt. No. 60) ¶¶ 124-28; Cmplt. (Dkt. No. 1)

¶¶ 118-21)  In moving to dismiss the FAC, Defendants contended that the RICO Amendment

bars any RICO claim, both because of these GIC-related allegations – given that the GICs

qualify as securities (see Ray Br. (Dkt. No.  64) at 27) – and because of the "bond fraud"

allegations.  (See id.; see also Ambac Br. (Dkt. No. 71) at 26-28)

       In dismissing the FAC, the California Court concluded that Defendants' GIC-

related conduct implicated the RICO Amendment, and that accordingly the FAC's RICO claim

was barred.  (See Order (Dkt. No. 147) at 17-18)  The California Court determined, however,

that the "bond fraud' scheme "does not fall within the scope of § 10(b) [of the Securities and

Exchange Act] or [17 C.F.R. § 10b-5 ("Rule 10b-5")]," because "[t]he alleged conduct would not

have been actionable by Plaintiffs as securities fraud," nor "actionable by the bond holders as

securities fraud," as "the FAC contains no allegations suggesting that Defendants made any

misrepresentations to the bond holders or that the bond holders were injured by Defendants'

conduct."[43]  (Id. at 16)

       Because Defendants had never suggested – in moving to dismiss the FAC – that

the California Court should consider whether the SEC could have brought an enforcement action

concerning the conduct underlying the alleged "bond fraud" scheme, the California Court did not

address this question.  In any event, in granting Defendants' motion to dismiss the FAC, the

---

[43]  Section 10(b) makes it "unlawful for any person . . . [t]o use or employ, in connection with the
purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in
contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j.  Rule
10b-5, which implements Section 10(b), forbids the use, "in connection with the purchase or sale
of any security," of "any device, scheme, or artifice to defraud" or any other "act, practice, or
course of business" that "operates . . . as a fraud or deceit."  17 CFR § 240.10b-5.

California Court gave Plaintiffs leave to plead a RICO claim "based solely on the bond fraud."[44] (Id. at 18)

The SAC omits the GIC-related allegations, and in their joint motion to dismiss, Defendants argued that Plaintiffs could not "sanitize" the SAC by deleting the GIC-related allegations in order to avoid the RICO Amendment.  (Jt. Mot. (Dkt. No. 223) at 19-20) Defendants also renewed their assertion that the "bond fraud" also triggered the RICO Amendment – despite the California Court's previous rejection of this argument – because "the California Court "ha[d] not . . . consider[ed] whether the conduct underlying the bond transactions alleged could be actionable as fraud by the SEC."  (Id.  at 21)

The California Court rejected Defendants' arguments.  As to Plaintiffs' alleged effort to "sanitize the SAC," the court found that "Defendants have cited no controlling authority, and the Court has found none, precluding a RICO plaintiff from amending the allegations of predicate acts to omit previously alleged conduct that would give rise to the PSLRA bar."  (September 26, 2019 Order (Dkt. No. 261) at 16)

As to whether the SEC could bring an enforcement action concerning the alleged "bond fraud," the California Court first observed that "Defendants have not cited, and the Court has not discovered, any Supreme Court or Ninth Circuit cases holding that the PSLRA bar applies when the SEC – but not a private party – has authority to bring a securities fraud suit." (Id. at 19)  The court acknowledged, however, that "some [district] courts in [the Ninth Circuit]

_____

[44]  In seeking leave to amend, Plaintiffs argued that "nothing in the case law precludes them" from omitting the GIC allegations in a subsequent pleading and "stat[ing] a claim under RICO based solely on the bond fraud."  (Order (Dkt. No. 147) at 18)  The California Court determined that the parties had not adequately briefed the issue of whether Plaintiffs could omit the GIC-related allegations in a subsequent pleading, and stated that Defendants would be permitted to address the propriety of such omissions in a future motion.  (Id.)

have found that the bar does apply where the SEC could bring [an enforcement] action," and "assume[d] for purposes of discussion that Plaintiffs' RICO claims would be barred if the SEC could have brought a securities fraud suit based on the alleged [bond fraud]."  (Id. at 19-20)

The California Court went on to conclude that the RICO Amendment bar does not apply to the alleged bond fraud, reasoning as follows:

> Plaintiffs' allegations are factually distinguishable from all of the SEC cases cited by Defendants, because all of those cases involved the SEC's exercise of its broad authority to protect securities investors or the securities markets. . . . Defendants have cited no case in which the SEC brought suit on facts similar to those alleged by Plaintiffs, that is, misrepresentations in the context of setting contractual interest rates on private loans.

(Id. at 21 (emphasis in original))

Defendants contend that the California Court erred in concluding that the RICO Amendment does not bar the SAC's RICO claims.  Defendants argue that – even if the California Court correctly found that Ninth Circuit law does not preclude a RICO plaintiff from omitting previously alleged conduct that implicates the RICO Amendment – "that is not the case in the Second Circuit."  (Ray Br. (Dkt. No. 272) at 21)  Defendants also argue – for the third time – that the "bond fraud" scheme is barred under the RICO Amendment.  (Id. at 22-24)

### a.    Omission of the GIC Allegations

As discussed above in connection with Defendants' statute of limitations arguments, Second Circuit law permits a plaintiff to omit in a subsequent pleading allegations previously made, even where the omission reflects a plaintiff's effort to avoid dismissal.  In connection with the FAC's GIC allegations, however, Defendants contend that, "[i]n this Circuit, Plaintiffs cannot sanitize their pleadings to avoid the PSLRA bar."  (Id. at 21)

The cases cited by Defendants (id.) do not compel such a conclusion.  Indeed, none of Defendants' cases address the omission – in a subsequent pleading – of fatal allegations

pled earlier.  Instead, most of these cases address unsuccessful efforts to characterize predicate

conduct actually pled as not actionable under the securities laws.  See Bald Eagle Area Sch.

Dist., 189 F.3d at 330 ("[Plaintiffs'] position ignores the reality that the same set of facts can

support convictions for mail fraud, wire fraud, bank fraud and securities fraud. . . . Consequently,

a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank

fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate

offenses amounts to securities fraud.  Allowing such surgical presentation of the cause of action

. . . would undermine the congressional intent behind the RICO Amendment."); Seippel v.

Jenkens & Gilchrist, P.C., 341 F. Supp. 2d 363, 373-74 (S.D.N.Y. 2004) (rejecting plaintiffs'

contention that "the alleged conduct would not have been actionable as securities fraud because

[plaintiffs] have not claimed [that they] decided to exercise stock options in reliance on

defendants' representations"; deeming the "in connection with" requirement of Section 10(b)

satisfied where "[t]he sale of . . . stock was an integral part of the [alleged fraud] scheme . . .

[and] defendants only approached [plaintiffs] because they knew of the planned sale of stock"),

amended on reconsideration, No. 03 CIV. 6942 (SAS), 2004 WL 2403911 (S.D.N.Y. Oct. 26,

2004); Burton v. Ken-Crest Servs., Inc., 127 F. Supp. 2d 673, 677 (E.D. Pa. 2001) ("[R]egardless

of the details of the fraud, there is no question that the whole of Plaintiff's allegations concern a

fraudulent transaction of securities.  Plaintiff cannot magically revive his claim by picking out

[discrete] details of his allegations and then claiming that they are not actionable as securities

fraud. . . . Despite Plaintiff's efforts, it is obvious that the entire cause of action surrounding the

pension fund scheme involves some type of securities fraud and that the alleged acts are

actionable under securities fraud statutes.").

Other cases cited by Defendants (Ray Br. (Dkt. No. 272) at 21) simply reaffirm the principle that the RICO Amendment applies even where the plaintiffs themselves could not pursue a securities fraud claim.  See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP, 612 F. Supp. 2d 267, 281, 283 (S.D.N.Y. 2009) ("Under [plaintiffs'] interpretation of [the RICO Amendment], so long as plaintiffs do not hold 'actionable' securities claims – that is, so long as they are pursuing aiders and abettors – they may proceed under RICO. . . . The better interpretation . . . is that the RICO Amendment bars claims based on conduct that could be actionable under the securities laws even when the plaintiff, himself, cannot bring a cause of action under the securities laws.").

In sum, Defendants have failed to cite authority demonstrating that Plaintiffs may not omit – in the SAC – their earlier GIC allegations that trigger application of the RICO Amendment.[45]  Because Defendants have not shown that the California Court erred in applying Ninth Circuit law, and have not demonstrated any relevant difference between Ninth Circuit and Second Circuit law with respect to omitting from subsequent pleadings allegations implicating the RICO Amendment, their motion for reconsideration and vacatur on this basis will be denied.

### b.   Bond Fraud

Defendants again insist that the bond fraud scheme provides an independent basis for dismissal pursuant to the RICO Amendment.

---

[45]  Indeed, Second Circuit case law appears to cut the other way.  See Ling v. Deutsche Bank, No. 04 Civ. 4566 (HB), 2005 WL 1244689, at *5-7 (S.D.N.Y. May 26, 2005) (dismissing RICO claims as barred by the RICO Amendment where "some of the individual Plaintiffs . . . use[d] stock to fund the LLCs and/or S Corporations" employed in tax shelter scheme, but permitting plaintiffs "to file another Complaint to conform with [the court's] [o]pinion" by, inter alia, "plead[ing] a RICO claim without those individual Plaintiffs who used marketable securities in connection with the LLCs or S Corporations").

As an initial matter, this Court acknowledges that district courts in this Circuit have concluded that the RICO Amendment applies where the SEC could have brought an enforcement action premised on a complaint's allegations.  As discussed above, however, the state of the law is the same in the Ninth Circuit.  And while Defendants assert that "[t]he California [C]ourt overlooked all of the authority from [the Second] Circuit recognizing that the possibility of an SEC enforcement action concerning the allegations in a RICO complaint suffices to bring the RICO claim within the PSLRA bar" (Ray Br. (Dkt. No. 272) at 23), the California Court expressly "assume[d] for purposes of discussion that Plaintiffs' RICO claims would be barred if the SEC could have brought a securities fraud suit based on the alleged predicate acts."  The California Court concluded, however, that Defendants had not made this showing.  (September 26, 2019 Order (Dkt. No. 261) at 20-21)

To succeed in connection with their instant motions, Defendants must demonstrate that the SEC could have brought an enforcement action premised on the bond fraud, and that the California Court's reasons for concluding otherwise are incorrect.  Defendants have not done so.

Defendants contend that "the SEC could plainly bring a securities fraud case relating to the underlying allegations of 'bond fraud[,]' because they are analogous to the allegations in S.E.C. v. Zandford, 535 U.S. 813 (2002)."  (Ray Br. (Dkt. No. 272) at 22)

Zandford addresses the scope of the phrase "in connection with the purchase or sale of any security," as set forth in Section 10(b) of the Securities Exchange Act and Rule 10b-5.  In that case, a securities broker "persuaded . . . an elderly man in poor health[] to open a joint investment account for himself and his mentally retarded daughter."  Promising to "conservatively invest" the man's money, the broker obtained discretion to manage the man's

64

account and "engage in securities transactions for [his and his daughter's] benefit without [their] prior approval." The broker misappropriated the victims' money, however, including by selling securities in their account and stealing the proceeds. Zandford, 535 U.S at 815. The SEC filed a complaint against the broker, contending that he had "engaged in a fraudulent scheme in which he made sales of his customer's securities for his own benefit." Id. at 816, 820. Zandford argued that "the sales themselves were perfectly lawful," and that while his subsequent misappropriation of the proceeds was fraudulent, his conduct lacked "the requisite connection with the sales [of securities]." Id.

The Supreme Court disagreed:

[The victims] were injured as investors through respondent's deceptions, which deprived them of any compensation for the sale of their valuable securities. They were duped into believing respondent would "conservatively invest" their assets in the stock market and that any transactions made on their behalf would be for their benefit for the "'safety of principal and income.'" The fact that respondent misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense. . . . It is enough that the scheme to defraud and the sale of securities coincide.

Id. at 822 (internal citation omitted).

In so ruling, the Supreme Court emphasized the "great[] threat to investor confidence in the securities industry" that conduct like Zandford's represents:

Not only does such a fraud prevent investors from trusting that their brokers are executing transactions for their benefit, but it undermines the value of a discretionary account like that held by the [victims]. The benefit of a discretionary account is that it enables individuals, like the [victims], who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval. If such individuals cannot rely on a broker to exercise that discretion for their benefit, then the account loses its added value.

Id. at 822-23.

In concluding that the alleged bond fraud here does not trigger the RICO Amendment, the California Court expressly distinguished <u>Zandford</u>.  Although Defendants argued that Zandford's conduct is analogous to the alleged bond fraud scheme in that "the core allegation [here] is that. . . Defendants exploited an alleged duty of trust by promising to sell securities and pass along the benefits of these sales to Plaintiffs, while secretly retaining the proceeds for themselves," the California Court noted that "in <u>Zandford</u>, the SEC brought suit to vindicate the investors who were bilked by the broker's misappropriation of profits from sales of securities."  (September 26, 2019 Order (Dkt. No. 261) at 21 (emphasis omitted))  The California Court went on to explain that "Plaintiffs' allegations are factually distinguishable from all of the SEC cases cited by Defendants," including <u>Zandford</u>, "because all of those cases involved the SEC's exercise of its broad authority to protect securities investors or the securities market." (<u>Id.</u>)

In seeking reconsideration, Defendants contend that the California Court "erroneous[ly] cabin[ed] . . . SEC authority to 'protecting investors' exclusively[,] or to instances where there has been a 'dissemination of [a] misrepresentation to the public.'"  (Ray Br. (Dkt. No. 272) at 23 (citation omitted))  But Defendants have not cited any case – from this Circuit or elsewhere – in which an SEC action has been premised on facts similar to the alleged bond fraud here.  Indeed, the cases Defendants cite all implicate the SEC's "broad authority to protect securities investors or the securities market."[46]  (September 26, 2019 Order (Dkt. No. 261) at 21)

---

[46]  Defendants assert that "judges in the Second Circuit have recognized that the SEC may bring an action even where there is no identifiable victim."  (Ray Br. (Dkt. No. 272) at 23 (citing <u>S.E.C. v. Tome</u>, 833 F.2d 1086 (2d Cir. 1987))  But such a circumstance has nothing to do with whether SEC enforcement actions are undertaken to "protect investors or the securities markets." And <u>Tome</u> – an insider trading case – provides no support for Defendants' position here.  Insider trading liability is premised on "'insur[ing] honest securities markets and thereby promot[ing] investor confidence,'" and is rooted in "the assumption that 'investors likely would hesitate to

The California Court's analysis is also fully consistent with Supreme Court law concerning the scope of the securities laws.  See Chadbourne & Parke LLP v. Troice, 571 U.S. 377, 388 (2014) ("As far as we are aware, every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained an ownership interest in financial instruments that fall within the relevant statutory definition." (emphasis omitted)).

Defendants have not "point[ed] to controlling decisions or data that the [California] court overlooked," In re BDC 56 LLC, 330 F.3d at 123 (internal quotation marks and citation omitted), and have identified no error in the California Court's analysis. Accordingly, Defendants' motions for reconsideration and vacatur are denied to the extent they are predicated on the applicability of the RICO Amendment.

## 4.  Whether Plaintiffs' RICO Claims Are Adequately Pled

Defendants contend that Ninth Circuit law and Second Circuit law differ as to the pleading standards for certain elements of a civil RICO claim, and that "Plaintiffs' allegations of a RICO enterprise, a pattern of predicate acts, and a conspiracy [do not satisfy] the stricter pleadings standards of the Second Circuit."  (Ambac Br. (Dkt. No. 274) at 22)

To plead a violation of 18 U.S.C. § 1962(c) – the substantive RICO claim Plaintiffs allege – "a plaintiff must show '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'"  Kim v. Kimm, 884 F.3d 98, 103 (2d Cir. 2018) (quoting DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001)).  The Ninth Circuit describes these elements in

---

venture their capital in a market where trading based on misappropriated nonpublic information is unchecked by law.'"  United States v. Kosinski, 976 F.3d 135, 144 (2d Cir. 2020) (quoting United States v. O'Hagan, 521 U.S. 642, 658 (1997)).

essentially identical language.  (See September 26, 2019 Order (Dkt. No. 261) at 22 (quoting

Eclectic Properties E., LLC v. Marcus & Millichap Co., 751 F.3d 990, 997 (9th Cir. 2014)))

### a.    **Relatedness**

Defendants contend that the SAC does not sufficiently allege "vertical" or

"horizontal" relatedness of the alleged enterprise's predicate acts, and that such allegations are

required under Second Circuit law, but not under Ninth Circuit law.  (See Ambac Br. (Dkt. No.

274) at 23-24)

The Second Circuit has explained that, "[b]ecause RICO does not apply to

'isolated or sporadic criminal acts,' it has a relatedness requirement," Reich v. Lopez, 858 F.3d

55, 60 (2d Cir. 2017) (quoting United States v. Indelicato, 865 F.3d 1370, 1383 (2d Cir. 1989)

(en banc)), whereby "[p]redicate crimes must be related both to each other (termed 'horizontal

relatedness') and to the enterprise as a whole ('vertical relatedness')."  Id. at 60-61 (quoting

United States v. Cain, 671 F.3d 271, 284 (2d Cir. 2012)).  "[P]redicate acts are horizontally

related when they[] [']have the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise are interrelated by distinguishing characteristics and are

not isolated events.[']"  Id. at 61 (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 240

(1989)).[47]  Predicate acts are vertically related where "the defendant was enabled to commit the

offense solely because of his position in the enterprise or his involvement in or control over the

enterprise's affairs, or because the offense related to the activities of the enterprise."  Id. (internal

quotation marks and citation omitted).

---

[47]  Although "horizontal relatedness can be established by linking each [predicate] act to the
enterprise" where the enterprise is one "whose business is racketeering activity, such as an
organized crime family," "courts must determine whether there is a relationship between the
predicate crimes themselves" when "dealing with an enterprise that is primarily a legitimate
business."  Reich, 858 F.3d at 61 (internal quotation marks and citations omitted).

The Ninth Circuit "ha[s] not adopted [the Second Circuit's] precise formulation" of relatedness as "having a 'horizontal' and 'vertical' component." United States v. Bingham, 653 F.3d 983, 992 n.5 (9th Cir. 2011). Nevertheless, the Ninth Circuit applies a "relatedness" requirement identical to the Second Circuit's definition of horizontal relatedness. See Howard, 208 F.3d at 749 ("'Related' conduct 'embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" (quoting H.J. Inc., 492 U.S. at 240)).

Because (1) Defendants did not challenge the sufficiency of Plaintiffs' "relatedness" allegations in their motions to dismiss the SAC (see Jt. Mot. (Dkt. No. 223); Supp. Mots. (Dkt. Nos. 224, 225, 227, 228)); and (2) the Ninth Circuit's relatedness requirement is the same as the Second Circuit's "horizontal relatedness" requirement, Defendants' complaint that the California Court "ma[d]e no finding regarding" horizontal relatedness provides no basis for granting relief.[48]  (Ambac Br. (Dkt. No. 274) at 23)

As to vertical relatedness, the Second Circuit has stated that this requirement "entails the simpler analysis." Reich, 858 F.3d at 61. In Reich, for example, a former U.S. ambassador to Venezuela contended that a Venezuelan energy company was a RICO enterprise that bribed Venezuelan officials to secure energy contracts without public bidding. With little

---

[48]  In any event, the SAC adequately pleads horizontal relatedness. The various mail and wire fraud predicate acts have the "same or similar purposes" and "results": defrauding the Projects in connection with providing financing for military housing projects, and thereby obtaining illicit profits. The predicate acts also share many of the same "participants" – Ray, GMAC, and Ambac – and "victims," including the Army, LaSalle, and the Air Force. Finally, the predicate acts share the same "methods of commission," including Ray's role as financial advisor, and misrepresentations regarding the nature and structure of the financial transactions in which the Projects and Defendants engaged. See Reich, 858 F.3d at 61.

discussion, the Second Circuit concluded that the predicate Travel Act violations (alleging bribery) and wire fraud (premised on telephone calls agents of the enterprise made to avoid disclosure of the enterprise's crimes) satisfied the vertical relatedness requirement. "[B]oth crimes relate to [the enterprise's] activities:  the Travel Act violations were done for [the enterprise's] profit, and the wire fraud was done to protect it from litigation." Id. at 58-59, 61.

Here, the alleged predicate acts of mail and wire fraud – misrepresentations to Plaintiffs, as well as to the Army, LaSalle, and the Air Force, regarding the nature of the financial transactions Defendants undertook in connection with the Projects, thereby obtaining undisclosed profits at the Projects' expense – "relate[] to the activities of the enterprise," id., in that they "were [made] for [the enterprise's] profit" or were made to prevent the Projects from uncovering the enterprise's scheme. Id.

In sum, the SAC adequately pleads relatedness.

### b.     Predicate Acts

Defendant Ambac contends that Plaintiffs "failed to adequately allege that [each Defendant] committed two predicate acts against each of them" in connection with several of the Projects.  (Ambac Br. (Dt. No. 274) at 24)

In order to adequately plead a violation of Section 1962(c) – the substantive RICO provision – a complaint must plead facts demonstrating that a defendant conducted the alleged racketeering enterprise through a pattern of racketeering activity. See Kim, 884 F.3d at 103.  A "pattern of racketeering activity" requires, inter alia, "'at least two acts of racketeering activity' [i.e., predicate acts] committed in a 10 year period." Cofacredit, S.A. v. Windsor Plumbing Supply Co., 187 F.3d 229, 242 (2d Cir. 1999) (quoting 18 U.S.C. § 1961(5)).  The Second Circuit has made clear that "[t]he requirements of section 1962(c) must be established as

to each individual defendant." DeFalco, 244 F.3d at 306 (citing United States v. Persico, 832

F.3d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of

racketeering engaged in by a defendant, rather than the collective activities of the members of the

enterprise, which are proscribed by section 1962(d).")).

        Accordingly, district courts in this Circuit require plaintiffs who assert Section

1962(c) claims to "allege that each defendant committed at least two predicate acts of

racketeering activity." Brewer v. Vill. of Old Field, 311 F. Supp. 2d 390, 403 (E.D.N.Y. 2004);

see, e.g., 236 Cannon Realty, LLC v. Ziss, No. 02 CIV.6683(WHP), 2005 WL 289752, at *5

(S.D.N.Y. Feb. 8, 2005) ("Because Cannon alleges that defendants were engaged in a scheme to

defraud, it must show that each defendant committed two predicate acts."); Jerome M. Sobel &

Co. v. Fleck, No. 03 Civ. 1041 RMB GWG, 2003 WL 22839799, at *6 (S.D.N.Y. Dec. 1, 2003)

("[T]o establish a violation of § 1962(c), plaintiffs must allege that each defendant committed at

least two predicate acts of racketeering activity. This is consistent with Rule 9(b)'s particularity

requirement where multiple defendants are charged with fraud." (internal citation omitted)),

report and recommendation adopted, No. 03CIV.1041RMBGWG, 2004 WL 48877 (S.D.N.Y.

Jan. 8, 2004).

        The Ninth Circuit has not addressed whether, in a multi-defendant civil RICO

case, two predicate acts must be alleged as to each defendant, although some district courts have

found such a requirement. See, e.g., Richards v. Cty. of Los Angeles, No. CV 17-400 BRO

(AGRX), 2017 WL 7411159, at *5 (C.D. Cal. Mar. 31, 2017) ("[W]here, as here, a plaintiff

alleges RICO claims against multiple defendants, the 'plaintiff must allege at least two predicate

acts by each defendant.'" (emphasis in original) (quoting In re WellPoint, Inc., 865 F. Supp. 2d

1002, 1035 (C.D. Cal. 2011))); see also Perez v. DirecTV Grp. Holdings, LLC, No. 816CV01440JLSDFM, 2019 WL 6362471, at *3 (C.D. Cal. July 23, 2019) (same).

Whether or not Ninth Circuit and Second Circuit authority are inconsistent on this point, the California Court expressly and repeatedly stated that Plaintiffs were required to plead two predicate acts against each Defendant.  (See April 12, 2018 Hearing Tr. (Dkt. No. 143) at 74 ("[Y]ou need to plead two predicate acts regarding each plaintiff against each defendant . . . ."); Order (Dkt. No. 147) at 22 (granting Defendants' motions to dismiss the FAC, and reminding Plaintiffs that, "[a]s discussed at the hearing [on the motions], it is the Court's view that two predicate acts must be alleged by each Plaintiff as to each Defendant"))  In sum, the California Court applied the same standards that govern in the Second Circuit.

Defendant Ambac maintains, however, that even if the California Court applied the appropriate standard, the SAC does not allege that it committed the requisite two predicate acts against several of the Plaintiffs, including the four Air Force Plaintiffs' Projects (the Lackland II, AETC I, AMC West, and Vandenberg Projects) and the Fort Sill Project.  (Ambac Br. (Dkt. No. 274) at 24)[49]

---

[49] In briefing before the California Court, Ambac contended, as to the Lackland II Air Force Project, that "the SAC . . . admits that Ambac had no involvement," and that, as to the Fort Sill Project, "the SAC contains no predicates, and [again] admits that Ambac had no involvement." (Ambac Supp. Br. (Dkt. No. 228) at 8)  Ambac further argued, as to all four Air Force Projects, that "the Air Force entities do not even plead a single email from or received by Ambac specific to any of these Projects."  (Jt. Mot. (Dkt. No. 223) at 30).

Plaintiffs did not substantively respond to Ambac's arguments regarding the Fort Sill Project and the Lackland II Air Force Project.  (See Pltf. Opp. Br. (Dkt. No. 233) at 4)  As to the predicates for the Air Force Projects more generally, Plaintiffs asserted that "communications that were on their face directed at different Plaintiff Projects [involving BBC] . . . induced the Air Force Projects to place trust in Ray and accept the resulting high interest rates and financing structures."  Because the same BBC representatives were involved in the negotiations regarding all of the Air Force Projects and BBC's Army Projects, Plaintiffs contended that communications

The SAC expressly states that Ambac was not involved in the Fort Sill Project or the Lackland II Air Force Project.  (See SAC (Dkt. No. 256) ¶ 236 ("Had the Projects known that GMAC and Jefferies were making these undisclosed profits from securitizing the loans pre-closing, they would have had the option either to demand a lower interest rate or to seek more competitive rates from these or other lenders.  Likewise, the Projects in which Ambac is involved (including all but the Fort Sill Project and the Lackland II Air Force Project) would have used this information to negotiate better insurance premiums if needed, and either better surety fees or a deal where no surety or bond insurance was required." (emphasis added)); see also id. ¶ 18 ("To maximize the ill-gotten fees that it received from the Projects, GMAC and Ambac, through Ray and initially Marfatia, falsely represented to the Projects (except the Fort Sill Army Project and the Lackland II Air Force Project) and [LaSalle] that . . . the rating agencies required the Projects to purchase a surety bond or cash fund a debt service reserve account in the amount of one year's principal and interest in order to receive a AAA rating." (emphasis added)))

Moreover, while the SAC otherwise lists specific predicate acts Ambac allegedly committed against each of the Projects (see id. ¶ 263), it does not assert any such predicate act as to the Fort Sill Project.  And while the SAC's list of predicate acts purports to describe predicate acts Ambac committed against "All Plaintiffs" – stating that "Ambac committed at least two . . . predicate acts with regard to each of the Plaintiffs, insofar as each of the relevant loan

---

regarding any BBC Army Project were relevant to all other Air Force Projects.  (See Pltf. Opp. Br. (Dkt. No. 236) at 28)

The California Court did not specifically address the sufficiency of the SAC as to Ambac's predicate acts in connection with the Fort Sill Project, the Lackland II Air Force Project, or the other Air Force Projects.

agreements, servicing agreements, credit enhancement agreements, and related transactions <u>for Plaintiffs who received credit enhancement from Ambac</u> required the payment of funds by wire transfer or through the mail" (<u>id.</u> (emphasis added)) – this language by its terms is not applicable to the Fort Sill Project or to the Lackland II Air Force Project, which apparently did not receive credit enhancement from Ambac.

As discussed above, the SAC asserts generally, as to all of the Air Force Projects (which shared the same private developer, BBC) that "all of the . . . communications directed to BBC" and described as predicate acts with respect to other Projects for which BBC was the private developer "were used for the purpose of inducing BBC Air Force Projects to retain Ray as a financial advisor and to rely on his representations regarding the financial structure for those Projects, . . . thus caus[ing] direct harm to each of the BBC Air Force Projects, which have been saddled with high interest rates and sub-optimal financing structures."  (<u>Id.</u>)

The Court concludes – as to all of the Army Projects other than the Fort Sill Project and all of the Air Force Projects other than the Lackland II Air Force Project – that the SAC sufficiently pleads predicate acts of mail and wire fraud.

"The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property (iii) furthered by the use of interstate mail or wires."  <u>Williams v. Affinion Grp., LLC</u>, 889 F.3d 116, 124 (2d Cir. 2018) (internal quotation marks and citations omitted).  Mail and wire fraud must be pled with particularity.  <u>See</u> <u>Lundy v. Catholic Health Sys. of Long Island Inc.</u>, 711 F.3d 106, 119 (2d Cir. 2013) ("On a motion to dismiss a RICO claim [predicated on mail or wire fraud], Plaintiffs' allegations must also satisfy the requirement that, '[i]n alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" (quoting Fed. R. Civ. P. 9(b))).[50]

"[A]ny 'scheme to defraud' under the mail and wire fraud statutes 'requires some element of deception,'" Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq., 758 F. Supp. 2d 153, 178 (E.D.N.Y. 2010) (quoting McLaughlin v. Anderson, 962 F.2d 187, 192-93 (2d Cir. 1992)), aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq., 443 F. App'x 582 (2d Cir. 2011), but the false or misleading statements need not be set forth in the mails or wires. See Affinion Grp., LLC, 889 F.3d at 125 n.6; see also Liberty Mut. Ins. Co. v. Blessinger, No. 06 CV 391 NGG ARL, 2007 WL 951905, at *5 (E.D.N.Y. Mar. 27, 2007) ("So long as the mailings and wire transfers alleged further an underlying scheme that itself has a fraudulent, deceptive purpose[,] Rule 9(b) is satisfied.  Thus, Rule 9(b) is satisfied so long as a plaintiff delineate[s], with adequate particularity, the specific circumstances constituting the overall fraudulent scheme." (internal quotation marks and citations omitted)).  Moreover, as noted earlier, "plaintiffs need not allege that each defendant itself made a misrepresentation as long as they allege sufficient facts showing each defendant's knowing or intentional participation in the alleged scheme to defraud." Equitable Acceptance Corp., 443 F. Supp. 3d at 492.

Here, the SAC alleges that the "stealth structure" was employed at all of the Air Force Projects except for the Lackland II Air Force Project.  (SAC (Dkt. No. 256) ¶ 232)  The SAC pleads that Ray and GMAC misrepresented to the private developers at each Project at which the "stealth structure" was used that "there would be no credit enhancement at closing,

---

[50]  "As to particularity, the 'complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" Lundy, 711 F.3d at 119 (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)).

and that any future credit enhancement obtained by the lender would be 'at the lender's expense.'" (Id. ¶ 218)  However, Ambac, Ray and GMAC intentionally concealed Ambac's involvement in these Projects in order to extract undisclosed credit enhancement fees.  (See, e.g., id. ¶¶ 220-32)  The SAC also describes documents that were used in furtherance of the alleged scheme to defraud each of these Projects.  (See id. ¶ 232 (alleging that, as to each Project at which the "stealth structure" was employed, each "Loan Agreement stated that any credit enhancement would be at lender's expense," and that "the documents disclosing Ambac's role and fees were kept off the closing index delivered to Borrower, and only listed on a secret stealth index delivered to Ambac"))  The SAC likewise asserts, in its predicate acts list, that "each of the relevant loan agreements, servicing agreements, credit enhancement agreements, and related transactions for Plaintiffs who received credit enhancement from Ambac required the payment of funds by wire transfer or through the mail."  (Id. ¶ 263)  These allegations are sufficient to plead Ambac's knowing and intentional participation in a scheme to defraud these Projects.

As to the Fort Sill and Lackland II Air Force Projects, however – for which Ambac did not provide credit enhancement and with respect to which the SAC expressly and repeatedly disclaims Ambac's involvement – the SAC does not plead that Ambac committed the requisite predicate acts.  Indeed, the SAC does not plead facts demonstrating that Ambac was even aware of its co-defendants' dealings with these Projects, or with schemes that did not involve fraudulent credit enhancement services.  Accordingly, those Plaintiffs associated with only the Fort Sill and Lackland II Air Force Projects – Sill Housing, LLC and Lackland Family Housing, LLC – may not assert RICO claims against Ambac.  The Court's analysis applies with equal force to these Plaintiffs' claims against Marfatia.

76

c.     **RICO Conspiracy**

The Jefferies Entities and Ambac contend that the SAC does not sufficiently allege a RICO conspiracy.  (See Jefferies Br. (Dkt. No. 270) at 19-20; Ambac Br. (Dkt. No. 274) at 25-26)  Ambac contends that, "[u]nder Second Circuit law, 'there can be no RICO conspiracy without a substantive RICO violation.'"  (Ambac Br. (Dkt. No. 274) at 24-25 (quoting Allen v. New World Coffee, Inc., No. 00 Civ. 2610 AGS, 2001 WL 293683, at *9 (S.D.N.Y. 2001)))  Because the Court has determined – except as to Plaintiffs Sill Housing, LLC and Lackland Family Housing, LLC – that the SAC sufficiently pleads a substantive RICO claim, Ambac's argument is rejected except as to those two Plaintiffs.  For the reasons explained below, the Jefferies Entities' challenge to the RICO conspiracy claim is likewise unavailing.

The conspiracy provision of the RICO statute, 18 U.S.C. § 1962(d), "makes it 'unlawful for any person to conspire to violate' the substantive provisions of RICO."  United States v. Pizzonia, 577 F.3d 445, 462 (2d Cir. 2009) (quoting 18 U.S.C. § 1962(d)).  Section 1962(d) "thus proscribes an agreement to conduct or to participate in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity."  Id.  "To prove the agreement element, [a plaintiff] must show that the defendant knew about and agreed to facilitate a racketeering scheme."  United States v. Zemlyansky, 908 F.3d 1, 11 (2d Cir. 2018) (internal quotation marks, citation, and brackets omitted); see also United States v. Arrington, 941 F.3d 24, 36-37 (2d Cir. 2019) (requiring proof that the "defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme").  "To prove the pattern element, [a plaintiff] must show that two or more predicate acts were, or were intended to be, committed as part of the conspiracy."  Zemlyansky, 908 F.3d at 11 (internal quotation marks, citation, and brackets

omitted).  Plaintiff need not prove that the defendant committed any predicate act.  <u>See</u> <u>Arrington</u>, 941 F.3d at 36.

The Jefferies Entities challenge only the "agreement" element of the RICO conspiracy claim.  They argue that the California Court erred in ruling that "Plaintiffs sufficiently alleged that the Jefferies Entities agreed to join a scheme to misrepresent themselves as a fiduciary," based on "'Plaintiffs['] specific[] alleg[ations] that the Jefferies Defendants learned of the scheme during their 2009 due diligence, and took affirmative steps to conceal the ongoing fraud.'"  (<u>See</u> Jefferies Br. (Dkt. No. 270) at 19-20 (quoting September 26, 2019 Order (Dkt. No. 261) at 23))

As an initial matter, the California Court made no such determination as to Plaintiffs' RICO conspiracy claim.  The language that the Jefferies Entities quote is taken from that portion of the California Court's decision that discusses whether the SAC sufficiently pleads the Jefferies Entities' participation in the alleged RICO enterprise.  This is a separate – albeit related – inquiry from whether the SAC adequately pleads the Jefferies Entities' membership in the alleged RICO conspiracy.

Moreover, the Jefferies Entities' repeated characterization of the alleged fraud scheme as a "scheme to misrepresent themselves as a fiduciary" (Jefferies Br. (Dkt. No. 270) at 19; <u>see</u> <u>also</u> <u>id.</u> at 20 (referring to the alleged conspiracy as one "to falsely hold themselves out as a fiduciary"); Jefferies Reply (Dkt. No. 294) at 13) is inaccurate and misleading.  The fraud scheme alleged in the SAC is one to defraud the Projects of money through, <u>inter</u> <u>alia</u>, inflated interest rates, expenses, and other charges.  As to this objective, the SAC adequately pleads facts demonstrating that the Jefferies Entities "knew about and agreed to facilitate [the alleged] racketeering scheme."  <u>Zemlyansky</u>, 908 F.3d at 11.  The SAC pleads that the Jefferies Entities

learned of "the fraudulent nature of the MHPI financings" from Ray during the due diligence process that preceded the Jefferies Entities' acquisition of Ray's business, and elected to proceed with their acquisition of the business and to work with Ray. The SAC further alleges that the Jefferies Entities misrepresented the purpose and need for an OID on the Fort Sill Project; misrepresented that the 2012 Fort Bliss Project loan was market rate; and – as the servicer for the earlier Projects – obtained inflated interest payments and fees from those Projects. (SAC (Dkt. No. 256) ¶¶ 25, 157-58, 178-81, 204, 262) Accordingly, the Jefferies Entities' motion will be denied as to the RICO conspiracy claim.

### 5.   <u>Group Pleading</u>

The Jefferies Entities – Jefferies & Co., Inc.; Jefferies LLC; Jefferies Mortgage; and Jefferies Group LLC – contend that "the California Court declined to consider separately each of [the Jefferies] Entities . . . in direct conflict with the law in this district, which requires a plaintiff to at least allege facts sufficient to inform each defendant about their individual behavior about which plaintiffs complain." (Jefferies Br. (Dkt. No. 270) at 17)

"It is well-established in this Circuit that plaintiffs cannot simply 'lump' defendants together for pleading purposes." <u>Canon U.S.A., Inc. v. F & E Trading LLC</u>, No. 215CV6015(DRH)(AYS), 2017 WL 4357339, at *7 (E.D.N.Y. Sept. 29, 2017) (quoting <u>Ritchie v. Northern Leasing Systems</u>, 14 F. Supp. 3d 229, 236 (S.D.N.Y. 2014)). This is so even where "allegations are made against families of affiliated entities." <u>Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC</u>, 366 F. Supp. 3d 516, 559 (S.D.N.Y. 2018) (internal quotation marks omitted). Federal Rule of Civil Procedure 8(a) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a rule that "is violated where a plaintiff, by engaging in 'group pleading,' fails to give each

defendant fair notice of the claims against it." Holmes v. Allstate Corp., No. 11 CIV. 1543 (LTS) (DF), 2012 WL 627238, at *22 (S.D.N.Y. Jan. 27, 2012) (citation omitted), report and recommendation adopted, 2012 WL 626262 (S.D.N.Y. Feb. 27, 2012).

In prohibiting "group pleading," courts acknowledge that "the principal function of pleadings under the Federal Rules is to give the adverse part[ies] fair notice of the claim[s] asserted so as to enable [them] to answer and prepare for trial." Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988). Accordingly, "[d]ismissal under Rule 8(a) 'is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise intelligible that its true substance, if any, is well disguised.'" Bancorp Servs., LLC v. Am. Gen. Life Ins. Co., No. 14-CV-9687 (VEC), 2016 WL 4916969, at *5 (S.D.N.Y. Feb. 11, 2016) (quoting Wynder v. McMahon, 360 F.3d 73, 80 (2d Cir. 2004)).

Where, as here, a complaint asserts fraud claims, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) must be considered in determining whether a complaint violates the "group pleading" prohibition. "[P]laintiff[s] must satisfy Rule 9(b) as to each defendant, and cannot do so by making vague allegations about the defendants as a unit." S.E.C. v. U.S. Envtl., Inc., 82 F. Supp. 2d 237, 241 (S.D.N.Y. 2000). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).

Here, at various points, the SAC refers to the Jefferies Entities collectively as "Jefferies." Early in the SAC, however, Plaintiffs explain the role of each Jefferies entity in the alleged fraudulent scheme. Jefferies & Co., Inc., "employed Ray and his team and served as placement agent and financial advisor on the 2010 Sill and 2012 Bliss transactions." (SAC (Dkt.

No. 256) ¶ 57)  In 2013, Jefferies & Co., Inc. merged with Jefferies LLC, after which time

Jefferies LLC became the employer of Ray and his team.  (Id. ¶¶ 57, 59)  Jefferies Mortgage is

identified as the entity that, in 2009, purchased the Ray-led military housing servicing business.

(Id. ¶ 4 n.1)  Jefferies Mortgage also "served as the lender for the 2010 Sill and 2012 Bliss

transactions."  (Id. ¶ 56)  Finally, Jefferies Group LLC "was Jefferies Mortgage's ultimate parent

company at the time of Jefferies Mortgage's dissolution," which occurred at some point after

2017,[51] and "received a distribution of Jefferies Mortgage's assets following Jefferies

Mortgage's dissolution."[52]  (Id. ¶ 58) This specification of roles "give[s] the [Jefferies Entities]

fair notice of the claim[s] asserted," Salahuddin, 861 F.2d at 42, and adequately "inform[s] each

[of the Jefferies Entities] of [its] alleged participation in the fraud."  DiVittorio, 822 F.2d at

1247.

       It is readily inferable, for example, that the alleged liability of Jefferies & Co.,

Inc. and Jefferies LLC, is predicated on their role as the employer of Ray and his team (and, in

the case of Jefferies LLC, as successor to Jefferies & Co.).[53]  (See SAC (Dkt. No. 256) ¶¶ 57, 59;

---

[51]  The SAC alleges that in February 2017 – two days after the court in the Monterey Bay
Project's state court action issued an order compelling Jefferies Mortgage to produce certain
records – "the Jefferies Defendants attempted to dissolve Jefferies Mortgage."  (SAC (Dkt. No.
256) ¶¶ 56, 247)  The SAC does not make clear when this dissolution occurred, however.
[52]  All of the Jefferies Entities share the same business address.  (See id. ¶¶ 56-59)
[53]  While courts in this Circuit "generally do not impose vicarious liability under RICO unless
the corporate . . . defendant is a central figure in the RICO scheme,'" Fairfield Fin. Mortg. Grp.,
Inc. v. Luca, 925 F. Supp. 2d 344, 350 (E.D.N.Y. 2013) (quoting Makowski v. United Broth. of
Carpenters & Jointers of Am., 08 Civ. 6150 (PAC), 2010 WL 302651, at *6 (S.D.N.Y. Aug. 2,
2010)), the SAC sufficiently pleads circumstances supporting imposition of such liability here.
See id. (listing as factors relevant to imposition of vicarious liability in RICO context whether "a
corporate . . . officer had knowledge of or was recklessly indifferent toward the unlawful
activity"; "the number of high-level employees involved in the racketeering activity, their degree
of participation . . . , whether these employees themselves committed the alleged predicate acts,
and whether the corporation substantially benefited from the racketeering activity" (internal
quotation marks and citation omitted)).

id. ¶¶ 240, 242-43 (alleging that Ray acted within the scope of his employment while an employee of the Jefferies Entities and that "Jefferies . . . [is] thus liable for [his] tortious and fraudulent conduct"); see also In re Parmalat Sec. Litig., 377 F. Supp. 2d 390, 409 (S.D.N.Y. 2005) (rejecting group pleading argument where "it [was] clear from the complaint that plaintiffs attribute the alleged misrepresentations and omissions to [certain of] the . . . entities and that they sue the other . . . entities entirely, or, at least, primarily on vicarious liability theories"). And the conduct of Ray and his team is set out with the requisite specificity.

The SAC likewise makes clear that Jefferies Mortgage is the entity that provided additional financing to the Fort Bliss Project – allegedly at an "excess interest rate . . . so significant that Ray and Jefferies Mortgage carved out a separate Interest Only strip . . . and securitized it in the form of a bond (see id. ¶ 234) – and that it served as the lender for the Fort Sill Project. (Id. ¶ 56) Jefferies Group LLC's liability appears to rest on its position as at least partial successor to Jefferies Mortgage. (Id. ¶ 58)

The Court acknowledges that when the SAC's allegations refer to "Jefferies," it is not always obvious which Jefferies Entity is at issue. But part of the ambiguity arises from the intertwined nature of these entities, including in connection with their dealings with Ray. For example, Jefferies Mortgage purchased Ray's business, but Ray himself was an employee of Jefferies & Co., Inc., and was later employed by Jefferies LLC.[54] And as the California Court

---

[54] In support of their motion to dismiss the SAC, the Jefferies Entities submitted an August 6, 2010 email – referenced in the SAC (see SAC (Dkt. No. 256) ¶ 213; August 6, 2010 e-mail (Dkt. No. 229-2)) – that illustrates the intertwined nature of the Jefferies Entities. In that email, Ray – whose email signature states that he is a Managing Director at "Jefferies & Company, Inc." – holds himself out as a representative of Jefferies Mortgage. (See August 6, 2010 email (Dkt. No. 229-2) ("As I have described in past conversations, Jefferies Mortgage Finance Inc. . . . is a commercial mortgage lender. As such, we don't finance military housing as an underwriter. . . . Instead, we originate a commercial mortgage loan off our own balance sheet. . . . This approach

noted, "Plaintiffs have alleged that the Jefferies [E]ntities in essence have operated as one entity" (September 26, 2019 Order (Dkt. No. 261) at 24), and that assertion is supported by documents referenced in the SAC that were supplied by the Jefferies Entities.  (See Jefferies Mortgage Purchase Agreement (Dkt. No. 229-1); August 6, 2010 e-mail (Dkt. No. 229-2))[55]

To the extent that the Jefferies Entities' motion is premised on a group pleading argument, the motion will be denied.

## CONCLUSION

For the reasons stated above, Defendants' motions for reconsideration are granted to the extent that (1) Plaintiffs' breach of fiduciary duty claims against Defendants Ambac and Marfatia are dismissed; (2) aiding and abetting breach of fiduciary duty claims premised on Defendants Ambac and Marfatia's breach of fiduciary duty are dismissed; and (3) Plaintiffs Sill Housing LLC and Lackland Family Housing LLC's RICO claims against Defendants Ambac and Marfatia are dismissed.  Defendants' motions for reconsideration are otherwise denied.  The

---

is consistent with how we have financed all our prior military housing transactions with [this developer]." (emphases added)))

[55]  To the extent Plaintiffs seek to hold Jefferies LLC and Jefferies Group, LLC liable on theories of successor liability, courts in this District have concluded that "'principles of successor liability apply to RICO claims.'"  Am. Buying Ins. Servs., Inc. v. S. Kornreich & Sons, Inc., 944 F. Supp. 240, 249 (S.D.N.Y. 1996) (quoting R.C.M. Exec. Gallery Corp. v. Rols Cap. Co., 901 F. Supp. 630, 635 (S.D.N.Y. 1995)); see id. ("In general, successor liability will lie when:  (1) there is an express or implied agreement to assume the other company's debts and obligations; (2) the transaction was fraudulent; (3) there was a de facto merger or consolidation of the companies; or (4) the purchasing company was a mere continuation of the selling company.").  The Jefferies Entities have not sought reconsideration as to the California Court's denial of their motion to dismiss on the ground that the SAC inadequately pleads successor liability; accordingly, this Court does not consider that question here.

Clerk of Court is directed to terminate the motions (Dkt. Nos. 268, 269, 271, 273).

Dated:  New York, New York
        March 30, 2021

SO ORDERED.

Paul G. Gardephe
United States District Judge