```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                            :
                                         Docket #1:19-cv-09193-
 MONTEREY BAY MILITARY HOUSING,   :  PGG-SLC
 LLC, et al.,
                                  :
                    Plaintiffs,
                                  :
   - against -
                                  :
 AMBAC ASSURANCE CORPORATION, et al.,   New York, New York
                                  :  November 14, 2022
                    Defendants.
------------------------------------ :


                       PROCEEDINGS BEFORE
                  THE HONORABLE SARAH L. CAVE,
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          BROWN RUDNICK LLP
                        BY:  LAUREN TABAKSBLAT, ESQ.
                             MEGHAN MCCAFFERTY, ESQ.
                             JOHANNA FAY, ESQ.
                        7 Times Square
                        New York, New York 10036

For Defendant AMBAC:    QUINN EMANUEL URQUHART & SULLIVAN LLP
                        BY:  DANIEL KELLY, ESQ.
                             TAYLOR JONES, ESQ.
                        51 Madison Avenue
                        New York, New York 10010




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES - CONTINUED:

For Defendant Jefferies: HERBERT SMITH FREEHILLS NEW YORK LLP
                         BY:  SCOTT S. BALBER, ESQ.
                         450 Lexington Avenue, 14th Floor
                         New York, New York 10017

For Defendant Ray:       GIBSON, DUNN & CRUTCHER, LLP
                         BY:  AMER AHMED, ESQ.
                         200 Park Avenue, 48th Floor
                         New York, New York 10166

For Defendant Marfatia:  KATTEN, MUCHIN, ROSENMAN LLP
                         BY:  DAVID GOLDBERG, ESQ.
                         575 Madison Avenue
                         New York, New York 10022

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                        PROCEEDINGS                    4
 2              THE CLERK:   Your Honor, this is in the matter
 3     of Monterey Bay Military Housing LLC, et al. v. AMBAC
 4     Assurance Corporation, et al., 19cv9193.  Counsel,
 5     please state your appearance for the record.
 6              MS. LAUREN TABAKSBLAT:   Good afternoon, Your
 7     Honor, Lauren Tabaksblat from Brown Rudnick on behalf of
 8     the plaintiffs, and with me today are my colleagues Meghan
 9     McCafferty and Johanna Fay.
10              THE COURT:   Okay, good afternoon.  Pleased to
11     meet you.  How about Jeffries?
12              MR. SCOTT BALBER:   Good afternoon, Your Honor,
13     Scott Balber from Herbert Smith Freehills on behalf of the
14     Jeffries entities, and nice to see you in person.
15              THE COURT:    Nice to see you and put a face with
16     the voice.  Okay, how about AMBAC?
17              MR. DANIEL KELLY:   Daniel Kelly from Quinn
18     Emanuel on behalf of AMBAC and with me is Taylor Jones.
19              THE COURT:   Okay, good afternoon.  Pleased to
20     meet you.  Mr. Ray.
21              MR. AMER AHMED:   Good afternoon, Your Honor,
22     Amer Ahmed from Gibson Dunn & Crutcher for defendant
23     Daniel Ray.
24              THE COURT:   Okay, nice to meet you.  And Mr.
25     Marfatia, Mr. Goldberg.
```

```
 1                        PROCEEDINGS                      5

 2           MR. DAVID GOLDBERG:   Good afternoon, Your

 3  Honor, David Goldberg from Katten Muchin on behalf of Mr.

 4  Marfatia.

 5           THE COURT:   I hope you don't mind that you're

 6  always last.

 7           MR. GOLDBERG:   I actually prefer.

 8           THE COURT:   Okay.  That's what I figured,

 9  that's what I figured.  Okay, so I have an agenda of

10  discovery issues that have accumulated over the last

11  several weeks, and so my hope is that we can get through

12  all those today, and if I left anything out, I'm sure you

13  will let me know.

14           Why don't we start with an issue that's sort of

15  lingered since our last conference, and that's the issue

16  of the NPA, the non-prosecution agreement that plaintiffs

17  were seeking additional documents as to Jefferies.  Let me

18  first ask Ms. Tabaksblat, is that still a live issue that

19  we need to resolve?

20           MS. TABAKSBLAT:   Yes, Your Honor.

21           THE COURT:   Okay.

22           MS. TABAKSBLAT:   We're waiting for the ruling.

23           THE COURT:   Okay, so I think I said in my last

24  conference that I was going to write on this.  I just

25  haven't had time.  So I wanted to just hear a little bit
```

```
 1                          PROCEEDINGS                    6
 2  more from the parties today and then I think make a
 3  decision hopefully while we're here.
 4            So now having had a chance to reflect on this,
 5  Ms. Tabaksblat, is there anything further you'd like me to
 6  consider about the plaintiffs' position about why the
 7  additional documents relating to the NPA are relevant and
 8  should be produced.
 9            MS. TABAKSBLAT:   Your Honor, I think we had
10  addressed it at the last hearing, and we, you know,
11  directed Your Honor at that point to the handful of
12  exhibits we attached, and we think that tells the position
13  as to the relevance of those documents.
14            THE COURT:   Okay.  Mr. Balber, anything else
15  you want to say?
16            MR. BALBER:   Nothing to add, Your Honor, thank
17  you.
18            THE COURT:   All right, well, having gone back
19  and I reviewed the transcript of everything that we
20  discussed previously.  I also went back and re-reviewed
21  the NPA itself as well as the decisions relating to Mr.
22  Littbach and the prosecution that the NPA appears to
23  relate to.  And based on that, my conclusions is that the
24  document, additional documents relating to the NPA are not
25  relevant and do not need to be produced.  The NPA is
```

1                              PROCEEDINGS                      7

2  focused on trading and the way that Jefferies was,

3  Jefferies' traders were buying and selling and things that

4  they were saying or not saying to the customers, that's

5  not at issue in this case.  This case is about financing

6  and very complicated transactions that precede the

7  creation  of the RNBS.  Based on that, I think the

8  additional documents would really be a detour from what

9  we're focused on in this case.  And so for that reason I'm

10 going to deny the plaintiffs' motion to compel production

11 of those documents.

12          Next let's start with the other issues that the

13 plaintiffs have raised.  Ms. Tabaksblat, I guess let's,

14 the Handler deposition, do you want to talk about that?

15          MS. TABAKSBLAT:    Thank you, Your Honor.  So

16 plaintiffs noticed the deposition of Mr. Handler.  He's an

17 executive at Jefferies.  There's documents that Mr.

18 Handler was both involved with the initial decision to

19 pursue the purchase of Capmark, selected the team to do

20 the due diligence on that, and specifically, and, Your

21 Honor, this is something that Jefferies actually raised in

22 their own letter on a different issued, characterized the

23 transaction as riskless biz.  And as I'm sure Your Honor

24 reviewed the defendants' letter where they're asking

25 plaintiffs to put up a witness on the basis for that

1                              PROCEEDINGS                    8

2     statement, that statement actually comes from the

3     defendants' own documents and it comes from an email

4     written by Mr. Handler.  It's exhibit D to the letter we

5     sent the Court.  Not only does Mr. Handler characterized

6     the transaction that way, he also says I share the belief

7     that we should be in this biz with him, meaning pursuing

8     this Capmark deal.

9          One of the central issues in this case concerns

10    successor liability and what Jefferies knew or didn't

11    know, what their motivation was in purchasing the Capmark

12    portfolio and this book of business.  When he says it's a

13    riskless biz, what that means and what they understood.

14    Jefferies has essentially articulated two reasons, related

15    reasons as to why Mr. Handler is not an appropriate

16    witness.  Obviously they characterized him as an Apex

17    witness.  They say either he has no relevant information.

18    That's clearly belied by just a handful of documents we've

19    put before the Court.

20         Moreover, they said, well, it's the burden –

21    there's others with similar knowledge that were involved

22    in these meetings and discussions.  And so you should take

23    those depositions first, and then you can establish, the

24    burden is on the plaintiffs to establish a basis to take

25    this deposition.

| 1 | PROCEEDINGS | 9 |

2          Respectfully, Your Honor, as the communications

3    show and as the law is clear, Mr. Handler wrote this

4    email.  If I put this document in front of Mr. Jennings as

5    Jefferies, or Mr. Egland (phonetic), as Jefferies counsel

6    suggests, they're going to say to me, well, I didn't write

7    that.  I have no idea what that means.  So at a minimum

8    we're entitled to ask him those questions.  We're entitled

9    to ask and explore, you know, why Mr. Handler pursued this

10   in the first place, what information he had, what these

11   discussions were.  He obviously has clearly relevant

12   information, and under the law we think there's a clear

13   entitlement to take the deposition.

14          THE COURT:  Okay, was he, and I can ask Mr.

15   Balber this question, was he a document custodian?

16          MS. TABAKSBLAT:  I believe he was, but I would

17   need to confirm that, or Mr. Balber may be able to answer.

18          THE COURT:  Okay, thank you.  Go ahead, Mr.

19   Balber.

20          MR. BALBER:  Thank you, Your Honor.  First of

21   all, he's not just a senior executive of Jefferies, he is

22   the global CEO of Jefferies Financial Group which is a

23   gigantic five billion plus a year revenue institution.

24   This is not some ordinary witness.

25          And I think it's important to take a step back

1                         PROCEEDINGS                    10

2  and understand what the transaction at issue was and how

3  it fits into this equation.  This was an $8.75 million

4  purchase of assets, not a business, assets from the

5  Capmark bankruptcy estate.  So this was a tiny, tiny deal.

6  The diligence for this deal lasted roughly two weeks, and

7  I'll get back to that in a minute, but I want to explain

8  what plaintiffs' broad-based theory here of the case and

9  how it's relevant to Mr. Handler.

10              So they claim that Jefferies met with Dan Ray as

11  part of this diligence process.  Dan Ray said I'm running

12  this big RICO conspiracy, would you like to join, and

13  Jefferies said sounds good, we're in.  That's the gist of

14  it.

15              Now, we've been doing discovery for years now.

16  Your Honor's been very involved in all of it.  There is

17  not a single piece of paper, not one, out of the many

18  millions produced that support anything.  Now, they are

19  going to depose, already scheduled, everybody involved in

20  the due diligence process.  We have four depositions

21  scheduled this week, for example, of Jefferies witnesses

22  in two states.  They're going to depose on Wednesday Paul

23  Frean, who was the chief risk officer of Jefferies, the

24  guy who evaluated exactly the risk question that

25  plaintiffs are asking about.  Next week they're going to

1

2  depose Johan Eveland who was a senior managing director

3  who was also involved in the due diligence process and the

4  meetings with Dan Ray and the like.

5        They've subpoenaed Bill Jennings, another

6  managing director heavily involved in this due diligence

7  process.  They're going to depose Joe Acoso, a fourth

8  managing director involved in all these discussions about

9  this $8.75 million asset purchase.  And, of course,

10  they're going to depose Dan Ray.

11        Now, all we're asking for today, Your Honor, is

12  to defer Mr. Handler's deposition until there can be a

13  conversation and a showing made one way or the other about

14  what Mr. Handler under the Apex doctrine may know uniquely

15  that all of these other witnesses don't know, can't

16  testify about, and what the basis is to take his

17  deposition.  Now, that's all we're asking for.  We, again,

18  we have all these depositions noticed for the next of

19  weeks and early December.  What's the rush?

20        Now, I realize embedded in this conversation is

21  the question of the extension of the discovery deadline.

22  I don't want to pre-judge it.  You're going to have

23  obviously your own views about it, Your Honor.  I'd be

24  very surprised if we are collectively able to finish

25  depositions in this case by December 23 when we don't even

```
 1                      PROCEEDINGS              12
 2  have agreement on 30(b)(6) topics.
 3          So, again, all I'm asking today is to defer this
 4  decision, let all these other witnesses who are already
 5  noticed, already scheduled be deposed, and then we can
 6  have a conversation about what is left that Mr. Handler
 7  uniquely may know that would warrant his deposition under
 8  the Apex doctrine.
 9          THE COURT:   Ms. Tabaksblat, (indiscernible)?
10          MS. TABAKSBLAT:   Your Honor, Mr. Balber just
11  argued a summary judgment motion for you.  You know,
12  obviously we're past the motion to dismiss.  The Court
13  sustains our allegations and told us we could go take
14  discovery.  If this is just an $8.75 million transaction
15  that was absolutely meaningless in the context of this $5
16  billion company, then why is Mr. Handler writing these
17  emails?  Why is he involved in this decision?  Why is he
18  calling it a riskless biz?  These allegations which I
19  obviously completely disagree with Mr. Balber's
20  characterization of the proof and what it shows, but it's
21  not a question of deferring what he knows that's different
22  or unique.  We put in front of the Court the emails that
23  he wrote; he wrote them.  There's no one else we can ask
24  those questions about other than Mr. Handler himself, and
25  under the law we're plainly entitled to do so.
```

```
 1                        PROCEEDINGS                13

 2              THE COURT:   What was his title in 2009, Mr.

 3    Balber?

 4              MR. BALBER:   Chief Executive Officer of the

 5    parent entity.

 6              THE COURT:   Okay.  Is there any --

 7              MR. BALBER:   The only other point I wanted to

 8    make was, yes, he sent a few emails.  That's it.  You've

 9    seen them all.  And, again, I think the recipients of the

10    emails and the people involved in doing the due diligence

11    and analysis this deal should, in the first instance, been

12    asked the question did you understand what Mr. Handler

13    meant by this, and if they say, oh, I have no idea what he

14    meant, well, that may be a different conversation.  If

15    they said, yeah, I know exactly what he meant.  We had

16    this conversation.  Here's what he said and here's what

17    the documents show that support it.  I think that would

18    address the issue.

19              So, again, the only question in the first

20    instance is timing, and we can come back to Your Honor

21    when these other depositions are done and fight it out,

22    and the chips will fall where they may, but, again, not

23    understanding why it needs to happen before everybody else

24    gets deposed.

25              THE COURT:   Well, Mr. Handler's going to sit
```

```
 1                         PROCEEDINGS                    14

 2   for a deposition.  I'm going to limit it to two hours.

 3   And it would be, it's, you know, should be focused on the

 4   topics that are raised in his email which is the

 5   acquisition of the assets from the Capmark estate.  And I

 6   fully support, you know, he's a busy person.  I can only

 7   imagine.  And so if his deposition takes place after all

 8   the other folks that Mr. Balber just listed, that would

 9   seem to make a lot of sense to me because then it could be

10   that much narrower and more focused.

11              But I think based on what I've seen in the

12   emails that he does appear unlike the witness in Iowa

13   which is the case that Jefferies cited to me in its case

14   I'm a little bit familiar with, that situation was

15   different.  Here we have emails where he's essentially

16   either organizing or among the people who are organizing

17   what is a very crucial, according to the parties, one way

18   or the other meeting that occurred in this case.

19              So I think it's appropriate for him to sit for

20   his deposition. I fully support scheduling it whenever

21   he's, whenever works for his schedule.  And by deciding

22   this issue today gives the parties even more time to

23   figure out a time to do it that works best for his

24   schedule along with everything else.  So on that one I

25   will rule in favor of the plaintiffs that Mr. Handler sit
```

1                         PROCEEDINGS                    15

2  for his deposition, like I said limited to two hours and

3  to the topics relating to the acquisition that are set

4  forth in the emails that are the exhibit to the

5  plaintiffs' motion.

6           Okay, from the plaintiffs' perspective any other

7  issues that you want to raise about the defendants'

8  productions?  I'm sure you have a lot to say about what

9  the defendants have said about your privilege issues, but

10  I want to let the defendants speak for some of those

11  issues.

12           MS. TABAKSBLAT:   That's correct, Your Honor.  I

13  think everything else is issues the defendants are raising

14  which we'd like to respond to.  The only other issue we'd

15  like to raise is the timeline for discovery, and I think

16  that's best deferred to the end.

17           THE COURT:   We'll talk about that at the end,

18  yeah.  Okay.  All right, so then with respect to the

19  issues that have been raised about the plaintiffs'

20  privileged documents, I guess that AMBAC.  Does one of you

21  want to take the lead on that?

22           MR. KELLY:   Thank you, Your Honor.  Just to

23  sort of briefly recap, most of this is set out in the

24  letter what's happened since the last discovery

25  conference.  We've meet and conferred with plaintiffs

1                         PROCEEDINGS                 16

2  three times, as Your Honor directed.  They've made,

3  they've given us four additional iterations of the

4  privilege log, they've made six additional productions,

5  totalling 11,000 documents.  Most of those productions

6  appear to be business communications with lawyers copied

7  on them that, as far as we're concerned, should've been

8  produced at the beginning.

9          On the underlying issue of the most contentious

10 one, the common interest privilege, they effectively

11 haven't budged, and they – we asked them to provide

12 additional factual support which they didn't meaningfully

13 do.  They did provide additional legal argument in the

14 form of raising the Kovel doctrine and raising the

15 functional equivalent doctrine which we think are waived.

16 To the extent that they're not waived, we think that they

17 --

18          THE COURT:   Waived, why?

19          MR. KELLY:   Because they – we have been raising

20 these issues with them since April, and they first brought

21 them up on October 20.  They previously asserted plain

22 common interest exception, they shared a common legal

23 interest, and they did that twice in two different letter

24 exchanges that we had, and it wasn't until October 20,

25 after we've met and conferred twice, that they introduced

1
2  Kovel functional equivalent doctrine.  In any event, we
3  think that those contentions fail on the merits, and we
4  think that production of those documents is warranted.

5          In addition, as we set forth in the letter,
6  given the conduct over these multiple meet and confers and
7  the previous letter exchanges, I mean since we first
8  pointed out issues with plaintiffs' privilege log, they've
9  produced 20,000 additional documents.  After they
10 represented that everything had been settled, counsel for
11 Dan Ray noted additional issues in their productions.
12 This was in late October, and they produced further
13 documents past that.  And we have lost faith in the
14 integrity of their review process --

15          THE COURT:  So what do you want me to do?

16          MR. KELLY:  We realize that that it's a little
17 bit strange to ask the Court toe effectively spot-check a
18 privilege log --

19          THE COURT:  Yeah.  Not going to happen.  I can
20 tell you you're going to be about fifth in line on my
21 privilege review cases right now.  So be very focused on
22 what it is you're asking me to do.

23          MR. KELLY:  Okay, well, with respect to the
24 common interest documents/Kovel/functional equivalent, we
25 think that a review of 30 documents paired with briefing

```
 1                          PROCEEDINGS                18
 2   setting forth the legal issues would be most helpful, and
 3   we propose that that's the appropriate course of action.
 4           THE COURT:   Okay.  And common interest is, that
 5   relates to the Air Force, Navy, Army, and JLL as well as
 6   the financial advisors that that issues encompasses all of
 7   those --
 8           MR. KELLY:   Right, when I said common interest,
 9   I mean third-party communications.
10           THE COURT:   Okay.
11           MR. KELLY:   Which they assert attorney-client
12   privilege in three anti-waiver doctrines.  Those would be
13   common interest and Kovel and functional equivalent.
14           THE COURT:   Okay.  All right, and then the
15   other issue is the unclean hands privilege log?
16           MR. KELLY:   Right, with respect to that we
17   noted a series of errors in both the productions and the
18   logs including that they withheld a letter from Senator
19   Warren --
20           THE COURT:   You love to talk about that letter.
21   It's like the fifth time in this case I've heard about
22   that letter.
23           MR. KELLY:   The letter was attached to an email
24   from a lobbyist that was heavily redacted which we also
25   would contend is inappropriate, but we sent them a letter
```

2  setting forth those issues, and they responded to us after

3  some time saying that they didn't think that they needed

4  to do anything, and we've met and conferred with them on

5  that issue and they confirmed that they hadn't even

6  obtained the underlying documents or looked into any of

7  our, any of the issues that we raised.  And we understand

8  that the Court has tried to minimize the burden associated

9  with the unclean hands productions, but we don't, we've

10 reviewed the transcripts and sort of written orders that

11 have come out of that, and we don't understand the Court

12 to effectively exempt them from the obligation to

13 investigate privilege calls that are raised.

14         THE COURT:   How many privileged documents were

15 withheld?

16         MR. KELLY:   I don't have that right off the top

17 of the head.  I think it's in the order of a thousand,

18 give or take.  It might be a little bit --

19         THE COURT:   It's not shocking to me that in a

20 government investigation the privilege assertion is

21 potentially overbroad, and it's not challenged because it

22 went a different way in terms of, didn't end up in court

23 in other words, and so there was not a challenge to the

24 privilege assertion.  So it doesn't sort of surprise me

25 that it was a generous assertion on the part of, you know,

```
 1                           PROCEEDINGS                    20
 2    counsel who was producing those documents.  But you have
 3    all the logs for those --
 4              MR. KELLY:   Yes.
 5              THE COURT:   Okay.  And are there particular
 6    segments of the investigation, of those investigations or
 7    those documents that were produced that are most relevant?
 8    I'm just trying to think of ways to narrow down what it is
 9    we actually need to focus on.  You now have all the
10    unclean hands or, you know, you have a lot of the unclean
11    hands information that you didn't have before.  Do we know
12    which of those, whether it was the Senate or the House or
13    DOJ or something else that are most pertinent to your
14    defense of this case?
15              MR. KELLY:   I don't want to go on the record
16    about that, I'm not prepared --
17              THE COURT:   It's something you could think
18    about.
19              MR. KELLY:   -- I'm happy to think about it.
20              THE COURT:   All right, let me hear from the
21    plaintiffs for a few minutes.
22              MS. TABAKSBLAT:   So, Your Honor, I'll start
23    with the unclean hands privilege log.  So as Your Honor
24    recalls, we've obviously spent a lot of time talking about
25    this unclean hands production, and I believe the way it
```

```
 1                      PROCEEDINGS                  21
 2  started was Your Honor said I don't want this to become a
 3  frolic and detour.  And where we ultimately ended up was
 4  the April 29, 2022 conference Your Honor said to us why
 5  can't you just give them the productions that were
 6  previously produced, and you even directed us not to re-
 7  review them, and we didn't.  We just took the productions,
 8  I actually can't even tell you whether we re-Bates stamped
 9  them, and we just turned them over.  And with respect to
10  the privilege log, we did exactly the same thing.
11            And so what I explained to counsel for AMBAC on
12  a meet and confer is I don't have the documents that were
13  withheld as privileged.  They're not in my possession.
14  They're in the possession of another law firm that
15  represented my client in connection with a government
16  investigation.  And so it's not a matter of us having an
17  obligation to review privilege assertions; I don't have
18  those documents.
19            THE COURT:   Can you get them?
20            MS. TABAKSBLAT:   Potentially, but I think the
21  second more important issue here is they haven't
22  demonstrated, and I understand that you just asked counsel
23  to demonstrate the relevance here, but, you know, Your
24  Honor, we produced the production, I don't have the exact
25  number, but it's thousands of documents, potentially tens
```

```
 1                    PROCEEDINGS                22
 2  of thousand, and the log itself, as counsel just
 3  indicated, has thousands of entries on it.  There hasn't
 4  been a single articulation of what else they need.  We
 5  started with give them summary documents, and then that
 6  turned into give them the entire production which we did.
 7  And up until now we've given them and keep giving them for
 8  something that Your Honor recognized was a I believe, I
 9  don't want to misquote the Court, but a tangential
10  affirmative defense, and there hasn't been any
11  articulation of the relevance.
12          So, yes, we don't have the documents, we can go
13  and try to obtain them, and then I don't know what the
14  universe of that database looks like.  We need to get a
15  transcript, we need to review it, as Your Honor said,
16  there could've been different privilege assertions in a
17  government investigation and how those, the interplay of
18  those and why those decisions were made which were made by
19  another firm that we weren't privy to and we don't
20  represent the client in that investigation with respect to
21  that particular issue.  And I just think that's completely
22  inappropriate without even any demonstration of relevance
23  --
24          THE COURT:  We've already crossed the bridge on
25  relevance.  I described the documents that are relevant.
```

```
 1                          PROCEEDINGS                    23
 2  So if they were withheld, if they were privilege documents
 3  that were relevant that were withheld, then they're
 4  automatically relevant.  Like they're part of the
 5  investigation, they're relevant.  Just because they're
 6  privileged doesn't make them irrelevant.
 7            MS. TABAKSBLAT:   Well --
 8            THE COURT:   So I understand you're trying to
 9  focus on why they need the privilege documents, I get
10  that, but they're relevant, they're part of what I've
11  already said is relevant.  So just the question of is the
12  privilege appropriately, is a privilege appropriately
13  asserted against those documents, and what I'm trying to
14  do is narrow down what we have to fight about.
15            MS. TABAKSBLAT:   Understood, but I think, Your
16  Honor, to the extent that they're relevant, I think we
17  come back to the initial question that the Court asked
18  which is can we do this through summary documents.  Do we
19  need to do a same privilege re-review with respect to
20  thousands of documents when we can get to the issue with a
21  much more narrowed universe.
22            THE COURT:   Well, I'm not at the point of
23  asking you to do a re-review of thousands of documents
24  that were withheld by another firm on the basis of
25  privilege.  What I am hoping that we can figure out is
```

1
2  looking at the logs are there particular documents that
3  defendants think are, A, most important to get if they're
4  not privileged and, B, the privilege assertion is most
5  questionable.  And that would be what we would be asking
6  you to, the plaintiffs to gather and re-review.  It makes
7  sense in a matter of efficiency to start the process of
8  getting, finding out where those documents are and getting
9  them even if you don't have to review them yet.  It makes
10 sense to have them or at least have access to them.  And
11 then we'll figure out what exactly it is we need to look
12 at.

13         MS. TABAKSBLAT:  Understood.  If Your Honor
14 doesn't have any further questions, I'll turn to the
15 privilege log in this case.

16         THE COURT:  Yes.

17         MS. TABAKSBLAT:  So we set forth in our letter
18 that, you know, the defendants are raising the, you know,
19 validity of a privilege log with respect to 42,000 entries
20 but actually only talking about a subset of common
21 interest documents which is 4,000 or so entries.  Of those
22 4,000 entries they've told us in a meet and confer last
23 week that they're not objecting to the assertion of common
24 interest with respect to the DSRF litigation which was the
25 precursor to this case.  So it's a much smaller subset.

1
2 I'm not sure, based on the direction Your Honor just gave
3 to defense counsel, that we need to go through the entire
4 history of what happened here --
5        THE COURT:   I don't want to go through the
6 history.
7        MS. TABAKSBLAT:   -- and that's fine.  So I
8 think I agree to the, I think that there's a proper basis
9 for the articulation of the common interest.  We did do a
10 re-review.  And so we do think that the issue needs to be
11 decided on a full record, and so it does sound appropriate
12 for the parties to be able to address a subset and for us
13 to state our position with respect to that subset.
14        THE COURT:   Okay, I mean my main caution, I
15 understand the distinction between the common interest
16 privilege, what the plaintiffs are saying about the
17 assertion in the non-litigation context versus the
18 litigation context.  It just does seem a little
19 inconsistent, at least just based on what I have in the
20 parties' letters, talking about the financing and
21 development of the projects.  I guess it's not clear to me
22 what legal advice was being given in that process, and so
23 that's what I'm struggling with such a broad assertion of
24 privilege, of the common interest privilege and something
25 that, you know, if it were the defendants asserting this,

PROCEEDINGS                    26

1

2  you'd be saying these are business decisions that are

3  being made and just because a lawyer's in the room doesn't

4  mean that they're privileged.

5          So that's the area where I'm struggling and then

6  also communications with, I mean Air Force, Army, Navy,

7  and JLO, I mean I understand there are a lot of different

8  housing projects for different branches of the armed

9  services, but, again, that's just a huge blanket assertion

10  of privilege.  And so, you know, I think trying to focus

11  it on the most important aspects of those communications

12  that you think are (indiscernible) by the common interest

13  privilege is really what's appropriate.

14          MS. TABAKSBLAT:   So, Your Honor, I completely

15  agree with everything you just said.  Prior to this

16  conference and prior to the submission of letters, we've

17  reached out to the defendants and said are there

18  particular parties or particular entries that you want to

19  have a conversation about because as counsel indicated we

20  did go back and did a re-review, and the product of that

21  re-review is a production because we looked at each

22  document and said is this a business, really a business

23  transaction that lawyers are copied on or is this in

24  furtherance of legal advice.  So that did result in a

25  production, and we're not claiming that every

```
 1                        PROCEEDINGS                    27
 2  communication that JLO or the Army is on is privileged.
 3  These were the basis of a particular review and inquiry
 4  that you just described.  But I think it's appropriate to
 5  address it on a document by document basis.
 6            THE COURT:   So if the defendants are saying
 7  they're not objecting to the DSRF documents under common
 8  interest and you said there were 4,000 entries, how much
 9  does that knock out?
10            MS. TABAKSBLAT:   I would need to get you the
11  exact numbers, but it's certainly a subset of that.  And
12  just so that we're clear, the entries don't perfectly
13  align with documents because there's a pair and an
14  attachment which I think explains the disconnect between,
15  you know, counsel indicating we produced X number of
16  documents which sounds larger than the entries.
17            THE COURT:   Okay.  All right, but what Mr.
18  Kelly's proposing is that the parties agree on 30 of the
19  common interest documents that I would review.  Can you do
20  that?  And usually what I do is I ask the parties to agree
21  on 30, 30 exemplars, and if you can't agree, then, you
22  know, you each submit 15 and then I review that 30.
23            MS. TABAKSBLAT:   We'll either agree or submit
24  15, but we will certainly comply.
25            THE COURT:   Okay, and then you want to do
```

PROCEEDINGS                    28

1
2   letter briefing I guess on the assertion of the privilege
3   issues.  Because, like I said, I kind of need more
4   information about what these relationships are.
5        MS. TABAKSBLAT:   Correct.  We'll provide the
6   legal basis along with the context of the document.
7        THE COURT:   Okay.  All right, so, Mr. Kelly,
8   then on the common interest privilege, it seems like we
9   have a process for you two meeting, well, both sides
10  meeting and conferring and selecting 30 documents, and if
11  you can't select 30, then the plaintiffs select 15 and the
12  defendants select 15, and then that'll be what I'll
13  review.  And then at the end we can talk about what a
14  schedule would be submitting those with a back and forth
15  set of letters.  Fair enough?
16       MR. KELLY:   Thank you.
17       THE COURT:   Okay, and then on the unclean
18  hands, do you want to reflect on that and talk among the
19  defendants about trying to figure out if there's, you
20  know, one particular investigation or a couple of
21  investigation that you're most focused on, potentially,
22  you know, privileged documents, A, that are most important
23  to you and, B, that you think the privilege assertion is
24  most questionable.
25       MR. KELLY:   Sure, we'll take a look at that and

```
 1                         PROCEEDINGS                    29
 2   we'll discuss amongst ourselves.  I think it would be
 3   helpful if plaintiffs could provide us with an attorney
 4   list --
 5             THE COURT:   Okay.
 6             MR. KELLY:   -- since one of the logs is
 7   supposed to have one.
 8             THE COURT:   All right.  Okay, we'll talk about
 9   that at the end.  Okay, thank you.  Anything else on
10   privilege then?  Okay.
11             All right, 30(b)(6) deposition topics.  Mr.
12   Balber, do you want to start with this?
13             MR. BALBER:   Sure, thank you, Your Honor.  So
14   this is an issue that's been germinating for a long time.
15   We had served most recently revised notices that reflected
16   the meet and confer process.  I think we did that middle
17   of September, September 19.  November 1 we got a response
18   finally which still takes issue with a number of topics.
19             In order, the first one of consequence is the
20   basis for plaintiffs' allegations, and this is something
21   that we mentioned a few minutes ago, which is, one, who
22   were the people at the various plaintiff projects and
23   developers that claim they believed that we Jefferies or
24   our predecessors were acting as fiduciaries.
25             THE COURT:   This is topic 17, right?
```

1                          PROCEEDINGS                    30

2              MR. BALBER:   That's number 17, who were those

3    people.  And then, secondly, what is plaintiffs' basis for

4    alleging that this was a riskless business?

5              THE COURT:   (indiscernible) to Mr. Handler's

6    email.

7              MR. BALBER:   Well, except they didn't have Mr.

8    Handler's email when they filed the complaint or when they

9    --

10             THE COURT:   I know.

11             MR. BALBER:   Yeah.  So - and we disagree with

12   the premise, but were they and what was their basis.

13   Happy to pause or happy to go to the next topic or

14   whatever.

15             THE COURT:   Let's get through all of them and

16   then I'll hear from (indiscernible).  So that's 17 and 19.

17             MR. BALBER:   That's right, Judge.

18             THE COURT:   Okay, and then 5 and 9 or whatever

19   order you want to go in is fine.

20             MR. BALBER:   Well, the next one is 48, and this

21   is another I think issue with consequence where plaintiffs

22   are claiming that there was some market interest rate and

23   that they were charged an excessively high interest rate

24   relative to whatever this claimed market is.  We obviously

25   take issue with the notion that there was any market

PROCEEDINGS                    31

1
2    interest rate or that the interest rate they were charged
3    was too high, but what we want the plaintiffs to proffer
4    witnesses to testify about is all the other deals that
5    they did, military housing deals, in the same timeframe
6    and what the interest rates they were charged.  Because,
7    again, if it turns out to be the case that our interest
8    rates were the same, were lower, were higher, that's all
9    relevant to the question of what this purported market
10   rate is and how it's calculated.
11        THE COURT:   Okay, so so far on all three of
12   these, I get why you want them.  Why does it need to be a
13   30(b)(6) topic as opposed to contention interrogatory or
14   something else?
15        MR. BALBER:   Well, I mean I guess it could be
16   contention interrogatories down the road, but I'm not, I'm
17   really not sure why that's a more efficient mechanism to
18   get there, and that's going to happen obviously later in
19   the process.  And I think if it turns out that the witness
20   who is the 30(b)(6) person says, well, it was Frank who
21   believed that you were fiduciary, well, I want to be able
22   to depose Frank, and I'm not going to know that until the
23   30(b)(6) gets deposed and that information's disclosed.
24        THE COURT:   Okay.  Well, on the interest rate
25   one though I guess what I'm struggling with is that kind

```
1                        PROCEEDINGS              32

2  of encyclopedic knowledge of a listing of interest rates

3  as opposed to just a document.  I mean is there anything

4  that's been produced in discovery that shows the other

5  interest rates for the projects?

6          MR. BALBER:  No, Your Honor.  I'm happy with

7  that as an alternative.  If they're wiling to produce a

8  document or documents and maybe the document can be just a

9  spreadsheet that a witness is going to be able to attest

10  to the veracity of, that would be great.  It doesn't need

11  to be a memory test, but somebody needs to be able to take

12  ownership for each project, and, again, there's four

13  developers, so it won't be 50 for each.  But whatever the

14  number is for each, we want to be able to test that.

15          THE COURT:  Okay.

16          MR. BALBER:  Number 5 and 9 relate to financial

17  sophistication, and obviously we take the position in this

18  case that these were extremely sophisticated entities who

19  were advised by extremely sophisticated advisors, and some

20  of the metrics of their financial performance is relevant

21  to that.  I'm not sure this needs to be encyclopedic

22  either, but, again, I'm not sure the basis for the

23  objection.

24          THE COURT:  Well, I understand – well, I would

25  object to having to remember my company's metrics and so I
```

1
2  understand sophistication and I totally get that and I

3  think that's a valid topic.  It's just the way that we're

4  going at it with these two topics, you know, and as we all

5  know, financial performance does not necessarily mean

6  sophistication.  I mean whoever won the lottery, you know,

7  two weeks ago was not necessarily a financially

8  sophisticated person.  Maybe he or she was, but they're

9  just very lucky.

10         Is there another way that we can come at

11  sophistication that doesn't require sort of a knowledge of

12  accounting, statistics, and things like that over time?

13         MR. BALBER:  The intent was not to have this to

14  be a statistical compilation, and maybe we can kind of

15  tweak the way it's framed because we do want to get at

16  financial sophistication.  I agree with you that, you

17  know, numbers are not necessarily indicative, although

18  they may be informative.

19         THE COURT:  Maybe.

20         MR. BALBER:  So I mean as long Your Honor is in

21  principle on board with the concept, I think we probably

22  could take that away and do a better job on framing it.

23         THE COURT:  I'm fine with the concept of

24  sophistication; I just want to come at it in a way that a

25  witness is better able to prepare for and not have you

PROCEEDINGS                    34

1

2   come back and complain that the witness wasn't prepared to

3   answer the question.  So whether that's, you know, I'm not

4   exactly sure, and this would be a question posed to a

5   developer 30(b)(6) witness or --

6             MR. BALBER:   Correct, yeah.

7             THE COURT:   So I mean I can think of other ways

8   to go at this.  How many financing deals have been done

9   before?  You know, what advisors, did you use advisors in

10  the past?  What did you do to prepare for these types of

11  transactions?  Who were your other advisors?  Like that

12  kind of thing I think is totally --

13            MR. BALBER:   That's right, and the quantum of

14  the deals and the number of different participants.

15  That's exactly right.  It was not intended to be

16  statistical, but that's exactly what we're looking for,

17  Your Honor.

18            THE COURT:   Okay, so if we could combine, I

19  mean I'll take time to hear from Mr. Tabaksblat, but maybe

20  she can reflect on the suggestion of a more holistic

21  approach to sophistication I think is better.  And I think

22  that's more likely to get you an answer that you're

23  looking for anyway.  Okay.

24            MR. BALBER:   And there's one more and then

25  that's it for our topics.  This is the guaranteed

```
 1                        PROCEEDINGS                    35
 2   investment contracts issue.
 3             THE COURT:   You got to remind me about this
 4   because I've been gone from the case for a while.
 5             MR. BALBER:   Yeah, so each of the deals had a
 6   component which was this guaranteed investment contract
 7   which in a prior iteration of the complaint plaintiffs
 8   claimed was fraudulent, that they were fraudulently
 9   induced to enter into these guaranteed investment
10   contracts.  When we were on the West Coast, our judge
11   there dismissed the complaint on PSLRA grounds because, as
12   you know as well - right.  So these were securities
13   contracts.
14             In the newest iteration of the complaint, the
15   operative version, plaintiffs have excised any reference
16   to these guaranteed investment contracts, but we still
17   have an affirmative defense, and we're still able to probe
18   whether, in fact, there were, or they still contend or
19   contended or had a basis to contend that these guaranteed
20   investment contracts were forced upon them under
21   fraudulent means.
22             THE COURT:   What I'm missing is the connection
23   between your - if they're no longer in the case, why do
24   you still (indiscernible) with them?
25             MR. BALBER:   Well, the fact that they've
```

excised them from the complaint doesn't mean they weren't

part of the gestalt of the total allegations they made in

the first instance, and if they are inseparable from the

remaining allegations, whether they plead them or not,

would give us, we believe, a basis to seek dismissal under

the PSLRA.

THE COURT:   So what is it about the GITs that

you want to know?

MR. BALBER:   What were the circumstances in

which they were agreed upon, what were you told, what did

you believe?  Of the things you were told and that you

believed, what was false?  What did you understand these

GITs to be and what did you understand them to mean?  And,

oh, by the way, in a prior complaint, which you all agreed

to, you made these allegations.  What's different today?

THE COURT:   I still don't understand why that,

what does any of that, how does that meet a defense that

gets rid of any claims against --

MR. BALBER:   Because if those GIT contracts,

whether alleged in the complaint or not, are tied to the

allegations that remain in the complaint, we would have a

basis to claim that the entire complaint is barred by the

PSLRA.

THE COURT:   Okay.  All right, you want to --

```
 1                    PROCEEDINGS                37
 2          MR. BALBER:   Thank you.
 3          THE COURT:   Thank you, Mr. Balber.  If you want
 4   to go in the same order so I can keep track.
 5          MS. TABAKSBLAT:   Sure.  So I'll just start by
 6   saying that, as Mr. Balber stated, we sent this letter on
 7   November 1.  We haven't - or November 2 it seems.  Sorry,
 8   November 1.  And Jefferies never reached out to meet and
 9   confer with us on this, and I think some of this we
10   could've maybe resolved because I agree with some of the
11   conversation that you just had with Mr. Balber, and I
12   think we also could've clarified some of these issues.
13          So with respect to the fiduciary duty, we didn't
14   say we're not putting up a witness with respect to that
15   topic.  We just said the term fiduciary duty calls for a
16   legal conclusion.  And I think the way to deal with this
17   is just to have a conversation about what the appropriate
18   term is, financial advisor or somebody who has a duty.
19   It's just an objection to the term.  We never objected to
20   putting a witness up on this, and I think this is
21   something that the parties can easily work through
22   between, in a discussion.
23          THE COURT:   Okay.
24          MS. TABAKSBLAT:   With respect to the riskless
25   biz document, as Your Honor recognizes and I discussed
```

1

2    earlier, I told you what the basis for that is.  I

3    actually don't know when that document was produced.  It

4    may have been produced in the DSRF action.  Standing here

5    today I can't tell you so I need to go back and look.  We

6    certainly are willing to put up a witness to say that,

7    that that's where it came from.  And so, again, these are

8    things I think the parties could work through.

9            With respect to the interest rate, again, Mr.

10   Balber mischaracterized our theory of the case.  We're not

11   saying there was a market interest rate and we didn't get

12   that.  We're saying that there were representations made

13   with respect to what rate we were going to be, we were

14   going to get with respect to each and every deal and that

15   with respect to the deals that are the plaintiffs in this,

16   the projects that are plaintiffs' in the case, we didn't

17   get that deal at that time because the bonds were presold

18   and Jefferies and Capmark and GMAC profited off of that.

19   So we're not comparing it to other rates.

20           I think more particularly and more important

21   with respect to this issue, and maybe that explanation of

22   what our theory is resolves the issue for Mr. Balber, but

23   more importantly, Mr. Balber and maybe some of the other

24   defendants stood in front of the Court on a phone call

25   months ago and told the Court that the interest rates with

```
 1                          PROCEEDINGS                    39
 2   respect to the other projects that Jefferies and AMBAC did
 3   is not relevant, and they objected to turning discovery
 4   over to us on what their other deals were.  And so the
 5   Court said, well, the plaintiffs can have three deals,
 6   they can't have the remainder of the deals.
 7              So for Mr. Balber to now get up here and say,
 8   well, this is relevant and we need a witness so you can
 9   tell us what your rates are but we're not going to give
10   you the rest of the market rate, I think we need to get to
11   that issue because that's not what we're alleging, but,
12   more importantly, if it is, then we should be entitled to
13   that discovery too.
14              THE COURT:  So your argument is you were
15   supposed to get, on deal A you were supposed to get 7
16   percent and instead you got something higher or lower than
17   that.  That's the argument.
18              MS. TABAKSBLAT:   Correct.
19              THE COURT:  Okay.  Not that there was some
20   other prevailing rate that somebody else got and you
21   didn't get.  It was just what was represented is not what
22   you got.
23              MS. TABAKSBLAT:  Our argument is not that the
24   rate for every military housing deal should've been 8
25   percent and we paid 15 percent on every deal.  Our
```

```
 1                      PROCEEDINGS                40
 2   argument is that there were representations with respect
 3   to best efforts to get a certain rate with respect to the
 4   risk that they were taking and components that were being
 5   charged to us as a result of that risk when, in fact,
 6   there was no risk that was ever taken.  And so there were
 7   components built into the pricing that was inconsistent
 8   with how, with the deal that we almost got, that we
 9   ultimately got.
10          So it's very deal specific.  It's looking at
11   what we were told the market was on X deal and then what
12   we were charged versus, and has nothing to do with the
13   other deals in the market.
14          THE COURT:   Okay.  I had suggested a compromise
15   on sophistication, 5 and 9.
16          MS. TABAKSBLAT:   Yeah, and, again, I think this
17   goes to the meet and confer issue.  We do not object to
18   putting up a witness on whether we had advisors, whether
19   we had lawyers.  We will obviously, and I believe there
20   are other topics that go to this.  The topics that were
21   identified here, 5 and 9, don't ask for that.  They ask
22   for the profits we made on this deal.  That doesn't have
23   to do with sophistication.  So, again, we agree with the
24   compromise that Your Honor articulated, and I think that's
25   something that the parties could agree to.
```

```
 1                        PROCEEDINGS                    41
```

```
 2            With respect to the GIX which I think is the
 3    last issue, Mr. Balber just articulated a theory that the
 4    district court had rejected.  He briefed this in his
 5    motion to dismiss, and he said he has a PSLRA defense
 6    because we previously argued this and then we withdrew it,
 7    and that doesn't exempt the PSLRA defense.  However, the
 8    Court said, the Court rejected that argument and allowed
 9    the case to go forward.  So I think that that has already
10    been resolved.
```

```
11            THE COURT:   Well, I mean the defense is still
12    in the case.  So I mean how hard is it to just have a
13    witness who can explain what the, what they knew, what the
14    plaintiffs knew about the GIX which is what they were told
15    and what they understood those deals to be.  That doesn't
16    seem unduly burdensome.
```

```
17            MS. TABAKSBLAT:   I think Your Honor's correct
18    that there's probably a very narrow category about how
19    this interacts with the claims that we are actually
20    pursuing, and with respect to that a witness can testify
21    as to that.  But with respect to the GIX generally and
22    every aspect in detail, I do think that's improper.
```

```
23            THE COURT:   I mean a 30(b)(6) witness is never
24    expected to testify about everything in detail, but I
25    guess I would put this in another, in the category of what
```

```
 1                         PROCEEDINGS              42
 2   the parties can talk about about what it is, Mr. Balber
 3   can maybe elaborate on what it is he needs for his
 4   defense, and you can prepare your witness to address that
 5   sort of narrow issue.  It does seem to be a relatively
 6   narrow issue but, you know, sort of just a basic
 7   understanding of how the GIX, you know, why they were
 8   alleged in the first place and then what relationship they
 9   had to the rest of the financing I think would just be
10   helpful.
11         MS. TABAKSBLAT:  I absolutely agree that a
12   discussion will be helpful, and I do think we can reach a
13   middle ground.
14         THE COURT:  Okay, great.  So I guess where we
15   are across the board is that on all of the issue that -
16   well, with the exception of the interest rate I guess the
17   plaintiffs are willing to meet and confer with the
18   defendants and try to come up with a satisfactory
19   resolution to each of these.
20         MS. TABAKSBLAT:  Correct.  And with respect to
21   the interest rate, Your Honor, we're happy to sit down, I
22   mean we did serve interrogatory responses on damages to
23   explain this, but we're also happy to have a meet and
24   confer and explain the damages that, you know, our damage
25   theory, and that may narrow the issue as well.
```

| 1 | PROCEEDINGS | 43 |

2          THE COURT:   Okay.  Okay, thanks.  Mr. Balber.

3          MR. BALBER:   Two points, Your Honor.  First of

4 all, as I said at the outset, we've been negotiating this

5 issue for seven months.  So to suggest that we somehow

6 jumped the gun in November by bringing this to Your

7 Honor's attention, when plaintiffs are asking us to adhere

8 to a December 23 cutoff, it's pretty laughable.

9          But let me focus on the substantive issue, and I

10 just want to be very clear because this could change the

11 dynamic of the case.  I understood Ms. Tabaksblat to say

12 that there is no market interest rate that they are

13 claiming should have governed this case.

14          THE COURT:   That's what I heard as well.

15          MR. BALBER:   Okay, so I just want to be clear

16 on that, that all that they're saying is that they were

17 promised some other rate different than the rate – and I

18 just want to make sure because I don't want to waste

19 anybody's time.  There was a different rate that they were

20 promised as opposed to what they got.  And if that's the

21 case, I just want a witness to tell me what that promised

22 rate was.

23          THE COURT:   Okay, the promised rate on the

24 actual deals.

25          MR. BALBER:   Yeah, on each deal, on each deal.

```
 1                        PROCEEDINGS                    44
 2            THE COURT:   On the non-MHPR deals as well?  I
 3   don't think that those matters.
 4            MR. BALBER:   Well, if the theory of the case
 5   has evolved, which it seems like it has, then yeah.  All I
 6   want to know is what rate were you promised.
 7            THE COURT:   So you want the witness to be able
 8   to testify to that --
 9            MR. BALBER:   Yes.
10            THE COURT:   Okay.  All right, what I'd like to
11   do, mindful that Thanksgiving is next week, I'd like to
12   give you, since there's some other issues the parties have
13   to meet and confer about as well, I'd like to give you one
14   more chance on the 30(b)(6)'s before I have to go sort of
15   taking a pen to the parties' 30(b)(6)'s which I have done
16   in the past, and I can tell you you're not going to like
17   it.  Neither side will like it because I know the least
18   about this of anybody.
19            MR. BALBER:   And just one more point.  My
20   recollection is that the operative complaint also talks
21   about above-market interest rates.  So if that's not the
22   case, I need to, I mean obviously we need to get this
23   documented crystal clear because that changes everything.
24            THE COURT:   You have a recording, you can get a
25   transcript of this --
```

```
 1                        PROCEEDINGS                    45
 2           MR. BALBER:   Yeah, well --
 3           (interposing)
 4           MR. BALBER:   Okay.
 5           THE COURT:   Okay.
 6           MS. TABAKSBLAT:   Your Honor, just so I can
 7   address that.  And I think the Court and Mr. Balber came
 8   to the conclusion at the end, but we're not saying that we
 9   weren't charged above interest rates.  What we're saying
10   is that it's not that every project across the entire
11   military housing portfolio had X rate and we were charged
12   Y.  What we're saying that in the context of those
13   particular projects, we were charged more than the market
14   rate.  And so it's not required to look at all these other
15   projects to ascertain what our theory is; we need to look
16   at the context of just the projects that are in this case.
17           THE COURT:   That's different --
18           MR. BALBER:   Okay, Judge --
19           THE COURT:   -- than what I understood you --
20           MR. BALBER:   That's different than what I
21   understood too.  And here's why our standing 30(b)(6)
22   topic matters.  Okay?  Give you a hypothetical.  On X date
23   we gave an interest rate to Y project.  The terms of that
24   project were the size, this location, these metrics.
25   Another project, not one of our projects, same day, same
```

PROCEEDINGS                          46

1

2   metrics, different interest rate.  I mean how based upon

3   what Mr. Tabaksblat just said as distinct from what she

4   said two minutes ago, how is that not directly relevant to

5   what is the market rate on a per project individualized

6   basis?  This is critically important.  This is the whole

7   case.

8           MS. TABAKSBLAT:   So, Your Honor, I may not be

9   articulating this clearly.  I'm not objecting to putting

10  up a witness with respect to the per project interest

11  rate.  What I'm saying is not relevant is what the

12  interest rates were for all the other projects in the

13  market that are not parties to this case.

14          THE COURT:   Okay, that's - you don't need that

15  - she's right that we did have a fight about this, and you

16  guys didn't want to produce it either.  But tell me is it

17  something different --

18          MR. BALBER:   Apples and oranges.

19          THE COURT:   I was afraid --

20          MR. BALBER:   Because I'm not claiming, Judge,

21  respectfully, that there was a market interest rate.

22          THE COURT:   I know.

23          MR. BALBER:   That's the difference.  They're

24  claiming you committed fraud by charging me an above-

25  market interest rate.  I don't think there's such a thing.

```
 1                        PROCEEDINGS                    47
 2  My witnesses will say what're you talking about?  This is
 3  not like a public stock exchange where you look at a price
 4  on the Bloomberg terminal.  It doesn't work that way.
 5  They're claiming it.
 6            So what - because I don't believe there is a
 7  market rate.  What I did with other projects is
 8  irrelevant.  But they're the ones, they're the ones who
 9  contracted with other lenders in the same timeframe and
10  agreed to interest rates.  And if those interest rates are
11  the same as or higher than the interest rates I charged on
12  projects that are similar in the same timeframe, it
13  fundamentally undermines their whole theory of the case.
14  That's why it's apples and oranges.  And we did, as Your
15  Honor may recall, we did identify a handful of projects
16  that they picked where we produced the documents.  But the
17  issue wasn't interest rates.  The issue was, if I recall,
18  the terms of the mortgage and note documents, what were
19  the terms that we offered these other deals.  We produced
20  three exemplars.  We haven't heard about it in six months.
21            THE COURT:   So the other thing that Mr. Balber
22  said he could live with on this, Ms. Tabaksblat, is a
23  spreadsheet just with the list of the rates of what the
24  other deals were.  Is that doable?
25            MS. TABAKSBLAT:   So I think, Your Honor, this,
```

```
 1                        PROCEEDINGS              48

 2  and I don't want to, I'm hesitant to sort of go into too

 3  much detail for the Court, but I think the disconnect here

 4  is that there's commercial loans which were the format of

 5  the loans that were relevant for the projects in our case

 6  and there's public offerings.  And so when we're talking

 7  about interest rates and so we're talking about what was

 8  promised on each deal, and it's in the context of

 9  different structures of the financing.

10        And so we're – I'm hesitant to sort of get into

11  too much detail, but so what our claim is is that we were

12  promised a commercial loan which was at Jefferies, GMAC,

13  Capmark, they were taking the risk.  They were going to

14  lock the rate on X date, and regardless of how the market

15  went, they were going to close on that deal.  They were

16  giving us certain T2 close.  In addition to that

17  commercial, as part of that commercial loan, what they

18  were going to give us was they were going to use their

19  best efforts to get us the best rate.

20        They were also charging us fees and OID, other

21  types of fees for the risk that they were taking that the

22  market was going to move dramatically.  What we ended up

23  learning through discovery, partially in the DSRF case,

24  partially in this case is that there was absolutely no

25  risk that was ever taken, and so they actually presold all
```

```
 1                        PROCEEDINGS                    49
 2  the bonds, they knew what the interest rate was before
 3  they closed any of our loans, and they profited off of the
 4  spread between the interest rate that they charged us and
 5  what they presold the bonds at.
 6            Now, Your Honor, if they had sold those bonds
 7  two hours after or two weeks after or two months after and
 8  they had actually taken that risk, then there wouldn't
 9  have been a misrepresentation as to what they told us they
10  were selling us and what they actually sold us.
11            So there is a claim here that the interest rate
12  that was being charged was different than the interest
13  rate we were told or the package that we were getting, but
14  it's not dependent on what any other project paid or how
15  they paid it.  It's based on the totality of the
16  discussions between the parties, the loan documents, the
17  transaction documents, and what we understood the terms of
18  the deal was.
19            THE COURT:   Okay.  So are your witnesses going
20  to be able to say, just pick Jefferies for example,
21  although I know it wasn't Jefferies at the time, but that
22  Jefferies charged us X interest rate and we should've
23  gotten Y interest rate?  Are your witnesses going to be
24  able to say that?
25            MS. TABAKSBLAT:   Our experts are.  Our
```

PROCEEDINGS                    50

1

2   witnesses are going to tell you that they had no idea how

3   they were defrauded or what misrepresentations were made

4   until they had experts come in, they got access to

5   Jefferies' internal documents.  They'll tell you what they

6   understood they were getting at the time, but our experts

7   are going to set forth exactly all these numbers that

8   you're asking for.

9        THE COURT:   I understand everything you're

10  saying but want to just repeat my question about the

11  spreadsheet with the rates for the other deals.  Is there

12  a document that already has that in it?

13       MS. TABAKSBLAT:   We don't have access to that

14  information.  I mean we don't – that's not discovery

15  that's been taken in this case where we have the rates for

16  every other deal that was done.  That's not part of this

17  case.

18       THE COURT:   Okay.  Will your witnesses be able

19  to say why they think the rate was too high or the rate

20  was not what it should've been?

21       MS. TABAKSBLAT:   The witnesses, I think the

22  appropriate witnesses, obviously there's different roles,

23  will be able to articulate the theory.  I just – or at

24  least what they understood they were getting

25  contemporaneously.

```
 1                         PROCEEDINGS                    51
 2             THE COURT:   Okay, thank you.  Mr. Balber.
 3             MR. BALBER:   Two points, Your Honor.  First of
 4   all, and I have to say this because the witnesses who've
 5   been deposed flatly contradict what Ms. Tabaksblat had
 6   said about risk.  Flatly contradicted it.  The traders
 7   testified, depositions in late September and early October
 8   I believe, that there was risk and there was a delta
 9   between when the bonds were sold and when the loans
10   priced.  Just completely false.
11             But let me get to the key point.  In their
12   interrogatory responses on damages, they claim hundreds of
13   millions of dollars in losses based upon a delta between
14   an interest rate that we charged them and some prevailing
15   market rate.  So how can I not be entitled to know what
16   they were paying to other lenders in other transactions in
17   the same business, the same time?  And Ms. Tabaksblat can
18   claim those were public deals, not this deal, I don't
19   think that's true.  But that goes to weight; it doesn't go
20   to relevance.
21             So let me have that spreadsheet, her clients had
22   access to it.  They can go back and look at their files
23   and pull the interest rates and send it to me.  I
24   shouldn't have to wait for some ersatz expert to claim six
25   months from now, aha, I found a market rate, and those are
```

```
 1                         PROCEEDINGS                    52

 2   the damages at issue.  It's in their interrogatory

 3   responses.

 4            THE COURT:   So do I have those in what I have

 5   today?

 6            MR. BALBER:   No, we can get them to you very

 7   quickly.

 8            THE COURT:   I'm just trying to find a way to

 9   narrow this.  Because you and I agree that a witness

10   sitting there is not going to encyclopedically remember

11   these rates.  And so I mean is Mr. Balber right, Ms.

12   Tabaksblat, that somebody can go look up – if Mr. Balber

13   gives you a list of the deals that he wants to know the

14   interest rate for that somebody could go look that up.

15            MS. TABAKSBLAT:   No, Your Honor.  Because for

16   some of these deals, there are deals that, again, we had

17   no involvement in, and so our – what I – I believe Mr.

18   Balber's mischaracterizing what our interrogatory

19   responses are, but I don't have them in front of me, and I

20   don't want to make a misrepresentation.  I think what

21   would be most helpful is for me to go back to our expert.

22   What I can tell you is that those interest rates that are

23   in our interrogatory responses are not based on other

24   deals, and it's certainly not based on discovery that the

25   defendants don't have.
```

And so I think what would be – and, again, I
don't want to misstate what's in there, but I know for
certain it's not based on X deal and I'm claiming an
interest rate and my expert is going to rely on an
interest rate for a project that we haven't turned over
discovery for.

MR. BALBER:   But that's exactly the point,
Judge.  They have some expert they've hired.  We all know
experts.  Their expert's going to say it should've been 2
percent, not 7 percent.  Now, I'm going to be able to
depose their expert.  But isn't it directly relevant if
their actual client, the actual project at the same time
were paying 7 percent to everybody else?  How can I not
know that?  How can I not say to the expert, okay, Ms.
Jones, thank you for your expert report.  I know you claim
it should be 2 percent.  Are you aware that Corvias closed
ten other projects in a three-month period and each of
them was 7 percent?

THE COURT:   Okay, so you say there are 50
other, there are 50 other deals --

MR. BALBER:   I think there are probably,
there's a maximum of 50 over the four developers.  I think
there's probably a few less than that.

THE COURT:   What I'm trying to do is come with

```
 1                        PROCEEDINGS              54
 2  the same approach that I took to you with the deals.  I
 3  don't think you really need to know for all 50, right, can
 4  you pick five that you really want to know the interest
 5  rate for?
 6            MR. BALBER:   No, Judge, because there's 18
 7  projects over a 12-year period.  So I really,
 8  respectfully, need to all of them, and I'm not
 9  understanding why there's a burden.  I understand that the
10  Brown Rudnick firm is not involved in those deals, but
11  their clients were.  This is not a heavy lift.
12            THE COURT:   Well, what about her point that
13  some of those deals were structured differently, and,
14  therefore, it's not apples to oranges.
15            MR. BALBER:   But that's something which, when I
16  say to the expert, Ms. Jones, are you aware they got 7
17  percent from this other deal, then Ms. Jones would say,
18  well, that's a different kind of deal.  But how am I not
19  entitled to know that from a discovery standpoint?  We can
20  all debate later whether they're the same or similar or
21  different or identical, but I'm entitled to know the
22  numbers.
23            THE COURT:   All right, well, I'm asking you to
24  look at your list, again, Mr. Balber, and figure out which
25  ones you really want to know the interest rates for, and
```

1                              PROCEEDINGS                          55

2    then share that with Ms. Tabaksblat, and then, Ms.

3    Tabaksblat, please ask your client how easily it is, easy

4    it is for them to get that information.  It seems to me

5    like that's a number that should be in some kind of

6    closing document or something that should not be

7    burdensome or maybe it's in a database somewhere.  But Mr.

8    Balber has persuaded me that this information is relevant.

9    I'm not sure the entire universe of what he's asking for

10   is relevant but at least some of it.  And so let's find

11   out how possible it is to get, to have your clients get

12   that information.  All right?

13        MS. TABAKSBLAT:   Your Honor, I'll look into

14   that, and I understand the Court's direction.  However,

15   with respect to Mr. Balber's argument, if the interest

16   rate that our client paid on other deals is relevant, how

17   is it not relevant what interest rate his clients gave

18   other projects?

19        THE COURT:   I'm not revisiting that question.

20   We've moved beyond that.  That was several months ago.  So

21   all I'm asking you is to look at the interest rate.  For

22   that discussion we were talking about production of a lot

23   of documents.  This is just is it possible to look up

24   those interest rates and put them in spreadsheet.

25        MS. TABAKSBLAT:   Understood.

```
 1                      PROCEEDINGS                56
 2          THE COURT:   Okay?  All right, I think those all
 3  the 30(b)(6) topics.  So those are all the discovery
 4  issues that I had on my list apart from talking about
 5  timing.  Is there anything else that anybody wants to
 6  raise?  Okay.
 7          Do we want to talk about discovery extension
 8  today or do we want to add that to the list of things that
 9  you're going to talk about?  Anybody?
10          MR. KELLY:   Your Honor, I'm happy to address
11  this.  We originally emailed plaintiffs to ask for their
12  agreement to a discovery extension, I believe it was last
13  Tuesday.  They responded the next day about three hours
14  before their letter was due, and then in their letter they
15  raised their opposition to an extension before meeting and
16  conferring with us.
17          I think, you know, if we had our preferences, we
18  would have an opportunity to meet and confer with them
19  about the schedule.  I think it's clear that there's a lot
20  of open issues even setting aside depositions here, and we
21  could use --
22          THE COURT:   All right, Ms. Tabaksblat.
23          MS. TABAKSBLAT:   We're always happy to meet and
24  confer, and so I think we'll take the opportunity.  What I
25  will say is that what the plaintiffs are concerned about
```

1

2 is a blanket 90-day extension and then everything just

3 getting delayed.  The Court granted the parties' joint

4 request for a five-month extension in May, and defendants

5 have taken one deposition to date.  And so we think that

6 we're in a position to either finish by December or very

7 close to December, and so we think it's premature at this

8 point to talk about a 90-day extension.  There may need to

9 be small extension or some limited exceptions.  But what

10 we'd like the parties to do is to work aggressively as

11 possible to try to finish as much as we can between now

12 and the end of December, and then if there's a handful of

13 remaining issues, I think it would be appropriate to

14 address that at that time, but we can have that

15 conversation and come back to you.

16          THE COURT:   Okay, fair enough.  It just – as a

17 practical matter – we haven't even talked about like the

18 letter briefing on the privilege issue.  It's going to

19 take you guys three to four weeks to get me that

20 information and then you have to give me at least a week

21 to look at it.  So that's a month right there, and it's

22 the holiday, it's your cutoff and it's the holidays.  So

23 I'm not excited about extending the deadline in a more

24 than three-year-old case, but I don't know that we have a

25 lot of choice if you need me involved in the process.

1

2 Okay?  So why don't I ask you to, you know, add that to

3 your list of things that you're conferring about.

4         So in terms of I guess the privilege issue, what

5 the defendants are asking for is I guess an attorney list,

6 a list of the attorneys who are on the privilege log for

7 the unclean hands productions, and then the parties need

8 to select the 30 documents, and then letter, letter,

9 letter, three letters.

10         So, Ms. Tabaksblat, do you know in terms of an

11 attorney list for the privilege, for the unclean hands

12 productions, is that something we can put our hands on?

13         MS. TABAKSBLAT:   Yeah, I'm pretty sure we gave

14 them most of them.  If there was a last log and there's a

15 few that were not, then we can certainly get that very

16 quickly.

17         THE COURT:   Okay.  How about we say that by

18 Friday.  And then can you – this Friday's the --

19         MS. TABAKSBLAT:   18th.

20         THE COURT:   18th.

21         MS. TABAKSBLAT:   That's not a problem.

22         THE COURT:   Okay.  And what I would really like

23 is to get – do you think before the holidays you could

24 have met and conferred and decided on what the 30

25 documents are by the 23rd?  Or is that too aggressive?

```
 1                         PROCEEDINGS                    59
 2            MR. KELLY:   That may be challenging, Your
 3  Honor.
 4            THE COURT:   Okay.  How about by Tuesday the
 5  29th?
 6            MR. KELLY:   Yes, I think --
 7            THE COURT:   Okay.  And so do you need – do the
 8  defendants need to see what those documents are in terms
 9  of getting your letter in first?  Can you do that at the
10  same time?  You sort of already know what the issues are,
11  right, you don't need to necessarily see what the 30
12  examples are, right?
13            MR. KELLY:   Yes.
14            THE COURT:   So could you get me your letter by
15  the 29th as well?
16            MR. KELLY:   Sure.
17            THE COURT:   Okay?  And then, Ms. Tabaksblat,
18  could you do yours by December 6?
19            MS. TABAKSBLAT:   Yes, Your Honor.
20            THE COURT:   Okay.  And then your reply, Mr.
21  Kelly, is there any chance you could do it by the 9th,
22  Friday the 9th?
23            MR. KELLY:   Yes, Your Honor.
24            THE COURT:   All right, and then the thing
25  that's tricky about, I then have a trial that following
```

```
 1                      PROCEEDINGS                  60
```

 2  week possibly.  But I could speak to, you could decide

 3  whether you want to come or do it by the phone, on the

 4  phone, 2 o'clock on December 19th is open.  That would

 5  give me time to read your letters and the documents, and

 6  then we can try to work through it in the conference.

 7  Fair enough?

 8             MR. KELLY:   Yes.  Can I ask one point of

 9  clarification which is whether, what the page limits

10  (inaudible).

11             THE COURT:   Yeah, can you keep it to five?

12             MR. KELLY:   Okay.

13             THE COURT:   Five each.  Five, five, and five.

14             MR. KELLY:   Thank you.

15             THE COURT:   Okay.  I already have a little bit

16  of a preview of it.  And the cases say what they say.  And

17  I will read them, so you don't need to do lengthy case

18  discussions.

19             Okay, and then the parties are also going to

20  meet and confer about the 30(b)(6) topics.  So is it

21  possible, I know you're doing the privilege thing at the

22  same time, but is it possible to try to resolve that, and

23  if you can't, get me a letter by the 16th which is the

24  Friday before about whatever remaining, outstanding

25  disputes on 30(b)(6) topics are?

```
 1                          PROCEEDINGS                      61
 2            MR. BALBER:   The 16th of December?
 3            THE COURT:   Yeah.
 4            MR. BALBER:   I'd rather get it done much, much
 5   quicker than that so we know - if we're going to be done
 6   with discovery by December 23 per plaintiffs' request, I
 7   think we need to resolve the 30(b)(6) issues way quicker
 8   than that.  I say sarcastically.
 9            THE COURT:   Yeah.  I just don't know when I can
10   get another conference for you.  Here's the thing, so I
11   have jury duty and I have a trial the first two weeks in
12   December.  So I'm hoping that I'm not attractive, but I
13   still have to do.
14            MR. BALBER:   What I would just suggest, Your
15   Honor, is, I mean we're prepared to talk to plaintiffs'
16   counsel in the next day, and if we can't resolve by, I
17   don't know, pick a day, beginning of next week, we'll
18   submit something each to you and then you'll, of course,
19   deal with it when you want.  But I just don't want it
20   hanging out there for five more weeks.
21            THE COURT:   Okay, that's fine, that's fine.  So
22   I'll leave it to you guys to move that as aggressively as
23   you want.  Okay, any other deadlines that I missed that
24   the parties - I guess the only other thing is the
25   extension.  You're going to meet and confer about that.  I
```

 1
 2 guess you should resolve that sooner rather than later as
 3 well, right, and so, you know, it's much better if you
 4 agree on how much time you need and submit a proposed
 5 stipulation that has everything laid out in it, but if you
 6 can't, then just a joint letter with what the competing
 7 proposals are, and I think that I've heard enough, I can
 8 rule just on letters.  Okay?
 9         All right, anything else anybody wants to raise
10 while we're together today?  Okay, if I could please ask
11 you to get a transcript of today.  We're recording this
12 proceeding as we usually do so you should be able to get
13 it through the ordinary course.  Nice to meet all of you
14 in person finally.
15         I guess last question is at 2 o'clock on
16 December 19 do you want to come here in person or do you
17 want to do it by phone?  What's your preference, Ms.
18 Tabaksblat?
19         MS. TABAKSBLAT:   Your Honor, we always like to
20 be in the courtroom, so we're happy to come in.
21         THE COURT:   Okay.  All right, any objection to
22 coming in?  Okay.  All right, so we'll see you in person
23 at 2 o'clock on December 19.  Thank you so much, have a
24 nice Thanksgiving holiday in the meantime.
25         (Whereupon, the matter is adjourned.)

63

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Monterey Bay Military Housing, LLC, et al. v. Ambac Assurance Corporation, et al., Docket #19-cv-09193-PGG-SLC, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____
              Carole Ludwig
Date:    November 15, 2022