```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


MONTEREY BAY MILITARY HOUSING,   : Docket #19-CV-9193

LLC, et al.,                     :

                    Plaintiffs,  :

      -against-                  :

AMBAC ASSURANCE CORP. et al.,    :

                    Defendants.  : New York, New York

                                 : December 19, 2022

--------------------------------: CONFERENCE



                    PROCEEDINGS BEFORE

              THE HONORABLE SARAH L. CAVE

              UNITED STATES MAGISTRATE JUDGE
```

```
Transcription Service: AOM Transcription

                   Phone: (631) 334-1445

                   E-mail: aomtranscription@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

```
                          APPEARANCES


For Plaintiff:          BROWN RUDNICK LLP
                        BY: Lauren Tabaksblat
                            Meghan McCafferty
                            Richard Darst
                        One Financial Center
                        Boston, MA 02128


For AMBAC:              QUINN EMANUEL URQUHART & SULLIVAN
                        BY:Taylor Lloyd Jones
                            Jeremy Andrew Baldoni
                            Rachel Elizabeth Epstein
                            Tenisha L. Williams
                        51 Madison Avenue
                        22nd Floor
                        New York, New York 10010


For Jefferies:          HERBERT SMITH FREEHILLS
                        BY: Scott Balber
                            Michael Jones
                            John O'Donnell
                            Barron Flood
                        450 Lexington Avenue
                        New York, NY 10017


For Dan Ray:            GIBSON DUNN & CRUTCHER
                        BY: AMER AHMED
                            HANNAH KIRSHNER
                            REED BRODSKY
                            CULLINAN WILLIAMS
                        200 Park Avenue
                        New York, NY 10166


For Chetan Marfatia:  KATTEN MUCHIN ROSENMAN
                        BY: Brian Mudrew
                        50 Rockefeller Plaza
                        New York, New York 10020
```

                    APPEARANCES (Continued)


For (Unknown):        (First Name Unknown) Bannon

INDEX

E X A M I N A T I O N S

|         | Re-<br>Direct | Cross | Re-<br>Direct | Cross |
|---------|-------|-------|--------|-------|
| Witness |       |       |        |       |
| None    |       |       |        |       |

E X H I B I T S

| Exhibit<br>Number | Description | ID | Voir<br>In | Dire |
|-------------------|-------------|----|----|------|
| None              |             |    |    |      |

PROCEEDINGS

1          THE DEPUTY CLERK:  Your Honor, this is in

2     the matter of Monterey Bay Military Housing, LLC, et

3     al., versus AMBAC Assurance Corporation, et al., 19

4     Civ. 9193.

5          Counsel, please state your appearance for

6     the record.

7          MS. TABAKSBLAT:  Good afternoon.  Lauren

8     Tabaksblat from Brown Rudnick on behalf of

9     plaintiffs.  And with me today are my colleagues,

10    Meghan McCafferty and Richard Darst.

11         THE COURT:  Okay.  Good afternoon.

12         Okay.  For AMBAC?

13         MR. JONES:  Good afternoon, Your Honor.

14    Taylor Jones from Quinn Emanuel for Defendant, AMBAC

15    Assurance Corporation.  And I'm joined by my

16    colleagues, Rachel Epstein, Jeremy Baldoni and

17    Tenisha Williams.

18         THE COURT:  Okay.  Good afternoon.

19         And, Ms. Williams, your order hasn't been

20    docketed yet, but we have signed it, so you're fine.

21         Okay.  Jefferies?  Is there --

22         MR. BALBER:  Good afternoon, Your Honor.

23         Scott Balber from Herbert Smith Freehills.

24    And with me are my colleagues, John O'Donnell,

25    Barron Flood and Michael Jones.

PROCEEDINGS

1              THE COURT:  Okay.  Good afternoon.

2              For Mr. Ray?

3              MR. AHMED:  Good afternoon, Your Honor.

4              Amer Ahmed for Dan Ray from Gibson Dunn &

5    Crutcher.  With me are my colleagues, Hannah

6    Kirshner, Reed Brodsky and Cullinan Williams.

7              THE COURT:  Okay.  Good afternoon.  I'll

8    add Williams to the list of popular names in this

9    case.

10             Okay.  Mr. Marfatia?

11             MR. MULDREW:  Good afternoon, Your Honor.

12             Brian Muldrew, Katten Muchin Rosenman, on

13   behalf of Defendant Chetan Marfatia.

14             THE COURT:  Okay.  Good afternoon.

15             For Malvern?  Do we have someone for

16   Malvern?  Okay.

17             And Mr. Bannon?  Okay.

18             MR. BANNON:  Your Honor, (inaudible).

19             THE COURT:  Okay.  Great.  Okay.  Lucky

20   you.

21             I'm going to start with you first because

22   we -- I'm hoping to get you out of here so you don't

23   have to be subjected to everything that we're going

24   to talk about today.

25             So I guess we'll start with AMBAC.

PROCEEDINGS

1    Mr. Jones, I don't know who is going to take the

2    lead on your side, but, obviously, we have

3    Mr. Bannon's letter that seems to maybe resolve some

4    of the issues, but where do things stand?

5            MR. JONES:  Yeah, I would agree with that,

6    Your Honor.  Several of the issues are resolved

7    based on Mr. Bannon's letter.  There still are a few

8    open issues, though --

9            THE COURT:  Okay.

10           MR. JONES:  -- certainly with respect to

11   documents.  We're still waiting on the Army to

12   produce Barry Scribner's (phonetic) documents or to

13   let us know if those documents have been lost.

14           THE COURT:  Okay.

15           MR. JONES:  We just learned for the first

16   time in Mr. Bannon's letter last week, that the

17   military never instituted a litigation hold.

18           We, obviously, disagree with that decision,

19   and we are considering a potential motion for

20   sanctions based on a failure to preserve documents,

21   but we, obviously, need more information about that.

22           Basically, we would like to know when the

23   Army will have an answer on Mr. Scribner's

24   documents.

25           THE COURT:  Okay.

PROCEEDINGS

```
 1            MR. JONES:  We'd like a commitment from
 2    them on when they'll be produced.
 3            Turning to the Air Force, we're also
 4    waiting for documents in response to our two-year
 5    request from the Air Force.  We understand that
 6    there were e-mail issues that, you know, caused
 7    that --
 8            THE COURT:  Yeah.
 9            MR. JONES:  -- request to have possibly
10    been overlooked, but we can't wait another three
11    months to get those documents.
12            THE COURT:  Right.  Okay.
13            MR. JONES:  As far as General Daley
14    (phonetic) goes, you know, we understand that the
15    Army is potentially willing to offer 30(b)(6)
16    testimony instead of --
17            THE COURT:  Okay.
18            MR. JONES:  -- you know, offering
19    Mr. Daley -- or General Daley as a witness.
20            We're open to potentially considering that,
21    as long as the Army is willing to offer 30(b)(6)
22    testimony on the topics for which we wanted General
23    Daley's testimony.  And that includes the
24    unclean-hands issues and his work investigating
25    housing conditions as part of Army Material Command.
```

PROCEEDINGS

```
 1              THE COURT:  Okay.  And have you served
 2    those topics on the Army, or do those have --
 3              MR. JONES:  We have not served 30(b)(6)
 4    topics yet.
 5              THE COURT:  Okay.
 6              MR. JONES:  We received the invitation to
 7    serve a 30(b)(6) --
 8              THE COURT:  Okay.
 9              MR. JONES:  -- notice last week, and we're
10    considering that offer now.
11              THE COURT:  Okay.  All right.
12              I would strongly encourage you to consider
13    that carefully.  I -- it's pretty unlikely that I
14    would be compelling General Daley to appear for a
15    deposition based on what's been said to me so far.
16    You know, that's not a ripe issue, but just based on
17    what's been presented, I don't think that this is a
18    case that should be garnering his attention unless
19    there's something, like, more specific like we've
20    addressed with some of the other witnesses in this
21    case.  So hopefully the parties can work that out.
22              So I'll give Mr. Bannon a chance to
23    respond, I guess, specifically on the Scribner
24    documents, the Air Force documents and, I guess, the
25    timing on receiving both of those.
```

PROCEEDINGS

1          MR. BANNON:  Sure, Your Honor.

2          With respect to the Scribner documents, the

3   Army is currently looking into two more domains that

4   were used --

5          THE COURT:  Okay.

6          MR. BANNON:  -- while working with the

7   Pentagon.  I expect the search to be done shortly.

8          THE COURT:  Okay.

9          MR. BANNON:  And in short time we will know

10   whether there are additional documents that are

11   being produced or not --

12          THE COURT:  Okay.

13          MR. BANNON:  -- I expect to have an answer

14   by the end of this week --

15          THE COURT:  Okay.

16          MR. BANNON:  -- on this issue.

17          THE COURT:  Great.

18          MR. BANNON:  With respect to the Air Force

19   documents, the Air Force is seeing this request for

20   the first time this week.

21          THE COURT:  Okay.

22          MR. BANNON:  (Inaudible) request.  I have

23   talked to them about it.  They do not have a

24   production timeline with respect to that yet.  It's

25   going to take them some time to get a bearing on how

PROCEEDINGS

 1    many documents they may have that are responsive to

 2    it.

 3                THE COURT:  Okay.

 4                MR. BANNON:  But I can update you as well

 5    at the end of this week when we have an idea on the

 6    other issues, if that will be helpful.

 7                THE COURT:  Okay.

 8                MR. BANNON:  And with respect to General

 9    Daley, we would be happy to the review the 30(b)(6)

10    request when it comes in (inaudible).

11                THE COURT:  Okay.  I appreciate that.

12                Mr. Jones, in terms of the documents from

13    the Air Force, it could potentially be a lot, or is

14    it possible for you to focus specifically -- instead

15    of just relying on the whole request, are there

16    particular categories that are most important that

17    would help Mr. Bannon prioritize his contact's

18    efforts?

19                MR. JONES:  I think we could potentially

20    hone in on some specific topics.

21                THE COURT:  Okay.

22                MR. JONES:  Certainly related to the Air

23    Force's approval of lender-selection decisions, any

24    other major decisions, you know, possibly some other

25    categories of documents.  I think what might make

PROCEEDINGS

1   sense --

2           THE COURT:  Okay.

3           MR. JONES:  -- is for us to follow up with

4   him in writing and highlight some particular

5   requests that are higher priority than others.

6           THE COURT:  Okay.  I assume that would be

7   helpful, Mr. Bannon?

8           MR. BANNON:  Very helpful.

9           THE COURT:  Okay.  Great.

10          Okay, so I'll rely on you, Mr. Jones, to

11  follow up with Mr. Bannon about that.

12          And then if -- Mr. Bannon, if you could

13  give us something on the docket by the end of the

14  week just letting us know the status of the Army

15  productions and the Air Force searches.

16          MR. BANNON:  No problem.

17          THE COURT:  Okay.  Okay.  Good.  All right.

18          If you don't want to stay, not to -- not --

19  no offense, but you're welcome to leave.  Okay.

20          Thank you very much, Mr. Bannon.

21          So then I had thought we -- that we would

22  cover the Malvern issue next because I was hoping to

23  let them go, but since there's nobody here from

24  Malvern, I'll just lump that in with everything else

25  that we're going to talk about.

PROCEEDINGS

1              So, Ms. Tabaksblat, why don't we start with
2      the issues that you've raised in your letter, and
3      let me know what's still open.
4              MS. TABAKSBLAT:  Your Honor, the first
5      issue we raised, which I think should be pretty
6      simple, is scheduling a date for Mr. Handler's
7      deposition.  We have reached out to Jefferies.  We
8      haven't received any proposed dates.  And we'd like
9      the Court to order them to provide proposed dates by
10     the end of the week.
11             THE COURT:  Okay.  All right.
12             Mr. Balber?
13             MR. BALBER:  Thank you, Your Honor.
14             First of all, I -- the way it was
15     characterized in Ms. Tabaksblat's letter was that
16     Jefferies refused to provide a date for Mr. Handler.
17     That's just flatly false.  They asked us for a date
18     last Wednesday --
19             THE COURT:  Okay.
20             MR. BALBER:  -- along with a series of
21     other depositions.  We understand your order.  We're
22     going to comply with it.
23             At the last conference, your Honor noted
24     that -- I'm not going to quote you back to you, but
25     you said at the end, after the rest of our witnesses

PROCEEDINGS

```
 1    were deposed --
 2                THE COURT:  Okay.
 3                MR. BALBER:  -- there are 35 witnesses in
 4    total who have not been scheduled yet.  I don't know
 5    why Mr. Handler needs to have his deposition
 6    scheduled by the end of this week when plaintiffs
 7    have countless depositions they've been unable to
 8    schedule of their people, numerous cancellations.
 9    We will get them a date before the end of discovery
10    deadline.  I can't get a date this week.  And,
11    again, I'm not sure why Mr. Handler is so special
12    that his deposition needs to be scheduled before 35
13    other witnesses whose notices have been out there
14    for months.
15                THE COURT:  Okay.  Ms. Tabaksblat?
16                I mean, I've ordered that he be deposed, so
17    it -- I'm not going to let Mr. Balber out of that,
18    so you have my word on that.
19                MR. BALBER:  And I'm not trying to get out
20    of it.
21                THE COURT:  No, I know.  I know.  I know.
22                MS. TABAKSBLAT:  Your Honor, so with
23    respect to this concept that there's 35
24    un-deposed -- unscheduled dates, obviously, we're
25    prioritizing the witnesses that we think are most
```

PROCEEDINGS

```
 1    important so we don't need to take duplicate
 2    depositions if we don't need to take 35.
 3              THE COURT:  Right.
 4              MS. TABAKSBLAT:  I don't understand why we
 5    can't get a date.  It could happen at the end of the
 6    discovery period.  But it -- you know, just for
 7    scheduling purposes, this is a deposition that's a
 8    priority for us.  So if we could get that scheduled
 9    sometime in the near future, I think it's important
10    to us to have that on the schedule.
11              THE COURT:  I understand, but it also sort
12    of flips exactly what Mr. Balber reminded me that I
13    said about Mr. Handler was -- he was sort of the
14    clean-up person on, you know, the issues that we had
15    talked about at the last conference.
16              So I -- I'm not going to order that
17    Jefferies provide you a date by the end of the week
18    because it's going to get worked out.  I've ordered
19    that it's going to happen.  It's not going to not
20    happen because I've held it in place.  So I
21    understand that it's a priority for you, but -- I
22    don't know who the other 35 are, but it will happen;
23    okay?
24              MS. TABAKSBLAT:  Understood.  Thank you,
25    Your Honor.  We will hold that in abeyance, and if
```

PROCEEDINGS

1    we need to --
2            THE COURT:  Okay.
3            MS. TABAKSBLAT:  -- (inaudible).
4            THE COURT:  Okay.  30(b)(6) topics?
5            MS. TABAKSBLAT:  Oh, my colleague,
6    Ms. McCafferty is going to address that.
7            THE COURT:  Okay.  Go ahead.  Thank you.
8            MS. McAFFERTY:  Good afternoon, Your Honor.
9            With respect to the 30(b)(6) topics that
10   the plaintiffs have issued to the Jefferies
11   entities, we have been going back and forth with
12   them over the past, you know, seven or eight months
13   with respect to -- we served initial deposition
14   topics in April, and we have revised those two
15   times, sent two -- sent two additional notices.  And
16   we were able to meet and confer with the Jefferies
17   entities last Thursday, and we discussed the
18   majority of their objections.  And we were able to
19   reach agreement, I believe, on approximately four
20   topics and --
21           THE COURT:  Okay.
22           MS. McAFFERTY:  -- there are four still
23   under consideration, and we're working those ones
24   out.
25           THE COURT:  Okay.

PROCEEDINGS

```
 1              MS. McAFFERTY:  But with respect to their
 2    main objections, there are two main categories.  The
 3    first is that they have argued that our topics are
 4    vague and overbroad.  And we would like to point out
 5    that each iteration that we've served upon them,
 6    we've attempted to limit that vagueness, add
 7    additional specificity, make the topics more
 8    particularized in order to facilitate this process
 9    and move forward.
10              Additionally, we do not find that the
11    topics in our second amended notice are overbroad.
12    They go to the specific projects and specific
13    knowledge that Jefferies would have.
14              Their second objection deals with a general
15    objection to Jefferies' knowledge about GMAC or
16    Capmark's financings.  However, we find that to be
17    incredibly relevant because in order to -- the
18    successor liability for Jefferies is predicated upon
19    their knowledge at the time in which that they
20    purchased these assets through the 363 sale.
21              And so all of our topics are narrowly
22    tailored to target Jefferies' knowledge of what GMAC
23    and Capmark were doing through these financings.  So
24    we do not find that, you know, they need to have
25    personal knowledge about the exact GMAC and Capmark
```

PROCEEDINGS

```
 1    findings at issue, but we are entitled to discover

 2    what their knowledge was at the time --

 3              THE COURT:  Okay.

 4              MS. McAFFERTY:  -- so that we can ascertain

 5    what their successor liability would be.

 6              THE COURT:  Okay.  Does anybody have a copy

 7    of the four that are in dispute that they can hand

 8    up to me?

 9              MR. BALBER:  There aren't four in dispute.

10              THE COURT:  Okay.

11              MR. BALBER:  There are dozens in dispute.

12              THE COURT:  Okay.

13              MR. BALBER:  So -- but I --

14              THE COURT:  Regardless, does anybody have

15    something I can look at that is a list of them.  I

16    don't think I have that.  In the pile of things that

17    I do get today, that was not one of them.

18              Okay.  Why don't you go ahead, Mr. Balber,

19    and if somebody has a copy they can give me, fine;

20    otherwise, I'll do my best.

21              MR. BALBER:  Yeah, I mean, I actually, as

22    we -- as I thought about today, I was trying to

23    navigate how you would want to approach this

24    because --

25              THE COURT:  Yeah.
```

PROCEEDINGS

```
 1              MR. BALBER:  -- there's a lot here.  I'm
 2    not sure us going through each one is going to be
 3    efficient --
 4              THE COURT:  No.
 5              MR. BALBER:  -- for your purposes.
 6              THE COURT:  No.
 7              MR. BALBER:  Right.  So I -- I mean, I
 8    think that that's a fair assessment of the two
 9    broad-based categories --
10              THE COURT:  Okay.
11              MR. BALBER:  -- of which there are issues.
12              As to the first, which is overbreadth, I
13    just want to give you one example, which is their
14    Topic Number 1.  This is where it stands now after
15    numerous iterations.  Jefferies knowledge of and
16    experience with MHPI projects, including the
17    debt-solicitation process, loan structuring, debt
18    financing, industry-standard interest rates,
19    industry-standard credit spreads, industry-standard
20    bond sales, industry-standard service fees and
21    profit margins.  That's one topic.
22              THE COURT:  Right.
23              MR. BALBER:  I don't know how I educate a
24    witness to talk about that from the Jefferies
25    perspective.
```

PROCEEDINGS

1         THE COURT:  Right.

2         MR. BALBER:  There's another request,

3   Number 3.  This is the -- as it currently stands.

4   Jefferies' communications concerning the Plaintiff

5   MHPI projects on their financing of such projects,

6   including, one, internal communications concerning

7   the Plaintiff MHPI projects.  Two, communications

8   with AMBAC regarding the Plaintiff MHPI projects.

9   Three, representations to and communications with

10  Plaintiff MHPI products, the military, the

11  developers, JLL, and any of their respective

12  advisors, including their commitments to serve as

13  financial advisor to provide best value, market

14  price and open-book pricing.  Four -- and I can go

15  on.  This is a single request.

16        And they're asking us, so we've had this

17  conversation in numerous meet-and-confers, to look

18  at the 100,000 documents-plus that we've produced,

19  communications, and have a witness prepared to talk

20  about them.  I don't know how to approach that.

21        THE COURT:  Well, will the plaintiffs give

22  Jefferies the documents that they want to ask a

23  30(b)(6) witness about?

24        MS. McAFFERTY:  Your Honor, with respect to

25  the topic that he just highlighted, we would like to

PROCEEDINGS

```
1    point out that the breadth of these topics mirror
2    exactly the topics that we've received from the
3    defendants --
4              THE COURT:  Right.
5              MS. TABAKSBLAT:  -- that we've committed to
6    put up.  For 18 different plaintiff projects, we've
7    committed to put up witnesses for, I believe, around
8    62 topics for each plaintiff.
9              THE COURT:  Okay.
10             MS. TABAKSBLAT:  So we've taken on the
11   burden to, you know, respond and prepare witnesses
12   for similarly worded topics.
13             THE COURT:  Right, but, you know, we need
14   to get at how this witness is going to prepare him
15   or herself to answer your questions.  And one way to
16   do that is -- if you're talking about internal
17   communications, then if the witness is shown a
18   communication, then the witness, you know, can do
19   his or her best to answer those questions.
20             If the witness gets those in advance, the
21   witness is going to be that much better prepared for
22   any other context for the -- you know, for that
23   particular document.
24             But, you know, I get why the topics are so
25   broad, but I also get why it's difficult to prepare
```

PROCEEDINGS

1    a witness for them.

2            So, again, I don't have the topics.  I

3    mean, if you want me to mark them up, you're not

4    going to like -- nobody's going to like what I do

5    with them, so I -- I'm not sure --

6            You know, I assume Jefferies -- Mr. Balber,

7    you're not opposed to putting up a 30(b)(6) witness

8    altogether, right?

9            MR. BALBER:  No.  And, in fact, I think

10   we've agreed to nine or ten topics out of the 50.

11           THE COURT:  Right.

12           MR. BALBER:  And that's another universe

13   that we believe we can reach agreement on.

14           THE COURT:  Okay.

15           MR. BALBER:  But all communications is

16   not -- that's not feasible.

17           THE COURT:  Okay.  But -- and, again -- I'm

18   sorry, I didn't write down what the two were that

19   you just read, Mr. Balber, but --

20           MR. BALBER:  Well, I read 1 and 3, Your

21   Honor.

22           THE COURT:  But in terms of the

23   relationship with AMBAC, for example, just as a

24   General matter, someone will be able to talk about

25   how Jefferies came to work with AMBAC in the first

PROCEEDINGS

1    instance and their relationship and what they did

2    with respect to the MHPI projects in particular,

3    right?

4              MR. BALBER:  That's a simple one because we

5    had absolutely no dealings with AMBAC.

6              THE COURT:  Okay.

7              MR. BALBER:  As plaintiffs well know, the

8    two deals that Jefferies did --

9              THE COURT:  Right.

10             MR. BALBER:  -- were not credit enhanced by

11   AMBAC --

12             THE COURT:  Okay.

13             MR. BALBER:  -- so that's a null set.

14             THE COURT:  Okay.

15             MR. BALBER:  Yes, I can have somebody

16   testify to that.

17             THE COURT:  Okay.  And they -- I was trying

18   to remember how many.  I thought it was only two or

19   three that Jefferies was involved in, but -- and so,

20   I guess, to step back, what is it that the

21   plaintiff -- for the topics that remain in dispute

22   then, what is it that the plaintiffs categorically

23   are trying to get from Jefferies that's not already

24   covered by all the other topics?

25             MS. McAFFERTY:  So, Your Honor, many of the

PROCEEDINGS

1    topics are still in dispute and one of the critical

2    issues for the plaintiffs is Jefferies' objection to

3    put up a witness to testify about anything that

4    relates to the successor-liability issue.

5          In particular, Topic 32 is still objected

6    to by the Jefferies defendants.  And this one is a

7    critical topic specifically targeted to Jefferies'

8    purchase of Capmark's MHPI business, including the

9    decision to acquire the MHPI business, due diligence

10   of the Capmark business, due diligence of the

11   Capmark MHPI loan portfolio, the Jefferies new

12   business approval submission submitted for the

13   Capmark MHPI business, and any negotiation with Ray

14   and Capmark regarding the terms of that acquisition.

15         That's an incredibly --

16         THE COURT:  Sure.

17         MS. McAFFERTY:  -- important topic to

18   establish success liability, and we still have not

19   been able to reach an agreement on that topic.

20         THE COURT:  Okay.

21         MS. McAFFERTY:  And additionally, with

22   respect to Topic 2, which Mr. Balber highlighted in

23   our meet-and-confer, we, you know, requested that

24   the defendants would commit to not object to

25   documents that would be introduced at the 30(b)(6)

PROCEEDINGS

```
 1    to the extent that we had not sent them previously.
 2    And we could not reach an agreement on that as well.
 3              THE COURT:  Okay.  I'm sorry.  So your
 4    proposal was -- with the documents is what?
 5              MS. McAFFERTY:  In terms of if we were not
 6    to provide the communications ahead of time --
 7              THE COURT:  I see.
 8              MS. McAFFERTY:  -- we wanted to ensure that
 9    there wouldn't be an objection to the document being
10    presented to the witness.  And we couldn't reach
11    agreement on that as well.
12              THE COURT:  Okay.  Okay.
13              Mr. Balber, so let's start with the
14    Capmark.  So, surely, someone will testify about how
15    that transaction came about and the due diligence
16    that was done.  Like, what -- what's the --
17              MR. BALBER:  That one, Judge --
18              THE COURT:  Okay.
19              MR. BALBER:  -- this is Number 32.  The
20    topic as stated is "Jefferies' Purchase of Capmark's
21    MHPI Business."  We did not purchase Capmark's MHPI
22    business.
23              THE COURT:  Okay.
24              MR. BALBER:  So that's the issue.
25              THE COURT:  Okay.
```

PROCEEDINGS

```
 1          MR. BALBER:  So if the topic were restated
 2    to be --
 3          THE COURT:  Okay.
 4          MR. BALBER:  -- Jefferies' purchase of the
 5    servicing assets from the Bankruptcy Court
 6    proceeding in the 363 sale, no problem.
 7          THE COURT:  Okay.  Can it say that?
 8          MS. McAFFERTY:  Yes, we can.
 9          THE COURT:  Okay.
10          MS. McAFFERTY:  I'm not a (inaudible).
11          THE COURT:  See --
12          MR. BALBER:  Well, this -- yeah, you know
13    what --
14          THE COURT:  Christmas miracle.
15          MR. BALBER:  If you've got five hours for a
16    meet-and-confer, we can have you join next time,
17    Judge.
18          THE COURT:  I've done it.  I've done it
19    once --
20          MR. BALBER:  Yeah.
21          THE COURT:  -- and I barely survived, so --
22          MR. BALBER:  Yeah.
23          THE COURT:  -- I'm trying to avoid doing it
24    for you, but I don't have a lot of hope.  But in any
25    event --
```

PROCEEDINGS

```
 1                 MR. BALBER:  That one's easy.

 2                 THE COURT:  All right.  Okay.

 3                 So -- well, just what -- the verbiage that

 4      Mr. Balber used about tailoring it to the servicing

 5      assets bought through the 363 sale, there doesn't

 6      seem to be any dispute about that, so that crosses

 7      one off the list.

 8                 MS. McAFFERTY:  And with respect to the

 9      ongoing disputes, we're willing to make an

10      additional submission --

11                 THE COURT:  Okay.

12                 MS. McAFFERTY:  -- going through the

13      specific topics at dispute.  That would expedite

14      many things.

15                 THE COURT:  What I would rather you do is

16      you try one more time.  And -- you know, and then if

17      there are any that remain in dispute, I'll look at

18      them.  And if I think we need to talk about them,

19      otherwise, I'll just mark them up so that you can

20      get this done because, I mean, we're creeping up --

21      before we know it, we're going to be in January, and

22      we have a February 15th cut off.  And I have a

23      feeling I know where -- what's coming.

24                 But, in any event, I -- I'm going to ask

25      you both to meet and confer one more time.  And if
```

PROCEEDINGS

1    it's a definitional issue, that should be easy to

2    resolve.  If it's a -- you know, sort of a

3    predecessor, you know, precursor question about what

4    Jefferies' role was, you know, obviously without

5    prejudice to plaintiffs' objection -- you know to

6    plaintiffs' objection to how Jefferies is

7    characterizing itself, fine.  But if it gets us to,

8    actually, the Jefferies' witnesses sitting down for

9    their 30(b)(6) deposition and getting documents in

10   front of them, that's what we need to do, is -- it's

11   not spin our wheels on, you know, how many topics

12   can we excruciatingly torture each other with.

13   Okay.

14            All right.  So meet and confer one more

15   time, and we'll talk at the end about submissions on

16   that.  Okay.

17            All right.  Plaintiffs' 30(b)(6)

18   objections.  So I thought we had dealt with this,

19   and I had directed, as the plaintiffs quote in their

20   letter, for the plaintiffs to look at the interest

21   rates and put them in a spreadsheet.

22            That hasn't happened?

23            MR. BALBER:  No, Judge.

24            THE COURT:  Okay.

25            MS. McAFFERTY:  Your Honor, with respect to

PROCEEDINGS

1  that, it was our understanding that the order from

2  the last hearing was to continue to discuss that

3  topic and how we might be able to provide that

4  information --

5          THE COURT:  Yeah.

6          MS. McAFFERTY:  -- to the defendants.

7          THE COURT:  Okay, well, quote, "Look up

8  those interest rates and put them in a spreadsheet."

9  That's pretty clear to me, but -- I don't

10  understand.  You know, at a minimum, I thought you

11  were willing to do that.  I thought I had your

12  agreement to do that, so...

13          MS. McAFFERTY:  So after the conference, we

14  received a letter from the Jefferies defendants with

15  respect to that topic --

16          THE COURT:  Okay.

17          MS. McAFFERTY:  -- on interest rates, and

18  they're now seeking additional information with

19  respect to each of those projects, including the

20  date of closing --

21          THE COURT:  Right.

22          MS. McAFFERTY:  -- initial sale of related

23  securities, coupon rate for securities and yield

24  rate for securities.  And so that, you know, goes

25  above and beyond just identifying the interest rates

PROCEEDINGS

 1    for the projects.

 2           Moreover, it -- it's still the plaintiffs'

 3    position that these financings were entirely

 4    different and are not relevant for the purposes of

 5    assessing the market rate that -- as the plaintiffs

 6    have alleged it.

 7           THE COURT:  Okay.  Well, I already

 8    overruled you on that, and I ordered you to produce

 9    something and you haven't, and you didn't move to

10    reconsider my ruling on that, so I'm -- for a second

11    time -- and we'll get to my feeling about motions

12    for reconsideration in a few minutes.  But you need

13    to produce the spreadsheet.

14           Mr. Balber?

15           MR. BALBER:  And we're not asking for any

16    additional information.

17           THE COURT:  Okay.  Okay.

18           MR. BALBER:  We just want to know the name

19    of the project, obviously --

20           THE COURT:  Yeah.

21           MR. BALBER:  -- the date and the interest

22    rate.

23           THE COURT:  Okay.  Yep.  That -- that's all

24    I'm asking.  Okay.

25           MS. McAFFERTY:  Can I just, if I could, ask

PROCEEDINGS

1    a clarifying question.

2              Is it for the 19 projects that the

3    defendants have specifically identified?

4              THE COURT:  Mr. Balber?

5              MR. BALBER:  I'm going to do my quick math.

6              Yeah, I believe there's 19 that we've

7    identified.  I mean, if there are others that we

8    don't know about, I don't see why those wouldn't be

9    included in the same universe.

10             THE COURT:  Well, I -- let me get you what

11   I think I can get you, and you're going to have lots

12   of time in depositions, and I'm sure there's going

13   to be a lot of follow-up requests after the

14   depositions.

15             So the -- a spreadsheet of the date, the

16   project, and the interest rate for the 19 projects.

17             MR. BALBER:  I count 18, but --

18             THE COURT:  Okay.  All right.

19             MR. BALBER:  If I was good at math, I

20   wouldn't --

21             THE COURT:  18 or 19, and you can -- you

22   guys can work that out.  Okay?

23             All right.  Thank you.

24             MS. McAFFERTY:  Thank you, Your Honor.

25             THE COURT:  So I think that's it on the

PROCEEDINGS

1    plaintiffs' Rule 30 (b)(6) depositions, right?

2              Anything -- anybody else?  Okay.

3              And then AMBAC's request for production

4    from the private litigation; who's going to take

5    that?

6              MR. JONES:  Yes, Your Honor.  Mr. Baldoni

7    will address it.

8              THE COURT:  Okay.  Go ahead.

9              MR. BALDONI:  Thank you, Your Honor.  We're

10   being quite targeted at this point with these

11   requests.

12             As Your Honor directed, first plaintiffs

13   produced productions from some regulatory and

14   government investigations.  We assessed those.  We

15   looked at them to see if anything was missing or if

16   that was enough.  And as it turned out -- excuse

17   me -- upon our careful review, there were some

18   significant gaps as to particular projects and

19   plaintiffs and developers -- excuse me -- so we

20   assessed low-burden ways to fill those gaps.  And

21   civil litigations was a way to do that because

22   documents have already been produced in certain

23   civil litigations.

24             We looked for cases where it appears that

25   productions have already been made, the same issues

PROCEEDINGS

1    are being litigated in those private litigations as

2    are being litigated here, and they are projects that

3    are the gaps where they haven't -- plaintiffs here

4    haven't produced unclean-hands documents in any

5    meaningful way.

6            So we honed in on two particular cases, two

7    particular projects.  So that's the D'Antonio

8    (phonetic) case about Monterey Bay, and Addi

9    (phonetic) about Fort Meade.

10           Notably, Balfour Beatty is the developer

11   that pled guilty to defrauding the U.S. government

12   about a year ago.  Balfour Beatty is associated with

13   eight projects.

14           The two cases that we're talking about here

15   are not Balfour Beatty projects.  They're projects

16   associated with some of the other developers.  And,

17   you know, we did a --

18           THE COURT:  Other developers in this case?

19           MR. BALDONI:  Other developers in this

20   case.

21           THE COURT:  Okay.

22           MR. BALDONI:  Particularly, Corvus,

23   Michaels and -- so the Monterey Bay case was started

24   as Clark and is now Michaels, and then the Addi case

25   is Corvias.

PROCEEDINGS

1          THE COURT:  Okay.

2          MR. BALDONI:  So it's all three of the

3    other developers in this.

4          THE COURT:  So what are -- what -- in the

5    Monterey and the Meade cases, what are -- what are

6    the nature of the claim?  Who are the plaintiffs in

7    those cases, and what are the nature of the claims?

8          MR. BALDONI:  The nature of the claims are

9    very similar to what's covered by our unclean-hands

10    defense, inadequate maintenance of the projects,

11    misrepresentations about the maintenance of the

12    projects.  It's a very overlapping set of facts as

13    to what's alleged in our unclean-hands defense.

14          And, again, the relevance is the same as

15    for, you know, the Balfour Beatty documents that

16    were produced earlier, which is that the

17    mismanagement of the projects, the failure to

18    maintain the projects, that impairs AMBAC security

19    interests.

20          I know Jefferies alleges in their defense

21    that they may have asked for a higher interest rate

22    had they known about these failures of management

23    and maintenance, so there's a significant overlap.

24    There's --

25          THE COURT:  What's the status of those two

PROCEEDINGS

1   cases?

2          MR. BALDONI:  So the -- let me -- one of

3   them -- let me just make sure I get the dates right.

4   So the Addi case involving Corvias, that was

5   dismissed based on a settlement in, I believe, May

6   of this year, of 2022.

7          THE COURT:  Okay.

8          MR. BALDONI:  And there -- on the public

9   docket, there's a number of letters about the status

10  of document productions indicating that productions

11  were made.  And it seems, based on public

12  information, that they would be relevant to our case

13  here.  So that case settled just about five or six

14  months after the Balfour Beatty guilty plea.

15          And the other case, the D'Antonio case

16  involving Monterey, that one -- document

17  discovery -- at least according to the public

18  docket -- ended last month.  I believe it was

19  November 7th.

20          THE COURT:  Okay.

21          MR. BALDONI:  So, again, we have reason to

22  believe that documents were produced in that case,

23  and they would be relevant here.  And as Your Honor

24  has indicated earlier, we think reproducing

25  documents that were produced in another litigation

PROCEEDINGS

1  is a fairly low-burden way for us to get -- fill in

2  some of these gaps about unclean-hands documents.

3          THE COURT:  Right, but what I'm not

4  understanding -- I understand that there are gaps in

5  the other unclean-hands productions that you've

6  gotten, but why does that matter, you know, that

7  these two are not there?

8          In other words, you should have plenty to

9  prove the unclean-hands defense, I would think, from

10  all the government investigations.  Is it -- is

11  there any reason to believe that what's in these

12  two, with these two projects, was any different than

13  any of the others?

14          MR. BALDONI:  Well, these are different

15  developers, and they have different people managing

16  the projects.  It's not the same cast of characters

17  across each project.  And if, say, there's a motion

18  to sever pending, if the case is broken up into

19  different cases, we'll have the unclean-hands

20  defense in different cases.

21          THE COURT:  Right.

22          MR. BALDONI:  Same thing if Balfour Beatty

23  decides we're going to, you know, settle our

24  plaintiffs --

25          THE COURT:  Right.

PROCEEDINGS

1              MR. BALDONI:  -- but then the other

2     plaintiffs go on, we would want to assert the

3     unclean-hands defense as to each of the plaintiffs.

4              THE COURT:  Okay.  Okay.  Ms. Tabaksblat or

5     Ms. McCafferty?  Okay.

6              MS. TABAKSBLAT:  So, Your Honor, I heard

7     counsel talk about gaps in the production and the

8     relevance of these documents, but what hasn't been

9     set forth in any of the meet-and-confers -- and

10    we've had several of them -- or in any of the

11    letters that were sent to the Court, are what these

12    gaps are.

13             What we've produced -- and we've obviously

14    spent a lot of time -- the Court's time and

15    attention on this issue -- are presentations for all

16    the developers, to the extent that they existed,

17    that summarized these conditions and these issues.

18             So in the context of Corvias, to the extent

19    that there would be an order to sever the claims, or

20    there would be a settlement where only certain

21    parties were left in the case, we have produced

22    summary presentations, or presentations that were

23    made.

24             In addition to the presentations, there

25    were also -- I believe it was quarterly reporting

PROCEEDINGS

1    that was done concerning the condition of these

2    projects, and those were turned over as well.  And

3    so --

4              THE COURT:  Including the Meade and

5    the Monterey projects were included?

6              MS. TABAKSBLAT:  These were Corvias, so

7    specifically with respect to Meade.

8              With respect to Monterey, I believe Clark

9    did make a production.  I believe that was limited

10   to -- and that would have come from the third party,

11   Clark.  I believe that was limited to a summary --

12   to presentations to the government, as opposed to

13   these quarterly filings.  And I don't know if they

14   existed.  I know that they did in the case of

15   Corvias.

16             But so what I haven't heard is what the

17   relevance of these are and how, based on that

18   relevance -- if it's relevant, what the gaps are,

19   and how, based on that, those gaps, what the

20   relevance is at all.  But I think that is very

21   critical, Your Honor, because, again, I'm not

22   counsel in any of those cases.  I have no idea.

23             I don't have access to those documents.

24   They are not within my custody and control.  I

25   imagine there are thousands, if not tens or hundreds

PROCEEDINGS

1    of thousands of documents.  And it seems to me that

2    even if there is some relevance here, which I quite

3    honestly question, and Your Honor has spent a lot of

4    time --

5              THE COURT:  I've also already overruled you

6    on that, too, so we're not going to re-litigate

7    that.

8              MS. TABAKSBLAT:  Well, we didn't -- no,

9    Your Honor, if I -- if I remember correctly, at the

10   February 2022 hearing, you specifically excluded

11   private litigations from the production.

12             THE COURT:  I said we would reconsider it

13   after we saw which -- what was produced from the

14   government.  And so what I hear Mr. Baldoni saying

15   is, okay, we have all that, but what's -- we don't

16   have anything that talks about Meade and Monterey

17   specifically.

18             MS. TABAKSBLAT:  Well, he didn't say that

19   we don't have anything that talks about Meade and

20   Monterey specifically.  He said we have gaps.  We

21   certainly have produced documents with respect to

22   Meade specifically, and I believe with respect to

23   Monterey as well, but for sure, with respect to

24   Meade.

25             THE COURT:  And unclean-hands documents as

PROCEEDINGS

1   to those two?  Okay.

2          MS. TABAKSBLAT:  We've produced government

3   presentations for the Corvias projects, as well as

4   these quarterly reports for Corvias.

5          THE COURT:  Okay.

6          MS. TABAKSBLAT:  And so what is missing

7   from what Mr. Baldoni just articulated is what these

8   gaps are specifically that he's claiming are

9   missing.

10          THE COURT:  Mr. Baldoni?

11          MR. BALDONI:  Yes.  Ms. Tabaksblat said "to

12   the extent they exist," and that's kind of the whole

13   meat of the problem.  We looked at these documents

14   that were produced.  There are some summary

15   documents about Meade, for example, but they're not

16   summary documents about the conditions of the

17   project that we have for Balfour Beatty projects,

18   for example.

19          For Meade, it's more like a summary of the

20   project as a whole, and there's an offhand mention

21   of, you know, there's a maintenance obligation or

22   issue or something like that.  We are lacking the

23   sort of summary documents analyzing the maintenance

24   issues with the projects.  We're missing the sorts

25   of investigatory documents about the allegations of

PROCEEDINGS

 1    misrepresentations about the maintenance issues.

 2              It's hard to prove a negative, Your Honor.

 3    We can go through, you know, document by document,

 4    some of what we have in terms of unclean hands from

 5    Meade and Monterey, but the bottom line of it is we

 6    don't have meaningful productions for the conditions

 7    of the -- these two projects and alleged

 8    misrepresentations about the maintenance of these

 9    projects for these two.

10              And, you know, like I said, we can go

11    through document by document on what we have and why

12    that's enough, but this is the sort of shortcut that

13    we can use to not spend a lot of time on this.

14              THE COURT:  Well, what I don't understand

15    is how this hindered you at all.  And, you know,

16    we're at the stage of taking depositions.  So why do

17    you need this?

18              MR. BALDONI:  We want to be able to --

19    well, this matters for summary judgment as -- and

20    trial as well, Your Honor.  But for -- we want to

21    confront a witness with, you knew that this was an

22    incorrect statement about the state of maintenance

23    of the projects.  You knew that this maintenance

24    request had not actually been done; right.  You knew

25    that these mold issues were so -- for example, a

PROCEEDINGS

1    summary document might say, of the 500 houses, 400

2    of them have severe mold problems that need to be

3    addressed.

4         We don't have those sort of summary

5    documents about the condition of the projects.  And

6    those are the sort of documents that we could put in

7    front of the witness who was in charge of Meade and

8    say, you were aware of this, right?  You weren't

9    putting funds towards this, right?  And we could

10   show that the misconduct there was enough to support

11   our unclean-hands defense for that particular

12   project.

13        THE COURT:  All right.  So what -- when you

14   say "summary documents," what -- the summary

15   documents that you have for the other projects are

16   summaries given to the government that talk about

17   the housing conditions and complaints about the

18   housing or what?

19        MR. BALDONI:  Well, there's a mix.  For the

20   Balfour Beatty projects, they got into quite a bit

21   of detail because they were trying to avoid pleading

22   guilty, as they ultimately did --

23        THE COURT:  Right.

24        MR. BALDONI:  -- about the extent of their

25   misconduct, the pervasiveness of the fraud; that

PROCEEDINGS

 1   sort of thing.  It's hard to know what's likely in

 2   the D'Antonio and Addi productions without seeing

 3   them, but presumably the document requests in those

 4   cases were about the same sorts of questions that

 5   we're asking here, which is, give us any documents

 6   that include an overview of the maintenance issues

 7   of these projects, any summaries of the complaints

 8   about conditions at the projects, any -- for

 9   misrepresentations, it's probably more specific, any

10   misrepresentation.

11          To some degree, we know that documents like

12   this were requested in the litigations, just based

13   on public information on the docket.  For others,

14   you know, it's kind of an inference based on the

15   allegations in the underlying complaints.

16          THE COURT:  Right, but Corvias and

17   Michael's weren't, as far as we know, investigated

18   criminally, right?

19          MR. BALDONI:  I believe Corvias was to some

20   degree.  I don't want to get that wrong, so I don't

21   want to say that for sure, but --

22          THE COURT:  Okay.  All right.  Well -- but

23   unlike Balfour Beatty, they didn't plead guilty;

24   let's put it that way, right?

25          MR. BALDONI:  Yes, Your Honor.

PROCEEDINGS

1            THE COURT:  Okay.

2            All right.  Well, Ms. Tabaksblat, would you

3    be willing to inquire of whoever represented the

4    plaintiffs in the Monterey and the Meade cases

5    whether there's, you know, any summary documents

6    about the conditions and the complaints about the

7    conditions that exist that have been produced?

8            MS. TABAKSBLAT:  Yes.  And just to clarify,

9    Your Honor, are you asking if there are summary

10   documents made -- to the extent that there were

11   summary documents made to the government, those were

12   produced --

13           THE COURT:  No, produced in the civil

14   litigation that weren't otherwise produced to the

15   government.

16           MS. TABAKSBLAT:  We will inquire about

17   that.

18           THE COURT:  Okay.  All right.  So if you

19   could do that and notify Mr. Baldoni, we'll talk

20   about a deadline for that at the end, I guess,

21   because we have some other things to schedule.

22           All right.  So, Mr. Baldoni, just so I sort

23   of document this correctly, summary documents that

24   talk about the conditions of the projects and

25   maintenance issues?

PROCEEDINGS

1           MR. BALDONI:  And also any

2    misrepresentations or allegations of fraud with

3    respect to the maintenance of the projects and the

4    conditions.

5           THE COURT:  Well, that would be in the

6    pleadings.  I -- so what I'm looking for is --

7    that's going not in the direction that I want to go

8    in.  I want to talk about what the facts are.  I

9    don't want to talk about what the allegations were.

10   So if there are summary documents about the

11   conditions or dealing with maintenance issues,

12   that's what I'm focused on; is that fair?

13          MR. BALDONI:  Yes.

14          THE COURT:  Okay.  Okay.  And for those

15   two, for Monterey and Meade, is there a particular

16   time period?

17          MR. BALDONI:  We would ask that it be

18   coextensive with these two cases.

19          THE COURT:  Okay.

20          MR. BALDONI:  I believe -- well, actually,

21   Your Honor, I believe Meade was closed in 2002 and

22   Monterey was closed in 2003, so we would want

23   information around the time of closing.  And based

24   on the nature of the unclean-hands defense, we do

25   need documents kind of on an ongoing basis.  So this

PROCEEDINGS

1   is quite a long time period, but that's what's

2   necessitated by the unclean-hands defense.

3          THE COURT:  Okay.  All right.  Okay.

4          Anything else on that, Mr. Baldoni?

5          MR. BALDONI:  One note in terms of custody

6   and control for the Monterey Bay case, and I believe

7   for -- well, for Monterey Bay, it is a plaintiff in

8   this case, so --

9          THE COURT:  Right.

10          MR. BALDONI:  -- it doesn't make sense to

11   say there's no custody or control.

12          For the Addi case, Corvias is a defendant,

13   which is a developer in this case.  So, again, I

14   don't think there's any issue with custody and

15   control of the relevant documents.

16          THE COURT:  Okay.  I don't think so.

17          So, Ms. Tabaksblat, you'll investigate that

18   for us.  Thank you.  Okay.

19          I think those are all the issues that were

20   listed in your letter, Ms. Tabaksblat.  Anything

21   else you wanted to raise?

22          MS. TABAKSBLAT:  The only other thing is

23   that Your Honor alluded to our motion for

24   reconsideration.  It's fully briefed before --

25          THE COURT:  I'm going to get to that at the

PROCEEDINGS

1   end.  Yep.  Okay.

2            All right.  So then I have -- I guess,

3   Mr. Balber, we will take your letter next.  Any

4   issues you've raised that we haven't already

5   covered?

6            MR. BALBER:  No, Your Honor.

7            THE COURT:  Okay.

8            MR. BALBER:  The only issue was the

9   30(b)(6) issue.  I think we need a date for the

10  provision of the interest rate information we talked

11  about.

12           THE COURT:  Yeah.  I was going to do -- I

13  was going to do all the dates at the end, if that's

14  okay.

15           MR. BALBER:  Then we're good, Your Honor.

16           THE COURT:  Okay.  All right.  Thank you.

17           Okay, Mr. Ray, any other issues in your

18  letter?

19           MS. KIRSHNER:  Good afternoon, Your Honor.

20  It's nice to be here.  I am here for the first time.

21           THE COURT:  Good.  Welcome.

22           MS. KIRSHNER:  We -- so the first issue we

23  have in our letter is the common-interest privilege

24  log issue.

25           THE COURT:  That's going to be next after

PROCEEDINGS

1    we go through everything, yeah.

2              MS. KIRSHNER:  Okay.  So then the only

3    other issue we had was our request for the extension

4    of the contention (inaudible).

5              So our request there is -- the deadline is

6    December 27th for that, and the request-to-admit

7    deadline is January 23rd.  So given where we are in

8    terms of depositions, as of right now 30(b)(6)

9    depositions have taken place, we would request that

10   that contention interrogatory deadline be extended

11   to align with the request-to-admit deadline.

12             THE COURT:  Yeah.

13             MS. KIRSHNER:  Previously, Your Honor's

14   scheduling order (inaudible) interim deadline.  The

15   most recent order did, which was when (inaudible)

16   formally requested it, but the parties were all --

17             THE COURT:  Okay.

18             MS. KIRSHNER:  -- (inaudible) to that.

19             THE COURT:  So January 23rd would be the

20   new deadline.  Okay.

21             Agreement?  Everybody's nodding.  Okay.

22   All right.  So be it.  That was an easy one.

23             MS. KIRSHNER:  And then there is the common

24   interest.

25             THE COURT:  Yeah.  Yeah.  I'm trying to get

PROCEEDINGS

1   through everything, sort of the housekeeping stuff,
2   and then we'll get to the really meaty stuff.  Okay.
3   Thank you, Ms. Kirshner.
4           All right.  Mr. Jones or Mr. Baldoni,
5   anything else in your letter?
6           MR. BALDONI:  Yes, Your Honor, we have the
7   issue to preclude plaintiffs' new categories of
8   damages.
9           THE COURT:  Yep.
10           MR. BALDONI:  So the -- you know, the short
11   of it here is that plaintiffs made their initial
12   disclosures about damages in 2018.  They
13   supplemented them once, which was also in 2018.
14   They have not supplemented their initial disclosures
15   about damages since.
16           In September of 2022, they disclosed three
17   entirely new categories of damages for the first
18   time in a response to a Jefferies interrogatory.
19   But, like I said, they have not updated their
20   Rule 26 disclosures.
21           THE COURT:  We're still in fact discovery,
22   right?
23           MR. BALBER:  Yes.
24           THE COURT:  Okay.  So it's not really ripe
25   yet.

PROCEEDINGS

```
 1              MR. BALDONI:  I believe it is, Your Honor.
 2    I don't think Rule 37 has a deadline that the, you
 3    know, failure to disclose has to happen after the
 4    close of fact discovery.  It requires, under
 5    Rule 26, timely supplementation of damages,
 6    computations and categories.  We -- our position is
 7    that's not been done.
 8              In this case, it took literally years to
 9    negotiate the scope of document productions.  We
10    litigated before Your Honor the number of
11    depositions, given the scope of the case, in terms
12    of subject matter and, you know, size of the case in
13    terms of money.
14              So we think it is, right now, plaintiffs
15    have failed to timely disclose these new categories
16    of damages.  We don't think that there's any reason
17    for them to have done that.
18              These damages theories are based on -- as
19    far as we can tell -- documents that were produced
20    many years ago, and they open up entire new subject
21    matters -- subject-matter areas of the case.
22    They're each about a market for a financial product
23    15 to 20 years ago that doesn't so much as appear in
24    the complaint.
25              THE COURT:  So why isn't this a summary
```

PROCEEDINGS

1   judgment issue?

2          MR. BALDONI:  There are cases holding that

3   this is not a summary judgment issue because this is

4   under Rule 37.  Rule 37 is about preclusion of

5   things that have not been adequately disclosed under

6   Rule 26.  I can probably get you a cite, if you need

7   it --

8          THE COURT:  All right.

9          MR. BALDONI:  -- but the -- Rule 37 is

10  designed specifically to incentivize plaintiffs to

11  disclose their damages theories and computations

12  early in the case so that they can be the subject of

13  fact discovery so that we can ask for documents

14  about them, so that we can take depositions about

15  them.  Here we are, you know, five years into the

16  case with the --

17         THE COURT:  We -- and we haven't finished

18  depositions yet.

19         MR. BALDONI:  Right.  So opening three new

20  subject-matter areas of the case where plaintiffs

21  said that it took their experts months to figure out

22  these new theories, we'll have to do the same.  And

23  then we will have to add deponents about these

24  topics to the list.  We'll have to go to third

25  parties about these three new financial markets from

PROCEEDINGS

1  20 years ago and say, you know, Third Party

2  Number 1, how did this market work?  Was Plaintiff

3  actually ripped off in this market?  Theory Number

4  2, was Plaintiff actually ripped off in this market?

5       These are all things that are not at all in

6  plaintiffs' complaint.  And I agree with Your Honor

7  that if these theories are not precluded now, we

8  will likely -- or we may, I suppose, move for

9  summary judgment about them.  But Rule 37 is

10  designed precisely to eliminate that waste and cut

11  the theories off early because they failed to

12  disclose them.

13       THE COURT:  Ms. Tabaksblat or

14  Ms. McCafferty?

15       MS. TABAKSBLAT:  Thank you, Your Honor.

16       So we think Your Honor is exactly correct.

17  We -- first of all, when Your Honor addressed the

18  disclosure requirements for damages at the September

19  2021 hearing, you said, I mean, they're called

20  initial disclosures for a reason.  It's not the be

21  all and end all.

22       These new damage theories -- or not even

23  new damage theories, but these extensions of damage

24  theories that have been previously disclosed are

25  based entirely on documents we received from various

PROCEEDINGS

 1    parties, both the defendants, as well as third

 2    parties in discovery.  They were ascertained based

 3    on extensive review by our experts, not by lawyers

 4    or anyone who would have been able to ascertain

 5    them.  They were disclosed in September of 2022,

 6    which, even before the discovery deadline was

 7    extended, was months before the existing deadline;

 8    and, now, with the new extension, is close to six

 9    months.  They were disclosed before a single

10    deposition in this case was taken, and so there's

11    ample time.

12          And the only other thing I'll say on this

13    is that the three cases that AMBAC cites in their

14    letter -- obviously, it's not on a full record, but

15    those three cases all involve a disclosure either

16    after the close of fact discovery or within a week

17    or two before the close of fact discovery.  And the

18    facts here are just clearly distinguishable.

19          THE COURT:  Well, to the extent that AMBAC

20    is asking permission to make a 37(c)(1) sanctions

21    motion now, I'm going to deny that request.  And let

22    me just say this, as to any other discovery

23    sanctions motion, save it until the end of fact

24    discovery.  I have so much on my plate with you

25    guys, it really is not efficient when you raise

PROCEEDINGS

1    issues that are not ripe and that can be left until

2    the end.

3         You know, you can -- you'll have to gamble

4    on this, Mr. Baldoni.  Either you decide not to ask

5    questions or you do.  But at this point, it is not a

6    good use of the parties' time or my time to be

7    dealing with sanctions motions while discovery is

8    still pending.

9         So the request to move for sanctions at

10   this time is denied without prejudice.  And when --

11   once we -- if we ever get to the end of fact

12   discovery, we'll talk about what anybody wants to

13   seek sanctions against anybody else about.

14        And if you want an example of how we did

15   this, I did it in the Curren (phonetic) case, we

16   waited until the end and we dealt with it all at

17   once.  So that's how we're going to do it here.

18   Okay.

19        Mr. Baldoni or Mr. Jones, any other issues,

20   sort of conference-related issues, from AMBAC before

21   we turn to privilege and the motion for

22   reconsideration?

23        MR. JONES:  So the one issue remaining from

24   our letter is the Malvern subpoena.  I don't know if

25   you want to discuss that now.

PROCEEDINGS

1              THE COURT:  Yep, we can do that.

2              MR. JONES:  Ms. Williams will handle that.

3              THE COURT:  Okay.  Very good.  Go ahead.

4              MS. WILLIAMS:  Good afternoon, Your Honor.

5              THE COURT:  Good afternoon.

6              MS. WILLIAMS:  Your Honor, in February of

7    this year, we subpoenaed Malvern Capital Partners on

8    behalf of our client, AMBAC.  Malvern is a sole

9    proprietorship; that is, its sole principal is

10   Austin Repetto, who was the former VP of finance for

11   GMH, now known in this case as Balfour Beatty

12   Communities.

13             And, Your Honor, we subpoenaed Malvern

14   based on a -- or a response to interrogatories from

15   plaintiffs identifying Malvern as their financial

16   advisor.  We also identified documents that included

17   Mr. Repetto, in his capacity as sole principal of

18   Malvern, he was communicating with various

19   representatives at BBC with regards to both

20   plaintiff and non-plaintiff projects.

21             So in response to our subpoena, Malvern's

22   counsel objected, objected.  And several months

23   later, we had a joint meet-and-confer with him.  In

24   that meet-and-confer, Mr. Trachtenberg, Malvern's

25   counsel, sort of took the position that he sees our

PROCEEDINGS

1    subpoena -- the document request included in our

2    subpoena in two categories, documents relating to

3    plaintiff projects and documents relating to

4    non-plaintiff projects.

5            With respect to the plaintiff projects,

6    Mr. Trachtenberg explained that his client didn't

7    have any involvement with those plaintiff projects

8    and, therefore, he wouldn't search for any

9    responsive documents.  And he also took the position

10   with respect to non-plaintiff projects that, you

11   know, the only way he would move forward in terms of

12   searching for documents that are responsive to our

13   subpoena is if AMBAC agreed to pay both his legal

14   fees, as well as any costs associated with complying

15   with the subpoena.

16           Now, Your Honor, first, as an initial

17   matter, there's an issue with Mr. Trachtenberg's

18   categorization of our document request because it

19   overlooks several categories of documents that are

20   unrelated to either plaintiff or non-plaintiff

21   projects.

22           THE COURT:  Okay.  So what are those

23   documents, those other categories?

24           MS. WILLIAMS:  Sure, Your Honor, we've

25   requested also -- with respect to RFP 39, we've

PROCEEDINGS

1    requested communications concerning GMAC, Jefferies

2    and Dan Ray that they were partial to AMBAC with

3    respect to credit enhancement.

4              We've also requested with -- for -- and for

5    RFP 49, we've also requested contracts, agreements,

6    or engagement letters between Malvern and the

7    developers.  And with respect to RFP 51, we've also

8    requested documents considering the decision --

9    plaintiffs' decision to join -- any of the

10   plaintiffs' decision to join this action.

11             THE COURT:  Okay.  So I get communications

12   with GMAC, Jefferies and Ray.  Why do you need

13   contracts with the developers and Malvern?

14             MS. WILLIAMS:  Your Honor, because the -- I

15   think the plaintiffs here, I'm -- it seems as though

16   they were -- they didn't have their individual

17   employees.  And so with respect to each of these

18   plaintiffs, they were ran by developers, various

19   different developers.  And so it's unclear to us who

20   exactly -- which specific entity Malvern worked

21   with, whether or not they worked with just BBC or

22   any of the other developers -- Michaels or any of

23   the other developers involved in this action.

24   That's the reason why we requested engagement

25   letters between Malvern and any of the other

PROCEEDINGS

1   developers.

2          THE COURT:  Okay.

3          MS. WILLIAMS:  Now, we did receive in our

4   production one engagement letter between BBC and

5   Malvern, but it's unclear to us the scope of work

6   that Malvern has engaged in with respect to either

7   just BBC or the other developers as well.

8          THE COURT:  Okay.  So then -- and you've

9   taken Mr. Repetto's deposition?

10         MS. WILLIAMS:  We have taken Mr. Repetto's

11  deposition, Your Honor.  And in that deposition, we

12  were only limited to documents that we have received

13  from BBC.

14         THE COURT:  Okay.

15         MS. WILLIAMS:  And during the course of the

16  deposition, Mr. Repetto had difficulty recalling a

17  lot of the discussions that he was included in.  So

18  it only further underscores, Your Honor, the need

19  for us to receive the documents that are in his

20  possession.

21         THE COURT:  Right.

22         MS. WILLIAMS:  He was unable to recall very

23  basic concepts.  For instance, he was unable to

24  recall, you know, why he thought that -- during his

25  time as the VP for finance, why he thought that GMAC

PROCEEDINGS

1   would have been -- was selected over other lenders

2   or with respect to concepts relating -- excuse me --

3   with respect to concepts like the rate lock and

4   other issues in the case, Mr. Repetto was unable to

5   recall, and --

6            THE COURT:  Was he a decision-maker for any

7   of the plaintiffs?

8            MS. WILLIAMS:  It seems that way.

9            THE COURT:  Okay.

10           MS. WILLIAMS:  He -- in his role with -- at

11  BBC, he is a -- he was the VP of finance.  And so he

12  worked for those -- the plaintiff entity, I believe,

13  Stewart, Bragg, Fort Bragg.  He worked on those

14  transactions.  And in his role with BBC was -- I

15  don't want to say he was the sole decision-maker,

16  but he did play a role in the financing and

17  debt-collection process of GMAC.

18           THE COURT:  Okay.  So he was at BBC when he

19  made that decision?

20           MS. WILLIAMS:  Right.

21           THE COURT:  So --

22           MS. WILLIAMS:  GMH, formerly known as --

23           THE COURT:  Okay.  So when did he set up

24  Malvern?

25           MS. WILLIAMS:  He set up Malvern in March

PROCEEDINGS

1   of 2005.

2          THE COURT:  Okay.  And so then what was --

3   well, this kind of gets into some of the privilege

4   issues that we're going to be talking about, but I

5   guess, you know, we're sort of creeping into that,

6   so I'll be giving everybody a chance to speak on

7   this, but the plaintiffs say that Malvern was the

8   functional equivalent of one of their employees and

9   they're seeking privilege over those documents.

10          So I'm a little confused about -- well,

11  for -- and just to confirm, there's nobody here from

12  Malvern, right?

13          Nobody's speaking on Malvern's behalf.  So

14  I don't know why Mr. Trachtenberg didn't come, but,

15  anyway --

16          MS. WILLIAMS:  Your Honor, if I may --

17          THE COURT:  Yeah.

18          MS. WILLIAMS:  -- you know, we're confused

19  as well because there seems to be a lot of

20  inconsistencies between what Malvern is saying and

21  what the plaintiffs are saying.

22          THE COURT:  Yeah.

23          MS. WILLIAMS:  For example, plaintiffs have

24  identified Malvern as the financial advisor to the

25  developers, and Malvern is saying they don't know

PROCEEDINGS

1    why plaintiffs have done that.

2              THE COURT:  Right.

3              MS. WILLIAMS:  Plaintiffs are now saying

4    that Malvern was their employee --

5              THE COURT:  Yeah.

6              MS. WILLIAMS:  -- and Malvern is saying,

7    Well, I didn't -- I've never done any work for

8    plaintiffs.  So it is -- Your Honor, there seems to

9    be a lot of inconsistencies between what the

10   plaintiffs are saying and what Malvern is saying.

11             THE COURT:  Okay.  So -- well, let me ask

12   you this, with respect to -- just to -- I'm sorry to

13   jump around, but the first -- first RFP that you

14   mentioned was communications with GMAC, Jefferies

15   and Ray.  So haven't Jefferies and Ray produced any

16   communications with Mr. Repetto or Malvern or you --

17   I thought you told me Request Number 39 was for

18   communications with GMAC, Jefferies and Ray.  Maybe

19   I miswrote down what you said.

20             MS. WILLIAMS:  Right.  Any communications

21   that would indicate that GMAC or Jefferies was

22   somehow partial to AMBAC for -- with respect to

23   credit enhancement.  Now, those communications could

24   have been with plaintiffs.  They could have been

25   internally within Mr. -- within Malvern's --

PROCEEDINGS

1   between -- I'm sorry.  Those communications could
2   have been with plaintiffs.  They could have been
3   with other individuals.  But we --
4           THE COURT:  Sorry.  Who was partial to
5   AMBAC?  The plaintiffs were partial to AMBAC or
6   Mr. Repetto was partial to AMBAC?  I'm not
7   following.
8           MS. WILLIAMS:  If I may, Your Honor.
9           THE COURT:  Yes.
10          MS. WILLIAMS:  Any communications that
11  suggest GMAC or Jefferies or Mr. Ray were partial to
12  AMBAC with respect to credit enhancement.
13          THE COURT:  I see.  Okay.  Okay.  But I
14  guess we know -- we would know that from Jefferies
15  or Ray though, right?
16          MS. WILLIAMS:  Well, not necessarily, Your
17  Honor, because if the plaintiffs are -- if
18  Mr. Repetto was having communications with any other
19  entity, or even plaintiffs concerning AMBAC or
20  Jefferies or Mr. Ray or Cap -- GMAC being favored --
21  favoring AMBAC over other monolines, those
22  communications wouldn't necessarily be in Mr. Ray's
23  or Jefferies' possession.
24          THE COURT:  Okay.  But why does that
25  matter?

PROCEEDINGS

1          Let's just say they were partial to AMBAC.
2    I mean, I think Mr. Balber told me a little while
3    ago he didn't have any -- Jefferies didn't have
4    anything to do with AMBAC, so...
5          MS. WILLIAMS:  Well, Capmark or GMAC, Your
6    Honor, if Mr. -- if Mr. Repetto has communications
7    during the time which he worked with Malvern --
8    worked at Malvern concerning AMBAC or AMBAC being
9    favored by the underwriter that was working on these
10   transactions, we think that those communications are
11   relevant and should be produced.
12         We'd like to know what was the -- what was
13   the thinking?  What was the -- his understanding of
14   whether or not AMBAC was favored or AMBAC was
15   subject to competitive bidding along with the other
16   monolines for the role as credit enhancer.
17         THE COURT:  Have you given Malvern,
18   Mr. Trachtenberg, a proposed list of search terms
19   that you want them to run on communications?
20         MS. WILLIAMS:  Your Honor, we haven't
21   even -- we weren't even able to sort of get there
22   with Mr. Trachtenberg.  Mr. Trachtenberg, very early
23   on, took the position that with respect to the
24   plaintiff projects, his client had no involvement
25   with the plaintiffs and, therefore, he's not even

PROCEEDINGS

1   going to look for documents.

2              THE COURT:  Okay.

3              MS. WILLIAMS:  The problem with that

4   position, Your Honor --

5              THE COURT:  It's opposite of what the

6   plaintiffs have said, yeah.

7              MS. WILLIAMS:  It's the opposite of what

8   the plaintiffs have said.  But also, Your Honor,

9   they've produced an engagement letter suggesting

10   that, you know, he provided consulting services.

11              But also, Your Honor, the -- there's

12   overlap between the personnel for each of the -- for

13   each of the various plaintiffs.  So the developers

14   had about four or five personnel that worked on each

15   of the plaintiff projects.  So communications and

16   discussions and conversations relevant to one

17   plaintiff, a non-plaintiff entity, could also be

18   relevant to the plaintiff entities as well.

19              THE COURT:  All right.  Well, let me say

20   this, Malvern needs to produce some documents

21   responsive to the subpoena.  I think the parties

22   should meet and confer about what that should be.  I

23   think Malvern's objection to producing anything at

24   all ever is not well founded based on the

25   information that's been given to me in this case,

PROCEEDINGS

1   particularly in connection with the privilege

2   issues.

3           So Malvern is not here today, so I'm not

4   going to take time during this conference to tick

5   through what those are, but my ruling is that

6   Malvern needs to produce documents.

7           I agree that the parties should meet and

8   confer about minimizing the scope and the burden on

9   somebody who's not a party to this case, so that --

10   that was the reason for my suggestion that you

11   propose search terms that will go at the

12   communications that you want.  Contracts with the

13   developers, that shouldn't be particularly

14   burdensome.  Most, I would hope would be -- that

15   shouldn't be a huge universe of what exists.  And

16   51 -- I forget what 51 was.

17           MS. WILLIAMS:  I'm not sure, Your Honor.

18           THE COURT:  The plaintiffs' decision to

19   join -- the plaintiffs' decision to join this

20   action.  I mean, that's probably getting into the

21   privilege issue, so I'm not going to push on that

22   one.  But with respect to 39 and 49 that are the two

23   that we've talked about today, I think those are

24   reasonable requests.  I think the parties should

25   meet and confer -- you and Mr. Trachtenberg should

PROCEEDINGS

1    meet and confer about a reasonable scope of search

2    in response to those that would -- in response to

3    those two requests that would get a reasonable

4    amount of documents without imposing an undue burden

5    on Malvern.  And let's see where you get to on that.

6    Okay?

7             MS. WILLIAMS:  Okay, Your Honor.  And with

8    respect to documents involving the plaintiff

9    projects --

10            THE COURT:  Yeah.

11            MS. WILLIAMS:  -- would it be okay for us

12   to propose search terms as well?

13            THE COURT:  Yeah.

14            MS. WILLIAMS:  We're fine with working with

15   Malvern to minimize any burden and happy to craft

16   them.

17            THE COURT:  Yes.  As far as the non-MHPR

18   projects, I mean, we've fought a lot about that in

19   this case.  I'm not inclined to push a non-party to

20   produce documents that don't relate to the MHPR

21   projects in this case.  But let's focus on the

22   plaintiff projects, the communications, the

23   contracts, and hopefully that comes up with a

24   reasonable scope.

25            Hi.

PROCEEDINGS

```
 1              MS. EPSTEIN:  Sorry, Your Honor.  Rachel
 2    Epstein.
 3              THE COURT:  Yes.
 4              MS. EPSTEIN:  I just have one potential
 5    proposal, which would be that Mr. Repetto
 6    (inaudible) search terms, run them, perhaps run a
 7    privilege screen.
 8              THE COURT:  Yeah.
 9              MS. EPSTEIN:  And then just (inaudible) one
10    way (inaudible).
11              THE COURT:  Okay.  That makes sense.  I'll
12    leave that up to you to try to work that out.  The
13    privilege may change based on what happens with the
14    other privilege issues that we're going to talk
15    about, but that makes a lot of sense.  So -- okay.
16    Thank you.
17              MS. WILLIAMS:  Thank you, Your Honor.
18              THE COURT:  Thank you, Ms. Williams.  Okay.
19              Any other AMBAC non-privilege,
20    non-motion-for-reconsideration issues?
21              Okay.  Thank you.
22              So let's talk about privilege.  So I have
23    the 30 examples and I have some questions.
24              First of all, Lou Derogatis,
25    D-E-R-O-G-A-T-I-S, I did not see him listed on any
```

PROCEEDINGS

1    of the attorney affiliation lists, and so I don't

2    know who he is.

3            MS. TABAKSBLAT:  He is an employee of BBC.

4    He is not an attorney.  He is in a finance position.

5            THE COURT:  Finance?  Okay.

6            MS. TABAKSBLAT:  Yes.

7            THE COURT:  Okay.  Mark Lavin, L-A-V-I-N,

8    he's on Exemplar Number 4.  Ms. Hubley (phonetic) is

9    asking him about -- it is a 2007 document, I think.

10           Mark Lavin?  Nobody knows him?

11           MS. TABAKSBLAT:  I believe he is a BBC

12   employee.

13           THE COURT:  Okay.  Not lawyer?  Non lawyer?

14           MS. TABAKSBLAT:  Correct.

15           THE COURT:  Okay.  Anthony Rabin,

16   R-A-B-I-N, Exemplar Number 5.

17           MS. TABAKSBLAT:  Your Honor, we believe

18   he's at BBC, but we would need to double check.

19           THE COURT:  Okay.  Okay.  Chris Bond also?

20   He's on the same e-mail.

21           MS. TABAKSBLAT:  Same.

22           THE COURT:  Okay.

23           MS. TABAKSBLAT:  Possibly, he's at BBC,

24   but we would need to check.

25           THE COURT:  Okay.

PROCEEDINGS

1              Okay.  Exemplar Number 12.  What is Core
2     Impact; C-O-R-E, I-M-P-A-C-T?  Or who is Core
3     Impact?
4              MS. McAFFERTY:  Your Honor, is that for --
5              THE COURT:  That's on Number 12.
6              MS. McAFFERTY:  Is that PL016912?
7              THE COURT:  No.  17737.
8              MS. McAFFERTY:  Your Honor, we would need
9     to look into that.
10             THE COURT:  Okay.  I'll just make a note of
11    it.  All right.
12             And then the sort of overarching question
13    is, only -- of the 30 exemplars that I have, only
14    one indicates, Number 15, that the plaintiffs have
15    asserted work product as to it as well; otherwise,
16    we're just talking about attorney-client and common
17    interest, right?
18             MS. TABAKSBLAT:  That's correct with
19    respect to these exemplars.  There's other
20    third-party communications on the law for which we
21    assert a work product assertion.
22             THE COURT:  Okay.
23             MS. TABAKSBLAT:  But with respect to the
24    exemplars that the defendants chose, but we
25    consented to, there's only one for which there is

PROCEEDINGS

 1    work product.

 2            THE COURT:  Okay.  All right.  And are the

 3    defendants challenging any of the work-product

 4    assertions by the plaintiffs?  Or am I just

 5    evaluating attorney-client privilege and the

 6    common-interest exception thereto?

 7            MS. KIRSHNER:  So the defendants are

 8    challenging work product (inaudible).  There are

 9    communications involving parties and any developers

10    who don't appear to relate to the subject of

11    validity --

12            THE COURT:  Okay.

13            MS. KIRSHNER:  (Inaudible.)

14            THE COURT:  Okay.  Okay.  So that is it?  A

15    yes, other than this litigation.  Okay.

16            MS. TABAKSBLAT:  And, Your Honor, the DSRF

17    litigation, I believe, counsel just indicated.

18            THE COURT:  Yes.  Okay.  Because it looked

19    to me there are at least, I think, five documents --

20    five of the exemplars that I have that seem to

21    relate to this litigation, but there's no

22    work-product assertion marked on the log.  Is -- so

23    are the plaintiffs not asserting work product as to

24    those documents then?

25            MS. TABAKSBLAT:  Your Honor, I assume that

PROCEEDINGS

```
 1    that was an oversight.  And I believe we're
 2    asserting -- we would be asserting both work product
 3    as well as attorney-client privilege.
 4              THE COURT:  Okay.  Well, that really makes
 5    this a lot harder because I -- this started out as
 6    just common interest, and now it's a -- nobody's
 7    briefed work product for me.
 8              MS. KIRSHNER:  May I just point out in the
 9    bottom line (inaudible) --
10              THE COURT:  No.  15 is 21496.  That's the
11    only one that's marked with a work-product
12    assertion.  Everything else -- all the other
13    exemplars that I have, the only label that's affixed
14    to them is attorney-client and common interest.
15    Okay.
16              All right.  So you're not challenging,
17    are you?  You are.
18              MS. KIRSHNER:  Oh, I'm -- the plaintiffs
19    are asserting (inaudible).
20              THE COURT:  Okay.
21              MS. KIRSHNER:  (Inaudible.)
22              THE COURT:  All right.  Okay.
23              So to the extent the plaintiffs are
24    asserting work-product privilege but that it's not
25    waived by virtue of the -- of the common interest,
```

PROCEEDINGS

1    the defendants are still challenging that or not?

2    Because a common interest is not a privilege.  It's

3    an exception to the rule that disclosure to a third

4    party waives the privilege.

5            So what I'm trying to understand is

6    whether -- if the plaintiffs are saying work product

7    is a privilege that applies, but it's not waived by

8    virtue of common interest, are the defendants

9    challenging that as well?

10           MS. KIRSHNER:  Yes, defendants are

11   challenging that but for communications between the

12   parties in the litigation, the present litigation

13   and the DSRF litigation.

14           THE COURT:  Okay.

15           MR. JONES:  Your Honor?

16           THE COURT:  Yes.

17           MR. JONES:  This is also the first time

18   we've heard that they're asserting work-product

19   protection over some of these documents that, you

20   know, they --

21           THE COURT:  Yeah.

22           MR. JONES:  -- talked to us about.  So I

23   think we would argue that they've waived

24   work-product protection to the extent they haven't

25   asserted it.

PROCEEDINGS

1              THE COURT:  Yeah.  Okay.

2              So I -- I've tried to kind of break --

3    break these into categories for purposes of

4    understanding more what the parties are arguing

5    about.  Maybe it makes sense to talk about

6    Clark/Duxbury first.

7              So it appears that they're affiliated

8    entities somehow.  Is Duxbury a successor to Clark

9    or an affiliate of Clark or what?

10             MS. TABAKSBLAT:  They are sister companies,

11   Your Honor.  They shared infrastructure and they

12   shared -- they shared infrastructure.  They shared,

13   sort of, office space.  And so to the extent that

14   these -- they were essentially organized under a

15   separate entity but to serve a function exclusively

16   for Clark.

17             In 2007, I believe -- and we have the

18   specific date in our brief -- Duxbury expanded and

19   provided these services for outside entities as

20   well, but initially they were formed exclusively to

21   provide advisory services for Clark and for no other

22   purpose.

23             And so I think, as we pointed out in our

24   papers, to demonstrate, like, the proximity of the

25   relationship, we didn't go separately, and there was

PROCEEDINGS

1   no separate third-party subpoena served on Duxbury.

2   But when this -- when there was an obligation to

3   produce documents by Clark, they collected and

4   produced documents on behalf of Duxbury as well.

5           THE COURT:  Okay.  Any of the defendants

6   want to speak to the Clark/Duxbury relationship?

7           MR. JONES:  I will briefly, Your Honor.

8           I don't believe they assert the

9   common-interest exception with respect to Duxbury,

10  so I think we're just talking about the Kovel

11  doctrine and the functional-equivalent doctrine

12  here.

13          THE COURT:  Okay.

14          MR. JONES:  I don't read anything

15  plaintiffs have asserted as saying that Duxbury

16  translated or interpreted information or

17  communications that counsel was unable to understand

18  on their own, and I think that's the requirement

19  under the Kovel doctrine.

20          I also don't see plaintiffs to be saying

21  that Duxbury was -- had primary responsibility for a

22  key corporate role, which I think is the crux of the

23  functional-equivalent doctrine.  Duxbury doesn't

24  seem to have had primary decision-making authority.

25  They don't seem to have negotiated or dealt with

PROCEEDINGS

```
 1    third parties as representatives of plaintiffs on
 2    their behalf.  So I don't think that any -- either
 3    the Kovel doctrine or the functional-equivalent
 4    doctrine apply here.
 5              THE COURT:  Okay.  Thank you.
 6              MS. TABAKSBLAT:  Can I make a point with
 7    respect to all of these documents?
 8              THE COURT:  Sure.
 9              MS. TABAKSBLAT:  And I know we said this in
10    our letter, but I think it's important for you to
11    understand the context.
12              We're not asserting that with respect to
13    each of these third parties that there's some
14    blanket privilege, and so there's no documents that
15    needs to be produced, and that every communication
16    with all these parties are privileged.  We've
17    produced thousands of documents between the
18    developers and the military, the military and the
19    developers and each of these third parties.
20              We're saying in certain contexts, each of
21    these serve a specific role that related to the
22    provision or that -- the -- that related to the
23    provision of legal advice.  And in those contexts,
24    the general waiver doesn't apply under one of the
25    exceptions that we've articulated.
```

PROCEEDINGS

 1              But with respect to Duxbury, we went
 2      through and, you know, the entire universe of what
 3      we're talking about here is something like 4,000
 4      entries.  Of those 4,000 entries, as counsel just
 5      articulated, there is a subset that relate to the
 6      DSRF litigation, which is not even being contested.
 7      And then, you know, those are -- these are just a
 8      subset of these communications.  We've produced
 9      thousands of communications with each of these
10      entities.
11              THE COURT:  Right.  Okay.  Go ahead,
12      Mr. Jones.
13              MR. JONES:  The role that Duxbury played is
14      a foundational question that doesn't have anything
15      to do with the -- a document-by-document analysis of
16      the role that Duxbury was playing.  Plaintiffs have
17      made their arguments about the role that Duxbury was
18      playing, and it doesn't establish that either of
19      these exceptions apply.
20              THE COURT:  So if -- could you articulate
21      for me if we could talk about -- putting aside the
22      functional equivalent and Kovel for now, putting
23      aside the advisors, let's focus on, sort of, the
24      military branches.
25              What is the common interest between the

PROCEEDINGS

1    plaintiffs and the military branches that underlies

2    what -- the documents that you've withheld as

3    privileged?

4              MS. TABAKSBLAT:  Your Honor, these are

5    essentially joint owners in a project.  And so

6    nobody -- I don't think anyone would ever come in to

7    this court and say, Well, there's two principals

8    that own a company, and the lawyer is giving advice

9    to both of them together, but that somehow breached

10   the privilege, or even if those two principals each

11   form their own legal, sole-purpose entity to then

12   jointly own this company.

13             That's what we have here.  We have the

14   military branch and the developers are -- their

15   joint-venture partners.  This isn't separate

16   entities, such as the cases the defendants cite,

17   where you're dealing with an advertising agency and

18   a company, and the advertising agency is giving

19   advice to the company.

20             The military and the developers each own a

21   percentage of these projects.  And together they

22   sought legal advice as to how to properly structure

23   these projects, how to make sure that they complied

24   with all available regulatory -- or required

25   regulatory compliances, how to select a developer,

PROCEEDINGS

1  and what different -- and what different

2  considerations went into that.

3       And as I articulated already, we're not

4  claiming that every single communication with

5  respect to each of these functions or each of these

6  issues that a company faces implicate a legal issue

7  that implicates a privilege.  But what we did here

8  is we looked at certain documents that either

9  involved consideration of potential legal issues or

10  involved counsel, and we assessed whether or not

11  these -- these communications, involved legal

12  issues.  And in those cases, we asserted a privilege

13  over those specific communications.

14       THE COURT:  Okay.  Some of these though --

15  so, like, Number 8, for example, 16724 -- well, I

16  guess maybe that's not a good one.  This is -- I

17  think this one is talking about this litigation, so

18  is -- are the defendants still challenging that one,

19  Number 8, 16724, the January 2017 Kirkland memo?

20       MS. KIRSHNER:  Sorry, Your Honor, I don't

21  have it right in front of me.

22       THE COURT:  Okay.

23       MS. KIRSHNER:  But if it's the 2017 memo, I

24  believe that one is exemplar -- one of the first

25  five documents.

PROCEEDINGS

```
 1            THE COURT:  I'm sorry?

 2            MS. KIRSHNER:  This is one of the first

 3    five on the exemplary --

 4            THE COURT:  No, it's Number 8.

 5            MS. KIRSHNER:  Number 8?  Sorry, Your

 6    Honor.

 7            THE COURT:  Okay.  It's a January 2017 memo

 8    from Kirkland.  And Kirkland previously represented

 9    the plaintiffs in this case, right?

10            MS. TABAKSBLAT:  That's correct.  And it --

11    and they represented the projects in the DSRF

12    action.

13            THE COURT:  Right.

14            MS. KIRSHNER:  So, Your Honor, the reason

15    why that is on the list of exemplar is the

16    (inaudible) companies are included, so --

17            THE COURT:  Okay.

18            MS. KIRSHNER:  -- (inaudible) were another

19    developer in the MHPI case that declined to join

20    this litigation.

21            THE COURT:  Okay.

22            MS. KIRSHNER:  They were involved in the

23    DSRF litigation.

24            THE COURT:  Okay.

25            MS. KIRSHNER:  To the extent they were on
```

PROCEEDINGS

1   communications relating to the present litigation,

2   which they did not agree to join, our position is

3   that their inclusion was privileged.  They weren't

4   part of the joint defense agreement in connection

5   with this litigation (inaudible).

6           THE COURT:  Okay.

7           MS. KIRSHNER:  At the very least, you know,

8   we -- I believe this document is not redacted, so,

9   of course, if there's discussion about the

10  litigation that they were involved in that they also

11  (inaudible).

12          THE COURT:  Okay.

13          MS. TABAKSBLAT:  Your Honor?

14          THE COURT:  Yes.

15          MS. TABAKSBLAT:  I'd like to just point

16  out -- and I believe counsel did just see this, is

17  that the Hunts were parties to the DSRF litigation.

18  This memo was written before this case was filed,

19  and so it potentially involves discussions of both,

20  but they would have been subject to a joint defense

21  agreement in connection with that case.

22          THE COURT:  Okay.  MetLife Document Number

23  1927338, nobody has any -- MetLife isn't anybody's

24  financial advisor?  There's no -- they weren't party

25  to any of the projects?

PROCEEDINGS

```
1            MS. TABAKSBLAT:  Your Honor, I believe
2    MetLife was an advisor to a different -- so does
3    this -- I think this involves a communication that's
4    not a party to this case.
5            THE COURT:  Yeah.
6            MS. TABAKSBLAT:  As you know, we did
7    produce communications concerning other non-MHPI
8    plaintiffs, and I believe this involves -- MetLife
9    is an advisor in connection with those projects.
10           THE COURT:  Okay.  So it was redacted for
11   relevance, not privilege?
12           MS. TABAKSBLAT:  Well, it was -- I believe
13   MetLife is an advisor, but not in connection with
14   any of the projects in our case.
15           THE COURT:  Okay.  So nobody would have any
16   common interest with them?
17           MS. TABAKSBLAT:  Well, the developer has
18   the common interest.  It's just not in connection
19   with the -- one of the projects.
20           THE COURT:  Well, the developers are not
21   parties to this case.
22           So who is David Rozen, by the way?
23   R-O-Z-E --
24           MS. TABAKSBLAT:  David Rozen is a former
25   employee of Corvias.
```

PROCEEDINGS

1          THE COURT:  Okay.  Let me -- I guess,

2     Ms. Kirshner, any other specific -- of the 30 that I

3     have, is there anything else that you want me to

4     understand about any of them in evaluating whether

5     the privilege applies and been --

6          MS. KIRSHNER:  Okay.  Not the specific

7     exemplars, but I can show you everything that --

8          THE COURT:  Sure.  Of course.

9          MS. KIRSHNER:  (Inaudible).

10         THE COURT:  Yep.

11         MS. KIRSHNER:  -- relationships, but I

12    think Mr. Jones touched on it, but (inaudible) they

13    still are serving the common-interest exceptions

14    with advisors, but they don't actually identify any

15    common legal interest in their letters.  So we have

16    to (inaudible).

17         So the meat of the issue for

18    common-interest exceptions seems to be the

19    military -- the military developers.

20         Now, plaintiffs' counsel just mentioned,

21    you know, these are joint ventures, and I think

22    that's the issue here.  They're relying entirely on

23    the fact that these two entities set up an LLC or an

24    LLP to carry out the military housing efforts, but

25    they -- this was, first, an entirely commercial

PROCEEDINGS

1    endeavor.  What happened here was the military

2    wanted to switch from a public financing model to a

3    private financing model.

4            They wanted to outsource that to a private

5    real estate developer.  They ran a competition.

6    They selected a developer.  The developers wanted

7    the lucrative government contracts and the fees that

8    go along with it, so they weren't completely

9    aligned.

10           I think that is exemplified by the fact

11   that, as Your Honor just mentioned, the developers

12   aren't plaintiffs in this case.  The military has

13   resisted discovery.  They, you know -- we just found

14   out, didn't even put in a litigation hold in this

15   case.  So they really are being treated separately

16   for purposes of this case.

17           But then more to the point, they set up

18   these joint-venture entities essentially so that

19   they could get the loan financing and distribute it

20   for these projects.  That's why the operating

21   agreements were often signed at the same time as the

22   financial close.  And so once they set up these

23   entities, then they move forward.  And the fact that

24   they had a shared interest in the structures being

25   legally compliant or in the projects doing well does

PROCEEDINGS

1  not create the common legal interest under the law.

2        Plaintiffs represented that they have

3  identified as narrow categories.  That's just not

4  true at all.  They've identified some -- well, I

5  think, three or four specific categories pre

6  formation.  And I'd be happy to talk through

7  those --

8        THE COURT:  Sure.

9        MS. KIRSHNER:  -- and why those are

10  insufficient.

11        So the first one is not narrow.  It is how

12  to properly structure the project.  That -- the

13  structuring of an entity is essentially a commercial

14  endeavor, and the case law finds -- or holds that a

15  collaborative effort to structure a deal or a

16  transaction that is essentially commercial in

17  nature, even if it has, you know, some legal

18  concerns or legal components, it's not a common

19  legal interest within the meaning of that exception.

20        So that's the first one that they cite.

21  And, again, it's ambiguous.  The point is they

22  wanted to ensure that the structure was easily

23  compliant.  The SEC case tells us that, you know, a

24  want to comply with regulations, with statutes, is

25  insufficient to establish a common legal interest.

PROCEEDINGS

 1          So the next one they cite is purchase

 2     options in the TDMP.  That is a new one that they've

 3     raised in their December 6th letter.  Similar to the

 4     other ones.  It's unclear exactly what they're

 5     talking about here, but the common legal interest is

 6     there.  There's not been any evidence provided that

 7     that would establish a common legal interest.  The

 8     TDMPs were documents authored by the developers,

 9     approved by the Army and Congress.  They essentially

10     laid out the whole plan for a given Army project.

11          And all we can assume is that, perhaps,

12     they've added that now because one of the exemplars

13     on the privilege log mentioned purchase options.  I

14     believe it's Number 1317921.  But our review of

15     their entire log suggests that's the only one that

16     mentions purchase options.

17          So, you know, another component of the

18     common-interest exception is that the disclosures

19     were made in furtherance of the common legal

20     strategy.  So, you know, we don't know if this just

21     applies to that one or if there are other documents

22     that they are withholding on it.  Anyway, that's the

23     second one.

24          The third one would be tax implications of

25     the project structures.  Similar to the other two,

PROCEEDINGS

```
 1    it's not exactly clear what the common legal
 2    interest is there.  If the developer wanted to
 3    ensure the partnerships were compliant with tax law,
 4    that's, again, compliant -- regular compliance with
 5    law and regulations is not a common legal interest.
 6         If they wanted to structure -- they wanted
 7    to set up a tax structure to get favorable tax
 8    treatment, that's a business decision.  And there's
 9    no evidence, nothing's been provided suggesting that
10    there was, for example, an imminent concern with an
11    audit, and so they were handling tax issues in
12    connection with that.
13         So those are the only three pre-formation
14    legal interests that have specifically been
15    identified.  And I can run through the
16    post-formation ones as well.
17         THE COURT:  Please do.
18         MS. KIRSHNER:  Okay.  So the first one --
19    now, this really goes back to plaintiffs' counsel's
20    comment with -- that they're narrow.  They've put
21    "shared legal strategies for protecting the
22    projects' ongoing legal interests."
23         So that would apply to any joint venture.
24    It's incredibly broad.  There's no specific legal
25    interest identified.  So, you know, we can't really
```

PROCEEDINGS

 1    say a lot more than that because we don't know what

 2    the specific narrow legal interests are.  But if you

 3    look at, you know, even the out-of-circuit case law

 4    that plaintiffs cite about joint ventures, it's a

 5    very specific approach to the common-interest

 6    exception.  The courts are going through document by

 7    document at some -- in some respects and really

 8    identifying each common legal interest.  Just

 9    asserting a blanket interest over any legal interest

10    that these projects might have is just -- it would

11    essentially eviscerate the -- what has been referred

12    to as "narrow exception."

13         So aside from that, the final one would be

14    the implications regarding AMBAC's credit downgrade

15    in 2008.  So that, as we explained in our letters,

16    was primarily a business discussion.  What happened

17    there was in 2008 the financial crisis, AMBAC's

18    credit was downgraded.  That was, you know, not

19    viewed as positive for the projects.  AMBAC, at that

20    point, had consent rights over all the projects, so

21    they were looking into refinancing.  AMBAC had to

22    provide consent for that.  They were essentially

23    trying to figure out how to remove AMBAC from their

24    projects at that point.

25         That was a business strategy.  The fact

PROCEEDINGS

```
 1    that it included the other stakeholders, it also
 2    included third-party advisors, like Barclays, in the
 3    decision to figure out a business strategy of how to
 4    get AMBAC off their deals.
 5            The fact that it might have also had some
 6    legal components where there were legal concerns
 7    that there could be litigation potentially stemming
 8    from such a strategy is not sufficient.  The case
 9    law says that a business strategy that has some
10    legal concerns is not sufficient to create a common
11    legal interest.
12            And, in fact, to our knowledge, there --
13    and, well, at least we noted in our first letter
14    that there have been no actual litigations that were
15    cited stem from this, and there weren't -- not any
16    identified in plaintiffs' opposition as well.
17            So to our knowledge, those discussions and
18    those potential legal concerns did not go anywhere.
19    And so, anyway, that is the final, kind of,
20    post-formation legal interest.
21            THE COURT:  Okay.
22            MS. KIRSHNER:  So those, I count five
23    specific -- well, I won't call them specific --
24            THE COURT:  Yeah.
25            MS. KIRSHNER:  Those are the legal
```

PROCEEDINGS

1    interests that are identified here.

2                THE COURT:  Okay.  Thank you.

3                Ms. Tabaksblat, do you want to respond to

4    any of that?

5                MS. TABAKSBLAT:  Your Honor, so I'll just

6    respond briefly, which is to say that we'll start

7    with AMBAC because that's the last one that we just

8    touched on.  And, obviously, Your Honor has had the

9    benefit of reviewing the exemplars, but both some of

10   the exemplars, as well as additional documents

11   withheld on the log relate to the discussions about

12   this 2008 downgrade and specifically the legal

13   implications that may come of it.

14               The fact that there was no litigation that

15   was commenced in 2008 doesn't preclude the assertion

16   of the common-interest privilege, as the case law is

17   clear, and I think we cite a number of cases in our

18   brief that talk about you don't have to actually

19   have a pending litigation to assert the privilege.

20               And as Your Honor is well aware, there

21   ultimately was a litigation that came out of it.  So

22   the consideration of potential legal implications

23   was well founded here.

24               With respect to the additional categories

25   that counsel just went through, again, the cases

PROCEEDINGS

 1   that the defendants rely on -- and we address those

 2   in Footnote 10 of our letter -- they're dealing with

 3   arm's-length entities, parties -- joint parties to

 4   an insurance agreement, an advertising company

 5   providing consulting to an entity.  They're not

 6   dealing with joint owners of a company.

 7           And here, yes, there is a commercial

 8   interest.  Every business has a commercial interest,

 9   which is to make money.  We disagree.  And I don't

10   think the record supports the assertion that this

11   was a handoff from the military to the developer.

12           In fact, it's been very clear at

13   depositions that the Army had to approve of the

14   lender that was selected.  And both JLL and the

15   military branch went through an extensive process.

16           And so these were very much joint owners of

17   projects.  Not everything that they did was legal in

18   nature, and that is consistent with the fact that we

19   produced a lot of documents.  But there were certain

20   instances here where there were objectives and there

21   were issues that needed to be addressed that did

22   implicate legal issues, and those were the issues

23   that we asserted the common-interest privilege.

24           And we do think that there is support for

25   that in the case law.  I'll direct the Court to the

PROCEEDINGS

1    In Re: Vella Holding, (phonetic) which we cite in

2    our brief at Footnote 9.  The defendants don't

3    address that.  And I think that that -- the

4    relationship there is much more analogous to the

5    ones that the defendants cite in their case.

6            Unless Your Honor has any further questions

7    with respect to the relationship between the

8    developers and the military branches, I would

9    want -- I do want to address one more point --

10           THE COURT:  Okay.

11           MS. TABAKSBLAT:  -- which is the Malvern

12   point, if that's okay.

13           THE COURT:  Okay.

14           MS. TABAKSBLAT:  So it seems like there has

15   been some confusion with respect to the relationship

16   between Malvern, and I'm hoping I can provide some

17   clarity with respect to that.

18           Mr. Repetto, who is the principal of

19   Malvern -- and, again, I don't represent Malvern,

20   and I have not been in any way involved in the

21   response to the document subpoena.  But Mr. Repetto,

22   who's the principal of Malvern, was formerly, as

23   counsel indicated, an executive vice president of

24   BBC.  And in his personal capacity as an employee of

25   BBC, which, at that time, was GMH, he was involved

PROCEEDINGS

1    in the debt selection process with respect to
2    certain of the earlier BBC projects.
3            After he left BBC, Mr. Repetto formed his
4    own company, Malvern, and he served two roles.  One
5    was an informal role in his personal capacity, which
6    was, if there was a question with respect to work
7    that he previously did, because he had a
8    relationship, on a one-off instance, he would get a
9    phone call or an e-mail, Hey, do you remember this?
10   And there's evidence in the record that there's -- I
11   can't give you an exact number, but approximately
12   five, a handful, less than ten communications of
13   that nature.  That's not in any capacity other than
14   that as a -- of a former employee.
15           THE COURT:  Are any of the exemplars an
16   example?
17           MS. TABAKSBLAT:  No, because I don't
18   believe there's an assertion of privilege over that,
19   but I -- I'm just trying to explain to the Court the
20   relationship.
21           THE COURT:  Okay.
22           MS. TABAKSBLAT:  With respect to the --
23   with respect to Malvern, Malvern was formally
24   retained, and I believe the engagement letter was
25   produced as an advisor to Air Force projects that

PROCEEDINGS

1    are not parties to this case.  So they are military

2    housing projects, but they are not plaintiffs in

3    this case.  They are Navy projects.  And so Malvern

4    performed an advisory role to those nonparties, but

5    not in connection with any -- in any of the projects

6    that are plaintiffs'.

7            THE COURT:  Okay.  So there wouldn't be any

8    privilege over those, right?

9            MS. TABAKSBLAT:  Well, those, again, are

10   the same joint defense, and so it's not a privilege

11   that's being asserted by a party to this case.  But

12   because the Court -- because we did produce

13   documents for nonparties, the same privilege that

14   would apply between the military branch and the

15   developer and the financial advisor, would apply in

16   that case, even though that party is not.  It's

17   between the same -- it is between the same joint

18   owners.  And it is -- even though it's not, it is

19   still an assertion of privilege between those same

20   parties; they're just not projects in the case.

21           THE COURT:  Okay, but it's not your

22   client's privilege to assert.

23           MS. TABAKSBLAT:  Well, it's the developers

24   and the military bases.

25           THE COURT:  Yeah.  But, again, the

PROCEEDINGS

1    developers are not here and the military is not

2    here.  I mean, they were, but they left.  But, you

3    know, they're not coming in and saying, That's our

4    privilege.

5          MS. TABAKSBLAT:  Well -- so, Your Honor, I

6    guess the -- I guess what the crux of the issue here

7    is that these are productions that were made

8    exclusively by the projects.  The way the

9    productions were made here is by the developers.

10   So, in theory, these are assertions by the

11   developers in connection with a production that the

12   developer is making.  And so it is -- that's the

13   assertion of privilege that we're asserting here.

14         THE COURT:  Okay.  That -- all right.

15   Okay.  Thank you.

16         Anything anybody else -- any of the other

17   defendants want to say about privilege?

18         MR. JONES:  Just a couple of points to

19   follow on what counsel might have said.  First of

20   all, to underscore something that I think the Court

21   has already hinted at, there are dozens of third

22   parties on plaintiffs' privilege log.  There's some

23   that they haven't even mentioned in their briefing.

24   There's MetLife.  There's Core Impact.  For all of

25   these entities, plaintiffs have made no argument

PROCEEDINGS

1    whatsoever as to how they qualify for an exception

2    to waiver.  The Court can reject those exceptions

3    out of hand as to those entities.

4           The other point that I would like to make

5    is Malvern, it doesn't seem like he was performing

6    any job for plaintiffs, let alone having primary

7    responsibility for a key corporate job.  So I think

8    it's clear that he doesn't qualify for the

9    functional-equivalent exception.

10          Thank you, Your Honor.

11          THE COURT:  Okay.  Thank you.

12          MS. KIRSHNER:  And, Your Honor?

13          THE COURT:  Yeah.

14          MS. KIRSHNER:  If I may --

15          THE COURT:  Sure.

16          MS. KIRSHNER:  -- respond.

17          So it's not true that the case law supports

18   that there is a blanket assertion of common

19   interest, legal interest, once there's joint owners

20   or a joint venture.  You know, indeed, the In Re:

21   Vella case that was mentioned, in that case, the

22   common interest was triggered by two different

23   events.  It wasn't just the (inaudible) formation --

24   (inaudible) joint venture.

25          And so, anyway, it is just -- this is an

PROCEEDINGS

1  incredibly broad assertion of the exception, and I

2  just respectfully direct Your Honor to the first

3  couple pages of (inaudible) letter, and I think it

4  is laid out there well, and I then I won't take

5  up --

6          THE COURT:  Okay.  I appreciate that.

7          MS. KIRSHNER:  -- any more time.

8          THE COURT:  Trust me, I've read it multiple

9  times, so -- okay.

10         So on the privilege then I need to get an

11  answer from the plaintiffs about confirming

12  Mr. Rabin, Mr. Vaughn and what Core Impact is.

13         MS. TABAKSBLAT:  Your Honor, with respect

14  to Mr. Rabin, Mr. Vaughn, those are both BBC

15  employees.  With respect to Core Impact, we can

16  advise -- we can send a letter to the Court.

17         THE COURT:  Okay.

18         MS. TABAKSBLAT:  (Inaudible.)

19         THE COURT:  Okay.  That would be great.

20  All right.

21         Then in terms of other deadlines, the

22  spreadsheet from the plaintiffs with the interest

23  rates, how long do we need to get that together?

24         MS. TABAKSBLAT:  Your Honor, it's going to

25  involve getting documents from multiple different

PROCEEDINGS

1    places.

2            THE COURT:  Okay.

3            MS. TABAKSBLAT:  Perhaps we could have

4    until the -- I guess the end of next week is a

5    holiday.

6            THE COURT:  Yes.

7            MS. TABAKSBLAT:  So perhaps the end of the

8    first week in January.

9            THE COURT:  Hold on one second.  I think

10   it's the 7th, but let me see.

11           The 6th; is that good?

12           MS. TABAKSBLAT:  I think that should be

13   okay.  And if we have --

14           THE COURT:  Okay.

15           MS. TABAKSBLAT:  -- an issue, I'll let the

16   Court know.

17           THE COURT:  Okay.  That's fine.  Okay.

18           And then we said -- so then the next thing

19   I have for you, Ms. Tabaksblat, is on the private

20   litigation, seeing if there are any summary

21   documents.  And how long is it going to take you to

22   find that out?

23           MS. TABAKSBLAT:  So, Your Honor, that

24   should be quicker, with the exception that I do not

25   know what people's vacation --

PROCEEDINGS

```
 1                THE COURT:  Right.
 2                MS. TABAKSBLAT:  -- and holiday schedules
 3     are.
 4                THE COURT:  Okay.
 5                MS. TABAKSBLAT:  So if --
 6                THE COURT:  How about we do this:  How
 7     about you -- it's more important to me that you let
 8     Mr. Baldoni know what's going on with that.  And
 9     if -- when you send me your letter on the 6th, if
10     you can, just update me on what the status is.
11     Okay?
12                MS. TABAKSBLAT:  Okay.
13                THE COURT:  But, obviously, if you have the
14     information, share it with them sooner.  Okay.
15                The damages issue raised by AMBAC was
16     denied without prejudice.  Malvern, I gave you
17     instructions about, you know, meeting and conferring
18     with them about their -- the subpoena to them.  And
19     then I think that's it for deadlines, unless I'm
20     missing something, right?  Okay.
21                MR. JONES:  Did you mention the military's
22     letter?
23                THE COURT:  I did -- I talked about that
24     with Mr. Bannon before he left, so I didn't bring
25     that up again.  But I'm going to get a letter from
```

PROCEEDINGS

1    him by the end of this week, I think.

2              So the last issue then substantively is the

3    motion for reconsideration.

4              So, Ms. Tabaksblat, that's your motion, so

5    is there anything else you want to say?

6              MS. TABAKSBLAT:  Your Honor, we -- you

7    know, we obviously -- we respect the Court's ruling,

8    and this was new information that came out

9    subsequent to the Court's ruling.  So after we

10   received the Court's decision, we deposed

11   Mr. Eveland.  And, you know, quite simply, Your

12   Honor, we just -- we presented the Court with the

13   testimony from Mr. Eveland, which we think -- which

14   we think suggests that to the extent that the Court

15   determined that the documents weren't relevant

16   because the RMBS consent judgment related to

17   treating and this case relates to the financing of

18   complex transactions, Mr. Eveland, I think,

19   highlights two points.

20             One is that the underlying nature of the

21   fraud was the same, which is that, in this case, the

22   way in which the -- we are alleging that the

23   fraudulent financing was executed was by preselling

24   the bonds, and that involved a differential between

25   the pricing that the projects were getting and the

PROCEEDINGS

1    pricing that the public was getting.  And so there

2    was the same differential in the pricing of bonds in

3    both cases.

4           The other thing that was highlighted

5    through that testimony was that it involved the same

6    groups and the same individuals, and so we -- you

7    know, we pointed the Court to a very, very specific,

8    discrete portion of Mr. Eveland's testimony.  And

9    respectfully, Your Honor, we believe that's new

10   information that we weren't able to present to the

11   Court in our prior motion, but it does go directly

12   to the Court's ruling.

13           THE COURT:  Okay.  Thank you.

14           Mr. Balber?

15           MR. BALBER:  Well, Your Honor, I feel like

16   I'm arguing this point for the third time because I

17   am -- oh, fourth.

18           THE COURT:  Four.

19           MR. BALBER:  Thank you, Your Honor.

20           Not sure what else to say other than

21   there's nothing in Mr. Eveland's testimony that

22   changes the dynamic.  He absolutely did not testify

23   that the nature of the fraud is the same.  He said

24   precisely the opposite.  We've all known since the

25   NPA was submitted in 2014 and plaintiffs referenced

PROCEEDINGS

1   in the complaint that the -- both groups, the

2   Military Housing Group and the RMBS Trading Group

3   were under the same rubric with the same two people

4   at the top.  There's no news there.  No reason to

5   revisit this, Your Honor.  Happy to address any

6   questions you have, but same old story for the

7   fourth time.

8           THE COURT:  Okay.  Thank you.

9           Anything further, Ms. Tabaksblat?

10          Okay.  I'm going to deny the motion, but

11  I'll get a written ruling out to you.  I promise I

12  will this time, unlike last time, so...

13          Okay.  Anything else anybody wants to raise

14  today that I missed?

15          Okay.  Hearing nothing.

16          All right.  So you -- it sounds like you

17  have a lot of depositions coming up.  I guess the

18  only thing we didn't talk about is the 30(b)(6)

19  topics for Jefferies.  You guys are going to meet

20  and confer on that.  Do you -- do we -- do you want

21  to just let me know if you can't work anything out,

22  or --

23          MR. BALBER:  I would suggest that

24  plaintiffs give us another iteration of their

25  request.  Happy to talk any time, but I feel like

PROCEEDINGS

 1    we've been doing a lot of talking and not making a

 2    lot of progress.

 3         THE COURT:  All right.  Well, how about I

 4    give you until the 6th, one -- January 6th, one last

 5    try.  And then if you can't -- you don't -- if you

 6    want to submit the topics to me at that -- the

 7    topics that are in dispute, I guess.

 8         Actually, strike that.  Give me the whole

 9    list of everything that's been agreed, and then mark

10    what's been -- what's in disagreement.

11         And if you -- Mr. Balber, if you have a

12    competing proposal for that topic, you know, or how

13    you would reword it, the -- you know, that's fine.

14    I don't know that I need to hear more argument on

15    this, but just whatever is in dispute and what the

16    parties' competing proposals are.  Fair enough?

17    Okay.

18         MS. TABAKSBLAT:  That works for us, Your

19    Honor.

20         THE COURT:  Okay.  So can we aim for

21    January 6th?  You can let me know that as well?

22         MR. BALBER:  That's fine, Judge.  Thank

23    you.

24         THE COURT:  Okay.  Do we have any 30(b)6s?

25    Are there any Jefferies 30(b)6s that are supposed to

PROCEEDINGS

1    take place before then?

2            MR. BALBER:  It has not been scheduled yet.

3    No.

4            THE COURT:  Okay.  So that's enough time

5    then for you to work it out.  Okay.

6            All right.  Did I forget anything?  Okay.

7    Very good.

8            All right.  Well, thank you all for coming

9    in today.  Have a nice holiday.  And I'm sure I will

10   be speaking to you in the new year.  Thank you.

11           MR. JONES:  Thank you.

12

13                        0o0

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2

3                    C E R T I F I C A T E

4

5        I, Adrienne M. Mignano, certify that the

6    foregoing transcript of proceedings in the case of

7    Monterey Bay Military Housing, LLC, et al. v. AMBAC

8    Assurance Corp. et al., Docket #19-cv-9193, was

9    prepared using digital transcription software and is

10   a true and accurate record of the proceedings.

11

12

13   Signature    _Adrienne M. Mignano_____

14                ADRIENNE M. MIGNANO

15

16   Date:        December 21, 2022

17

18

19

20

21

22

23

24

25