UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONTEREY BAY MILITARY HOUSING, LLC, MONTEREY BAY LAND, LLC, MEADE COMMUNITIES LLC, FORT BLISS/WHITE SANDS MISSILE RANGE HOUSING LP, RILEY COMMUNITIES LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, I, LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, II, LLC, CARLISLE/PICATINNY FAMILY HOUSING LP, BRAGG COMMUNITIES LLC, FORT DETRICK/WALTER REED ARMY MEDICAL CENTER LLC, PICERNE-FORT POLK FUNDING, LLC, RUCKER COMMUNITIES LLC, STEWART HUNTER HOUSING LLC, SILL HOUSING LLC, AETC HOUSING LP, AMC WEST HOUSING LP, LACKLAND FAMILY HOUSING, LLC, and VANDENBERG HOUSING LP,<br><br>                Plaintiffs,<br><br>   -v-<br><br>AMBAC ASSURANCE CORPORATION, JEFFERIES MORTGAGE FINANCE, INC., JEFFERIES & COMPANY INC., JEFFERIES L.L.C., JEFFERIES GROUP LLC, DANNY RAY, and CHETAN MARFATIA,<br><br>                Defendants. | CIVIL ACTION NO.: 19 Civ. 9193 (PGG) (SLC)<br><br>**OPINION AND ORDER** |

**SARAH L. CAVE**, United States Magistrate Judge.

## I. **INTRODUCTION**

Before the Court is the letter-motion of Defendants Ambac Assurance Corporation

("Ambac") and Dan Ray ("Ray", with Ambac, the "Moving Defendants"), challenging Plaintiffs'[1]

---

[1] Plaintiffs are Monterey Bay Military Housing, LLC, Monterey Bay Land, LLC, Meade Communities LLC, Fort Bliss/White Sands Missile Range Housing LP, Riley Communities LLC, Fort Leavenworth Frontier Heritage Communities I, LLC, Fort Leavenworth Frontier Heritage Communities, II, LLC, Carlisle/Picatinny Family Housing LP, Bragg Communities LLC, Fort Detrick/Walter Reed Army Medical Center LLC, Picerne-

assertions of attorney-client privilege over communications with third parties with whom Plaintiffs claim to have a common interest.  (ECF Nos. 537; 543 (the "Motion"); see ECF Nos. 515; 518).  Following two conferences with the parties and an in camera review of an agreed sample of 30 privileged documents (the "Exemplars"), the Court upholds Plaintiffs' assertion of privilege as to certain Exemplars and rejects their assertion as others, the latter of which Plaintiffs are required to produce, along with similar documents, in accordance with this Opinion & Order.

## II.  BACKGROUND

### A.  Factual Background

#### 1.  Plaintiffs' claims

The factual background of this action is set out in detail in prior decisions issued by the Honorable Paul G. Gardephe and the undersigned.  See Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., No. 19 Civ. 9193 (PGG) (SLC), 2021 WL 4173929 (S.D.N.Y. Sept. 14, 2021) ("Monterey Bay II"); Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d 673 (S.D.N.Y. 2021) ("Monterey Bay I").[2]  The Court incorporates those factual summaries, and all defined terms.

Very briefly, Plaintiffs are 18 "project entities" that operate, pursuant to the Military Housing Privatization Initiative of 1996 ("MHPI"), 16 privatized military housing projects (the "MHPI Projects") at 20 military bases throughout the United States.  Monterey Bay I, 531 F. Supp. 3d at 685.  Due to the MHPI, "the military wanted to switch from a public financing model to a private financing model."  (ECF No. 590 at 83; see ECF No. 545-1 at 8 (noting the Army's decision

---

Fort Polk Funding, LLC, Rucker Communities LLC, Stewart Hunter Housing LLC, Sill Housing, LLC, AETC Housing LP, AMC West Housing LP, Lackland Family Housing, LLC, and Vandenberg Housing LP.

[2] Unless otherwise indicated, all internal citations and quotation marks are omitted from case citations.

"to privatize family housing and related ancillary facilities at certain military installations" pursuant to the MHPI)). To do so, the MHPI Projects "'collectively needed billions of dollars of long-term financing' for development and construction." <u>Monterey Bay I</u>, 531 F. Supp. 3d at 685 (quoting ECF No. 256 ¶ 4). Each of the MHPI Projects was a "partnership" between a branch of the United States military (the United States Department of the Army (the "Army"), Department of the Navy (the "Navy"), and the United States Air Force (the "Air Force") (together, the "Military Branches")) and "one of four private developers," Corvias, Clark, BBC, and Michaels (the "Developers"). (ECF No. 256 ¶¶ 86, 97, 102, 107, 111, 116, 121, 125, 130). <u>See</u> <u>Monterey Bay I</u>, 531 F. Supp. 3d at 685 (citing ECF No. 256 ¶¶ 2–3).

Among the financial institutions that provided loan origination services for the MHPI Projects was non-party GMAC, of which Ray was a managing director. <u>Monterey Bay I</u>, 531 F. Supp. 3d at 685–86. "Ray chose Defendant Ambac, an AAA-rated insurance company to insure, or 'credit enhance,' the load for the Fort Meade Project, thereby permitting GMAC to syndicate the loan by selling AAA-rated bonds." <u>Id.</u> at 686. Defendant Chetan Marfatia ("Marfatia") was a managing director of Ambac. <u>Id.</u> at 684. In 2009, Defendant Jefferies Mortgage purchased, in a bankruptcy proceeding involving GMAC's successor, non-party Capmark,[3] the servicing assets for Ray's military housing business, and Defendant Jefferies & Co. hired Ray and his team to continue the business. <u>Id.</u> at 691. (<u>See</u> ECF No. 590 at 26–27).

Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 et seq. ("RICO") and other state law theories, arising out of alleged fraud the

---

[3] <u>See</u> ECF No. 256 ¶ 4 n.1.

Defendants[4] committed in connection with financing the development and renovation of military housing projects.  See Monterey Bay II, 2021 WL 4173929, at *1.  (See also ECF No. 353 at 7; see generally ECF No. 256).  Plaintiffs claim that, among other things, Defendants set "above-market credit spread on Project loans" that enabled them to "realiz[e] secret profits based on that above-market interest rate," "manipulated the 'shadow ratings'" that Ray, GMAC, Ambac, and Marfatia "claimed were necessary for the Projects' credit enhancement[,]" misrepresented that the rating agencies required bond insurance and a surety bond on the Projects' loans, entered into "stealth" credit enhancement agreements with Ambac, and required the Projects to accept an OID, even though there was "no economic purpose" for doing so, thereby enabling "Ray and GMAC to make millions in profits on [] pre-closing bond sales."  Monterey Bay I, 531 F. Supp. 3d at 688–89, 691.

### 2.  Third Parties With Whom Plaintiffs Communicated

The Motion concerns whether the attorney-client privilege or the work product protection shield communications (the "Third Party Communications") that Plaintiffs had or shared with a fourteen-page list of individuals affiliated with the Military Branches and outside advisors and consultants, with all of whom Plaintiffs contend they share a common interest.[5] (ECF Nos. 539-5; 543; 545).[6]

---

[4] "Defendants" refers to Ambac, Jefferies (which refers to Jefferies Mortgage, Jefferies & Co, Jefferies LLC, and Jefferies Group LLC), Ray, and Marfatia.

[5] Appendix A to the Motion listed about three dozen individuals affiliated with third parties (ECF No. 543 at 6–9), and the parties also submitted "Plaintiffs' Supplemental Privilege Log Attorney Affiliation List," (ECF No. 539-5), from which the Court inferred that there were earlier iterations, which Plaintiffs then submitted at the Court's direction.  (ECF Nos. 573-1; 573-2).  The Court refers to the four lists together as the Affiliation List.

[6] The Moving Defendants are not challenging Plaintiffs' assertion of the work product protection over communications about this action or a related litigation between Ambac and the MHPI Projects involving the Debt Service Reserve Fund ("DSRF")  (the "DSRF Action").  (ECF No. 590 at 72; see ECF No. 344 at 10).

### a.  **Military Branches**

The only evidence Plaintiffs have submitted to support their assertion that the Third Party Communications are privileged is an example of a limited partnership agreement for one of the Plaintiff MHPI Projects, Carlisle/Picatinny Family Housing LP ("Carlisle").  (ECF Nos. 545 at 1 n.3; 545-1 (the "Carlisle Agreement")).  The other parties to the Carlisle Agreement are:  (i) GMH Military Housing-Carlisle/Picatinny Limited Partner LLC, (ii) GMH Military Housing-Carlisle/Picatinny General Partner LLC, (iii) GMH/Army Integrated LLC (together "GMH"), and (iv) the Army.  (ECF No. 545-1 at 2).  The stated purpose of the Carlisle Agreement is to establish a "limited partnership to design, demolish, develop, expand, renovate, construct, manage, maintain and repair" the Carlisle housing and related facilities (the "Carlisle Project").  (Id. at 8). As part of the Carlisle Agreement, the Army contracted with one of the Developers (GMH, BBC's predecessor), which delivered a CDMP detailing the Developer's proposal for the "design, demolition, development, expansion, renovation, construction, management, maintenance and repair" of the Carlisle Project.  (Id.)  Pursuant to the Carlisle Agreement, GMH was to receive periodic distributions, while the Army would only receive distributions in the event of a transfer of its interest or a dissolution.  (Id. at 35–38, 48–49).

Plaintiffs cite the Carlisle Agreement to support their assertion that "Plaintiffs in this case are legal joint ventures[] formed and owned jointly by a developer . . . and the sponsoring Military branch."  (ECF No. 545 at 1).  Although "joint venture" appears neither in the SAC, (see generally ECF No. 256), nor in the Carlisle Agreement, Plaintiffs argue in opposition to the Motion that "[t]he relationship between the developers and the [M]ilitary [B]ranches[] is a classic ongoing enterprise the common interest privilege is designed to protect."  (ECF No. 545 at 2).

Plaintiffs continue, with citation to some of the Exemplars but not any other agreements, declarations, or testimony, that:

> in structuring the Plaintiff joint ventures, counsel for the developers and the military provided legal advice jointly to these joint project owners on how to properly structure the Projects[], Purchase Options in the Community Development Management Plans [('CDMPs')], for each Project[], the tax implications of the Project structures, and post formation, shared legal strategies for protecting the Projects' ongoing legal interests . . . . [F]ollowing Ambac's credit rating downgrade in 2008, the military and developers had to assess the legal effect of Ambac's downgrade on the Projects and whether any action had to be taken to protect these joint ventures.  The military and developers recognized that this action was likely to include litigation and their communications reflect concrete analyses on how this potential litigation would impact the Projects.[]  The military had approval rights on major decisions made by the Projects and any litigation on behalf of the Projects had to be discussed with the military from the outset.[]

(Id.; see also ECF No. 590 at 77 (Plaintiffs asserting that they were "essentially joint owners in a project" with the Military Branches)).

### b.  The Advisors

The Moving Defendants (not Plaintiffs) have provided the Court with a list of 38 legal advisors, financial advisors, and consultants (the "Advisors") with whom Plaintiffs contend they share a common interest.  (ECF No. 543 at 6–9).  Plaintiffs contend that the Advisors were: (i) "translating or advising on the complex financial structures of the Projects"; and/or (ii) the "functional equivalent" of employees of Plaintiffs.  (ECF No. 545 at 3–5).  Apart from pointing to the communications in the Exemplars, Plaintiffs have not submitted any retention agreements with any of the Advisors or other evidence of who retained them and what role they held.

One Advisor Plaintiffs discuss is Duxbury Financial ("Duxbury"), "the sister corporation of Clark [that] provided litigation advisory services that were indispensable in evaluating the Projects' legal avenues following Ambac's credit rating downgrade."  (ECF No. 545 at 4; see

ECF No. 590 at 73).  Plaintiffs assert (without citation to evidence) that Kirkland & Ellis LLP ("Kirkland"), the MHPI Projects' outside litigation counsel, "relied on Duxbury's financial knowledge to translate key components of the Projects' financial structure and determine whether the Projects had the legal right to terminate Ambac's policy and if so, the best legal strategy to pursue that right."  (ECF No. 545 at 4).  Plaintiffs also claim that Clark (one of the Developers) used "Duxbury's litigation advisory services" to develop "legal strategies for addressing the Ambac downgrade, as well as examining the legal strategies for disputes with other insurers[.]"  (Id.)  Plaintiffs assert that "Duxbury's employees were treated as analogous to Clark employees[,]" and state that Clark produced Duxbury's communications.  (Id. at 5; see ECF No. 590 at 73–74).

Plaintiffs also discuss Barclays Capital Inc. ("Barclays"), which "was retained"—by whom Plaintiffs do not specify, but apparently, Developer BBC (see ECF No. 518-2 at 2 (the "Barclays Agreement"))—"to perform the financial analysis necessary to develop a legal strategy related to the termination of Ambac as [an] insurer."  (ECF No. 545 at 5).  Plaintiffs assert that "Barclays had primary responsibility for providing the financial analysis to assist with developing the best legal strategy for the Projects, engaged in a continuous, close relationship with Plaintiffs' principals connected to these legal matters; and, because they were hired to perform this specific role, possessed information that no one else at the companies had."  (Id.)  Barclays was represented by Ballard Spahr, which, Plaintiffs assert, "communicated directly with developer BBC's employees and acted as an extension of BBC's legal team."  (Id.)

Plaintiffs also describe John Rydle ("Rydle") as an advisor who "translate[d] financial concepts and securities concepts for BBC counsel[,]" and Jones Lang LaSalle ("JLL") as an advisor

to Projects involving the Army and Air Force and to Plaintiffs "throughout the CDMP process and project implementation."  (ECF No. 545 at 4).

Finally, Plaintiffs contend that Malvern Capital Partners, LLC ("Malvern") "served a similar role to Duxbury with regard to the BBC Navy projects," which are not Plaintiffs in this action. (ECF No. 545 at 5; see ECF No. 559-11 at 3–8 (Malvern consulting services agreement with BBC relating to Navy housing project)).  Plaintiffs describe Malvern's Austin Repetto ("Repetto"), as "a long-term advisor to BBC[, who] had a close relationship with the company, including as one of GMH's (BBC's predecessor) shareholders[,]" and "worked directly with BBC in-house and outside counsel and had the authority to request legal analysis from BBC counsel."  (ECF No. 545 at 5).  Despite Plaintiffs' assertions about Malvern's integral role, however, Malvern disavows Plaintiffs' description of Malvern as a financial advisor on "some . . . of the Developers' MHPI [P]rojects" as "a mistake[,]" and professes to have "nothing to do with this lawsuit[,]" (ECF No. 575 at 1–2), nor any documents relating to the MHPI Projects, communications with Ambac, or syndication of loans arising from the MHPI Projects.  (ECF No. 559-3; see ECF No. 590 at 60–64).

In response to questions from the Court, (see ECF No. 590 at 69), Plaintiffs submitted a letter asserting, again without any evidentiary support, that Core Impact, whose name appears in some of the Exemplars, was engaged by GMH (now BBC), "to provide strategic support services to GMH on the military housing privatization program, including solicitation response and proposal preparation for Plaintiff projects Fort Stewart, Fort Detrick, and Fort Bliss." (ECF No. 583).

B. **Procedural Background**

On August 28, 2017, Plaintiffs filed the original complaint in this action in the Northern

District of California (ECF No. 1).   See Monterey Bay I, 531 F. Supp. 3d at 693–94.

On September 21, 2017, Ambac moved to transfer the action (the "Transfer Motion"), in which

Marfatia and Jefferies joined.   Monterey Bay II, 2021 WL 4173929, at *3.   While the Transfer

Motion was pending, Plaintiffs filed the First Amended Complaint, which the Defendants moved

to dismiss.  (ECF Nos. 60; 62–64; 66; 71).   On January 2, 2018, the Honorable Beth Labson

Freeman of the United States District for the Northern District of California denied the Transfer

Motion. (ECF No. 108).  On July 17, 2018, Judge Freeman granted Defendants' Motions to Dismiss

for lack of personal jurisdiction, except as to the Monterey Bay Plaintiffs' claims against Ambac.

(ECF No. 147 at 6–11).   Judge Freeman also held, under Fed. R. Civ. P. 12(b)(6), that Plaintiffs

failed to state a RICO claim, and granted Plaintiffs leave to amend.  (Id. at 11–24).

On January 16, 2019, Plaintiffs filed the Second Amended Complaint (the "SAC") (ECF No.

220; see ECF No. 256), seeking, in addition to compensatory and treble damages, equitable relief

in the form of "[r]elieving [them], in whole or in part, from a continuing obligation to make

payments to Ambac or its bond insurers[,]" "[d]eclaring any purported disclaimer by Jefferies

Mortgage of its fiduciary duty to the Sill and Bliss Projects null and void[,]" and "[d]isgorgement

of all profits and fees, both disclosed and undisclosed[.]"  (ECF Nos. 220 at 85; 353 at 14).   On

February 15, 2019, Defendants renewed their Motions to Dismiss.  (ECF Nos. 223–28).   On

September 26, 2019, Judge Freeman denied the renewed Motions to Dismiss and transferred the

action to this Court.  (See generally ECF No. 261).  On arriving in this District, Defendants moved

for reconsideration.  (ECF Nos. 268; 269; 271; 273 (the "Reconsideration Motions")).

On March 31, 2021, Judge Gardephe issued <u>Monterey Bay I</u>, granting the Reconsideration Motions only "to the extent that (1) Plaintiffs' breach of fiduciary duty claims against Defendants Ambac and Marfatia [were] dismissed; (2) aiding and abetting breach of fiduciary duty claims premised on Defendants Ambac and Marfatia's breach of fiduciary duty [were] dismissed; and (3) Plaintiffs Sill Housing LLC and Lackland Family Housing LLC's RICO claims against Defendants Ambac and Marfatia [were] dismissed."  531 F. Supp. 3d at 731.

In April 2021, Defendants filed answers to the SAC.  (ECF Nos. 323–26). On September 14, 2021, the Court denied Plaintiffs' motion to strike the unclean hands defense asserted by Ambac, Jefferies, and Ray, and granted Jefferies' cross-motion to file an amended answer to the SAC.  <u>Monterey Bay II</u>, 2021 WL 4173929, at *6, *8.

Throughout fact discovery, the parties had numerous discovery disputes that required 16 conferences and as many orders to resolve.  (ECF min. entries Aug. 12, 2021; Sept. 14, 2021; Dec. 17, 2021; Jan. 6, 2022; Jan. 24, 2022; Feb. 14, 2022; Mar. 3, 2022; Mar. 16, 2022; Apr. 29, 2022; May 9, 2022; May 25, 2022; July 5, 2022; Aug. 3, 2022; Sept. 7, 2022; Sept. 29, 2022; Nov. 14, 2022; Dec, 19, 2022; <u>see</u> ECF Nos. 346; 353; 358; 369; 371; 379; 385; 388; 401; 402; 408; 409; 419; 422; 429; 452; 454; 459; 464; 466; 474; 475; 476; 485; 486; 489; 499; 501; 503; 512; 523; 525).  In advance of a conference scheduled for November 14, 2022, the Moving Defendants first brought to the Court's attention "deficiencies in Plaintiffs' privilege log and Plaintiffs' improper assertions of the common interest doctrine to withhold" the Third Party Communications.  (ECF No. 515; <u>see</u> ECF No. 518).  Ambac raised the deficiencies with the Court only "[a]fter multiple meet-and-confer calls and <u>nine</u> iterations of Plaintiffs' privilege log[.]"  (ECF No. 518 at 1; <u>see</u> ECF No. 525 at 15–16 (counsel "ha[d] been raising these [privilege] issues with

[Plaintiffs' counsel] since April [2022]")).  Plaintiffs responded, providing "context" to support "the assertion of common-interest privilege" over the Third Party Communications.  (ECF No. 519).  The Court heard argument from the parties on November 14, 2022, (see ECF min. entry Nov. 14, 2022), following which the Court set a schedule for the parties to submit Plaintiffs' privilege logs (the "Logs"), the Exemplars for the Court's in camera review, and additional letter-briefs.  (ECF Nos. 523 at 1; 525 at 58).  On November 29, 2022, Plaintiffs submitted the Logs and the Exemplars (ECF Nos. 539 – 539-5), and the Moving Defendants and Plaintiffs subsequently submitted letters arguing their respective positions on the privilege.  (ECF Nos. 543; 545).  On December 19, 2022, the Court heard further argument from the parties.  (ECF min. entry Dec. 19, 2022 (the "Conference"); see ECF Nos. 580; 590–91).

### III. **DISCUSSION**

Plaintiffs assert that the Third Party Communications are protected by one or more of three exceptions to the general rule that voluntary disclosure of attorney-client privileged information to a third party waives the privilege:  (i) the common interest doctrine; (ii) the "Kovel" rule; and/or (iii) the functional equivalent doctrine.  (See ECF Nos. 525 at 18; 545 at 1–5).  And, although only one of the Exemplars is designated as protected by the work product doctrine, at the Conference, Plaintiffs asserted that other Third Party Communications are also protected by work product, which the Moving Defendants contend has been waived.  (ECF No. 590 at 69, 72).  The Court sets forth the standards for these doctrines before analyzing whether they protect the Third Party Communications from disclosure generally, and each of the Exemplars individually.

**A. Legal Standards**

    **1. Attorney-Client Privilege**[7]

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." Upjohn Co. v. U.S., 449 U.S. 383, 389 (1981). Under federal law, the attorney-client privilege applies only if all the following are met:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 441 (S.D.N.Y. 1995) (quoting United States v. United Shoe Mach. Corp., 89 F. Supp. 357, 358–59 (D. Mass. 1950)). Under New York law, for the privilege to apply, the communication must have been made "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship." Spectrum Sys. Int'l Corp. v. Chem. Bank, 78 N.Y.2d 371, 377–78 (1991). The communication must also "be primarily or predominantly of a legal character." Id. at 378. In evaluating whether the privilege applies, the "critical inquiry" is "whether, viewing the lawyer's communication in its full content and context, it was made in order to render legal advice or services to the client." Id. at 379.

---

[7] The parties do not address choice-of-law, but cite cases applying attorney-client privilege and the common interest doctrine under New York and federal law, the latter of which, "as interpreted by the Second Circuit, is essentially in accord with New York law on the pertinent issues." Gulf Is. Leasing, Inc. v. Bombadier Cap., Inc, 215 F.R.D. 466, 470 n.2 (S.D.N.Y. 2003).

The party invoking the attorney-client privilege bears the burden of demonstrating that the privilege applies. See In re Grand Jury Proc., 219 F.3d 175, 182 (2d Cir. 2000) ("In re Grand Jury I"); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 470–71 (S.D.N.Y. 1993); Spectrum, 78 N.Y.2d at 377.  To meet this burden, the party asserting the attorney-client privilege must show that the communications were "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance."  Brennan Ctr. for Just. at N.Y. Univ. Sch. Of L. v. U.S. Dep't of Just., 697 F.3d 184, 207 (2d Cir. 2012).  "Any ambiguities as to whether the essential elements have been met are construed against the party asserting the privilege."  Koumoulis v. Indep. Fin. Mktg. Grp., Inc., 295 F.R.D. 28, 38 (E.D.N.Y. 2013), aff'd, 29 F. Supp. 3d 142 (E.D.N.Y. 2014).  As this Court has explained, "the privilege attaches not only to communications by the client to the attorney, but also to advice rendered by the attorney to the client, at least to the extent that such advice may reflect confidential information conveyed by the client."  In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig., No. 14 MD. 2542 (VSB) (SLC), 2020 WL 8465433, at *2 (S.D.N.Y. Oct. 30, 2020) (quoting Bank Brussels, 160 F.R.D. at 441–42).  The mere fact, however, that a document was transmitted between an attorney and a client does not render the document privileged. See Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.), 139 F.R.D. 295, 300 (S.D.N.Y. 1991). Rather, it "must contain confidential communication relating to legal advice."  Id.; see Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2001 WL 1356192, at *1 (S.D.N.Y. Nov. 2, 2001) (rejecting argument that "any reference to any communication between [a client] and one of his attorneys on any document shields that entire document from disclosure, whether or not the

document reveals communications made by [the client] to his attorneys in confidence and for the purpose of obtaining legal advice").

Because in-house lawyers often perform both legal and business functions, "communications between a corporation's employees and its in-house counsel, though subject to the attorney-client privilege, must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice[,]" with only the latter being protected by the attorney-client privilege.  Brown v. Barnes & Noble, Inc., 474 F. Supp. 3d 637, 648 (S.D.N.Y. 2019), aff'd, 2020 WL 5037573 (S.D.N.Y. Aug. 26, 2020).  "The privilege . . . attaches only if 'the predominant purpose of the communication is to render or solicit legal advice.'"  Tower 570 Co. LP v. Affiliated FM Ins. Co., No. 20 Civ. 799 (JMF), 2021 WL 1222438, at *2 (S.D.N.Y. Apr. 1, 2021) (quoting Pritchard v. Cnty. of Erie (In re Cnty. of Erie), 473 F.3d 413, 420 (2d Cir. 2007)).  Therefore, a document that is "'predominantly a business communication' is not protected merely because it 'involved legal considerations' and 'counsel was copied.'"  Tower 570, 2021 WL 1222438, at *2 (quoting LSH Co. v. AXA Equitable Life Ins. Co., No. 18 Civ. 2111 (JMF), 2019 WL 10947152, at *1 (S.D.N.Y. Aug. 26, 2019)); see Mazzocchi v. Windsor Owners Corp., No. 11 Civ. 7913 (RA) (SDA), 2020 WL 4038342, at *1 (S.D.N.Y. July 17, 2020) ("[Merely] including an attorney . . . as a 'cc' to [] emails does not make the communications privileged."); LPD N.Y., LLC v. Adidas Am., Inc., No. 15 Civ. 6360 (MKB), 2018 WL 6437078, at *5 (E.D.N.Y. Dec. 7, 2018) ("That attorneys were copied on communications between business personnel does not, by itself, entitle the communications to protection.").  The privilege does, however, "'protect[] from disclosure communications among corporate employees that reflect advice rendered by counsel to the

corporation,' and thus 'the dissemination of confidential communications to [the corporation's employees] does not defeat the privilege.'"  In re Keurig, 2020 WL 8465433, at *2 (quoting Bank Brussels, 160 F.R.D. at 442).

"The attorney-client privilege was designed 'to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and [the] administration of justice.'"  TVT Recs. v. Island Def Jam Music Grp., 214 F.R.D. 143, 144 (S.D.N.Y. 2003) (quoting Upjohn, 449 U.S. at 389).  "Because the privilege 'stands in derogation of the public's right to every [person]'s evidence . . . it ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'" TVT Recs., 214 F.R.D. at 144 (quoting In re Grand Jury I, 219 F.3d at 182); see Brown, 474 F. Supp. 3d at 648 ("The privilege is narrowly construed because it renders relevant information undiscoverable."); accord Coventry Cap. US LLC v. EEA Life Settlements Inc., No. 17 Civ. 7417 (VM) (SLC), 2021 WL 4312026, at *3 (S.D.N.Y. Sept. 22, 2021).

Finally, "[i]t is well-established that the attorney-client privilege is waived if the holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the communication to a third party or stranger to the attorney-client relationship."  Denney v. Jenkens & Gilchrist, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004).  Thus, the party invoking the attorney-client privilege must also show "'that the communications between client and attorney were made in confidence and have been maintained in confidence.'"  Id. (quoting In re Horowitz, 482 F.2d 72, 81–82 (2d Cir. 1973)).

### a. **Common Interest Doctrine**

The common interest doctrine "is not a separate privilege but 'an extension of the attorney client privilege.'"  Gulf Is., 215 F.R.D. at 470 (quoting United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989)).  It is "an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege."  Sokol v. Wyeth, Inc., No. 07 Civ. 8442 (SHS) (KNF), 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008). "The common interest doctrine precludes a waiver of the underlying privilege concerning confidential communications between the parties 'made in the course of an ongoing common enterprise and intended to further the enterprise,' irrespective of whether an actual litigation is in progress." Id. (quoting Schwimmer, 892 F.2d at 243).  The doctrine "is intended to allow clients to share information with an attorney for another party who shares the same legal interest." Gulf Is., 215 F.R.D. at 471; see SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC, No. 01 Civ. 9291 (JSM), 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002) ("The purpose of the common interest privilege is to permit a client to share confidential information with the attorney for another who shares a common legal interest.").  The doctrine therefore "protect[s] the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel."  Schwimmer, 892 F.2d at 243.

The party invoking the doctrine to show that the attorney-client privilege was not waived through disclosure to a third party bears the burden of "demonstrat[ing] that the parties communicating:  (1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy."  Sokol, 2008 WL

3166662, at *5; see Bank Brussels, 160 F.R.D. at 447 (explaining that "the doctrine applies where parties are represented by separate counsel but engage in a common legal enterprise"). Of course, the communication itself must, in the first instance, be protected by the attorney-client privilege or the work product doctrine, for the common interest doctrine to apply. See Sokol, 2008 WL 3166662, at *5; Gulf Is., 215 F.R.D. at 470; In re F.T.C., No. 18 MD. 304 (RJW), 2001 WL 396522, at *4 (S.D.N.Y. Apr. 19, 2001).  The party invoking the doctrine must make this showing "based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence."  Gulf Is., 215 F.R.D. at 472; see Bowne, 150 F.R.D. at 472 (rejecting assertion of privilege where party offered no affidavits, "specific deposition testimony or other competent evidence").  The party cannot meet its burden by "'mere conclusory or ipse dixit assertions'" in its counsel's unsworn motion papers.  von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 146 (2d Cir. 1987) (quoting In re Bonanno, 344 F.2d 830, 833 (2d Cir. 1965)).

Although, at its core, the doctrine protects communications between multiple clients represented by the same attorney, "the doctrine is not limited to such situations."  Denney, 362 F. Supp. 2d at 415.  Rather, "the weight of authority is that the common interest doctrine does extend at least to situations 'where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'"  Bank Brussels, 160 F.R.D. at 447 (quoting Schwimmer, 892 F.2d at 243).  "With regard to the 'interest' that must be shown, federal case law has repeatedly held that communications regarding business matters—even where litigation is pending or imminent—do not qualify for protection from discovery under the common interest [doctrine]."  Gulf Is., 215 F.R.D. at 471; see In re F.T.C., 2001 WL 396522, at *5

(noting that "courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); <u>Walsh v. Northrop Grumman Corp.</u>, 165 F.R.D. 16, 18 (E.D.N.Y. 1996) (noting that "[t]he doctrine does not extend to communications about a joint business strategy that happens to include a concern about litigation"). "'What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal.'" <u>In re F.T.C.</u>, 2001 WL 396522, at *3 (quoting <u>N. River Ins. Co. v. Columbia Cas. Co.</u>, No. 90 Civ. 2518 (MJL), 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995)). Even then, "[o]nly communications made in the course of an ongoing legal enterprise, and intended to further the enterprise, are protected." <u>Id.</u>

The common interest doctrine "is narrowly construed[,]" <u>Gulf Is.</u>, 215 F.R.D. at 471 (collecting cases), and the Second Circuit has cautioned that expansions of the attorney-client privilege under the common interest doctrine should be "cautiously extended." <u>United States v. Weissman</u>, 195 F.3d 96, 100 (2d Cir. 1999); <u>see</u> <u>In re Rivastigmine Pat. Litig.</u>, No. 05 MD. 1661 (HB) (JCF), 2005 WL 2319005, at *3 (S.D.N.Y. Sept. 22, 2005) (same), <u>aff'd</u>, 2005 WL 3159665 (S.D.N.Y. Nov. 22, 2005). Under New York law, "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." <u>Spectrum</u>, 78 N.Y.2d at 377.

### b. **The Kovel Rule**

In <u>United States v. Kovel</u>, 296 F.2d 918, 922 (2d Cir. 1961), the Second Circuit held that the attorney-client privilege "can protect communications between a client and his accountant,

or the accountant and the client's attorney, when the accountant's role is to clarify communications between attorney and client." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999). Just as an interpreter can translate between an attorney and client who speak different languages, "Kovel recognized that an accountant can play a role analogous to an interpreter in helping the attorney understand financial information passed to the attorney by the client." Ackert, 169 F.3d at 139 (citing Kovel, 296 F.2d at 922). The Kovel rule does not, however, shield "a communication between an attorney and a third party . . . solely because the communication proves important to the attorney's ability to represent the client." Ackert, 169 F.3d at 139 (citing Hickman v. Taylor, 329 U.S. 495, 508 (1947)). For the Kovel rule to apply, the attorney must have been relying on the third party advisor "to translate or interpret information given to [the attorney] by his client[,]" not to provide information that the client did not already have. Ackert, 169 F.3d at 139–40.

### c. **The Functional Equivalent Doctrine**

"Under the functional equivalent doctrine, where a consultant serves as a de facto employee of a company, communications between the consultant and the company's lawyers are protected by the attorney-client privilege, and disclosure to the consultant of privileged communications to which the consultant was not a party does not waive the privilege." Walsh v. CSG Ptrs., LLC, 544 F. Supp. 3d 389, 392 (S.D.N.Y. 2021). The rule recognizes that "there is little reason if any 'to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice.'" Id. (quoting In re Copper Mkt. Antitrust Litig., 200 F.R.D. 213, 219 (S.D.N.Y. 2001)). The Second Circuit has yet to adopt the doctrine, "and some district

courts have expressed skepticism about whether it would do so." Walsh, 544 F. Supp. 3d at 392;

but see, e.g., Bellridge Cap., LP v. EVmo, Inc., No. 21 Civ. 7091 (PGG) (SLC), 2022 WL 17490961,

at *5 (S.D.N.Y. Dec. 6, 2022) (finding that defendant's former CEO "was the functional equivalent

of an employee who possessed primary responsibility for [negotiation of key agreement] and

thus had unique information critical to the issues in this action [about alleged breach of that

agreement] such that the attorney-client privilege protect[ed] his communications with"

defendant's counsel).

　　　　Courts assessing whether a consultant is the functional equivalent of an employee have

considered several factors, including:

> (1) whether the consultant had a primary responsibility for a key corporate job;
> (2) whether the consultant had a continuous and close working relationship with
> the company's principals on matters critical to the company's position in litigation;
> (3) whether the consultant is likely to possess information possessed by no one
> else at the company; (4) whether the consultant exercised independent decision-
> making on the company's behalf; (5) whether the consultant served as a company
> representative to third parties; and (6) whether the consultant sought legal advice
> from corporate counsel to guide his or her work for the company.

Walsh, 544 F. Supp. 3d at 392 (citing, inter alia, In re Restasis (Cyclosporine Ophthalmic Emulsion)

Antitrust Litig., 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019)); see Bellridge, 2022 WL 17490961, at

*4; Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., 232 F.R.D. 103, 113 (S.D.N.Y. 2005).

The proponent of the functional equivalent doctrine "bears the burden of establishing that it

applies." Walsh, 544 F. Supp. 3d at 393.

### 2. **Work Product Doctrine**

　　　　"Federal law governs the applicability of the work product doctrine in all actions in federal

court." Wultz v. Bank of China Ltd., 304 F.R.D. 384, 393 (S.D.N.Y. 2015). "[D]ocuments and

tangible things that are prepared in anticipation of litigation or for trial by or for another party or

its representative" are eligible for work product protection.  Fed. R. Civ. P. 26(b)(3)(A).  For the work product doctrine to apply, the party claiming protection bears the burden of establishing "that the material at issue '(1) [is] a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by [its] representative.'" Pilkington N. Am., Inc. v. Mitsui Sumimoto Ins. Co. of Am., 341 F.R.D. 10, 13 (S.D.N.Y. 2022) (quoting Allied Irish Banks, P.L.C. v. Bank of Am., N.A., 252 F.R.D. 163, 173 (S.D.N.Y. 2008)). In response to a challenge to the work product protection, the party asserting the protection must "submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only the challenged elements of the applicable privilege or protection, with the ultimate burden of proof resting with the party asserting the privilege or protection." A.I.A. Holdings, S.A. v. Lehman Bros., Inc., No. 97 Civ. 4978 (LMM) (HBP), 2002 WL 31385824, at *6 (S.D.N.Y. Oct. 21, 2002), supplemented by, 2002 WL 31556382 (S.D.N.Y. Nov. 15, 2002); see Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB) (HBP), 2007 WL 473726, at *4 (S.D.N.Y. Feb. 14, 2007) ("The party asserting the protection of the work-product doctrine bears the burden of proof.").  The party asserting the protection can meet this burden "only by an evidentiary showing based on competent evidence . . . and [it] cannot be 'discharged by mere conclusory or ipse dixit assertions.'"  Bowne, 150 F.R.D. at 470 (quoting von Bulow, 811 F.2d at 146).

Concerning the second prong, "[i]n anticipation of litigation" means that "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998).  "Documents prepared in anticipation of litigation

are work product, even when they are also intended to assist in business dealings." <u>Schaeffler v.</u> <u>United States</u>, 806 F.3d 34, 43 (2d Cir. 2015).  But "[d]ocuments prepared in the ordinary course of business, or that would have been created whether or not litigation was anticipated, are not protected by work-product immunity." <u>In re Copper</u>, 200 F.R.D. at 221.  A party's "consider[ation of] the possibility of litigation . . . is insufficient to trigger the protection of the work product doctrine[.]" <u>Gucci Am., Inc. v. Guess?, Inc.</u>, 271 F.R.D. 58, 75 (S.D.N.Y. 2010); <u>see</u> <u>Kingsway</u>, 2007 WL 473726, at *5 (collecting cases); <u>In re Grand Jury Proc.</u>, No. 11 MD. 189, 2001 WL 1167497, at *15 (S.D.N.Y. Oct. 3, 2001) ("<u>In re Grand Jury II</u>") (explaining that "a generalized desire to avoid litigation is insufficient to meet the 'in anticipation of litigation' requirement"). "Rather, the party must have taken 'affirmative steps in anticipation of litigation.'" <u>Brook v.</u> <u>Simon & Ptrs., LLP</u>, No. 17 Civ. 6435 (GBD) (SLC), 2021 WL 5919207, at *4 (S.D.N.Y. Dec. 15, 2021) (quoting <u>Gucci</u>, 271 F.R.D. at 75).

In contrast to the attorney-client privilege, "the protection afforded work product is not waived merely because the material is disclosed to a third party." <u>Bank of Am., N.A. v. Terra Nova</u> <u>Ins. Co.</u>, 212 F.R.D. 166, 169 (S.D.N.Y. 2002).  A party does, however, "waive[] the work product protection by taking actions inconsistent with . . . its purpose, such as disclosing work product to its adversary, or by placing privileged documents 'at issue' in a litigation[.]" <u>N.Y. Times Co. v. U.S.</u> <u>Dep't of Just.</u>, 939 F.3d 479, 494 (2d Cir. 2019).  "[C]ourts find that the work-product privilege is waived only if disclosure to the third party 'substantially increases the opportunity for potential adversaries to obtain the information.'" <u>Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n,</u> <u>Inc.</u> No. 03 Civ. 725 (KAJ) (RO), 2004 WL 1542259, at 81 (S.D.N.Y. July 9, 2004) (quoting <u>In re Grand</u> <u>Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982</u>, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982)).

In addition, failure to furnish an adequate privilege log identifying which privilege is being asserted may also be grounds for finding the protection waived.  See Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C., 499 F. Supp. 2d 475, 479 (S.D.N.Y. 2007) (holding that plaintiff's failure to "identify which privilege is being asserted" constituted a waiver); Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc., 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (finding that "fail[ure] to specify work product as the particular privilege protecting [] various documents . . . waived work product immunity for the documents").  "Just as the party seeking to assert a claim of privilege bears the burden of establishing the existence of the privilege, that same party has the burden of establishing nonwaiver."  Granite Ptrs., L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 54 (S.D.N.Y. 1999).  Courts in this District have noted that "only 'flagrant' violations of these rules should result in a waiver of privilege."  Dey, L.P. v. Sepracor, Inc., No. 07 Civ. 2353 (JGK) (RLE), 2010 WL 5094406, at *2 (S.D.N.Y. Dec. 8, 2010); see Chevron Corp. v. Donziger, No. 11 Civ. 0691 (LAK) (JCF), 2013 WL 4045326, at *3 (S.D.N.Y. Aug. 9, 2013) (finding that insufficiently detailed descriptions of documents to support the assertion of privilege did not waive privilege); Pem-Amer., Inc. v. Sunham Home Fashions, LLC, No. 03 Civ. 1377 (JFK) (RLE), 2007 WL 3226156, at *2 (S.D.N.Y. Oct. 31, 2007) (finding that tardy privilege log did not waive privilege).

The work product protection is not absolute, however.  "A finding that a document was prepared 'because of the prospect of litigation . . . does not necessarily mean that the document will be protected against discovery,' but instead that the 'document is eligible for work-product' protection."  Brook, 2021 WL 5919207, at *5 (quoting Adlman, 134 F.3d at 1202–03).  Pursuant to Federal Rule of Civil Procedure 26(b)(3)(A), "work product materials are discoverable if (i) they

are otherwise discoverable under Rule 26(b)(1), and (ii) the party seeking them shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Rackwise, Inc. v. Foley Shechter Ablovatskiy, LLP, No. 19 Civ. 11094 (AT) (SLC), 2020 WL 7342743, at *8 (S.D.N.Y. Dec. 14, 2020) (quoting Rule 26(b)(3)(A)). "A substantial need exists 'where the information sought is essential to the party's defense, is crucial to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative values on contested issues.'" Gucci, 271 F.R.D. at 74–75 (quoting Nat'l Cong. for Puerto Rican Rts. v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000)). "Even when a showing of substantial need has been made, the court must 'protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" Brook, 2021 WL 5919207, at *5 (quoting Fed. R. Civ. P. 26(b)(3)(B)).

**B. Application**

Applying these standards, the Court conducted an in camera review of the Exemplars and reaches the following conclusions.

### 1. Purpose of the Third Party Communications

As an initial matter, the Court finds that some of the Third Party Communications over which Plaintiffs seek to assert the attorney-client privilege were not made "for the purpose of obtaining or providing legal assistance." Brennan Ctr., 697 F.3d at 207. For example, Exemplar 1[8] is a communication about whether BBC's records contained a copy of an agreement with Ambac. (See § III.B.6.a, infra). Similarly, Exemplar 4 is a communication about contracts to be shown to

---

[8] The Court refers to the Exemplars by the number assigned by the parties.

rating agencies.  (See § III.B.6.d, infra).  A client's retrieval and forwarding of documents to an attorney, however, is not a communication for the purpose of obtaining or providing legal advice, and disclosure of these Third Party Communications will "not reveal any confidential attorney-client communications."   Renner, 2001 WL 1356192, at *4–5 (finding that attorney-client privilege did not apply to client's communications forwarding non-privileged documents); see Gulf Is., 215 F.R.D. at 472 (finding that attorney-client privilege did not apply to communications that did not reflect "any legal strategies").  Accordingly, for those Third Party Communications that are not protected by the attorney-client privilege, the Court does not need to analyze whether the common interest exception applies to them.  See Sokol, 2008 WL 3166662, at *5; Gulf Is., 215 F.R.D. at 470 (declining to reach common interest doctrine as to documents to which attorney-client privilege did not apply); In re F.T.C., 2001 WL 396522, at *4; see also In re Lifetrade Litig., No. 17 Civ. 2987 (JPO) (KHP), 2022 WL 3644357, at *4 (S.D.N.Y. Aug. 24, 2022) (noting that common interest doctrine "applies only to communications that otherwise would be protected by the attorney-client or work product doctrine").

### 2.  Common Interest Exception

The question whether the common interest exception applies to any of the Third Party Communications requires the Court first to assess the relationship between the Military Branches and the Developers.  (See ECF No. 590 at 82 (noting that "the meat of the issue" is the relationship between the Military Branches and the Developers)).  Plaintiffs advance five "common legal interest[s]" they shared with the Military Branches:  (i) how to structure the MHPI Projects in compliance with applicable law; (ii) "[p]urchase [o]ptions" in the CDMPs; (iii) the "tax implications" of the MHPI Projects; (iv) post-formation, "shared legal strategies for protecting the

[MHPI] Projects' ongoing legal interests"; and (v) assessing "the legal effect of Ambac's [2008] downgrade on the [MHPI] Projects and whether any action had to be taken to protect these joint ventures." (ECF No. 545 at 2; see ECF No. 590 at 84–89). As noted above, to support their argument that the Military Branches and the Developers were "joint-venture partners[,]" (see ECF No. 590 at 77), Plaintiffs have submitted only the Carlisle Agreement. (ECF No. 545-1).

As an initial matter, apart from the Carlisle Agreement, Plaintiffs have not submitted any declaration or deposition testimony describing these alleged common legal interests, any common interest agreement with the Military Branches or their Advisors, nor any other evidence, and have therefore "failed to carry [their] burden of demonstrating the applicability of the common interest doctrine." In re Rivastigmine, 2005 WL 2319005, at *5; see Bank Brussels, 160 F.R.D. at 448 (finding that plaintiff failed to provide evidentiary support for a "coordinated legal strategy" and therefore common interest doctrine did not prevent waiver of attorney-client privilege); see also Gulf Is., 215 F.R.D. at 473 (finding that defendant failed to submit deposition testimony supporting existence of common interest). Nor do the Exemplars themselves provide sufficient detail to demonstrate common interest. Rather, Plaintiffs "ask[] this Court to simply trust, in a vacuum," that a common legal interest existed among themselves, the Developers, and the Military Branches, which is insufficient to satisfy their burden to show that the common interest doctrine applies. Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp., 162 F. Supp. 3d 145, 155 (E.D.N.Y. 2016).

The Carlisle Agreement does not satisfy Plaintiffs' evidentiary burden. Even if Plaintiffs are correct that the Carlisle Agreement represents a form of "joint owners[hip]" (ECF No. 590 at 77), common ownership or affiliation "does not excuse a party from demonstrating the

applicability of the common interest rule." <u>Gulf Is.</u>, 215 F.R.D. at 474.  The Carlisle Agreement reflects the parties' purpose to fund and complete the Carlisle Project, (<u>see</u> ECF No. 545-1 at 8), which is a venture that "is commercial in nature and does not qualify for protection under the common interest rule." <u>Gulf Is.</u>, 215 F.R.D. at 473.  Further, the Carlisle Agreement provides that GMH was to receive periodic distributions, while the Army would receive distributions only in the event of a transfer of its interest in the Carlisle Project or a dissolution, demonstrating that GMH and the Army did not "have an identical legal interest, as required" for the common interest doctrine to apply. <u>S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Prop. LLC</u>, No. 01 Civ. 9291 (JSM), 2002 WL 1334821, at *4 (S.D.N.Y. June 19, 2002); <u>see</u> <u>Bank of Am., N.A. v. Terra Nova Ins. Co.</u>, 211 F. Supp. 2d 493, 497 (S.D.N.Y. 2002) (finding no common interest where parties had different roles and obligations under the agreement); <u>see also</u> <u>In re Rivastigmine</u>, 2005 WL 2319005, at *4 (noting that "economic rights, standing alone, are generally not sufficient to support application of the common interest doctrine").  And, to the extent that GMH and the Army may have shared a desire for the Carlisle Project to be completed, that desire was "simply a commercial concern." <u>Johnson Matthey, Inc. v. Rsch. Corp.</u>, No. 01 Civ. 8115 (MBM) (FM), 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002), <u>reconsideration granted in part on other grounds</u>, 2002 WL 31235717 (S.D.N.Y. Oct. 3, 2002); <u>see</u> <u>Terra Nova</u>, 211 F. Supp. 2d at 497 (explaining that "the mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties").  Accordingly, Plaintiffs have not met their evidentiary burden to show that the common interest doctrine applies to the Third Party Communications between the MHPI Projects, the Developers, and the Military Branches.

Apart from Plaintiffs' insufficient evidentiary showing, the Court finds that none of their asserted "common legal interest[s]" support the application of the common interest doctrine. (ECF No. 545 at 2).  First, the asserted interests in (i) "structur[ing] th[e] [MHPI] [P]rojects, . . . to make sure that they complied with all regulatory" compliances, (ii) the "tax implications" of the MHPI Projects, and (iii) their "ongoing legal interests" (ECF No. 590 at 77, 85–86; see also ECF No. 545 at 2), "do[] not transform [a] common interest and enterprise into a legal, as opposed to commercial, matter."  Walsh, 165 F.R.D. at 19.  As other courts in this District have recognized, sharing "a desire that the transaction be legally appropriate" is not sufficient to invoke the common interest doctrine.  Terra Nova, 211 F. Supp. 2d at 497; see In re F.T.C., 2001 WL 396522, at *5 (finding that "concern[] about the consequences of failing to comply with applicable law and regulations" was "not enough to transform [] mutual commercial interest . . . into a coordinated legal strategy").

Second, Plaintiffs fail to explain how "[p]urchase [o]ptions" in the CDMP demonstrate a common legal interest.  (ECF No. 545 at 2).  Plaintiffs have not provided the Court with an example of a CDMP or otherwise described the terms of a purchase option, and the most the Court can discern from the SAC is that at least one of the CDMPs was "shared with the Army and Congress." (ECF No. 256 ¶ 102).   The Court is left to draw the inference that the "purchase options" represented a contractual right—whose right, Plaintiffs do not say—to purchase an interest in one of the MHPI Projects.  See, e.g., LJL 33d St. Assocs., LLC v. Pitcairn Prop. Inc., 725 F.3d 184, 195 (2d Cir. 2013) (describing purchase option as party's contractual right should certain events occur); In re 85 Flatbush RHO Mezz LLC, Nos. 22 Civ. 6241 & 22 Civ. 6233 (CS), 2022 WL 11820407, at *2 (S.D.N.Y. Oct. 20, 2022) (same).  Such an arrangement, however, is similarly commercial in

nature and does not qualify for the common interest doctrine.  See Network-1 Techs., Inc. v. Google LLC, Nos. 14 Civ. 2396 & 14 Civ. 9558 (PGG) (SN), 2019 WL 6701909, at *2 (S.D.N.Y. Dec. 9, 2019) (finding that parties' "shared financial interest" did not establish common interest); see also Gulf Is., 215 F.R.D. at 472–73 (finding that agreement for "payment of money [was] commercial in nature and does not qualify for protection under the common interest rule").

Finally, a need to assess the impact of, and any action in response to, Ambac's 2008 downgrade (ECF No. 545 at 2), is insufficient because the common interest doctrine "does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation." Bank Brussels, 160 F.R.D. at 447; see In re F.T.C., 2001 WL 396522, at *5 (finding that "a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule").  Thus, none of Plaintiffs' asserted common interests support application of the common interest doctrine.

The case Plaintiffs cite as the strongest support for the application of the common interest doctrine here, In re Velo Holdings, Inc., 473 B.R. 509 (Bankr. S.D.N.Y. 2012), is distinguishable. (See ECF Nos. 545 at 2 n.9; 590 at 90–91).  At issue in Velo were communications between Velo Holdings Inc. and its affiliated debtors ("Vertrue") and Barclays Bank PLC (the "Agent"), which served as the administrative agent for Vertrue's first lien lenders.  473 B.R. at 511–12.  Vertrue, unlike Plaintiffs here, did not invoke "the entire commercial relationship or 'joint business strategy'" to support the common interest doctrine, but rather pointed to the narrower "common legal interest in 'developing a strategy to prevent the termination of [Vertrue's] merchant processing agreements with . . . " a particular vendor.  Id. at 515–16.  The court found that Vertrue presented evidence showing that, on learning of the vendor's plan to terminate the

agreements, "Vertrue and the Agent promptly began to formulate a legal strategy aimed at preserving these agreements." Id. at 516.  Thus, while the common legal strategy was "grounded in the parties' commercial relationship," once the vendor threatened termination, "Vertrue and the Agent shared a common legal interest in crafting a strategy to prevent the termination of the processing agreements." Id.  Apart from the fact that, as discussed above, Plaintiffs have failed, for any of the asserted common legal interests between the Developers and the Military Branches, to make an evidentiary showing comparable to Vertrue's showing in Velo, here, the record shows a "solely commercial" relationship, not a common legal strategy.  HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 73 (S.D.N.Y. 2009).  Instead, the circumstances here more closely align with those in Terra Nova, where the court held that "the mere fact that the parties were working together" through letter of credit agreements "to achieve a commercial goal cannot by itself result in an identity of interest between the parties."  211 F. Supp. 2d at 497. As in Terra Nova, and unlike in Velo, Plaintiffs have failed to demonstrate a common legal strategy beyond the commercial relationship between the MHPI Projects, the Developers and the Military Branches, and, accordingly, the common interest doctrine does not apply.

### 3.  The Kovel Rule

Plaintiffs invoke the Kovel rule to protect communications with Advisors who, they say, were "translating or advising on the complex financial structures of the [MHPI] Projects to the [D]evelopers' attorneys or acting as the Plaintiffs' agent." (ECF No. 545 at 3).  Given the Court's conclusion that Plaintiffs have failed to establish a common legal interest between the MHPI Projects, the Developers and the Military Branches, Third Party Communications involving advisors to the Military Branches are not privileged.  (See § III.B.2, supra).

As to Third Party Communications between the MHPI Projects, the Developers, and Advisors such as Duxbury, Barclays, JLL, and Malvern (see §§ II.A.2.a–b pp. 5–7, supra), Plaintiffs bear the burden of showing that the Advisor involved in the communication was necessary "to translate or interpret information given to [the attorney] by his client." Ackert, 169 F.3d at 139–40. The Court finds that Plaintiffs have failed to meet this burden because they have offered only counsel's arguments and representations, not documents or sworn testimony, to support their position. See Hanniford v. City of Poughkeepsie, No. 21 Civ. 10359 (PMH), 2022 WL 17325762, at *2 n.2 (S.D.N.Y. Nov. 29, 2022) (noting that statements of counsel were "not evidence"); Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 182 (E.D.N.Y. 2000) ("[A]n attorney's statement or argument is not evidence.") (citing Raucci v. Town of Rotterdam, 902 F.2d 1050, 1059 (2d Cir. 1990)). For example, as to Duxbury, Plaintiffs' counsel asserted during the Conference that Duxbury and Clark "are sister companies" that "shared infrastructure[,]" and that Duxbury was "formed exclusively to provide advisory services for Clark and for no other purpose." (ECF No. 590 at 73). Were those facts true, however, they should have been very simple to prove with, for example, Duxbury's formation documents, a services agreement between Duxbury and Clark, or deposition testimony. Cf. Spectrum Dynamics Med. Ltd. v. Gen. Elec. Co., No. 18 Civ. 11386 (VSB) (HBP), 2021 WL 4131650, at *4 (S.D.N.Y. Sept. 9, 2021) (noting that "requiring corporate parties to establish a common representation or interest is not an arduous task") (citing In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig., No. 14 MD. 2542 (VSB) (HBP), 2019 WL 6736132, at *8 (S.D.N.Y. July 18, 2019)). Plaintiffs have offered no such evidence as to Duxbury, nor have they done so for Barclays, Rydle, or JLL, as to whom Plaintiffs offer nothing more than their counsel's unsubstantiated characterizations.

(ECF No. 545 at 4).  The copy of the Barclays Agreement with BBC that <u>Ambac</u> submitted—not Plaintiffs—contemplated that Barclays would provide "general business and financial analyses" of BBC or act as "dealer-managers and/or underwriter[,]" and therefore does not support Plaintiffs' position.  (ECF No. 518-2 at 2).  As for Malvern, Plaintiffs' argument is undermined by Malvern's own protestations of its non-involvement with any of the MHPI Projects. (<u>See</u> ECF Nos. 575 at 1–2; 559-3; 590 at 60–64).

Even if Plaintiffs had substantiated the Advisors' roles with evidentiary support, the Exemplars themselves do not demonstrate that the Advisors were "necessary for the communication with the lawyers[.]"  <u>Lifetrade</u>, 2022 WL 3644357, at *5.  The Exemplars the Court has reviewed (<u>e.g.</u>, Exemplars 20, 21, 26–29), do not reflect the Advisors "translat[ing] or interpret[ing] information" exchanged between the Developers and their attorneys, <u>Ackert</u>, 132 F.3d at 139–40, or "enabl[ing] counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice."  <u>Church & Dwight Co. Inc. v. SPD Swiss Precision Diagnostics, GmbH</u>, No. 14 Civ. 585 (AJN), 2014 WL 7238354, at *2 (S.D.N.Y. Dec. 19, 2014) (finding attorney-client privilege waived where party made "no such showing" that third party communications were necessary to improve comprehension of attorney-client communications); <u>see</u> <u>Walsh</u>, 544 F. Supp. 3d at 395 (finding that defendant failed to show "that it played [an] interpretive function" and therefore its communications with companies' counsel were not privileged).  The Exemplars are, at most, the type of communication that "proves important to the attorney's ability to represent the client[,]" to which the <u>Kovel</u> doctrine does not apply.  <u>Ackert</u>, 132 F.3d at 139–40.

### 4. **Functional Equivalent Doctrine**

In the alternative, Plaintiffs assert that the Advisors—dozens of them (ECF No. 543 at 6–9)—were all the "functional equivalent" of employees of the Developers. (ECF No. 545 at 4–5). The Court's analysis as to Duxbury, Barclays, Rydle, JLL, and Malvern above, (see § III.B.3, supra) equally supports the conclusion that these Advisors were not "de facto employee[s]" of the Developers and their communications did not remain privileged under the functional equivalent doctrine. Walsh, 544 F. Supp. 3d at 392. First, Plaintiffs have not provided a sufficient basis from which the Court could find that the dozens of representatives of the Advisors on the Affiliation List all "had a primary responsibility for 'a key corporate job' at any" of Developers. Id. at 392. Second, while these Advisors may have "had a close working relationship" with the Developers concerning the MHPI Projects, the purpose of that relationship "was to effectuate a business transaction." Id. at 393; see Ex.-Im. Bank, 232 F.R.D. at 114 (noting that if the functional equivalent doctrine "were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring deal, the exception would swallow the basic rule . . . that there is no privilege protecting communications between clients and their accountants"). That litigation might arise from those transactions "in the future does not alter the analysis [because] [t]he same can be said of almost any complex corporate business transaction." Walsh, 544 F. Supp. 3d at 393. Third, even if the Court were to assume that each of the Advisors were "expert[s] in [their] field"—which Plaintiffs have failed to establish—Plaintiffs have "not provided any evidence as to what information [the Advisors] possessed that no one else at [the Developers] would not have possessed or could not have developed on their own." Id. Fourth, Plaintiffs do not detail any decisions the Advisors on the Affiliation List made

independently.   See id. (finding that defendant failed to "submit[] evidence that it had independent decision-making on behalf of" third parties).  Fifth, the Exemplars do not show that the Advisors "served as a representative of [the Developers] to third parties."   Id.  Finally, Plaintiffs have not put forward any evidence showing that the Advisors "solicited legal advice from" the Developers' counsel, "as opposed to [the Advisors providing information] to [the Developers] and their legal counsel."   Id. (finding that declaration failed to show that outside advisor sought legal advice "as distinct from the lawyers' company clients").  Accordingly, the Court finds that Plaintiffs have not established that the Advisors were "the functional equivalent or de facto employee[s] of any of [the Developers] whom [they] advised and assisted with the" MHPI Projects.  Id.

The rare cases that have applied the functional equivalent doctrine to find that the privilege was not waived are distinguishable.  For example, in Peralta v. Cendant Corp., the court found that privileged information a former employee—the direct supervisor of the plaintiff— learned from the defendant's counsel during her employment at the defendant "remain[ed] privileged upon the termination of her employment."  190 F.R.D. 38, 41 (D. Conn. 1999).  After the former employee's employment ended, however, information she learned from counsel that "went beyond [her] knowledge of the circumstances of plaintiff's employment and termination, and beyond [the former employee's] other activities within the course of her employment with the defendant" were not "entitled to defendant's attorney-client privilege."   Id.  This Court reached a similar conclusion in Bellridge Capital, finding that the defendant had met its burden of showing that, when the key agreement in dispute was negotiated, the defendant's former CEO "was the functional equivalent of an employee who possessed primary responsibility for

[negotiating the agreement]" such that the attorney-client privilege protected the former CEO's communications with the defendant's counsel about those negotiations.  2022 WL 17490961, at *5.  Plaintiffs have not shown that any of the representatives of the Advisors on the Affiliation List were former employees of the Developers such that the analysis in either Peralta or Bellridge could provide support for finding that the functional equivalent doctrine prevented waiver of the attorney-client privilege here.

### 5.  Waiver of Work Product Protection

Of the 30 Exemplars, Plaintiffs have designated only one (Exemplar 15) on the Logs as subject to work product protection.  (See § III.B.6.o, infra).  During the Conference, the Court noted, however, that at least five other Exemplars also appeared to contain work product relating to this action, but Plaintiffs had not designated them as work product on the Logs.  (ECF No. 590 at 70 ("[S]o are the plaintiffs not asserting work product as to those documents then?")).  Plaintiffs' counsel responded that it "was an oversight" and Plaintiffs were "asserting both work product as well as attorney-client privilege."  (Id. at 70–71).  The Moving Defendants' counsel responded that, while the Moving Defendants did not challenge Plaintiffs' work product assertion as to documents relating to this action or the DSRF Action, "[t]his [was] the first time" Plaintiffs purported to assert work product protection over other Third Party Communications, and therefore, Plaintiffs had "waived work-product protection to the extent they haven't asserted it" on the Logs.  (Id. at 72).

In this District, it has long been clear that an "attorney may waive the benefits of" the work product protection "because it is the attorney's material, not the client's, receiving protection."  Carte Blanche, 130 F.R.D. at 32.  Pursuant to Local Civil Rule 26.2(a), "where a claim

of privilege is asserted in objecting to any means of discovery or disclosure . . . (1) [t]he person asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed . . . ."  Local Civ. R. 26.2(a)(1); see Fed. R. Civ. P. 26(b)(5)(A) (providing that party claiming privilege "must . . . (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed . . . in a manner that . . . will enable other parties to assess the claim.")).  Thus, courts in this District have held the protection can be waived by "failing to specify work product as the particular privilege protecting [] various documents" on a privilege log.  Carte Blanche, 132 F.R.D. at 32; see, e.g., Aurora Loan, 499 F. Supp. 2d at 479 (finding that failure to identify which privilege was being asserted constituted a waiver); Bowne, 150 F.R.D. at 489–90 (finding that "belated invocation of work-product protection" without sufficient explanation effected a waiver of that protection).  Other courts in this District "have applied a more flexible standard before finding waiver based on" the failure to comply with Local Rule 26.2(a)(1) or Rule 26(b)(5)(A), In re Honeywell Int'l, Inc. Sec. Litig., 230 F.R.D. 293, 299 (S.D.N.Y. 2003), and have reviewed "the nature of the violation, its willfulness or cavalier disregard for the rule's requirements, and the harm which results to other parties."  AFP Imaging Corp. v. Philips Medizin Sys., No. 92 Civ. 6211 (LMM) (THK), 1993 WL 541194, at *3 (S.D.N.Y. Dec. 28, 1993); accord Schiller v. City of New York, 245 F.R.D. 112, 118 (S.D.N.Y. 2007); RMED Int'l Inc. v. Sloan's Supermarkets, Inc., No. 94 Civ. 5587 (PKL) (RLE), 2003 WL 41996, at *3 (S.D.N.Y. Jan. 6, 2003).

Under either the more strict "Bowne standard" or "the more flexible AFP Imaging standard," the Court finds that Plaintiffs have waived the work product protection for any Third Party Communications that they have not already designated on the Logs as work product.

Honeywell, 230 F.R.D. at 293 (finding that, under either standard, party waived work product by failing to timely assert it in privilege logs).  While the Court does not detect any bad faith or willfulness on Plaintiffs' part, the Court does observe that the parties have been debating Plaintiffs' privilege assertions since April 2022, Plaintiffs have revised the Logs <u>nine</u> times throughout the parties' meet-and-confer process, and fact discovery is set to close on February 22, 2023.  (ECF Nos. 515 at 1; 518 at 1; 525 at 15–16; 528).  In addition, Plaintiffs have asserted work product for other documents on the Logs, and the Moving Defendants "were entitled to rely on" Plaintiffs' privilege assertions in the Logs when the meet-and-confer process began over ten months ago and in their submissions to the Court on the privilege disputes. <u>Honeywell</u>, 230 F.R.D. at 299.  For Plaintiffs to wait to assert work product over additional documents until after the parties completed their submissions on the privilege issues and <u>after</u> the Court brought it to their attention during the Conference "undermines the very purpose of privilege logs, and promotes the kind of gamesmanship that courts discourage in discovery."  <u>Id.</u> at 299–300.  Plaintiffs may not, at the eleventh hour of fact discovery, "re-engineer privilege logs to align their privilege assertions with their legal arguments."  <u>Id.</u> at 299.  Accordingly, the Court finds that, aside from Third Party Communications relating to (i) this action or (ii) the DSRF Action, as to both of which the Moving Defendants do not contest the work product protection, (<u>see</u> ECF No. 590 at 72), Plaintiffs have waived work product protection for any documents that Plaintiffs have not previously marked on the Logs as work product.

6.  **Application to Exemplars**

Applying these principles, the Court conducted an <u>in camera</u> review of the Exemplars and reaches the following conclusions.

### a. **Exemplar 1**

This is an email from one BBC employee to another BBC employee, copying an attorney at Ballard Spahr, outside counsel to Barclays (see ECF No. 539-5 at 4, 12), about an agreement with Ambac.  Plaintiffs assert that this email is protected by the attorney-client privilege and the common interest doctrine.  The BBC employees are not seeking or receiving legal advice, nor is the Ballard Spahr attorney proffering it, and therefore, it is not protected by the attorney-client privilege.  (See §§ III.A.1.a, III.B.2, supra).  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### b. **Exemplar 2**

This is an email from a BBC employee to Air Force personnel, JLL personnel, and another BBC employee (see ECF No. 539-5 at 8), the subject of which is the "Implications of Army litigation for AF portfolio (BBC)[.]"  Plaintiffs have designated this document as protected by attorney-client privilege and the common interest doctrine, but not work product, despite its apparent relation to litigation.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches, nor the Kovel or functional equivalent doctrines as to JLL, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.B.2–4, supra).  In addition, only to the extent that this communication relates to this action or the DSRF Action is Exemplar 2 protected by the work product protection (see ECF No. 590 at 72); if it relates to another litigation, the work product protection has been waived by Plaintiffs' failure to designate it as work product on the Log.  See Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### c. Exemplar 3

This is an email from Repetto at Malvern to two non-lawyer employees at GMH (BBC's predecessor) seeking their comments on a "Memo to Acquire Bonds" prepared by McKenna Long & Aldridge LLP ("McKenna"), BBC's counsel.  (See ECF No. 539-5 at 4–5, 11).  Plaintiffs have designated this document as protected by the attorney-client privilege and the common interest doctrine.  The Court has concluded that the Kovel and functional equivalent doctrines do not apply to Malvern, and therefore, the attorney-client privilege has been waived.  (See §§ III.B.3–4, supra).  See Network-1, 2019 WL 6701909, at *2 (finding that outside advisor's presence on communication "destroy[ed] the privilege"); Argos Holdings Inc. v. Wilmington Tr. Nat'l Ass'n, No. 18 Civ. 5773 (DLC), 2019 WL 1397150, at *3 (S.D.N.Y. Mar. 28, 2019) (holding that consultant's presence, which was not necessary to facilitate legal advice, waived privilege).  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### d. Exemplar 4

This is an email between two non-lawyer BBC employees, Malvern's Repetto, and McKenna asking about contracts to be shown to the rating agencies.  (See ECF No. 590 at 68).  Plaintiffs assert that this document is protected by attorney-client privilege and the common interest doctrine.  This document is not protected by the attorney-client privilege because neither the BBC employees nor Repetto are seeking or receiving legal advice, and, in any event, neither the common interest nor the functional equivalent doctrines apply to Malvern.  (See §§ III.B.2, III.B.4, supra).  Any work product protection for this email has been waived for

lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### e.  Exemplar 5

This email reflects a BBC employee forwarding to other BBC employees a memorandum and attachments prepared by McKenna, BBC's counsel.  (See ECF No. 539-5 at 4).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  This email is a "communication[] among corporate employees that reflect[s] advice rendered by counsel to the corporation[,]" and therefore, is protected by the attorney-client privilege.  Bank Brussels, 160 F.R.D. at 442; accord In re Keurig, 2020 WL 8465433, at *2.  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### f.  Exemplar 6

This is an email between two BBC employees and Malvern's Repetto regarding a "Confidential Draft Moody's Report for your Review."  (See ECF No. 539-5 at 4; see ECF No. 590 at 68).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  This email was not sent for the purpose of providing or seeking legal advice, and therefore, is not protected by the attorney-client privilege.  (See §§ III.A.1.a, III.B.2, supra).  Even if it were, Plaintiffs have failed to demonstrate that the common interest, Kovel, or functional equivalent doctrines apply to Malvern, and therefore, any privilege has been waived. See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Any work

product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### g.   Exemplar 7

This is an email from a GMH (BBC's predecessor) employee to another GMH employee and an attorney from McKenna, counsel for GMH and BBC, seeking legal advice about a rate lock agreement.  (See ECF No. 539-5 at 4–5).  Plaintiffs assert that Exemplar 7 is protected by the attorney-client privilege and the common interest doctrine.  Because the GMH employee sent this email for the purpose of seeking legal advice, it is protected by the attorney-client privilege. (See §§ III.A.1.a, III.B.2, supra).  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.

### h.   Exemplar 8

This is an email from an attorney at Kirkland, counsel to Developer Clark, to other Developers, their counsel, and an in-house attorney for the Army, attaching a memorandum regarding "potential fraud theories" against Ambac.  (ECF No. 539-5 at 2, 8).  As with Exemplar 2, Plaintiffs have designated this document as protected by attorney-client privilege and the common interest doctrine, but not as work product, despite its apparent relation to litigation.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.A.1.a, III.B.2, supra).  In addition, only to the extent that this communication relates to this action or the DSRF Action is Exemplar 8 protected by the work product protection, (see ECF No. 590 at 72); if it relates to another litigation, the work product

protection has been waived by Plaintiffs' failure to designate it as work product on the Log.  See

Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### i.  Exemplar 9

This is an email from a Kirkland attorney to other Developers, their counsel, and an Army

in-house attorney, attaching an "Updated Strategy Memo."  (ECF No. 539-5 at 2, 8).  As with

Exemplars 2 and 8, Plaintiffs have designated this document as protected by attorney-client

privilege and the common interest doctrine, but not work product, despite its apparent relation

to litigation.  As set forth above, Plaintiffs have not demonstrated a common interest between

the Developers and the Military Branches, and therefore, the attorney-client privilege would not

protect this communication.  (See §§ III.A.1.a, III.B.2, supra).  In addition, only to the extent that

this communication relates to this action or the DSRF Action is Exemplar 9 protected by the work

product protection, (see ECF No. 590 at 72); if it relates to another litigation, the work product

protection has been waived by Plaintiffs' failure to designate it as work product on the Log.  See

Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### j.  Exemplar 10

This is an email from a Kirkland attorney to BBC and another Kirkland attorney discussing

scheduling a meeting with JLL.  As with Exemplars 2, 8, and 9, Plaintiffs have designated this

document as protected by attorney-client privilege and the common interest doctrine, but not

work product, despite its apparent relation to litigation.  From the context of the emails that

precede Exemplar 10, it appears that the attorney sent this email for the purpose of providing

legal advice to her client and it is therefore protected by the attorney-client privilege.  In addition,

only to the extent that this communication relates to this action or the DSRF Action is

Exemplar 10 protected by the work product protection (see ECF No. 590 at 72); if it relates to another litigation, the work product protection has been waived by Plaintiffs' failure to designate it as work product on the Log.  See Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### k.  Exemplar 11

This is an email from a Kirkland attorney to BBC and two Air Force personnel, at least one of whom is an attorney, regarding "BBC Air Force Project Diligence – Advisor contacts." (ECF No. 539-5 at 8).  As with Exemplars 2, 8, 9, and 10, Plaintiffs have designated this document as protected by attorney-client privilege and the common interest doctrine, but not work product, despite its apparent relation to litigation.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.A.1.a, III.B.2, supra).  In addition, only to the extent that this communication relates to this action or the DSRF Action is Exemplar 11 protected by the work product protection, (see ECF No. 590 at 72); if it relates to another litigation, however, the work product protection has been waived by Plaintiffs' failure to designate it as work product on the Log.  See Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### l.  Exemplar 12

This is an email from a GMH (BBC's predecessor) employee to other GMH employees and Core Impact employees regarding an RFP that Rydle prepared.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  For the reasons set forth above, Plaintiffs have failed to demonstrate the Kovel or functional equivalent doctrines as to Rydle or Core Impact (see §§ III.B.3–4, supra), and therefore, any attorney-client privilege that

may have attached to this email has been waived.  See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### m.  Exemplar 13

This is an email from a non-attorney with the Army to GMH, JLL, other Army personnel and attorneys, and McKenna regarding a "no purchase option" provision for one of the MHPI Projects.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches regarding purchase options, or that the Kovel or functional equivalent doctrines apply to JLL, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.B.2–4, supra).  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### n.  Exemplar 14

This is an email from a GMH (BBC's predecessor) employee to another GMH employee forwarding advice from McKenna regarding one of the MHPI Projects.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  This email is a "communication[] among corporate employees that reflect[s] advice rendered by counsel to the corporation[,]" and therefore, is protected by the attorney-client privilege.  Bank Brussels, 160 F.R.D. at 442; accord In re Keurig, 2020 WL 8465433, at *2.  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.  Any

work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### o.  Exemplar 15

This an email in which a Duxbury employee forwards to himself a copy of Duxbury's 2011 Business Update.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine, and this is the only Exemplar that they have also designated for work product protection.  This email was not sent for the purpose of providing or seeking legal advice, and therefore, is not protected by the attorney-client privilege.  (See §§ III.A.1.a, III.B.2, supra).  Even if it were, Plaintiffs have failed to demonstrate a common interest with respect to Ambac's 2008 downgrade (see § III.B.2, supra), nor do the Kovel or functional equivalent doctrines apply to Duxbury, (see §§ III.B.3–4, supra), such that attorney-client privilege has been waived.  See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Redacted portions of Exemplar 15 do, however, appear to have been prepared for or in anticipation of litigation involving Ambac, and therefore constitute work product, a designation that Plaintiffs timely and correctly asserted on the Logs.

### p.  Exemplar 16

This is an email from a Clark employee to attorneys at Neal, Gerber & Eisenberg ("NGE") and Arent Fox ("Arent"), Clark's outside counsel, providing comments on draft agreements for the Monterey Project.  (See ECF No. 539-5 at 6–7).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  Because the Clark employee sent this email for the purpose of seeking legal advice, it is protected by the attorney-client privilege.

(See §§ III.A.1.a, III.B.2, supra).  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.

### q.  Exemplar 17

This is an email from NGE, Clark's counsel, to Clark as well as representatives of the Army and JLL regarding comments on a developer services agreement for the Monterey Project. (See ECF No. 539-5 at 7).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches, or the Kovel or functional equivalent doctrines as to JLL, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.B.2–4, supra).  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### r.  Exemplar 18

This is an email from an in-house attorney for Picerne forwarding copies of several agreements with Ambac to other Picerne employees and attorneys at Ballard Spahr, Barclays' counsel, and Holland & Knight LLP ("H&K"), Corvias' counsel.  (See ECF No. 539-5 at 2).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine. This email was not sent for the purpose of providing or seeking legal advice, and, therefore, is not protected by the attorney-client privilege.   (See §§ III.A.1.a, III.B.2, supra).   Even if it were, Plaintiffs have failed to demonstrate a common interest with respect to Ambac's 2008 downgrade (see § III.B.2, supra), or the Kovel or functional equivalent doctrines as to Barclays, (see §§ III.B.3–4, supra), such that attorney-client privilege has been waived.  See Network-1,

2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3. Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### s.  Exemplar 19

This is an email from a Picerne employee to an in-house attorney at Picerne and an attorney at Ballard Spahr, Barclays' counsel, forwarding correspondence between Picerne and MetLife. (See ECF No. 539-5 at 2, 12). Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine. As an initial matter, the Picerne employee is not seeking legal advice in this email. In addition, Plaintiffs' counsel conceded at the Conference that MetLife was not an advisor to any of the MHPI Projects. (ECF No. 590 at 80–81). The presence of MetLife, and Barclays, to whom neither the Kovel nor functional equivalent doctrines apply, (see §§ III.B.3–4, supra), on Exemplar 19 waives the attorney-client privilege. See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3. Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### t.  Exemplar 20

This email reflects a Picerne employee forwarding to JLL emails from H&K, Corvias' counsel, regarding a consent to assign Capmark's servicing agreement. (See ECF No. 539-5 at 2). Plaintiffs assert that this email is protected by the attorney-client privilege. The Court has found that neither the Kovel nor the functional equivalent doctrines apply to JLL, (see §§ III.B.3–4,

supra), such that any attorney-client privilege has been waived.  See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### u.  Exemplar 21

This is an email from a Picerne employee forwarding to other Picerne employees, as well as Army personnel and JLL employees, drafts of agreements for the Fort Sill Project.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  As set forth above, Plaintiffs have not demonstrated a common interest between the Developers and the Military Branches, and therefore, the attorney-client privilege would not protect this communication.  (See §§ III.A.1.a, III.B.2, supra).  In addition, the Court has found that neither the Kovel nor the functional equivalent doctrines apply to JLL, (see §§ III.B.3–4, supra), such that any attorney-client privilege has been waived.  See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### v.  Exemplar 22

This is an email from Corvias' in-house counsel to Joe McDonald ("McDonald"), who appears on the Affiliation List as "Corvias Surety Broker[.]"  (ECF No. 539-5 at 15).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  Plaintiffs argue that the Kovel doctrine applies to prevent waiver of the privilege as to Exemplar 22.  (ECF No. 545 at 4; see id. at 4 n.12).  As with the other Advisors, however, the Court has

found that Plaintiffs have failed to show that the Developers' attorneys communicated with McDonald for purposes of translating financial information.  (See § III.B.3, supra).  Plaintiffs have provided no retention agreement with McDonald, description of his services, or other evidence from which the Court could conclude that he was "necessary" for the Developers' communications with their attorneys or was acting as Corvias' agent.  Lifetrade, 2022 WL 3644357, at *5.  In addition, only to the extent that this communication relates to this action or the DSRF Action is Exemplar 22 protected by the work product protection, (see ECF No. 590 at 72); if it relates to another litigation, the work product protection has been waived by Plaintiffs' failure to designate it as work product on the Logs.  See Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### w.  Exemplar 23

This is an email from an attorney at Levine Staller, Developer Michaels' counsel, to an attorney at Hawkins, Delafield & Wood LLP, Corvias' counsel, and representatives of IRM Management ("IRM") and The Concourse Group ("Concourse") regarding third party contracts for the Fort Leavenworth Project.  (See ECF No. 539-5 at 2, 8).  Plaintiffs assert that this email is protected by the attorney-client privilege.  Plaintiffs have offered no information about what role IRM and Concourse filled; they do not appear on the Affiliation List.  To the extent Plaintiffs are claiming IRM and Concourse were advisors, then, as with the other Advisors, the Court finds that Plaintiffs have failed to show that the Developers' attorneys communicated with them for purposes of translating financial information under the Kovel doctrine.  (See § III.B.3, supra).  Plaintiffs have provided no retention agreement with IRM and Concourse, description of their services, or other evidence from which the Court could conclude that they were "necessary" for

the Developers' communications with their attorneys or were the functional equivalent of employees of the Developers.  Lifetrade, 2022 WL 3644357, at *5.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### x.  Exemplar 24

This is an email from one GMH (BBC's predecessor) employee to another forwarding McKenna's advice regarding negotiations with the Army.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  This email is a "communication[] among corporate employees that reflect[s] advice rendered by counsel to the corporation[,]" and therefore, is protected by the attorney-client privilege.  Bank Brussels, 160 F.R.D. at 442; accord In re Keurig, 2020 WL 8465433, at *2.  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### y.  Exemplar 25

This is an email from a Clark employee to a Duxbury employee and a Clark employee forwarding JLL's summary of a meeting about Ambac, which was attended by representatives not only from BBC, Picerne, the Army, Clark, and JLL, but various unrelated entities including MetLife, NY Life, Fannie Mae, Freddie Mac, and "Actus."  (See ECF No. 539-5 at 4, 8, 13).  Plaintiffs assert that the portion of Exemplar 25 discussing Ambac is protected by the attorney-client privilege

and common interest doctrine.  The presence of the unrelated entities in this meeting, however, signifies that the discussion was not protected by the attorney-client privilege.  (See §§ III.A.1.a, III.B.2, supra).  Further, the Court has found that no common interest existed concerning Ambac's downgrade, and that the Kovel and functional equivalent doctrines do not apply to JLL.  (See §§ III.B.3–4, supra).  Only to the extent that this communication relates to this action or the DSRF Action is Exemplar 25 protected by the work product protection, (see ECF No. 590 at 72); if it relates to another litigation, the work product protection has been waived by Plaintiffs' failure to designate it as work product on the Logs.  See Honeywell, 230 F.R.D. at 299; Bowne, 150 F.R.D. at 489–90.

### z.  Exemplar 26

This is an email between Clark and Duxbury employees discussing legal advice from an NGE attorney about an MBIA ratings downgrade.  (ECF No. 539-5 at 13).  Plaintiffs assert that this email is protected by the attorney-client privilege.  The Court has concluded, however, that Plaintiffs have failed to show that either the Kovel or the functional equivalent doctrines apply to Duxbury, (see §§ III.B.3–4, supra), and, therefore, the attorney-client privilege has been waived.  Any work product protection for this email has been waived for lack of designation, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### aa. Exemplar 27

This is an email between two Clark employees discussing advice from an attorney at NGE regarding Capmark.  (See ECF No. 539-5 at 6).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  This email is a "communication[] among

corporate employees that reflect[s] advice rendered by counsel to the corporation[,]" and therefore, is protected by the attorney-client privilege.  Bank Brussels, 160 F.R.D. at 442; accord In re Keurig, 2020 WL 8465433, at *2.  Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.

### bb. Exemplar 28

This is an email between two Clark employees discussing legal advice from an attorney at NGE regarding Ambac's Debt Service Reserve Policy.  (See ECF No. 539-5 at 6, 13).  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine. Exemplar 28 appears to be a "communication[] among corporate employees that reflect[s] advice rendered by counsel to the corporation[,]" and therefore, is protected by the attorney-client privilege.  Bank Brussels, 160 F.R.D. at 442; accord In re Keurig, 2020 WL 8465433, at *2. Third parties do not appear on this email and therefore, the Court does not address whether common interest applies.

### cc. Exemplar 29

This is an email between two Clark employees discussing a call among Clark, Duxbury, and an NGE attorney, who provided advice regarding Capmark.  Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine.  The Court has found, however, that the Kovel and functional equivalent doctrines do not apply to Duxbury, (see §§ III.B.3–4, supra), such that attorney-client privilege has been waived.  See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3.  Any work product protection for this email has been waived for lack of designation on the Logs, and, in any event, this

document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

### dd. Exemplar 30

This is an email from a Duxbury employee to an attorney at Sidley Austin LLP ("Sidley"), Clark's counsel, regarding good standing certificates for a rate lock. (See ECF No. 539-5 at 7). Plaintiffs assert that this email is protected by the attorney-client privilege and common interest doctrine. Exemplar 30 was not sent for the purpose of seeking or receiving legal advice, and therefore is not protected by the attorney-client privilege. (See §§ III.A.1.a, III.B.2, supra). Even if it were, the Court has held that the Kovel and functional equivalent doctrines do not apply to Duxbury, (see §§ III.B.3–4, supra), such that attorney-client privilege has been waived. See Network-1, 2019 WL 6701909, at *2; Argos Holdings, 2019 WL 1397150, at *3. Any work product protection for this email has been waived for lack of designation on the Logs, and, in any event, this document is not entitled to work-product protection as there is no indication that it was prepared in anticipation of litigation.

*      *      *

Because the Court has found that Plaintiffs failed to make the requisite evidentiary showing to support application of the common interest, Kovel, and functional equivalent doctrines, and has pointed out examples of evidence that might have helped satisfy that burden, Plaintiffs may be tempted to ask the Court for permission to supplement the record on the Motion and have another attempt to make their case. While the Court cannot prevent Plaintiffs from making that request, the Court must reiterate that the defects in Plaintiffs' privilege assertions have been apparent for over ten months, and Plaintiffs have had notice that the

Moving Defendants were seeking the Court's intervention to resolve the disputes since October of last year.  It is well-settled law in the Second Circuit that the party asserting a privilege bears the burden, using competent documentary or testimonial evidence, to show that the privilege applies.  See In re Grand Jury I, 219 F.3d at 182; Gulf Is., 215 F.R.D. at 472; Bowne, 150 F.R.D. at 470–71; Spectrum, 78 N.Y.2d at 377.   Further, the Court was required to construe against Plaintiffs "[a]ny ambiguities as to whether the essential elements have been met[.]"  Koumoulis, 295 F.R.D. at 38.  Plaintiffs had more than enough opportunity to prove first to the Moving Defendants, and then to this Court, that the privileges they claimed in the Logs applied.  They have failed to do so to the extent described above, and now, they must produce the documents as to which the Court has concluded no privilege applies.

## IV. **CONCLUSION**

For the reasons set forth above, the Court rules as follows:

(1) Exemplars 1, 3, 4, 6, 12, 13, 17, 18, 19, 20, 21, 23, 26, 29, and 30 are not protected by any privilege and must be produced to Defendants.

(2) Exemplars 2, 8, 9, 11, 22, and 25 are protected from disclosure by the work product doctrine only to the extent that they relates to this action or the DSRF Action, and if they relate to another litigation, the work product protection has been waived by Plaintiffs' failure to designate them as work product on the Logs.

(3) Exemplars 5, 7, 10, 14, the redacted portions of 15, 16, 24, 27, and 28 are protected from disclosure and do not need to be produced.

(4) Plaintiffs shall review the Logs and produce any additional documents in accordance with the Court's rulings as to the Exemplars.

(5) The parties may <u>mutually</u> agree among themselves to revise the Logs or the privilege

protections for individual Exemplars without seeking further leave of Court.

(6) The parties are directed to meet and confer and by **Wednesday, January 25, 2023**,

file a joint letter advising of the status of Plaintiffs' production of additional

documents in accordance with the Court's rulings in this Opinion & Order.

The Clerk of the Court is respectfully directed to close ECF No. 539.

Dated:      New York, New York
            January 19, 2023

SO ORDERED.

SARAH L. CAVE
United States Magistrate Judge