UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONTEREY BAY MILITARY HOUSING, LLC, MONTEREY BAY LAND, LLC, MEADE COMMUNITIES LLC, FORT BLISS/WHITE SANDS MISSILE RANGE HOUSING LP, RILEY COMMUNITIES LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, I, LLC, FORT LEAVENWORTH FRONTIER HERITAGE COMMUNITIES, II, LLC, CARLISLE/ PICATINNY FAMILY HOUSING LP, BRAGG COMMUNITIES LLC, FORT DETRICK/WALTER REED ARMY MEDICAL CENTER LLC, PICERNE-FORT POLK FUNDING, LLC, RUCKER COMMUNITIES LLC, STEWART HUNTER HOUSING LLC, SILL HOUSING, LLC, AETC HOUSING LP, AMC WEST HOUSING LP, LACKLAND FAMILY HOUSING, LLC, and VANDENBERG HOUSING LP,

Plaintiffs,

- against -

AMBAC ASSURANCE CORPORATION, JEFFERIES MORTGAGE FINANCE, INC., JEFFERIES & COMPANY, INC., JEFFERIES LLC, JEFFERIES GROUP LLC, DANNY RAY, and CHETAN MARFATIA,

Defendants.

**MEMORANDUM
OPINION & ORDER**

19 Civ. 9193 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this civil RICO action, Plaintiffs – eighteen entities engaged in housing construction at military bases nationwide – allege that Defendants – lenders, loan servicers, and insurers for Plaintiffs' military housing projects – "formed a RICO enterprise to illegally profit on the financing" of these projects. Plaintiffs assert substantive RICO and RICO conspiracy

claims, as well as state law claims. (See Second Amended Complaint ("SAC") (Dkt. No. 256) ¶¶ 4, 251-307)

On March 22, 2024, Defendants moved for summary judgment on Plaintiffs' claims. (See Jefferies Mot. (Dkt. No. 858); Ray Mot. (Dkt. No. 874); Ambac Mot. (Dkt. No. 880); Marfatia Mot. (Dkt. No. 909)) Plaintiffs have moved for partial summary judgment on Defendants' affirmative defense of unclean hands. (Pltf. Mot. (Dkt. No. 867))

After the summary judgment motions were fully briefed, Plaintiffs and Defendants Ambac Assurance Corp. and Chetan Marfatia entered into a stipulation of dismissal. (Dkt. No. 1073) Accordingly, only Plaintiffs' claims against (1) Defendants Jefferies Mortgage Finance, Inc., Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC (the "Jefferies Defendants") and (2) Defendant Danny Ray remain.

For the reasons stated below, the motions for summary judgment filed by the Jefferies Defendants and Defendant Ray will be granted, and Plaintiffs' motion will be denied.

## BACKGROUND

### I.    FACTS[1]

#### A.    Privatized Military Housing

In January 1996, Congress enacted the Military Housing Privatization Initiative (the "Military Housing program" or "MHPI") as part of the 1996 Defense Authorization Act.

---

[1] To the extent that the Court cites facts drawn from the parties' Local Rule 56.1 statements, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where the opposing party disagrees with the movant's characterization of the cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

(Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 151)  The MHPI program authorized the U.S. military to contract with private developers for the development and construction of housing for military families on military bases.  (Id. ¶¶ 152-53)  The purpose of the program is to allow "'the military services to leverage scarce appropriated funds and existing assets (land and improvements) to solve the military housing problem and obtain private-sector expertise, resources, and market-based incentives to improve the quality of life for Service Members and their families.'"  (Id. ¶ 154 (quoting Epstein Decl., Ex. 3 (Dkt. No. 912-3) at 12))[2]  Since 1996, the MHPI program has leveraged approximately $4 billion in government funding into more than $32 billion in total private funding and investment to deliver more than 200,000 privatized homes for military families.  (Id. ¶ 157)

All component departments of the United States military, including the Department of the Army and the Department of the Air Force, have participated in the MHPI program.  (Id. ¶ 159)

### B.    The Plaintiff Entities and Affiliated Developers

Plaintiffs operate sixteen privatized military housing projects (collectively, the "Projects") at Army and Air Force bases across the country.[3]  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No.

---

[2]  The page numbers of documents referenced in this Opinion – except as to deposition transcripts – correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Citations to depositions are to the page numbers assigned by the court reporter.

[3]  Plaintiffs and the military housing projects they operate are as follows:  Monterey Bay Military Housing, LLC and Monterey Bay Land, LLC (operators of the "Monterey Bay Project" in California); Fort Bliss/White Sands Missile Range Housing LP (operator of the "Fort Bliss Project" in Texas and New Mexico); Carlisle/Picatinny Family Housing LP (operator of the "Carlisle Project" in Pennsylvania and New Jersey); Stewart Hunter Housing LLC (operator of the "Fort Stewart Project" in Georgia); Fort Leavenworth Frontier Heritage Communities, LLC and Fort Leavenworth Frontier Heritage Communities, II, LLC (operators of the "Fort Leavenworth Project" in Kansas); Meade Communities LLC (operator of the "Fort Meade Project" in Maryland); Riley Communities LLC (operator of the "Fort Riley Project" in Kansas);

3

953) ¶¶ 2256-75) Each Project entity is associated with one of four private developers: Corvias Military Living LLC ("Corvias");[4] Balfour Beatty Communities, LLC ("Balfour");[5] Clark Realty Capital, LLC ("Clark"); or Michaels Military Housing, LLC ("Michaels").[6] (Id. ¶¶ 2276-81) A chart listing the relevant Projects, the affiliated MHPI project entity (or entities), the affiliated private developer, the military branch, and the closing date of the relevant loan transaction is shown below:

| Project | MHPI Project Entity | Developer | Military Branch | Closing Date |
|---|---|---|---|---|
| Fort Meade | Meade Communities LLC | Corvias | Army | 5/1/2002 |
| Fort Bragg | Bragg Communities LLC | Corvias | Army | 8/1/2003 |
| Monterey Bay | Monterey Bay Military Housing, LLC and Monterey Bay Land, LLC | Clark | Army | 10/1/2003 |
| Fort Stewart | Stewart Hunter Housing LLC | Balfour | Army | 11/1/2003 |
| Fort Detrick | Fort Detrick/Walter Reed Army Medical Center LLC | Balfour | Army | 7/1/2004 |
| Fort Polk | Picerne-Fort Polk Funding LLC | Corvias | Army | 9/15/2004 |
| Fort Bliss | Fort Bliss/White Sands Missile Range Housing LP | Balfour | Army | 7/1/2005 |

---

Bragg Communities LLC (operator of the "Fort Bragg Project" in North Carolina); Fort Detrick/Walter Reed Army Medical Center LLC (operator of the "Fort Detrick Project" in Maryland); Picerne-Fort Polk Funding, LLC (operator of the "Fort Polk Project" in Louisiana); Rucker Communities LLC (operator of the "Fort Rucker Project" in Alabama); Sill Housing, LLC (operator of the "Fort Sill Project" in Oklahoma); AETC Housing LP (operator of the "AETC Project" in Oklahoma, Arizona, Texas, and Florida); AMC West Housing LP (operator of the "AMC West Project" in Washington, Oklahoma, and California); Lackland Family Housing, LLC (operator of the "Lackland AFB Project" in Texas); and Vandenberg Housing LP (operator of the "Vandenberg AFB Project" in California).

[4] Corvias was formerly known as Picerne Military Housing, LLC. (Id. ¶ 2281)

[5] Balfour was formerly known as GMH Military Housing. (Id. ¶ 2276)

[6] The Monterey Project was developed in 2003 by Clark, which sold its interest in the Project to Michaels in 2021 – after this lawsuit was filed. (Id. ¶¶ 2278-80)

4

| Fort Leavenworth | Fort Leavenworth Frontier Heritage Communities, LLC[7] and Fort Leavenworth Frontier Heritage Communities, II, LLC | Michaels | Army | 3/1/2006 |
|---|---|---|---|---|
| Fort Rucker | Rucker Communities LLC | Corvias | Army | 4/1/2006 |
| Fort Riley | Riley Communities LLC | Corvias | Army | 7/1/2006 |
| Carlisle | Carlisle/Picatinny Family Housing LP | Balfour | Army | 7/21/2006 |
| AETC | AETC Housing LP | Balfour | Air Force | 2/6/2007 |
| Vandenberg AFB | Vandenberg Housing LP | Balfour | Air Force | 11/1/2007 |
| AMC West | AMC West Housing LP | Balfour | Air Force | 7/21/2008 |
| Lackland AFB | Lackland Family Housing, LLC | Balfour | Air Force | 12/23/2008 |
| Fort Sill | Sill Housing, LLC | Corvias | Army | 6/1/2010 |

(Id. ¶¶ 2256-81; ¶¶ 2534, 2603, 2697, 2786, 2865, 2933, 3104, 3201-02, 3280-81, 3359-60, 3413-18, 3481-82, 3549, 3667, 3717, 3974 (specifying closing dates for each Project's loan))

Four Projects entered into agreements to assume additional debt after the original financing: Fort Bragg on December 17, 2007 (Def. Jt. R. 56.1 Stmt. (Dkt. No. 954) ¶ 1297-98), Fort Stewart on January 10, 2008 (id. ¶ 1742), AMC West on October 9, 2009 (id. ¶ 2098), and Fort Bliss on November 21, 2012. (Id. ¶ 1787)

### C.    The Financing Selection Process

Each Project selected a lender to secure financing. (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2306) For Army Projects, the selected developer and the Army – with the assistance

---

[7] Although named in the SAC as "Fort Leavenworth Frontier Heritage Communities, I, LLC," the correct name for that entity is "Fort Leavenworth Frontier Heritage Communities, LLC." (See Pltf. Opp. (Dkt. No. 952) at 52 n.133)

of Jones Lang LaSalle ("Jones Lang")[8] – prepared and disseminated a Request for Proposals ("RFP") to solicit financing proposals from certain firms, including Goldman Sachs, Lehman Brothers, Merrill Lynch, Raymond James, and Bank of America. (Id. ¶ 2306-08; Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 661) The developers then evaluated the RFP responses including, inter alia, each potential lender's proposed interest rates, financing structures, and other potential products and services. (Id. ¶ 666) In evaluating each financing proposal, the Army gave weight to "[t]he total amount of loan proceeds" and the "[c]ertainty of execution." (Id. ¶¶ 667-68) After receiving RFP responses, "the developer and [Jones Lang] each completed their own detailed analysis of each RFP response and assessed both [qualitative] factors (e.g., prior MHPI experience, certainty of closing, and ease of execution) and [quantitative] factors (e.g., interest rates, cost of capital, and costs and benefits of credit enhancement)." (Id. ¶ 682) After completing those analyses, the developers and Jones Lang each made recommendations to the Army as to which lender to select. (Id. ¶ 689) The Army had final approval over the lender determination and the terms governing financing for each Army Plaintiff Project. (Id. ¶ 691)

For Air Force Projects, the lender determination proceeded differently. The Air Force "required each potential developer to conduct its own internal debt competition to select a debt provider for the project before the developers responded to the Air Force's RFP[.]" (Id. ¶ 1814) After the RFP responses were submitted, "the Air Force and its financial advisors reviewed the submitted financing information to determine if the developer's selected debt provider

---

[8] Jones Lang is "one of the world's leading real estate management and service firms." (Def. Jt. R. 56.1 Stmt. (Dkt. No. 189) ¶ 337) Jones Lang's "role was to 'advise the Army on their participation in the . . . debt competition process." (Id. ¶ 179) Jones Lang also acted as a financial advisor and consultant to the Air Force. (Id. ¶ 183)

provided the 'best value' financing plan relative to the other debt financing proposals."[9] (Id. ¶ 1828)

### D.    The Defendants

#### 1.    Lenders

General Motors Acceptance Corp. ("GMAC") and two of its subsidiaries – GMAC Commercial Holding Capital Corp. ("GMAC Lender"), a mortgage lender, and GMAC Commercial Holding Capital Markets Corp. ("GMAC Broker-Dealer"), a securities broker-dealer – competed to provide loan origination services for the Projects. (Id. ¶¶ 189, 192, 196) Both of the GMAC subsidiaries are wholly owned subsidiaries of GMAC Commercial Holding Corp. ("GMAC Commercial"). (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 206) Between 1999 and 2006, GMAC Lender was selected to obtain financing for thirty-four MHPI projects, including the following Projects at issue here:  Fort Meade, Fort Bragg, Monterey Bay, Fort Stewart, Fort Detrick, Fort Polk, Fort Bliss, Fort Leavenworth, and Fort Rucker. (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2361)

In 2006, GMAC sold a majority stake in GMAC Commercial to a group of private equity funds. GMAC Commercial was then renamed Capmark Financial Group Inc. ("Capmark"). (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 206-07) Between 2006 and 2009, Capmark was selected to obtain financing for eighteen MHPI projects, including the following Projects at issue here:  Fort Riley, Fort Carlisle, AETC, Vandenberg AFB, AMC West, and Lackland AFB.[10] (See Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2364)

---

[9] In addition to Jones Lang, the Air Force obtained financing, real estate, and transaction advice from The Concourse Group, EMAX Financial, Peter S. Cooke Military Housing Company, and Federal Privatization Services. (Id. ¶¶ 184, 1831)

[10] Capmark also provided the loans for a 2007 Fort Bragg Project refinancing and a 2008 Fort Stewart Project refinancing. (Id.)

By the fall of 2009, Capmark was in financial distress and sought to sell some of its assets. (Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 52)  On October 16, 2009, Defendant Jefferies Mortgage Finance, Inc. ("Jefferies Mortgage") entered into a purchase agreement with two Capmark subsidiaries – Capmark Finance, Inc. and Capmark Capital, Inc. – to purchase certain of their assets.[11]  (Id. ¶ 59)  According to the Jefferies Defendants,[12] Jefferies Mortgage purchased the right to service the loans previously made by GMAC and Capmark, and a right of first refusal to make future potential loans to the Fort Sill Project.  (Id. ¶¶ 53, 76)  According to Plaintiffs, however, Jefferies Mortgage "purchased Capmark's military housing servicing business" in its entirety, which included the servicing of loans and right of first refusal regarding future loans to the Fort Sill Project.  (Ptlf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2290)  On June 1, 2020, Jefferies Mortgage and the Fort Sill Project executed a loan agreement.  (Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 97)  On November 21, 2012, Jefferies Mortgage provided a second loan to the Fort Bliss Project.  (Id. ¶ 123)

In sum, GMAC, Capmark, and the Jefferies Defendants were selected to provide financing for the Projects at issue here.[13]  (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2320)

---

[11] On October 25, 2009, Capmark filed a bankruptcy petition.  (Id. ¶ 60)  On December 10, 2009, the Bankruptcy Court approved the purchase agreement the two Capmark entities had entered into with Jefferies Mortgage.  (Id. ¶ 70)

[12] As noted above, in addition to Jefferies Mortgage, three other Jefferies entities are Defendants in this action:  Jefferies & Company, Inc., Jefferies LLC, and Jefferies Group LLC.  Jefferies & Company, Inc. changed its name to Jefferies LLC in 2013.  (Id. ¶ 2)  Jefferies Group LLC is the ultimate corporate parent of Jefferies Mortgage and Jefferies LLC.  (Id. ¶ 3)

[13] The Court refers to GMAC, Capmark, and the Jefferies Defendants collectively as "the Lenders."

### 2.    <u>Danny Ray</u>

Defendant Danny Ray served as Senior Vice President and Managing Director of Project Finance at GMAC – and then at Capmark – between 1999 and 2009. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 234-35)  In 2009, Ray joined Defendant Jefferies & Company., Inc., as a managing director.[14]  (Id. ¶ 237)  In his roles at GMAC, Capmark, and Jefferies, Ray led the Lenders' bids to obtain financing for the Projects at issue.  (Id. ¶¶ 236, 238)

### 3.    <u>Ambac Assurance Corporation</u>

Defendant Ambac Assurance Corporation provided financial guaranty insurance – referred to as "credit enhancement" – for all of the Plaintiff Projects except for Lackland AFB and Fort Sill.[15]  (Id. ¶ 271)  In its credit enhancement policies, Ambac agrees to make payments to the holder of a fixed income or debt obligation where the Project responsible for making payment does not meet its payment obligation.  (Id. ¶¶ 245-46)  Credit enhancement can add value to an investment product by providing a guarantee of the timely payment of principal and interest for investors, which in turn results in interest savings and enhanced marketability for issuers such as Plaintiffs.  (Id. ¶ 244)

---

[14]  Plaintiffs assert that "Ray . . . appears to have simultaneously held a Managing Director position with [Jefferies Mortgage]." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 237)

[15]  Ambac did not provide credit enhancement for the second rounds of financing at Fort Bliss and AMC West. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 2101; Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 134)

In addition to credit enhancement, Ambac and its affiliates offered debt service reserve fund ("DSRF") surety bonds[16] and interest rate swaps[17] in connection with MHPI transactions. (Id. ¶ 284)

### 4.    Defendant Chetan Marfatia

Defendant Chetan Marfatia joined Ambac in 1998 as a credit analyst in Ambac's structured real estate group. (Id. ¶ 314) He became the head of that group – which focused on debt related to the construction of military housing – in 2003 or 2004. (Id. ¶ 275) In that position, he supervised a team of Ambac credit underwriters who worked to offer credit enhancement to more than two dozen military housing projects, including all of the Plaintiff Projects except for Lackland AFB, Fort Sill, and the second round of financings for Fort Bliss and AMC West. (Id. ¶¶ 271, 315-16, 2101; Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 134)

---

[16] Debt service reserve fund surety bonds were required by rating agencies in order for borrowers to obtain investment-grade ratings. Surety bonds thus assist borrowers in obtaining financing while offering additional protection to investors. (Id. ¶ 286) According to Defendants, Ambac issued surety bonds for the following Projects: Fort Meade, Fort Bragg (2003), Monterey Bay, Fort Stewart (2003), Fort Detrick, Fort Polk, Fort Bliss (2005), Fort Leavenworth, Fort Rucker, Fort Riley, Carlisle, AETC, Vandenberg AFB, and Fort Stewart (2008). (Id. ¶ 290) According to Plaintiffs, however, beginning with the Fort Bliss (2005) Project, Plaintiffs "purchased liquidity facilities from GMAC or Capmark. GMAC/Capmark then substituted those liquidity facilities with lower-priced Ambac surety bonds." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 290)

[17] In an interest rate swap transaction, two parties swap cash flows, with one party paying a fixed rate of interest and one party paying a floating rate of interest. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 296); see also Alaska Elec. Pension Fund v. Bank of Am. Corp., 175 F. Supp. 3d 44, 50 (S.D.N.Y. 2016) ("An interest rate swap is an agreement between two counterparties to exchange interest rate payments on an agreed notional amount over a set period of time. Typically, one party will pay based on a 'fixed' interest rate on the notional amount that does not vary from one payment to the next, while the other party will pay based on a variable 'floating' interest rate that is tied to an independent benchmark. . . . Such a fixed-for-floating rate swap allows parties with floating rate debt to hedge their interest rate exposure by receiving a variable rate on the notional amount in exchange for paying a fixed rate on that same notional amount."). One or more of Ambac's subsidiaries provided interest rate swaps in connection with four Projects in exchange for a fee: Fort Leavenworth, Fort Rucker, Fort Riley, and AETC. (Id. ¶ 297)

10

### E.      The Alleged Fraudulent Schemes

Plaintiffs contend that Ray and the Lenders (1) fraudulently inflated the interest rate on the loans that the Projects took out; and (2) entered into a "joint venture" with Ambac and Marfatia to fraudulently inflate the amount that the Projects paid for various services and fees, including for credit enhancement.

### 1.      The Interest Rate Scheme

The SAC alleges that "Ray, GMAC, and later Jefferies charged the Projects inflated interest rates and [realized] undisclosed profits on the Project loans." (SAC (Dkt. No. 256) ¶ 9) According to Plaintiffs, this alleged conduct was the "centerpiece of the fraud." (Id. ¶ 67) The inflated interest rate scheme began "in connection with the Monterey [Bay] Project, when Ray and GMAC first set the interest rate above market to include undisclosed profits in the form of an inflated 'credit spread' (the difference between a bond's coupon rate or yield and an underlying benchmark rate)." (Id. ¶ 11)

The SAC further alleges that

> GMAC and later Jefferies would originate a Project loan and misrepresent to the private developer and [Jones Lang] (and through them the Project) that they had set the credit spread (the interest rate spread above the then applicable reference rate, such as the 30 year swap rate), and, therefore, the coupon interest rate on the loan, at market as required by investors or the market.

(Id. ¶ 178) Ray assured Plaintiffs that "this process would make certain that the credit spread was a true market rate and that the Projects would receive the full benefit of competition." (Id. ¶ 182)

According to Plaintiffs, however, GMAC – and later Capmark and Jefferies – would "sell bonds or certificates on the loans prior to closing and at a premium to par, given the above[-]market interest rate on the underlying loans, immediately reaping profits while simultaneously assuring it would bear no risk on the loans it was going to issue." (Id. ¶ 179) This "inflated . . . credit spread" – which was "above market" – enabled "GMAC to make tens of

millions of dollars of undisclosed profits on the sale of bonds." (Id. ¶ 11) "To this day, the Monterey [Bay] Project and subsequent Projects continue to suffer substantial harm in paying inflated interest rates on these long-term loans." (Id.) Plaintiffs go on to allege that "Defendants Ray and GMAC concealed the fraud by repeatedly assuring the Projects that they were not making a profit on the sale of the bonds to third-party investors." (Id. ¶ 14) Plaintiffs were not able to detect the alleged fraud because there was no "available market data that would have allowed the Projects to detect the inflated credit spread." (Id.)

### 2.    The Credit Enhancement Scheme

Plaintiffs further contend that Ray and GMAC (and GMAC's successors, Capmark and Jefferies) formed a secret "joint venture" or "exclusive" relationship with Marfatia and Ambac that enabled Ambac to charge the Projects above-market rates for credit enhancement and other services. (Id. ¶ 176)

For example, while "Ray repeatedly represented . . . that GMAC would negotiate the most favorable terms possible" for credit enhancement (id. ¶ 175) – "Ray and his co-conspirators . . . ensured that there was no 'selection' process or negotiation of credit enhancer rates." (Id. ¶ 176) As a result of the alleged "collusive enterprise," "GMAC, Ray, Marfatia, and Ambac had predetermined that Ambac would provide credit enhancement at rates designed to benefit Ambac and, in turn, the rest of the [alleged collusive] enterprise, at the expense of the Projects." (Id.)

In 2005, however, "the Army through [Jones Lang] requested that the Project credit enhancement be competitively bid." (Id. ¶ 215) Plaintiffs say that this competitive bidding mandate "posed a serious threat to Defendants' [collusive] enterprise" because "it would lessen Ambac's ability to charge inflated credit enhancement fees," and would risk "exposing the Ray scheme to take profits from the bond sale[s]." (Id. ¶ 216) Accordingly, "Defendants created a

self-termed 'stealth' structure[] in which there would be no competitive bidding process, and Ambac would be placed as the Project's credit enhancer without the knowledge of the developer or the Army." (Id. ¶ 217)  Under this "stealth structure," "the Loan Agreement for each stealth Project clearly indicated that there would be no credit enhancement at closing, and that any future credit enhancement obtained by the lender would be 'at the lender's expense.'" (Id. ¶ 218) "Ambac secretly provided (and was secretly paid for) two separate types of credit enhancement," however:  (1) "an undisclosed Credit Enhancement Agreement, for which [Ambac] was paid an undisclosed monthly premium for insuring the principal balance of the loan"; and (2) "Ambac also insured [and was compensated for providing] one year's worth of annual debt service at each stealth Project," using a "liquidity facility guarantee." (Id. ¶¶ 220-21)  According to Plaintiffs, "[t]his self-described stealth structure allowed Defendants to further conceal the scheme and to avoid the competitive bidding process, provided GMAC with an unearned profit in the form of the liquidity facility fee split, and ensured that no third-party credit enhancer would be placed at the MHPI Projects." (Id. ¶ 223)

### 3.    Undisclosed and Improper Fees

The SAC further alleges that "GMAC and Jefferies . . . charged the Projects . . . unjustified and undisclosed fees, which were disguised and misrepresented in the closing instructions." (Id. ¶ 237)  For example, some of the Projects were charged an unnecessary "rate-lock fee." (See id. ¶¶ 205-212)  The rate-lock fee was imposed by GMAC to "guarantee [the] purported market interest rate through closing." (Id. ¶ 205)  According to Plaintiffs, this fee "was paid in consideration for GMAC appearing to bear the risk of market fluctuation on the interest rate between [the date of the particular MHPI project agreement] and the time of the bond sale." (Id.)  Plaintiffs contend, however, that GMAC faced no risk from fluctuations in the

market rate of interest, because on "the very same day" of an MHPI project agreement "GMAC was able to unload any risk of market fluctuation" by selling the bonds. (Id. ¶ 206)

Defendants also used Original Issue Discounts ("OIDs") to obtain additional undisclosed profits. "[A]n OID occurs when a financial instrument sells for a price less than its stated redemption price at maturity." (Id. ¶ 192) According to Plaintiffs, "Ray affirmatively misled the Projects regarding the need for, and purpose of, an OID." (Id. ¶ 193) While Ray told Plaintiffs that "the OID was financially neutral to the Projects, but . . . helped GMAC/Jefferies sell the bonds post-closing at a discount to par" (id.), in reality "Ray used the OID as a tool to conceal that he was selling the bonds prior to closing at a substantial and secret profit." (Id. ¶ 194) Plaintiffs also contend that alleged "inflated principal balances" associated with Project loans are "attributable to the OIDs." (Id. ¶ 195)

The SAC further alleges that – in order to obtain provide credit enhancement from Ambac in connection with the loans – each Project was required to obtain "shadow" (i.e., non-public) ratings from third-party rating agencies of the proposed debt offering. According to the SAC, Defendants "rigged the rating system" by imposing an "artificial ratings cap" that "enabled GMAC and Ambac to . . . mask the inflated charges and the overall supposed need to credit enhance the GMAC loan and/or bonds." (Id. ¶¶ 16-17)

The SAC further alleges that "[b]eginning in approximately 2005, Ambac, GMAC, Ray, and Marfatia intentionally misrepresented to the Projects that GMAC was providing a Liquidity Facility to the Projects, when, in fact, GMAC was immediately assigning the Liquidity Facility to Ambac and receiving a full release and taking no real market risk." (Id.

¶ 291) According to Plaintiffs, Defendants engaged in this subterfuge "in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing."[18]  (Id. ¶ 299)

### F.        The Debt Service Reserve Fund Litigation

"In late 2015, Ambac initiated multiple lawsuits against the MHPI Projects[.]"  In these lawsuits, Ambac claimed that the Projects had not funded debt service reserve fund accounts (the "DSRF Litigation").  (Id. ¶¶ 32 n.2, 244)  Plaintiffs say that "in late 2016 and early 2017" – as a result of discovery in the DSRF Litigation – Defendants' "multi-faceted [fraud] scheme began to surface," notwithstanding the "extraordinary lengths" to which Jefferies and Ray went "to avoid discovery."  (Id. ¶¶ 245-46)

In response to Ambac's lawsuit regarding the debt service reserve fund, Monterey Bay Military Housing LLC and Monterey Bay Land LLC brought an action for declaratory relief in California Superior Court, seeking a declaration that they were not required to "to post more than $27,000,000.00 in cash reserves or purchase a new surety bond" under the agreement between Ambac and the Monterey Bay Project.  (See Superior Ct. Cmplt. (Dkt. No. 18-1) at 18-31)  During discovery in that action, "the California state court granted five discovery orders compelling discovery from Jefferies, including [the production of] Ray's early GMAC documents and emails."  (SAC (Dkt. No. 256) ¶ 246)  According to Plaintiffs, "[w]ithin hours after Ray and Jefferies had received subpoenas [authorized by the California state court,] Ray – "after consulting with Jefferies['] in-house counsel" – "began to delete thousands of responsive

---

[18]  In their briefing, Plaintiffs assert that "Ray and the [Lenders] . . . conspired with Ambac to provide Plaintiffs with an interest-rate swap at artificially inflated prices which enabled them to once again split the resulting excess fees without the Projects' awareness."  (Pltf. Opp. (Dkt. No. 995) at 41; see also id. at 41-42)  This alleged fraud is not asserted in the SAC, however, and Plaintiffs cannot amend the SAC by including new allegations in their brief opposing summary judgment.  See Rene v. Mustafa, No. 16-CV-4072(JS)(ST), 2024 WL 1332556, at *16 (E.D.N.Y. Mar. 28, 2024) ("It is settled law that one may not amend one's complaint via an opposition to a summary judgment motion.").

MHPI documents on the Jefferies document system." (SAC (Dkt. No. 256) ¶ 247; see also Pltf. Mot. for Preservation Order (Dkt. No. 17) at 6)

On February 6, 2017, the California Superior Court directed Jefferies Mortgage to produce access logs that would reflect Ray's deletions. Two days later, the Jefferies Defendants dissolved Jefferies Mortgage. (Id.) After Jefferies Mortgage was dissolved, Defendant Jefferies Group LLC – the parent company of all the Jefferies Defendants – received a distribution of Jefferies Mortgage's assets. (Id. ¶ 58)

In 2017, the California Superior Court granted the Monterey Bay plaintiffs summary judgment in their action for declaratory relief. (See Kurtz Decl. (Dkt. No. 18) at 2) And in the DSRF Litigation, Ambac agreed to the dismissal of its claims with prejudice. (SAC (Dkt. No. 256) ¶ 32 n.2)

## II.   PROCEDURAL HISTORY

### A.   The Complaint

The Complaint in the instant action was filed on August 28, 2017, in the Northern District of California. (See Cmplt. (Dkt. No. 1)) Ambac, the Jefferies Entities, Ray, Marfatia, and two Annandale Plantation, LLCs – in which Ray allegedly invested his ill-gotten gains – are named as defendants. The Complaint alleges that Defendants were members of a racketeering enterprise, and pleads claims for violations of the RICO statute as well as state law claims. (Id. ¶¶ 143-84)

The Complaint alleges a variety of fraudulent conduct, including charging the Projects "an inflated interest rate on the Project loans"; manipulating "'shadow' ratings from rating agencies to the detriment of the Projects"; conspiring "to charge the Projects for unnecessary and inflated surety and bond insurance fees and premiums"; rigging the bidding process for Guaranteed Investment Contracts ("GICs") for the Projects; charging the Projects for

16

"inflated deal expenses"; the unnecessary use of Original Issue Discounts; and concealment of the fraudulent conduct. (Id. ¶¶ 6-27)

According to the Complaint, by "early 2005" Jones Lang "began to observe that GMAC seemed partial to using Ambac for credit enhancement on its MHPI deals." As a result, Jones Lang "insisted that GMAC competitively bid out credit enhancement." (Id. ¶ 19)

### B.     Proceedings in the Northern District of California

#### 1.     Motions to Transfer and to Dismiss

Three weeks after the Complaint was filed, Ambac moved – pursuant to 28 U.S.C. § 1404(a) – to transfer venue to the Southern District of New York. (See Transfer Br. (Dkt. No. 39)) Ambac contended that "the Southern District of New York is clearly the most appropriate venue for this case," because "New York is the domicile of the plurality of the parties and likely the majority of material witnesses, and is the locus of the greatest number of contacts relating to plaintiffs' claims." (Id.) By contrast, "only one of the 28 parties . . . has an address in [the Northern District of California], virtually no witnesses reside [t]here, and the activities . . . that supposedly occurred [there] are de minimis."[19] (Id. (first emphasis omitted)) Marfatia and the Jefferies Defendants joined in Ambac's motion to transfer. (See Dkt. Nos. 47, 91)

While the transfer motion was pending, Plaintiffs filed an amended complaint (the "FAC") that added allegations stating that Monterey Bay Military Housing LLC has its principal place of business in Seaside, California, which is within the Northern District of California. (See FAC (Dkt. No. 60) ¶ 33) Defendants then moved to dismiss the FAC arguing, inter alia, that the California court lacks personal jurisdiction over them; that Plaintiffs' claims are time-barred; that

---

[19] In moving to transfer, Ambac did not contend that the Northern District of California court lacked personal jurisdiction over it; indeed, Ambac "concede[d] [that] there would be [personal] jurisdiction" over Ambac in that district. (Nov. 30, 2017 Tr. (Dkt. No. 86) at 9)

Plaintiffs' claims are barred by the Private Securities Litigation Reform Act (the "PSLRA"); and that the FAC fails to state a claim. (See Mots. (Dkt. Nos. 62, 63, 64, 66, 71))

### 2.    The California Court's Orders Concerning Defendants' Motions to Transfer and to Dismiss

On January 2, 2018, the California court denied the motion to transfer. (See Order (Dkt. No. 108)) While concluding that the Southern District of New York would be a proper venue and would have jurisdiction over all the Defendants, the California court gave "great weight" to Plaintiffs' choice of forum and concluded that it "outweighs other factors" relevant to the transfer analysis. (See id. at 6, 11, 19)

In a July 17, 2018 order, the California court granted Defendants' motions to dismiss for lack of personal jurisdiction, except as to the Monterey Bay Plaintiffs' claims against Ambac.[20] (See Order (Dkt. No. 147) at 6-11)

Despite this finding, the California court went on to address Defendants' motions to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The California court concluded that (1) the PSLRA bars Plaintiffs' RICO claims,[21] because the predicate racketeering

---

[20] In arguing that the California court had personal jurisdiction over the Defendants, Plaintiffs relied primarily on the RICO statute, 18 U.S.C. § 1965(b), which states that "[i]n any action under [the RICO statute] in any district court . . . in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by a marshal thereof." 18 U.S.C. § 1965(b). The California court concluded that Plaintiffs failed to state a claim under the RICO statute, however. (See Order (Dkt. No. 147) at 7 ("Unless and until a viable RICO claim is stated, § 1965(b) cannot provide a basis for this Court's exercise of personal jurisdiction over Defendants."))

[21] The PSLRA amended the RICO statute to bar RICO claims predicated on conduct actionable as securities fraud. See 18 U.S.C. § 1964(c) ("[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962 [of Title 18 of the United States Code].").

acts implicate guaranteed investment contracts, which are securities (id. at 13-18);[22] (2) Plaintiffs' RICO claims are barred by the RICO statute's four-year statute of limitations, given that Plaintiffs filed suit more than seven years after the last Project closed and more than four years after the last financing transaction relating to the Projects was completed, and Plaintiffs had not alleged facts sufficient to demonstrate that they could not have discovered the fraud and resulting injury earlier (id. at 19-21);[23] and (3) Plaintiffs had not alleged the elements of their RICO claim with the particularity required under Fed. R. Civ. P. 9(b).[24] (Id. at 21-22)

The California court granted Plaintiffs leave to amend. (Id. at 24)

### 3. The SAC and the California Court's Orders Denying Defendants' Motions to Dismiss and Transferring the Case

The SAC was filed on January 16, 2019.[25] (Dkt. No. 220) The SAC contains no claims against Annandale Plantation LLCs; the parties are otherwise the same as those named in the FAC. Plaintiffs' claims under the RICO statute – previously pled as a single cause of action – are pled in the SAC as separate substantive RICO and RICO conspiracy claims. The SAC

---

[22] The California court rejected Defendants' argument that the FAC's allegations as to the credit spread aspect of the scheme – which the court referred to as the "bond fraud" – provided a separate and independent basis for applying the PSLRA bar. (See Order (Dkt. No. 147) at 15-16)

[23] As to Plaintiffs' lack of diligence in discovering the alleged fraud, the California court cited (1) the transparency of market interest rates; (2) allegations in the FAC that Jones Lang had "observe[d] that GMAC seemed partial to using Ambac for credit enhancement," and that Plaintiffs had "felt the need to question Defendants" about the interest rates; and (3) Plaintiffs' failure to plead facts demonstrating a fiduciary relationship, which might explain their delay in bringing suit. (See Order (Dkt. No. 147) at 20 (internal quotation marks and citations omitted))

[24] The California court also ruled that it would not exercise supplemental jurisdiction over Plaintiffs' state law claims, given the absence of a viable federal claim. (See Order (Dkt. No. 147) at 22) With respect to the state law claims, the court nevertheless noted "a number of defects" in those claims, including "[m]ost fundamentally" that "Plaintiffs do not allege which state laws apply" to them. (Id. at 22-23)

[25] The SAC was re-filed on July 22, 2019 (see SAC (Dkt. No. 256)), after the California court ruled on various redaction requests. Citations to the SAC are to Dkt. No. 256.

otherwise asserts the same claims for relief set forth in the FAC.  (See generally FAC (Dkt. No. 60); SAC (Dkt. No. 256))

As relevant to the statute of limitations issue, the SAC omits the FAC's allegation that Jones Lang "observe[d] [in 2005] that GMAC seemed partial to using Ambac for credit enhancement," and therefore "insisted that GMAC competitively bid out credit enhancement." (FAC (Dkt. No. 60) ¶ 21)  The SAC instead merely states that Jones Lang requested "that GMAC competitively bid out credit enhancement."  (See SAC (Dkt. No. 256) ¶¶ 23, 215)  The SAC also alleges, in some detail, the ways in which Ray and GMAC represented to the Projects that they were fiduciaries.  (See, e.g., id. ¶¶ 93-156)  Finally, the SAC adds allegations concerning the lack of transparency regarding the market rate of interest for new issue bonds:  "Unlike publicly reported treasury bond interest rates, the 'market' rate for new issue bonds for the MHPI Projects was not transparent to the Plaintiffs," who "had no visibility or transparency into when the investors committed to purchase the bonds or the amounts investors paid for the bonds, both of which are necessary to understand the true market interest rate."  (Id. ¶ 180)  As a result, "Plaintiffs had no way of knowing that Ray and his employers had charged MHPI borrowers a substantial premium[] attributable to the above-market interest rate [that the Lenders had provided for]."  (Id.)

Defendants moved to dismiss the SAC.  (See Jt. Mot. (Dkt. No. 223); see also Supp. Brs. (Dkt. Nos. 224-28))  They argued, inter alia, that (1) Plaintiffs' claims are time-barred, and that Plaintiffs cannot cure this defect by deleting allegations previously pled in the FAC; (2) the SAC's allegations demonstrate that Plaintiffs were on inquiry notice of their claims long before they filed suit; and (3) the California court lacks personal jurisdiction over them.  (Jt. Mot. (Dkt. No. 223) at 14-18, 31-35)

In a September 26, 2019 order, the California court denied Defendants' motion to dismiss, but transferred the action to the Southern District of New York, concluding that it lacked personal jurisdiction over most of the Defendants (the "September 26, 2019 Order"). (See September 26, 2019 Order (Dkt. No. 261))

As to Defendants' Rule 12(b)(6) motion, the California court ruled that Plaintiffs' RICO claims are not time-barred, finding that (1) Plaintiffs are permitted to delete the FAC's allegations suggesting that they were on inquiry notice; and (2) the SAC sufficiently explains why Plaintiffs did not inquire further into GMAC's preference for obtaining credit enhancement and other services from Ambac. (Id. at 11-15)

As to Defendants' personal jurisdiction arguments, the California court again concluded that Ambac was the only Defendant over which it had personal jurisdiction, and then only as to the Monterey Bay Plaintiffs' claims. (Id. at 40) Rather than dismissing all other claims against Defendants on Rule 12(b)(2) grounds, however, the California court "sua sponte reconsider[ed] its denial of the prior motion to transfer the case to the SDNY Court under 28 U.S.C. § 1404(a),"[26] and determined that transfer was warranted. (Id. at 40-45) Accordingly, the California court transferred this action to the Southern District of New York, and ordered Defendants to file answers to the SAC within 30 days after transfer. (Id. at 46)

## C.    Order Denying Reconsideration

Transfer to the Southern District of New York was effected on October 4, 2019, and the case was assigned to this Court that same day. (Dkt. No. 267) After the transfer, all

---

[26] In deciding to transfer this action, the California court cited Ninth Circuit law "recogniz[ing] that a case may be transferred under § 1404(a) to cure a lack of personal jurisdiction in the transferor court." (September 26, 2019 Order (Dkt. No. 261) at 41 (citing, inter alia, Muldoon v. Tropitone Furniture Co., 1 F.3d 964, 967 (9th Cir. 1993)))

21

Defendants moved for reconsideration of the California court's September 26, 2019 order denying their motions to dismiss. (See Marfatia Recon. Mot. (Dkt. No. 268); Jefferies Recon. Mot. (Dkt. No. 269); Ray Recon. Mot. (Dkt. No. 271); Ambac Recon. Mot. (Dkt. No. 273))

In a March 31, 2021 order, this Court denied Defendants' motion for reconsideration. Although this Court concluded that the California court erred in addressing the merits of Plaintiffs' claims – having ruled that it had personal jurisdiction only as to Defendant Ambac, and then only as to the Monterey Bay Plaintiffs' claim against Ambac (see March 31, 2021 Opinion (Dkt. No. 311) at 31) – this Court largely declined to reconsider and vacate the California court's order, because Defendants had not demonstrated prejudice. (See id. at 31-83).[27]

As to the statute of limitations issue, this Court found that – under Second Circuit law – it was permissible for the California court to consider Defendants' statute of limitations arguments regarding the SAC without reference to the FAC's allegation that in 2005, Jones Lang noticed GMAC's preference for using Ambac for credit enhancement. (Id. at 51-53) This Court concluded that "even if the omitted allegations were considered, they are not sufficient to demonstrate" – at the motion to dismiss stage – "that Plaintiffs were on inquiry notice [of the alleged fraud]." The FAC's allegations – considered as a whole – suggest that "Plaintiffs undertook some inquiry into GMAC and Ambac's conduct" but that Defendants had developed a "'stealth structure' that concealed Ambac's role in the Projects and . . . misrepresent the use of

---

[27] This Court granted Defendants' motions for reconsideration to the extent that "(1) Plaintiffs' breach of fiduciary duty claims against Defendants Ambac and Marfatia [were] dismissed; (2) [Plaintiffs'] aiding and abetting breach of fiduciary duty claims premised on Defendants Ambac and Marfatia's breach of fiduciary duty [were] dismissed; and (3) Plaintiffs Sill Housing LLC and Lackland Family Housing LLC's RICO claims against Defendants Ambac and Marfatia [were] dismissed." (Id. at 83)

credit enhancement in those projects." (Id.) Accordingly, this Court ruled that Defendants had not demonstrated that the SAC's allegations show "that Plaintiffs were on inquiry notice of their RICO claims" prior to 2017, and that "Plaintiffs RICO claims are . . . [therefore] barred by the applicable four-year statute of limitations." (Id. at 57)

### D.    Motions for Summary Judgment

On March 22, 2024, Defendants moved for summary judgment on Plaintiffs' claims. (See Jefferies Mot. (Dkt. No. 858); Ray Mot. (Dkt. No. 874); Ambac Mot. (Dkt. No. 800); Marfatia Mot. (Dkt. No. 909)) Plaintiffs cross-moved for partial summary judgment on Defendants' affirmative defense of unclean hands. (Pltf. Mot. (Dkt. No. 867))

## DISCUSSION

## I.    LEGAL STANDARDS

Summary judgment is warranted when the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "'Where . . . the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party' s claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)). "If the movant meets its burden, 'the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment.'" UMB

Bank, N.A. v. Bluestone Coke, LLC, No. 20-CV-2043 (LJL), 2020 WL 6712307, at *3 (S.D.N.Y. Nov. 16, 2020) (quoting Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"[S]ummary judgment may, of course, be an appropriate means for disposing of an action that is barred by the statute of limitations," but "it may not be granted if there is a genuine issue of fact as to when the limitations period began or expired and that fact is material to the question of whether the statute has run." Giordano v. Mkt. Am., Inc., 599 F.3d 87, 93 (2d Cir. 2010).

24

## II.   ANALYSIS

### A.    Defendants' Motions for Summary Judgment

In moving for summary judgment, the Jefferies Defendants and Ray contend that all of Plaintiffs' claims are barred by the applicable statutes of limitations. (See Ray Br. (Dkt. No. 879) at 15-20; Jefferies Br. (Dkt. No. 864) at 31-35; Marfatia Br. (Dkt. No. 911) at 29-46; Ambac Br. (Dkt. No. 886) at 22-23)

Ray separately argues that

1.    Plaintiffs' claims fail because they are premised upon "extra-contractual statements not incorporated into the integrated loan documents," and there is no basis to impute upon Ray a fiduciary duty to the Projects such that Plaintiffs' claims could be premised on Ray's alleged breaches of that duty (Ray Br. (Dkt. No. 879) at 20-33);

2.    "[e]ach alleged [m]isrepresentation is not actionable on one or more of the following grounds: (a) there is no evidence it was made . . . , (b) it is not false, (c) it constitutes 'puffery,' (d) it is not material, and/or (e) Plaintiffs could not have reasonably relied on it" (id. at 34-48);

3.    the alleged omissions are not actionable because Ray did not have a duty to disclose the information underlying the alleged omissions or because Plaintiffs cannot establish reliance, damages, or materiality (id. at 48-53);

4.    the RICO claims (both substantive and conspiracy) and the conspiracy to commit common law fraud claim fail because there is no actionable misrepresentation or omission (id. at 53-54);

5.    the RICO claims also fail for lack of causation (id. at 54-55); and

6.    the aiding and abetting a breach of fiduciary duty claim fails because Plaintiffs have not established an underlying breach of fiduciary duty (id. at 55-56).

The Jefferies Defendants separately argue that they are entitled to summary judgment because

1.    they are not GMAC and Capmark's successors and therefore cannot be liable for GMAC and Capmark's conduct (Jefferies Br. (Dkt. No. 864) at 35-36);

2.    they did not "knowingly agree[] to join, or commit[] any overt acts in furtherance of [the alleged RICO] conspiracy" (id. at 36-39);

25

3.    there is no evidence that the Jefferies Defendants engaged in the "conduct of an enterprise" (id. at 40-41);

4.    there is no evidence that the Jefferies Defendants engaged in a "pattern of racketeering" (id. at 41-45);

5.    there is no evidence that any alleged predicate acts proximately caused Plaintiffs' injuries (id. at 45-46);

6.    the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims (id. at 47);

7.    "Plaintiffs' state-law-fraud claims are impermissibly re-packaged breach of contract claims" that are premised on alleged misrepresentations that did not happen or are otherwise not actionable (id. at 47-53); and

8.    Plaintiffs' breach of fiduciary duty and aiding and abetting claims fail because the Plaintiff entities that contracted with Jefferies expressly agreed that Jefferies was not acting as an advisor or fiduciary, and "Plaintiffs have proffered no evidence that any of the Jefferies Entities had knowledge of any purported 'fiduciary relationships,' much less encouraged any other defendant to breach its purported duties to any Plaintiff" (id. at 54-57).

Plaintiffs respond that all of their claims are timely because "Defendants' complex fraud went undetected until 2015, when Ambac initiated the DRSF Litigation and Plaintiffs obtained Jefferies internal documents in discovery. Upon learning of that scheme, Plaintiffs timely commenced this action in August 2017." (See Pltf. Opp. (Dkt. No. 952) at 83-98)

Plaintiffs further argue that,

1.    as to their substantive RICO claim, "[t]he record is replete with evidence that each Defendant participated in a racketeering enterprise and conspiracy," "each Defendant is liable for the full scope of harm caused by that conspiracy, irrespective of whether they participated in every aspect of the scheme," and "[a]t a minimum, there are material disputed facts concerning each Defendant's role and conduct rendering summary judgment inappropriate" (id. at 52-66);

2.    all Defendants are liable for RICO conspiracy because "[t]here is no requirement that a RICO conspirator be involved in all aspects of the conspiracy" (id. at 66-68);

3.    as to their fraud and fraudulent inducement claims, they have demonstrated (or at least have created a genuine dispute of material fact as to), numerous

26

misrepresentations concerning (a) the loan structure and interest rate; (b) the necessity of a "rate lock"; (c) the Lenders' efforts to competitively bid credit enhancement premiums; (d) the need for and the function of OIDs; (e) Ray and the Lenders' role as a financial advisor to the Projects; (f) the necessity to utilize third-party loan servicers; and (g) the cost advantages of using liquidity facilities rather than surety bonds; and omissions concerning "the improper, unnecessary and excessive interest and fees to the projects," which Defendants "had an affirmative duty to disclose" despite the merger clauses in the loan origination agreements (id. at 68-78);

4.  there is ample evidence of Plaintiffs' conspiracy to commit fraud claim based on the same misrepresentations (id. at 78-79); and

5.  Ray and the Lenders breached their fiduciary duties to the Projects "by repeatedly misrepresent[ing] that they would serve as financial advisors to the Projects, provide services typically ascribed to a financial advisory function, and advocate for the best interests of the Projects" while, in reality, "us[ing] that position to defraud the Projects." (Id. at 79-83).

### 1.   Whether Fort Leavenworth Frontier Heritage Communities LLC and Monterey Bay Military Housing LLC Have Standing

Ambac argues that Fort Leavenworth Frontier Heritage Communities, LLC and Monterey Bay Military Housing LLC have not suffered an injury-in-fact, and thus lack Article III standing.[28]  (See Ambac Br. (Dkt. No. 886) at 21-22)

The "'irreducible constitutional minimum' of standing consists of three elements. A "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)).  The requisite "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized[;] . . . and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted).  "[T]o

---

[28] Although Ambac is no longer a defendant in this case, Ray and the Jefferies Defendants joined in arguments made by their co-defendants. (See, e.g., Ray Sum. J. Reply (Dkt. No. 882) at 11 n.2; Jefferies Sum. J. Reply (Dkt. No. 865) at 7 n.3)

27

defeat a defendant's motion for summary judgment" based on standing, "the plaintiff must produce evidence showing the presence of a genuine issue regarding standing that would warrant resolution by trial." Lugo v. City of Troy, New York, 114 F.4th 80, 88 (2d Cir. 2024) (emphasis omitted).

Here, Ambac argues that Fort Leavenworth Frontier Heritage Communities LLC has not suffered an Article III injury-in-fact because it was not the entity that contracted with GMAC regarding the Fort Leavenworth Project. According to Ambac, the contracting entity was Plaintiff Fort Leavenworth Frontier Heritage Communities II, LLC. (Ambac Br. (Dkt. No. 886) at 21-22 (citing Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 1432); see also Epstein Decl., Ex. 507 (Dkt. No. 902-7) at 2 (loan agreement between GMAC and "Fort Leavenworth Frontier Heritage Communities II, LLC"))

Plaintiffs respond that Fort Leavenworth Frontier Heritage Communities LLC contracted directly with GMAC (Pltf. Opp. (Dkt. No. 952) at 52 n.133), citing an agreement in which that entity agreed – as the original leaseholder of the land on which the Fort Leavenworth Project was developed – that the relevant loan and interest rate swap would be secured by its leasehold interest in the land. (See Takaksblat Decl., Ex. 642 (Dkt. No. 1040-139) at 2 (agreement between Fort Leavenworth Frontier Heritage Communities, LLC (as sublessor), Fort Leavenworth Frontier Heritage Communities, II, LLC (as sublessee), GMAC Commercial Holding Capital Corp. (as lender), and Ambac Financial Services, LLC (as "swap provider"))) While the agreement Plaintiffs cite shows that Fort Leavenworth Frontier Heritage Communities LLC agreed that Ambac would hold a security interest in the land originally leased by Fort Leavenworth Frontier Heritage Communities LLC, Plaintiffs have not explained how that fact demonstrates that that entity was injured by GMAC's conduct, given that GMAC entered into a

28

loan agreement with Fort Leavenworth Frontier Heritage Communities II, LLC, and not with Fort Leavenworth Frontier Heritage Communities LLC. (See Pltf. Opp. (Dkt. No. 952) at 52 n.133)

The same is true as to Plaintiff Monterey Bay Military Housing LLC. The SAC asserts an injury to the undefined "Monterey Project" (see SAC (Dkt. No. 256) ¶¶ 107-10, 261-64), but it was Plaintiff Monterey Bay Land, LLC – and not Plaintiff Monterey Bay Military Housing LLC – that contracted with GMAC and Ambac regarding a loan and credit enhancement. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 863, 878) In response to Ambac's argument that Monterey Bay Military Housing LLC lacks standing, Plaintiffs assert that "Monterey Bay Military Housing, LLC contracted directly with GMAC as part of GMAC's servicing agreement as the lessor of the land on which the Monterey Bay Project was developed and was ultimately responsible for the servicing fees." (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2698 (citing Takaksblat Decl., Ex. 618 (Dkt. No. 943-19) § 3.07(a)); see also Pltf. Opp. (Dkt. No. 952) at 53 n.133)) But Plaintiffs have not explained how Monterey Bay Military Housing LLC suffered an injury as a result of Defendants' alleged fraud, whether in connection with the agreement Plaintiffs cite, or otherwise. (See Pltf. Opp. (Dkt. No. 952) at 52 n.133)

In sum, Plaintiffs have not "produce[d] evidence showing the presence of a genuine issue regarding" Leavenworth Frontier Heritage Communities LLC and Monterey Bay Military Housing LLC's "standing that would warrant resolution by trial." Lugo, 114 F.4th at 88 (emphasis omitted). Accordingly, Defendants' motions for summary judgment will be granted as to the claims of these two entities.

### 2.    Whether Plaintiffs' RICO Claims are Time-Barred

Defendants argue that Plaintiffs' RICO claims are barred by the applicable statute of limitations. (See Ray Br. (Dkt. No. 879) at 15-20; Jefferies Br. (Dkt. No. 864) at 31-35; Marfatia Br. (Dkt. No. 911) at 29-46; Ambac Br. (Dkt. No. 886) at 22-23)

### a.    Applicable Law

"The statute of limitations for a civil RICO claim is four years." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (citations omitted). "In RICO cases, [the Second Circuit applies] a discovery accrual rule[.]" Id. Under this rule, it is the "discovery of the injury, not discovery of the other elements of a claim," that "starts the clock" for purposes of the statute of limitations. Rotella v. Wood, 528 U.S. 549, 555 (2000); see also Corcoran v. New York Power Authority, 202 F.3d 530, 544 (2d Cir. 1999) (in order for a claim to accrue, plaintiff "'need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim'" (quoting Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998))).

Accordingly, "[i]n a RICO case, the first step in the statute of limitations analysis is to determine when the plaintiff sustained the alleged injury for which the plaintiff seeks redress." Koch v. Christie's Int'l PLC, 699 F.3d 141, 150 (2d Cir. 2012). "The court then determines when the plaintiff 'discovered or should have discovered the injury and begin[s] the four-year statute of limitations period at that point.'" Id. (alteration in original) (quoting In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 59 (2d Cir. 1998)). "In other words, 'the limitations period does not begin to run until [the plaintiff has] actual or inquiry notice of the injury.'" Cohen, 711 F.3d at 361 (alteration in original) (quoting Merrill Lynch P'ships, 154 F.3d at 60).

"With respect to inquiry notice, a duty to inquire is triggered by information that 'relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action

against the defendants.'" Cohen, 711 F.3d at 361 (quoting Newman v. Warnaco Grp., 335 F.3d 187, 193 (2d Cir. 2003)). However, the information "need not detail every aspect of the [subsequently] alleged fraudulent scheme." Staehr v. Hartford Fin. Servs. Grp., 547 F.3d 406, 427 (2d Cir. 2008).[29] Indeed, "'the RICO statute of limitations runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were "storm warnings" that should have prompted an inquiry.'" Koch, 699 F.3d at 151 (quoting Koch v. Christie's Int'l PLC, 785 F. Supp. 2d 105, 114 (S.D.N.Y. 2011)); see also World Wrestling Ent., Inc. v. Jakks Pacific, Inc., 328 F. App'x 695, 697-98 (2d Cir. 2009) (affirming dismissal of RICO claims as time-barred where "storm warnings" put plaintiff on inquiry notice six years before action was filed).

"The duty of inquiry results in the imputation of knowledge . . . in two different ways, depending on whether the [plaintiff] undertakes some inquiry." LC Capital Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003). "Where a RICO plaintiff does begin or has begun to inquire once the duty [to inquire] arises, the Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date." Koch, 699 F.3d at 153 (citation omitted). "[W]hen a RICO plaintiff 'makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose.' Thus, once there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred." Id. (internal citations omitted) (quoting

---

[29] "Although Staehr analyzed inquiry notice in the securities fraud context and was . . . implicitly overruled by the Supreme Court's interpretation of the Sarbanes-Oxley Act in Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010), Staehr is still informative for understanding the common law discovery rule." Fernandez v. UBS AG, 222 F. Supp. 3d 358, 383 n.10 (S.D.N.Y. 2016); see also Koch, 699 F.3d at 152 (noting that "pre-Merck securities fraud cases grounded inquiry notice doctrine upon common law principles that are applicable to RICO actions," and therefore these cases can continue to inform analysis of inquiry notice in the RICO context).

31

Lentell v. Merrill Lynch & Co., 396 F.3d 161, 168 (2d Cir. 2005)). "In such a case, knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive." Id. (citing Jakks, 328 F. App'x 695 at 697).

"Determining whether a plaintiff had 'inquiry notice' is judged using an objective standard, requiring evaluation of all relevant circumstances." Koch, 785 F. Supp. 2d at 114. A court may, however, consider "[t]he [p]laintiffs' sophistication in financial matters . . . in determining when inquiry notice was triggered." In re Integrated Res., Inc. Real Est. Ltd. P'ships Sec. Litig., 851 F. Supp. 556, 568 (S.D.N.Y. 1994) (citations omitted); see also Tab P'ship v. Grantland Fin. Corp., 866 F. Supp. 807, 811 n.3 (S.D.N.Y. 1994) ("[A] court may consider the sophistication of a plaintiff investor in evaluating . . . inquiry notice . . . because an investor's sophistication affects the extent to which a court may properly conclude that a particular event should have influenced that investor to inquire into the likelihood of fraud involving his or her investment.").

"[T]he question of inquiry notice need not be left to a finder of fact," In re Merrill Lynch, 154 F.3d at 60, and "the Court may determine whether plaintiffs were on notice as a matter of law." In re London Silver Fixing, Ltd., Antitrust Litig., 332 F. Supp. 3d 885, 913 (S.D.N.Y. 2018) (citation omitted); see also, e.g., Goel v. Am. Digital Univ., Inc., No. 14-CV-1895 (KBF), 2017 WL 1082458, at *9-13 (S.D.N.Y. Mar. 21, 2017) (ruling at summary judgment that plaintiffs had actual notice or were on inquiry notice of their RICO injuries outside of the four-year limitations period).

### b.    **Analysis**

Here, the Complaint was filed on August 28, 2017. (See Dkt. No. 1) Accordingly, for Plaintiffs' RICO claims to be timely, Plaintiffs must not have discovered (or have been able to discover with reasonable diligence) their injury earlier than August 28, 2013.

### i.   When Plaintiffs' Alleged Injuries Occurred

In connection with the "first step" of the statute of limitations analysis, a court looks to "when the plaintiff sustained the alleged injury for which the plaintiff seeks redress." Koch, 699 F.3d at 150.  Where a plaintiff alleges that "defendants['] conduct was . . . fraudulent at the outset because '[defendants] could never achieve the promised objectives'" – for example, where a plaintiff was fraudulently induced to enter into a contract – the injury occurs upon execution of the agreement.  See Goel, 2017 WL 1082458, at *9 (quoting In re Merrill Lynch, 154 F.3d at 59) (RICO injury occurred when plaintiffs were fraudulently induced to enter into two agreements); CSI Inv. Partners II, L.P. v. Cendant Corp., 180 F. Supp. 2d 444, 458 (S.D.N.Y. 2001) (complaint alleged that defendants' fraud "induced [p]laintiffs to enter into [a] [p]urchase [a]greement on terms . . . which they would not have accepted had they known the undisclosed facts"; held that injury "occurred when [p]laintiffs entered into the [p]urchase [a]greement on those terms").

Here, Plaintiffs allege in the SAC that they suffered injury as a result of (1) "inflated interest rates and undisclosed profits on the Project loans" (SAC (Dkt. No. 256) ¶ 9-12); (2) unnecessary use of credit enhancement and "inflated credit enhancement fees" (id. ¶¶ 14-17, 21, 216); (3) "unnecessary and inflated surety bond and insurance fees and premiums" (id. ¶¶ 18, 24, 221-23, 291, 299); (4) "unnecessary and inflated rate lock fees" (Id. ¶¶ 185-191, 205-12); (5) "inflated and unnecessary OID [Original Issue Discount] charge[s]" (Id. ¶ 261-62; see also id. ¶¶ 25-28, 31, 192-203 (discussing the use of OIDs); and (6) other "inflated deal expenses."  (Id. ¶ 20)

At summary judgment, Plaintiffs describe the cause of their injuries in somewhat different terms.  (See Pltf. Opp. (Dkt. No. 952) at 84-98 (in response to Defendants' statute of limitations arguments, describing Plaintiffs' injuries as (1) "the excess interest rates"; (2) the

provision of "credit enhancement at above-market rates"; (3) "excessive servicing fees"; (4) "improper fee-splitting" with respect to swaps and liquidity facilities; and (5) "unnecessary" rate lock fees))

In opposing Defendants' motion for summary judgment on statute of limitations grounds, Plaintiffs do not address when their alleged injuries occurred. Plaintiffs instead focus on step two of the analysis for the timeliness of civil RICO claims – whether they had actual or inquiry notice of their injuries outside of the limitations period. (See Pltf. Opp. (Dkt. No. 952) at 83-98)

The Court concludes that – regardless of the shifting nature of Plaintiffs' alleged injuries – all of those injuries arise out of the loan and related agreements that the Plaintiff Projects entered into with one or more Defendants. Indeed, Plaintiffs state that their claims are premised on Defendants' misrepresentations regarding "the structure and terms of loan financing" for the Projects – misrepresentations that Defendants allegedly made in connection with various loan and related agreements – and which resulted in Defendants "overcharg[ing] the Projects hundreds of millions of dollars." (Pltf. Opp. (Dkt. No. 952) at 10; see also SAC (Dkt. No. 256) ¶¶ 97-155 (alleging that Defendants made misrepresentations as to each of the Project loan agreements and that Plaintiffs "relied on these written and verbal representations in closing"); Id. ¶ 261 (explaining how the Projects were harmed)). Accordingly, Plaintiffs' injuries occurred upon execution of the relevant agreements at closing. See Simmons v. Reich, No. 19-CV-3316(EK)(ST), 2020 WL 7024345, at *9 (E.D.N.Y. Nov. 30, 2020) ("Plaintiffs allege that largely Defendants made fraudulent misrepresentations in connection with their loan agreements, causing them to take out loans with illegally high interest rates. Assuming their allegations are

34

true, Plaintiffs sustained an injury when they assumed these loan obligations." (citation omitted)), aff'd, No. 20-4114, 2021 WL 5023354 (2d Cir. Oct. 29, 2021) (summary order).[30]

The first Project at issue in this action closed on May 1, 2002 (Def. Jt. R. 56.1 Stmt. (Dkt. No. 954) ¶ 946), the last Project at issue in this action closed on June 1, 2010 (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 3974), and the last refinancing closed on November 21, 2012

---

[30] Under the Second Circuit's "separate accrual rule," a "new [RICO] claim accrues and the four-year limitations period begins anew each time a plaintiff discovers or should have discovered a new and independent injury.'" Merrill Lynch P'ships, 154 F.3d at 59. "The separate accrual rule is triggered only if the injury is 'new and independent[,]' [however.]" Am. Med. Ass'n v. United Healthcare Corp., No. 00 Civ. 2800 (LM), 2006 WL 3833440, at *1 (S.D.N.Y. Dec. 29, 2006) (quoting Merrill Lynch P'ships, 154 F.3d at 59) In this regard, "allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained." Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc., No. 16-CV-9576 (KMK), 2019 WL 4688628, at *6 (S.D.N.Y. Sept. 25, 2019) (quoting World Wrestling Ent., Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (summary order)).

Here, Plaintiffs have not argued that the "separate accrual rule" applies, nor do they contend that any of their alleged excessive fee injuries are "new" or "independent" of the "centerpiece of the fraud" (SAC (Dkt. No. 256 ¶ 9) – the "gravamen" or core of their case (Pltf. Opp. (Dkt. No. 952) at 84-85) – which is the alleged underlying inflated interest rate injury. See also Merrill Lynch P'ships, 154 F.3d at 59 (holding that plaintiffs had not alleged "new" or "independent" injuries where the alleged "scheme was fraudulent at the outset").

Having not asserted that the separate accrual rule applies, Plaintiffs have waived any such argument. (See Pltf. Opp. (Dkt. No. 952) at 83-98). Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n, No. 14-CV-10116 (VSB), 2020 WL 4699043, at *4 (S.D.N.Y. Aug. 12, 2020) ("In the Second Circuit, a party that fails to raise an argument in its opposition papers on a motion for summary judgment has waived that argument."), aff'd sub nom. Phoenix Light SF DAC v. U.S. Bank Nat'l Ass'n, No. 20-1312-CV, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (summary order).

Even absent Plaintiffs' waiver, the separate accrual rule would have no application here. All of Plaintiff's alleged excessive fee injuries arise out of a "scheme [that] was [allegedly] fraudulent at the outset," Merrill Lynch P'ships, 154 F.3d at 59, and "are derivative of the core injury sustained" – that being the alleged inflated interest rate injury. See Tech. Opportunity Grp., Ltd.., 2019 WL 4688628, at *6 (citation omitted). Accordingly, Plaintiffs have alleged one RICO claim that accrued when they first "discover[ed] or should have discovered" their alleged inflated interest rate injury. Merrill Lynch P'ships, 154 F.3d at 59.]

(Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 127) – more than four years before Plaintiffs filed the August 28, 2017 Complaint.

### ii.   Actual or Inquiry Notice of the Alleged Inflated Interest Rate Injury

Having concluded that Plaintiffs' alleged injuries occurred – at the latest – by November 21, 2012, the Court next considers when Plaintiffs had actual or inquiry notice of their injuries. <u>Cohen</u>, 711 F.3d at 361.

The Court begins with the alleged injury that Plaintiffs describe as the "gravamen" of their claims – the "excess interest rates" scheme. (Pltf. Opp. (Dkt. No. 952) at 84-85; <u>see</u> <u>also</u> SAC (Dkt. No. 256) at 51 (alleging that "[a] central part of Defendants' scheme allowed GMAC, and later Jefferies, to make undisclosed and outsize profits at the expense of the Projects" by charging "inflated interest rates" "above the expected yield of the marketplace"))

In connection with this alleged injury, the parties analyze the notice issue developer-by-developer (<u>see, e.g.</u>, Ray Br. (Dkt. No. 879) at 17-20; Pltf. Opp. (Dkt. No. 952) at 88-95), and the Court adopts this approach. The Plaintiff Projects are essentially shell entities through which the developers – in partnership with the relevant military branch – manage the day-to-day operations of the Projects. Therefore, if a developer had actual notice of an alleged injury, or was on inquiry notice of an alleged injury, that knowledge may be imputed to the corresponding Plaintiff Project.

### (a)   Balfour Beatty Communities, LLC

Balfour is the developer for the Fort Stewart, Fort Bliss, Fort Detrick, Carlisle, AETC, Vandenberg AFB, AMC West, and Lackland AFB Projects. (<u>See</u> Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 1460) Defendants argue that Balfour had actual knowledge of, or was on inquiry notice of, the alleged inflated interest rate injury as of August 18, 2009, at the latest. (<u>See</u>

36

Ray Br. (Dkt. No. 879) at 18 (arguing that Balfour had notice as of 2005, or at the latest in 2009); Jefferies Reply (Dkt. No. 866) at 13 (arguing that Balfour had knowledge at least by August 18, 2009); Marfatia Br. (Dkt. No. 911) at 38 (arguing that Balfour had knowledge in 2009)) Because all Defendants contend that Balfour had notice by 2009 – which is more than four years before the August 28, 2017 Complaint was filed – the Court will first address the evidence from 2009.

On August 13, 2009, "Barclays Bank sent [Balfour] details regarding the [Fort] Bliss 2005 bonds, including details concerning . . . the interest only strip held by the Lenders,[31] representing the interest charged on the project loan but not sold to the investors."[32] (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 2217; see also Epstein Decl., Ex. 588 (Dkt. No. 926-39) at 2 ("Attached is the Fort Bliss debt service schedule with the mortgage payments, servicing, credit enhancer fees, [Interest Only] strip and certificate payments broken out.")) Lou DeRogatis – a Balfour project manager for the Fort Bliss Project[33] – forwarded this email to another Balfour employee, with the following comment: "Check out the [Present Value] of the Interest Only strip. $4.2mm. If [Ray] did that on all his transactions, with all his development partners, it would [be] quite a windfall for his group at the expense of the projects." (Epstein Decl., Ex. 588 (Dkt. No. 926-39) at 2)

---

[31] "An 'interest-only strip' is a security based solely on the interest payments from a . . . pool of bonds." SEC v. Goldstone, 300 F.R.D. 505, 507 n.2 (D.N.M. 2014) (internal quotation marks and citation omitted).

[32] Plaintiffs do not contest that this email (and the information contained therein) was received by Balfour. (See Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 2217)

[33] DeRogatis was Balfour's "project manager from the financial perspective" for the Fort Bliss Project and served as Balfour's Fed. R. Civ. P. 30(b)(6) witness in this case. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶¶ 499, 505)

This email correspondence demonstrates that as of August 13, 2009, Balfour knew that Ray had made $4.2 million from interest rate differentials on the Fort Bliss Project, which came "at the expense of the projects." (Id.) This information "relates directly to the misrepresentations and omissions that Plaintiffs later alleged in [this] action against the [D]efendants." Newman, 335 F.3d at 193 (citations omitted). Indeed, the SAC's central allegation – the "gravamen" of the alleged fraud (see Pltf. Opp. (Dkt. No. 952) at 84-85) – is that "Defendants overcharged the Projects hundreds of millions of dollars in fraudulent interest . . . which otherwise would have been available . . . for much needed repairs and improvements to homes for military personnel and their families." (Id. at 10)

Plaintiffs concede that DeRogatis received this email and stated that the present value of the Interest Only strip appeared to generate "quite a windfall for [Ray's] group at the expense of the projects" (see Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 1667), and they do not contend that Balfour investigated this issue. (Id.) Plaintiffs instead contend that this email exchange did not put the Balfour Projects on actual notice, or on inquiry notice, of their alleged inflated interest rate injury. (See Pltf. Opp. (Dkt. No. 952) at 91 (addressing the notice issue but not asserting that DeRogatis – or anyone else at Balfour – investigated whether the Lenders had charged the Balfour Projects inflated interest rates))

In arguing that this 2009 email exchange did not put Plaintiffs on notice of their alleged inflated interest rate injury, Plaintiffs cite testimony from two GMAC witnesses to the effect that "the I/O strip [issue] arose solely because of benchmark rate movement between the rate lock date and the loan closing." (Pltf. Opp. (Dkt. No. 952) at 91 (citing Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 3117) (citing Epstein Decl., Ex. 555 (Dkt. No. 942-62) at 2-6)) Plaintiffs concede, however, that "this testimony is untrue." (Id.) In any event, false testimony from two

38

GMAC witnesses in 2022 about the significance of the Interest Only strip in 2009 does not shed light on what Balfour's employee understood the significance of the Interest Only strip to be in 2009. And it is crystal clear from the August 13, 2009 email that DeRogatis – a Balfour project manager for the Fort Bliss Project – understood that Ray had obtained a huge windfall in interest "at the expense of the projects." (Epstein Decl., Ex. 588 (Dkt. No. 926-39) at 2)

In sum, the August 13, 2009 email correspondence demonstrates that Balfour had – at a minimum – knowledge constituting a "'storm warning' that should have prompted an inquiry." Koch, 699 F.3d at 151 (internal quotations and citation omitted). In other words, by August 13, 2009, Balfour had "knowledge of facts that would suggest to a reasonably intelligent person the probability that [the Balfour-related Projects] ha[d] been injured." Id. at 153. And because there is no evidence that Balfour "mad[e] [an] inquiry" at that point, knowledge of the alleged inflated interest rate fraud will – as discussed below – be imputed to all Balfour-related Projects as of August 13, 2009. Cohen, 711 F.3d at 361-62.

Once Balfour had notice of the alleged inflated interest rate injury regarding the Fort Bliss Project, the remaining Balfour-related Projects were also on inquiry notice. In other words, as a result of the August 13, 2009 email correspondence, all of the Balfour-related Projects should have discovered that Ray and the Lenders were making a profit on the interest rate differential at the expense of the Projects.

Because all of the Balfour-related Projects had notice of the alleged inflated interest rate injury outside of the four-year statute of limitations period, their RICO claims are time-barred to the extent they are premised on this theory of fraud.[34]

---

[34] In arguing that Balfour was on inquiry notice as of 2005, Defendants cite an April 2005 email exchange between a Balfour employee and a Jones Lang employee regarding whether the Fort

(b)    **Clark Realty Capital, LLC**

Clark was the developer for the Monterey Bay Project. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 530) Defendants argue that – through Clark – the Monterey Bay Project was on notice of its alleged inflated interest rate injury as of August 17, 2005, at the latest. (See Ray Br. (Dkt. No. 879) at 17 (arguing that Clark had notice of the inflated interest rate injury by 2003 and certainly by 2005); Marfatia Br. (Dkt. No. 911) at 37-48 (same); Jefferies Br. (Dkt. No. 864) at 32 (arguing that Clark had notice of the inflated interest rate injury by 2005))

In August 17, 2005 email correspondence, Clark employees Tad Guleserian and Greg Day[35] discussed the fact that Ray and GMAC were selling Project bonds at a lower interest

---

Bliss Project should "lock" its interest rate. The Jones Lang employee wrote: "we need to work to get the lowest cost of financing as possible. Anything extraordinary we pay in spread goes to GMAC, not the soldiers." (Epstein Decl., Ex. 753 (Dkt. No. 932-3) at 2)

Plaintiffs respond that this comment "from [the Jones Lang employee] that after rate lock any delta in credit spread 'goes to GMAC' is not incompatible with Plaintiffs' claims," because "the Financing Firms were free to sell the bonds at a higher rate post rate lock, so long as the loan interest rate was set at rate lock at the investor credit spread." (Pltf. Opp. (Dkt. No. 995) at 90 (emphasis in original)) In other words, Plaintiffs contend that this email exchange did not alert Balfour (and would not have alerted a reasonable party in Balfour's position) that the interest rates that the Projects paid were inflated. Plaintiffs' argument is, however, inconsistent with their claim that Defendants had represented to Plaintiffs that "the Projects would receive the benefit of any improvement in the [Qualified Institutional Buyer] market spreads prior to closing via an adjustment to ensure pricing comparable to a bond offering." (Id. at 23) Assuming that this was in fact Balfour's understanding – as Plaintiffs contend – then any indication that GMAC would derive profit from an interest rate differential should arguably have triggered a duty to investigate whether that differential was generated before or after the rate lock. Balfour did not undertake any such investigation, and therefore the Balfour-related Projects were arguably on inquiry notice of their inflated interest rate injury in 2005. The Court need not decide whether the April 2005 email exchange discussed above is sufficient to trigger inquiry notice, however, given its finding that Balfour was on inquiry notice by August 13, 2009, a date that is also outside the limitations period.

[35] Guleserian's responsibilities at Clark included the evaluation of financing proposals for military housing projects. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 538) Day was part of Clark's financial advisory team and – together with Guleserian – wrote the financial plan component of Clark's Request for Quotation response for the Monterey Bay Project. (Id. ¶¶ 536, 787)

rate than what they had charged the Projects, resulting in windfall profits to GMAC. Guleserian wrote: "F*?% Dan Ray and GMAC, Gary says 7 days after we issued the bonds with GMAC, GMAC sold the bonds to 3rd parties with GMAC skimming at least 50bps [basis points] according to Gary."[36] (Epstein Decl., Ex. 352 (Dkt. No. 920-2) at 2) Day responded: "May dan ray drink a [vial] of skin-eating virus and jump into a scorpion pit." (Id.)

This email exchange demonstrates that as of August 17, 2005, Clark had knowledge of the precise conduct Plaintiffs now complain of in this lawsuit – that GMAC was securing profits at the expense of the Projects by advising the Projects to pay an inflated, above-market interest rate, re-selling Project bonds at a lower yield to third parties, and reaping the profit from the spread. This information "should have prompted an inquiry" by Clark. Koch, 688 F.3d at 151 (internal quotations and citation omitted).

Plaintiffs do not contend that Clark conducted any such inquiry, however. Plaintiffs instead respond that "Clark did not give 'any credence' to the information relayed in Mr. Gul[e]serian's 2005 email, which originated from a Lehman Brothers banker." (Pltf. Opp. (Dkt. No. 952) at 88-89) According to Plaintiffs, "Lehman's only interest in conducting this outreach two years after the Monterey Bay Project loan was originated was to convince the project to retain them to conduct a refinancing." (Id.) But Day's response to Guleserian's email – that he hoped that Ray would "drink a [vial] of skin-eating virus and jump into a scorpion pit" – indicates that he accepted the assertion that Ray and GMAC had resold the MHPI bonds at a profit of "at least 50bps [basis points]." In any event, the test for inquiry notice here does not turn on the subjective reaction of the Clark employees to the tip from the Lehman Bros. banker.

---

[36] Plaintiffs represent that the "Gary" referenced in this email was "a Lehman Brothers banker." (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 4129)

The test for inquiry notice is instead an objective one, see Koch, 785 F. Supp. 2d at 114, and the tip from the Lehman Bros. banker that Ray and GMAC had resold the MHPI bonds at a significant profit implicates the same alleged inflated interest rate injury that is the "gravamen" of Plaintiffs' claims in this action.

The Court concludes that the August 17, 2005 email exchange between the Clark employees demonstrates that Clark (and therefore Plaintiff Monterey Bay Land, LLC) had "knowledge of facts that would suggest to a reasonably intelligent person the probability that [Plaintiff Monterey Bay Land] had been injured." Koch, 699 F.3d at 153. Because there is no evidence that Clark made an inquiry as a result of this tip, knowledge will be imputed to Plaintiff Monterey Bay Land, LLC as of the date of the August 17, 2005 email, which is outside the RICO statute of limitations. Cohen, 711 F.3d at 361-62. Accordingly, Plaintiffs' RICO claims are time-barred to the extent they are based on the theory that Monterey Bay Land, LLC suffered an injury by virtue of having paid inflated interest rates.

### (c)    Michaels Military Housing, LLC

Michaels was the developer of the Fort Leavenworth Project (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 560), and Defendants contend that this Project – through Michaels – had notice of the alleged inflated interest rate injury by 2008. (See Ray Br. (Dkt. No. 879) at 18 (arguing that Michaels was on inquiry notice in 2008); Jefferies Br. (Dkt. No. 864) at 32 (same); Marfatia Br. (Dkt. No. 911) at 39 (arguing that Michaels was on inquiry notice by 2006, and that the facts that put it on inquiry notice were confirmed in 2008))

In an October 16, 2008 email, Jorge Garza – a Raymond James employee – wrote the following to Ronald Hansen, a Michaels senior vice president (see Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 583-85):

42

Keep in mind Capmark does not hold any of these bonds in its portfolio. You sign a loan doc for a specified [amount] and rate, but you never see the actual offering documentation or final Limited Offering Memorandum. Only the actual investors get it, but not the developer. We sa[w] that in Presidio Monterey the rate to the developer and the project was about 6.67%, but investors got 6.25%. In other words, GMAC kept 42 [basis points] for themselves and the bonds in GMAC's/Capmark's box for a nanosecond and then [they] sell the bonds at a higher price (lower yield) to investors. The developer was not too happy to find out they got dinged by 42 bps. This does not include any bond insurance or servicer fees. It is not too transparent, but it seems the Army has no[] problem overpaying, but puts [Raymond James] under the microscope because [Jones Lang] wants to give the deal to someone else. It is all about patronage, where [Federal National Mortgage Association] ends up buying the majority of Capmark's bonds.

(Epstein Decl., Ex. 729 (Dkt. No. 930-29) at 2-3)

In response, Hansen asks how much "anyone know[s]" about "[C]apmark taking down as a loan and then selling the bonds at a profit." Garza responds: "A lot of folks know about it, but [Jones Lang] allows [C]apmark to get away with it." (Id. at 2) Garza further states: "I will call you later with more details and examples." (Id.)

This email exchange demonstrates that as of October 2008 Michaels had knowledge amounting to – at a minimum – a "storm warning" that the Lenders were profiting off the difference between interest rates charged to the Projects and the interest rates paid by investors, and that the Lenders only held the bonds for a "nanosecond" before selling them to third parties at a lower yield. This information "relates directly to the misrepresentations and omissions that Plaintiffs" have alleged in this case. Newman, 335 F.3d at 193. (See SAC (Dkt. No. 256) ¶¶ 9-15 (alleging that Defendants charged the Projects "inflated interest" and reaped "undisclosed profits" at the expense of the Projects, and that the Lenders "rarely carried any loan" because it was "pre-sold through bond syndication prior to closing"); see also Pltf. Opp. (Dkt. No. 952) at 20 ("Plaintiffs relied on the Financing Firms' numerous representations that the loan interest rate would be set based on the price talk with [qualified institutional buyers] to

43

provide the lowest cost of financing and that the loan would be originated and held on their balance sheets until sold"))

Plaintiffs dismiss this email as "another marketing email" from a finance firm seeking business from Michaels. (Pltf. Opp. (Dkt. No. 952) at 89) According to Plaintiffs, Garza had no firsthand knowledge as to GMAC and Capmark's practices, and Michaels "'didn't put much stock in'" what he said, "given Raymond James' status as a competitor to GMAC and Mr. Garza's propensity for trying to paint Raymond James as a better alternative to GMAC." (Id.) As a result, Hansen and Michaels did not attempt "to ascertain whether the information was accurate." (Id. at 88)

As discussed above, however, the standard for inquiry notice is objective, Koch, 785 F. Supp. 2d at 114, and even "rumors" from third parties can be sufficient to trigger inquiry notice. See, e.g., Berger v. Metra Elecs. Corp., No. 92 Civ. 6452 (LBS), 1995 WL 3022, *3-4 (S.D.N.Y. Jan. 3, 1995) (deposition questions regarding "rumors" of allegedly fraudulent gifts sufficient to put plaintiff on notice of potential injury), aff'd sub nom. Somma v. Metra Elecs. Corp., 71 F.3d 404 (2d Cir. 1995); Kronfeld v. Advest, Inc., 675 F. Supp. 1449, 1459 (S.D.N.Y. 1987) (granting defendant summary judgment premised on statute of limitations where "public discussion of precisely the matter allegedly misrepresented . . . would put any reasonably diligent plaintiff on inquiry notice").

Here, the Court concludes that the Fort Leavenworth Project – through its developer Michaels – was on inquiry notice of its alleged inflated interest rate injury by October 2008, because it had "knowledge of facts that would suggest to a reasonably intelligent person the probability that [it] had been injured." Koch, 699 F.3d at 153. And because Michaels made no inquiry after October 2008 (see Pltf. Opp. (Dkt. No. 952) at 88 (conceding that Michaels did

not attempt to "ascertain whether [the allegation as to the inflated interest rate] was accurate"), knowledge will be imputed as October 2008, which is outside the RICO statute of limitations. Cohen, 711 F.3d at 361-62. Accordingly, Plaintiffs' RICO claims are time-barred to the extent they are based on an alleged inflated interest rate injury sustained by the Fort Leavenworth Project.

### (d)    Corvias Military Living LLC

Corvias is the developer for the Fort Meade, Fort Bragg, Fort Polk, Fort Rucker, Fort Riley, and Fort Sill Projects. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 391) Defendants argue that Corvias was on notice of the Projects' alleged inflated interest rate injury by at least 2011. (See Ray Br. (Dkt. No. 879) at 17-18 (arguing that Corvias was on inquiry notice at least by March 2011, if not by 2005); Marfatia Br. (Dkt. No. 911) at 38-39) (same); Jefferies Br. (Dkt. No. 864) at 32 (arguing that Corvias was on inquiry notice by June 2004))

In March 2011, Corvias's chief financial officer David Rozen received a voicemail from a Mutual of Omaha employee who had purchased MHPI bonds on behalf of his employer. The Mutual of Omaha employee explained that he had purchased bonds from the Lenders "at a premium to par" before the loan to the Fort Sill Project had closed.[37] (Def. Jt. R. 56.1 Stmt. (Dkt.

---

[37] As a general matter, "[w]hen a bond or other debt instrument trades at face value" – or, the price to be paid to the bondholder upon redemption – "it is said to trade 'at par.'" 6A Fletcher Cyc. Corp. § 2674. "[B]onds [that] sell at a price greater than par . . . are said to sell at a premium." Comm'r v. Korell, 339 U.S. 619, 628 n. 10 (1950) (internal citations and quotations omitted). "When a bond sells at a premium, it is generally because the interest it bears exceeds the rate of return on similar securities in the current market. For the right to receive this higher interest rate the purchaser of a bond pays a premium price when making the investment." Hanover Bank v. Comm'r, 369 U.S. 672, 677 (1962) (citations omitted).

The fact that the Lenders priced the MHPI bonds at a premium reflects the Lenders' view that they expected the bonds to return future interest payments at above-market rates. (See also SAC (Dkt. No. 256) ¶ 234 (stating that, for one of the loans, "Ray and Jefferies had secret pre-commitments from investors to buy the debt at a staggering 8% above par – reflecting a highly

No. 891) ¶ 2192) Rozen forwarded a recording of that voicemail to Corvias employee Ken Richard stating: "Smoking gun on the Sill deal. This is the Mutual of Omaha buyer. He paid a premium at issuance." (Epstein Decl., Ex. 746 (Dkt. No. 930-46) at 2) About a week later, Rozen followed up by email with the Mutual of Omaha employee, asking whether he had asked "Jefferies anything about the Sill proceeds." (Id., Ex. 747 (Dkt. No. 930-47) at 2) The Mutual of Omaha employee responded that Jefferies "said they provided an interest rate lock to the Army and that was the cost of the lock. . . . [T]hat is my interpretation." (Id.) Rozen forwarded this email to John Germain – one of Corvias's "advisors at Barclays" – stating: "FYI. I can't tell if he believes this or not, but they just lied to him." (Id.; Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 2194)

Based on these March 2011 communications, the Court concludes that the Corvias-related Projects had knowledge at that time of facts constituting – at a minimum – "storm warnings" of the same injury that Plaintiffs allege in the SAC: that the Fort Sill Project had been charged an inflated interest rate on the Fort Sill loan because the Lenders were able to sell the MHPI bonds at a premium to par before the loan closed. The Corvias-related Projects were also aware that the Lenders were lying to bond investors in order to conceal that fact.[38]

---

inflated interest rate on the loan")) And because these future interest payments would reflect the interest rate paid by the Corvias Fort Sill Project on the underlying loan, the reported bond premium indicates – as Corvias's CFO acknowledged at the time (see Epstein Decl., Ex. 746 (Dkt. No. 930-46) at 2) – that the Corvias Fort Sill Project had been charged an excessive, above-market interest rate on the underlying loan.

[38] Defendants also cite a 2005 email exchange in which Jones Lang informs Corvias that the interest rate GMAC is charging is "'not based off a[n] open market competition.'" (See Ray Br. (Dkt. No. 879) at 17 (quoting Epstein Decl., Ex. 156 (Dkt. No. 895-6) at 2)) Plaintiffs respond that the 2005 Jones Lang email "is not inconsistent with what was communicated to the Projects," because "[t]he Financing Firms represented the loan interest rate would be based off the market credit spread ascertained through discussions with [qualified institutional buyers],

Plaintiffs argue that this information is not sufficient to trigger inquiry notice, because "Mutual of Omaha was a minority holder and the purchase price and date of all the bonds would need to be known" in order to make a determination that the Fort Sill Project had paid an inflated interest rate. (Pltf. Opp. (Dkt. No. 952) at 92)  The fact that Mutual of Omaha was a minority holder of the MHPI bonds and that Plaintiffs did not have full information about all of the bond purchases is not dispositive on the issue of whether the March 2011 voicemail and email communications triggered a duty of inquiry, however, because triggering information "need not detail every aspect of the [subsequently alleged] fraudulent scheme," Staehr, 547 F.3d at 427, and the statute of limitations runs "even if the 'amount of damage is not certain.'" World Wrestling Ent., Inc. v. Jakks Pac., Inc., 530 F. Supp. 2d 486, 527 n.17 (S.D.N.Y. 2007), aff'd, 328 F. App'x 695 (2d Cir. 2009) (summary order) (quoting In re Merrill Lynch Ltd. P'ships Litig., 7 F. Supp. 2d 256, 264 (S.D.N.Y. 1997), aff'd, 154 F.3d 56 (2d Cir. 1998)).

Moreover – unlike Balfour, Clark, and Michaels – Corvias made "some inquiry" after receiving the March 2011 voicemail and email.  See LC Capital Partners, 318 F.3d at 154. According to Plaintiffs, the inquiry proceeded as follows:

After receiving the voicemail from the Mutual of Omaha employee, Rozen "[and] others at Corvias" "attempted to determine whether the information provided aligned with what Ray and Jefferies had represented regarding the Fort Sill Project certificate pricing and whether the information had broader implications for the project financing."[39]  (Pltf. Add'l R. 56.1 Stmt.

---

which Jefferies witnesses have acknowledged is not public information." (Pltf. Opp. (Dkt. No. 952) at 92 n.207)  Given this Court's findings regarding the March 2011 email correspondence, it need not decide whether this 2005 email exchange is alone sufficient to trigger inquiry notice.

[39] The parties use the terms "certificates" and "bonds" interchangeably.  (See, e.g., SAC (Dkt. No. 256) ¶ 6 (discussing the sale of certain "bonds (also known as certificates)"))

47

(Dkt. No. 953) ¶ 4139) Rozen "requested that Mutual of Omaha share the sources and uses information they received as part of the private placement memorandum in order to compare it to the sources and uses of the project closing pro forma." (Id. ¶ 4140) "Follow-up conversations with Mutual of Omaha did not reveal the total amount of bonds purchased or any information regarding who the other Fort Sill certificate holders were[, however]." (Id. ¶ 4141)

Rozen also "shared the information with [Jones Lang]," in the hope that Jones Lang could "provide additional context or identify other bondholders." (Id. ¶ 4142)

Aware that FreddieMac and FannieMae were large investors in MHPI projects, Rozen also "attempted to 'meet with them multiple times.'" (Id. ¶¶ 4143-44) In Rozen's "single meeting" with FreddieMac and FannieMae employees, however, they "were uncooperative and did not share any of their bond purchase information." (Id. ¶¶ 4143-44)

Given that Corvias conducted some inquiry after receiving the March 2011 voicemail and email, the Court must determine "when a reasonably diligent investigation would have revealed" the alleged inflated interest rate injury suffered by the Corvias-related Projects "to a person of reasonable intelligence." Koch, 699 F.3d at 153 (citation omitted).

According to Plaintiffs, "[t]he measures taken by Mr. Rozen, at a minimum, establish a material factual dispute as to whether the investigation was reasonable" and could have revealed the Corvias-related Projects' alleged inflated interest rate injury.[40] (Pltf. Opp.

---

[40] Although Plaintiffs frame the inquiry notice issue as whether "Corvias's investigation . . . uncover[ed] the facts necessary to bring the cause of action, to trigger the statute of limitations" (Pltf. Opp. (Dkt. No. 952) at 95), it is "discovery of the injury, not discovery of the other elements of a claim," that triggers the running of the statute of limitations clock. Rotella, 528 U.S. at 555; see also Corcoran, 202 F.3d at 544 (in order for a claim to accrue, plaintiff "need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim"); Rio Tinto PLC v. Vale, No. 14CIV3042RMBAJP, 2015 WL 7769534, at *7 (S.D.N.Y. Nov. 20, 2015) ("'The statute of limitations begins to run on the date that the plaintiff

(Dkt. No. 952) at 94)  However, Plaintiffs do not dispute that they received information indicating that Mutual of Omaha had purchased Fort Sill Project bonds from a Lender at a premium to par before the loan closed.  Corvias's chief financial officer described the circumstances of this Project bond sale as a "'[s]moking gun.'"[41]  (See Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 107 (quoting Epstein Decl., Ex. 746 (Dkt. No. 930-46) at 2))  A "reasonably diligent investigation" of the information provided by Mutual of Omaha at the time the information was provided to Corvias would have revealed the alleged inflated interest rate injury suffered by the Corvias-related Projects "to a person of reasonable intelligence."  Koch, 699 F.3d at 153.  Indeed, the nature of the injury was apparent from what the Mutual of Omaha employee told Rozen.

In sum, by March 2011, Corvias had notice of the precise injury about which Plaintiffs now complain.  Indeed, John Picerne – Corvias's founder and chief executive officer

---

learned of his or her injury, not on the date that the plaintiff learned that his or her injury may have resulted from racketeering activity.'" (quoting Woods v. Mercier, No. 11 Civ. 6502, 2012 WL 3925852, at *3 (W.D.N.Y. Sept. 7, 2012))).

Yien-Koo King v. Wang, No. 14-CV-7694 (LJL), 2020 WL 6875403 (S.D.N.Y. Nov. 23, 2020) – cited by Plaintiffs (Pltf. Opp. (Dkt. No. 952) at 93) is not persuasive to the extent it suggests that inquiry notice is not triggered until a plaintiff is aware of the "'facts necessary to bring a cause of action.'"  See Yien-Koo King, 2020 WL 6875403, at *16 (quoting In re Glob. Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 204 (S.D.N.Y. 2003)).  Indeed, in Koch, 699 F.3d at 149-50, the Second Circuit squarely held to the contrary.  See id. (rejecting the argument that inquiry notice is not triggered until "a RICO plaintiff [has] discovered the facts showing the fraud, including scienter"; holding that "a RICO claim accrues upon the discovery of the injury alone").

[41] Plaintiffs assert that the "smoking gun" comment is presented out of context, but they don't explain why this evidence should be disregarded.  The conclusory assertion that evidence is presented out of context is not, standing alone, sufficient to create a genuine issue of material fact.  See, e.g., F.T.C. v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) (noting that "conclusory statements that facts listed in [an] [adversary's] Rule 56.1 Statement are 'incorrect,' 'vague,' 'incomplete,' or 'disputed' are not sufficient to put any fact in dispute").

(Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 406) – admitted as much at his deposition, in discussing a conversation he had with Corvias employee Ken Richard in March 2011:

> [I]t appeared to me at that time from Ken [Richard], and I didn't get deeply involved in it, but it appeared to me at that time through Ken that there was some sense of a little bit of price manipulation in the sale of the bonds.
>
> That there was a commitment to buy the bonds at X rate ahead of time, already committed. The bonds ended up getting sold – it appeared on paper that they were sold at a higher rate, which was the rate that we were living with.
>
> From Ken's best understanding of this, Dan [Ray] was profiting on the spread in the middle. And he started to assume that the profiting had been taking place for years and years on all of the transactions that we had done.

(Epstein Decl., Ex. 742 (Picerne Dep.) (Dkt. No. 930-42) at 204:23-205:15; see also id. at 208:05-209:23 (Picerne testifying that by "late [20]10 or early [20]11" he understood that Ray was manipulating the interest rates of Project bonds and "ma[king] money off the pricing differential."))

Because a reasonably diligent investigation in March 2011 would have revealed the alleged inflated interest rate injury suffered by the Corvias-related Projects, the statute of limitations as to the Corvias-related Projects began running at that time, and expired in March 2015 – more than two years before the August 28, 2017 Complaint was filed. Accordingly, Plaintiffs' RICO claims are time-barred to the extent they are based on an alleged inflated interest rate injury sustained by the Corvias-related Projects.

*    *    *    *

The Court concludes that all four developers associated with the Plaintiff Projects had actual notice, or were on inquiry notice, of the alleged inflated interest rate injury suffered by

50

the Projects before August 28, 2013 – outside the four-year statute of limitations for RICO claims.[42]

<b>iii.    Effect of Plaintiffs Having Actual Notice of,<br>or Being on Inquiry Notice of, the<br><u>Alleged Inflated Interest Rate Injury</u></b>

The Court has determined that Plaintiffs had actual notice of, or were on inquiry notice of, the alleged inflated interest rate injury that is the "gravamen" of their RICO claims and the alleged "centerpiece of the fraud" (SAC (Dkt. No. 256) ¶ 9) outside the RICO statute of limitations period.

As discussed above, however, the SAC asserts that Defendants caused Plaintiffs to suffer a number of other injuries in addition to Plaintiffs' core claim regarding inflated interest rates, including (1) "inflated credit enhancement fees" (id. ¶¶ 14-21, 21, 216); (2) "unnecessary and inflated surety bond and insurance fees and premiums" (id. ¶¶ 18, 24, 221-23, 291, 299);

---

[42] Aside from Plaintiffs' developer-specific arguments discussed above, Plaintiffs contend more generally that they would have had to receive a great deal of additional information before being placed on inquiry notice. In this regard, Plaintiffs say that they "would have needed to know the investor credit spread determined by the Financing Firms from 'price talk' with [qualified institutional buyers], when the indications of interest were received, when the bond commitments were received, the movement, if any, of the benchmark rate between the rate lock date and the certificate sale date, the actual certificate placement prices, and the placement times." (Pltf. Opp. (Dkt. No. 952) at 86)

But Plaintiffs misconstrue the relevant legal standard for determining when the duty of inquiry is triggered. As discussed above, each developer was explicitly told in substance, and understood, that the Lenders were charging excessive rates of interest. Given that that is the precise injury that is the "gravamen" of the SAC's claims and the "centerpiece of the [alleged] fraud," the duty of inquiry was triggered when that information was received. See Int'l Bhd. of Teamsters Loc. 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc., No. 10-CV-1692 (RJD), 2012 WL 13202126, at *7 (E.D.N.Y. Apr. 19, 2012) ("[K]nowledge of the injury is sufficient to start the [RICO statute of limitations] clock running, even if the plaintiff is unaware of the other elements required to state a RICO claim."); Simmons, 2020 WL 7024345, at *9 (finding that RICO claims based on "fraudulent misrepresentations in connection with . . . loan agreements causing [plaintiffs] to take out loans with illegally high interest rates" were time-barred because plaintiffs were aware of their injuries "at the time of closing, even if they did not appreciate [the interest rates'] illegality at that time").

(3) "unnecessary and inflated rate lock fees" (id. ¶¶ 185-191, 205-12); (4) "inflated and unnecessary [Original Issue Discount] charge[s]" (id. ¶ 261-62; see also id. ¶¶ 25-28, 31, 192-203 (discussing the use of OIDs)); and (5) other "inflated deal expenses." (Id. ¶ 20; see also Pltf. Opp. (Dkt. No. 952) at 84-98 (addressing whether Plaintiffs were on inquiry notice of "above-market rates" for credit enhancement, "excessive servicing fees," "improper fee-splitting" with respect to swaps and liquidity facilities, and "unnecessary" rate lock fees))

The parties appear to disagree as to what effect, if any, the Court's determination regarding the untimeliness of Plaintiffs' inflated interest rate claim would have on Plaintiffs' remaining theories of injury underlying their RICO claims.

Defendants generally confine their statute of limitations analysis to the alleged inflated interest rate injury, and argue that Plaintiffs' RICO claims are time-barred in their entirety. (See Jefferies Br. (Dkt. No. 864) at 31-32 (addressing only the purported injury that Plaintiffs "were paying interest rates that were higher than the rates paid to investors in the corresponding certificates"); Ray Br. (Dkt. No. 879) at 20 (focusing on the alleged inflated interest rate scheme, providing limited analysis as to the alleged injuries related to "credit enhancement," and omitting the remaining alleged injuries from its analysis); Marfatia Br. (Dkt. No. 911) at 35 (arguing that "[t]he law in this Circuit does not permit Plaintiffs to claim that the various alleged misconduct was all part of a comprehensive fraud scheme, while simultaneously claiming [that] their failure to investigate was reasonable because they were only aware of one aspect of the alleged scheme"); see also Ray Reply (Dkt. No. 883) at 12 n.4 ("Plaintiffs' claim not to have notice of allegedly 'excessive' servicing fees, 'fee-splitting,' and 'unnecessary' rate lock fees does not absolve them of a duty to inquire regarding the 'gravamen' of the fraud. The storm

warnings Plaintiffs received triggered a duty to inquire into any related misrepresentations about the [Project debt] transactions." (internal citations omitted)))

Plaintiffs, for their part, address each of their alleged injuries separately, arguing that they were not on notice of any of these injuries outside the four-year statute of limitations period. (Pltf. Opp. (Dkt. No. 952) at 84-98)

"Where a complaint alleges several types of misconduct, [however,] '[a plaintiff] need not know the details of each' to be placed on inquiry notice." Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012) (quoting Staehr, 547 F.3d at 434); see also Thompson v. Metro. Life Ins. Co., 149 F. Supp. 2d 38, 48 (S.D.N.Y. 2001) ("[I]t is not necessary for a plaintiff to understand every permutation of his or her injury. . . ."). Instead, in order for inquiry notice to be triggered, plaintiff "merely must be aware of the 'general fraudulent scheme.'" In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09 CIV. 2137 LTS MHD, 2010 WL 3239430, at *7 (S.D.N.Y. Aug. 17, 2010) (quoting In re Integrated Res. Real Estate Ltd. P'ships Sec., 815 F. Supp. 620, 637 (S.D.N.Y. 1993)); Marshall v. Milberg LLP, No. 07 CIV. 6950 (LAP), 2009 WL 5177975, at *3 (S.D.N.Y. Dec. 23, 2009) (applying these principles to RICO claim).

For example,

> in LC Capital Partners[, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148 (2d Cir. 2003)], the plaintiffs alleged several types of misconduct, including under-reserving for insurance claims and predatory pricing. 318 F.3d at 150. [The Second Circuit] affirmed the dismissal of the complaint, stating that the storm warnings related to under-reserving should have "alert[ed] any reasonable investor that something is seriously wrong." Id. at 155.

Staehr, 547 F.3d at 434 (last alteration in original). The same is true here with respect to the alleged inflated interest rate injury and Plaintiffs' related assertions that Defendants engaged in a pattern of charging Plaintiffs excessive or unnecessary fees. Plaintiffs' knowledge of their

alleged inflated interest rate injury should have communicated to them – as in <u>LC Capital Partners</u> – that "something [was] seriously wrong."[43]

This finding is also fully consistent with Plaintiffs' presentation of their claims in the SAC and in their summary judgment briefing, where they characterize their RICO claims as premised on a single, integrated fraud scheme. (<u>See, e.g.</u>, SAC (Dkt. No. 256) ¶ 8 ("The scheme essentially had the following elements, all of which constituted a long-running pattern of racketeering."); <u>id.</u> ¶ 23 (describing Defendants' alleged efforts to "retool[] the scheme"); <u>id.</u> ¶ 31 (alleging that "Defendants have gone to extraordinary lengths to fraudulently conceal the above scheme"); Pltf. Opp. (Dkt. No. 952) at 12 (arguing that Plaintiffs were not on notice of "the scheme"))

In sum, here – as in <u>LC Capital Partners</u> and <u>Staehr</u> – Plaintiffs' knowledge – outside the limitations period – that Defendants had fraudulently induced them to pay inflated interest rates – and then allegedly profited from that fraud by re-selling Project bonds at a lower rate – should have communicated to Plaintiffs "'that something [was] seriously wrong.'" <u>Staehr</u>, 547 F.3d at 434 (quoting <u>LC Capital Partners</u>, 318 F.3d at 155). Because the four developers and

---

[43] As discussed above, Plaintiffs have not argued that the separate accrual rule applies here, nor does the evidence suggest that Plaintiffs' remaining injuries are "new and independent" from the inflated interest rate injury. <u>See</u> <u>Merrill Lynch P'ships</u>, 154 F.3d at 59. "[A]n ongoing or additional injury does not trigger the accrual of a new RICO claim unless that injury is 'new and independent from the original injury.'" <u>Oriska Ins. Co. v. All Staffing, Inc.</u>, No. 09 CIV. 4024 (DAB), 2010 WL 1028726, at *1 (S.D.N.Y. Mar. 11, 2010); <u>see also</u> <u>Tech. Opportunity Grp.</u>, 2019 WL 4688628, at *6-7 (collecting cases). Where, as here, a plaintiff has actual notice of, or is on inquiry notice of, "'the core injury sustained," the statute of limitations begins running both as to the "core injury" and any alleged related injuries. <u>See</u> <u>Tech. Opportunity Grp.</u>, 2019 WL 4688628, at *6 (quoting <u>World Wrestling Ent., Inc.</u>, 530 F. Supp. 2d at 524)). Accordingly, the Court's finding that Plaintiffs had actual notice of, or were on inquiry notice of, their alleged inflated interest rate injury establishes that Plaintiffs' RICO claims are time barred, as to both the core inflated interest rate injury and all related alleged injuries.

the affiliated Plaintiff Project entities were on notice of the "gravamen" and "centerpiece" of the alleged fraud scheme – the alleged inflated interest rate injury – outside of the four-year statute of limitations period, Plaintiffs' substantive RICO and RICO conspiracy claims (SAC (Dkt. No. 256) Counts I and II) are time-barred in their entirety.

### iv.   Whether Plaintiffs Were on Notice of their Remaining Alleged Injuries

Although the Court concludes that Plaintiffs' knowledge of their inflated interest rate injury outside the limitations period requires that Defendants be granted summary judgment on Plaintiffs' RICO claims, the Court will go on to consider separately whether Plaintiffs' remaining alleged injuries are pled in the SAC, whether there is evidence supporting these alleged injuries and, if so, whether Plaintiffs had actual notice of, or were on inquiry notice of, their remaining alleged injuries outside the limitations period.

### (a)   Alleged Credit Enhancement Injury

The SAC alleges that Plaintiffs suffered injury as a result of "inflated credit enhancement fees" they paid in connection with Project loans.  (SAC (Dkt. No. 256) ¶¶ 15, 216; see also Pltf. Opp. (Dkt. No. 952) at 32-36, 95-96)

In the SAC, Plaintiffs assert that their credit enhancement injury was sustained in two phases.  The first phase occurred "[p]rior to the July 2005 Fort Bliss transaction."  At that time, "Ray and Marfatia represented to the Projects that they needed a rating from third-party rating agencies on the underlying proposed transaction before Ambac could provide credit enhancement." (SAC (Dkt. No. 256) ¶ 16)  To satisfy the purported need for a third-party rating, "Ray and Marfatia insisted that the Projects obtain 'shadow ratings,'" i.e., ratings that are not publicized.  (Id.)  GMAC and Ambac, in turn, relied on the shadow rating to "justify . . . setting the inflated interest rates and the need for, and amount of, credit enhancement."  (Id.)  GMAC

55

accomplished this in part by imposing an "artificial ratings cap" – meaning, no "MHPI Projects involving Ambac credit enhancement" would receive a shadow rating above an "A" – because projects that received a higher rating did not require credit enhancement. (Id. ¶ 17)

Although "Ray promised the developers for each of the Projects and [Jones Lang] that he would use good faith and best efforts to negotiate credit enhancement fees with Ambac," in reality "Ray engaged in no meaningful negotiation with Ambac," and "went to extraordinary lengths to maximize the credit enhancement fees that Ambac could charge the Projects and . . . protect[] Ambac from competition." (Id. ¶¶ 21-22)

The second phase began in late 2004, after Jones Lang "suggested that GMAC competitively bid out credit enhancement." (Id. ¶ 23)  In response, Ray, Marfatia, and Ambac told the Projects "that no credit enhancement was going to be involved in forthcoming deals, and thus there was no need to open the transaction to Ambac's competitors." (Id.)  In reality, Defendants created so-called "stealth structure[s]" which secretly baked-in "a monthly fee for Ambac credit enhancement into the loan interest rate." (Id. ¶ 24)

Notwithstanding these allegations in the SAC, in the course of this litigation, Plaintiffs have effectively conceded that the evidence does not support their "shadow ratings" and "stealth structure" claims. (See Epstein Decl., Ex. 796 (Dkt. No. 932-50) at 22 (Plaintiffs' interrogatory answer stating that "Plaintiffs no longer contend that Ambac created an artificial ratings cap with respect to any of the Plaintiffs' projects"); Pltf. Opp. (Dkt. No. 952) at 51 n.132 (conceding that "Ambac's involvement in the stealth structure was eventually disclosed to Plaintiffs after the loans closed in monthly waterfall statements"))

In opposing Defendants' summary judgment motion, Plaintiffs now contend that "[t]he credit enhancement injury is not that Ambac and Marfatia provided credit enhancement to

56

the Projects . . . but that Ambac and Marfatia provided credit enhancement at above-market rates, and, beginning with Fort Bliss, did so in contravention of [Jones Lang's] explicit competitive bidding mandate." (Id. at 95)  As discussed below, however, regardless of how Plaintiffs characterize their alleged credit enhancement injury, Plaintiffs each had actual notice of, or were on inquiry notice of, their credit enhancement injury outside of the RICO statute of limitations.

**Corvias:**  In connection with an RFP for the Fort Bragg Project in 2002, Corvias asked GMAC whether it would be willing to seek competitive bids for credit enhancement. (Epstein Decl., Ex. 205 (Dkt. No. 917-5) at 3-4)  In response, GMAC – through Defendant Ray – stated that it was not willing to seek competitive bids for credit enhancement, because GMAC and Ambac had "developed a proprietary lending structure" that "leverages the strengths of our two companies and delivers synergistic value to the overall proposal, in terms of interest rate, loan terms, and fees." (Id. at 4)  The Corvias Fort Bragg Project nonetheless selected GMAC as the loan provider, despite GMAC's statement that it was not willing to seek competitive bids for credit enhancement.  (See Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 1000).  Accordingly, as of 2002, Corvias was on notice that GMAC would not competitively bid credit enhancement.[44]  And for the period between 2002 and the 2005 Fort Bliss Project – when Jones Lang asked GMAC to conduct competitive bidding for credit enhancement – Plaintiffs have not offered evidence that they were misled as to the rates they paid for credit enhancement.  See, e.g., World Wrestling Ent., 530 F. Supp. 2d at 524-27 (plaintiff was on inquiry notice of its injury – "lower than

---

[44]  Plaintiffs were also on notice of what the Corvias Projects were being charged for credit enhancement relative to what other MHPI projects were being charged for that service.  In connection with a December 2010 Project Quarterly Report, Jones Lang prepared a spreadsheet summarizing, inter alia, the rates for credit enhancement paid by 45 MHPI projects.  (See Epstein Decl., Ex. 40 (Dkt. No. 892-45))  Accordingly, to the extent that the Corvias Projects were being charged above-market rates for credit enhancement, Plaintiffs were on notice of that fact as of December 2010.

competitive royalty rates" – where, inter alia, plaintiff was aware that defendant was issuing licenses without "competitive bidding"), aff'd, 328 F. App'x 695 (2d Cir. 2009).

As discussed above, the SAC asserts that after the July 2005 Fort Bliss transaction, Jones Lang asked GMAC to conduct competitive bidding for credit enhancement. Jones Lang questioned GMAC about its relationship with Ambac and "the need for credit enhancement," and expressed the Army's interest in competitive bidding as a way "to ensure [that the Army] [was] getting the most advantageous terms and structure related to [credit] enhancement." (Epstein Decl., Ex. 308 (Hill Dep.) (Dkt. No. 919-8) at 248:19-250:5) According to Plaintiffs, however, after Jones Lang delivered this competitive bidding "mandate," Defendants "conceal[ed] Ambac's involvement so as to avoid credit enhancement competition" and permit the continued application of "above-market rates." Defendants pursued this course by having the Lender purchase the credit enhancement directly from Ambac, without the Projects' knowledge or involvement. (Pltf. Opp. (Dkt. No. 952) at 34, 95-96)

Undisputed evidence shows, however, that Corvias was aware that Ambac was providing credit enhancement for the Projects that followed the 2005 Fort Bliss transaction. For example, in 2006 – within months of closing the Fort Rucker and Fort Riley transactions – those Projects began receiving monthly reports from GMAC disclosing the precise payments being made to Ambac for credit enhancement. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 2179 (citing Epstein Decl., Ex. 737 (Dkt. No. 906-38) at 11, 53 (June 2006 Fort Rucker Financial Activity report disclosing Ambac credit enhancement fees); id., Ex. 738 (Dkt. No. 906-39) at 13, 50-51 (December 2009 Rucker Financial Activity report disclosing payments to Ambac for credit enhancement); id., Ex. 456 (Dkt. No. 901-6) at 8, 57 (September 2006 Riley Financial Activity Report disclosing Ambac credit enhancement fees))) And on July 16, 2010, Corvias received the

58

Credit Enhancement Agreement between GMAC and Ambac for the Fort Rucker Project. This agreement specifies the premium Ambac is charging for its credit enhancement services. (Def. Jt. R. 56.1. Stmt. (Dkt. No. 891) ¶ 2188 (citing Epstein Decl., Ex. 743 (Dkt. No. 930-43) at 6))

Plaintiffs do not dispute that they received these reports and the Credit Enhancement Agreement, nor do they dispute that these documents disclose the fact that Ambac was providing credit enhancement in connection with Projects that post-date the 2005 Fort Bliss transaction. (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶¶ 2179, 2188; see also Epstein Decl., Ex. 26 (Rozen Dep.) (Dkt. No. 912-28) at 239:12-241:20 (Rozen, Corvias's Vice President of Finance, testifying: "You make it sound like I'm refuting that I ever had visibility into [Ambac's role in providing credit enhancement]. . . . I knew what we paid [for] enhancement, I knew what it was for, I knew how much it cost.")) Plaintiffs instead complain that Defendants did not disclose that the Projects were "being charged above-market credit enhancement fees" and "that the rate was set without competitive bidding." (Id. ¶ 2188; see also Pltf. Opp. (Dkt. No. 952) at 95-96)

Putting aside Plaintiffs' blatant recharacterization of their alleged credit enhancement injury post-discovery,[45] the record at summary judgment demonstrates that there is

---

[45] Allegations of the so-called "stealth structure" are – in part – what enabled Plaintiffs to defeat Defendants' statute of limitations arguments at the motion to dismiss stage. (See July 17, 2018 Order (Dkt. No. 147) at 19-21 (California court ruling that Plaintiffs' RICO claims in the FAC are barred by the statute of limitations because, inter alia, "Plaintiffs allege that in 2005 the Army's real estate consultant, Jones Lang LaSalle, 'began to observe that GMAC seemed partial to using Ambac for credit enhancement on its MHPI deals'"; granting leave to amend) (quoting FAC (Dkt. No. 60) ¶ 21); Sept. 26, 2019 Order (Dkt. No. 261) at 10-15 (California court denial of Defendants' motion to dismiss the SAC; finding the SAC's RICO claims timely because, inter alia, Plaintiffs had deleted the allegation concerning Jones Lang's 2005 suspicions regarding the GMAC-Ambac relationship; relying on Plaintiffs' allegations that "Defendants developed a 'stealth structure' to help conceal and maintain their fraud scheme"); Mar. 31, 2021 Mem. Op. & Order (Dkt. No. 311) (this Court denying reconsideration of the California court's September 26, 2019 Order because, inter alia, "it is not clear as a matter of law that Plaintiffs' inquiry was lacking, and that a reasonably diligent inquiry should have uncovered the fraud," because Plaintiffs developed "the 'stealth structure' that concealed Ambac's role in the Projects"))

no genuine issue of material fact as to Corvias's knowledge that the Lenders had refused to conduct competitive bidding for credit enhancement, both before the 2005 Fort Bliss transaction – as discussed above – and after that transaction. For example, in connection with the 2005 Fort Bliss Project – which is when Plaintiffs contend that the "stealth structure" for disguising the payments to Ambac was created (see SAC (Dkt. No. 256) ¶¶ 23-24) – GMAC did not agree – in its RFP response – to competitively bid credit enhancement.[46] (See Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 614) Plaintiffs nonetheless selected GMAC as the lender. (Id.)

Moreover, the loan agreements for post-Fort Bliss Corvias Projects give the Lenders "sole discretion" to obtain credit enhancement "in whatever form" and "from whatever issuer [and] upon whatever [t]erms" they see fit. (Id. ¶ 618)

Corvias was also on inquiry notice that the rates the Corvias Projects were paying for credit enhancement were "above-market." As discussed above, the rates that the Corvias Projects were being charged for credit enhancement were disclosed to the Corvias Projects. And as a result of the Jones Lang spreadsheet concerning the rates for credit enhancement being paid by 45 other MHPI projects (Epstein Decl., Ex. 40 (Dkt. No. 892-45), Corvias was well situated to determine whether the rates the Corvias Projects were paying for credit enhancement were excessive in light of what other MHPI projects were paying for that service. (See Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 182, 368)

Finally, at least by 2006, Corvias understood that the credit enhancement fees it was being charged were excessive, and that credit enhancement was – in any event – unnecessary. (See, e.g., Epstein Decl., Ex. 18 (Bicho Dep.) (Dkt. No. 912-20) at 304:16-308:14 (a

---

[46] Plaintiffs "do not dispute that GMAC's financial proposal for the Fort Bliss Project did not explicitly . . . commit to competitive bidding credit enhancement." (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 613)

Corvias employee testifying that between the Fort Polk Project in 2004 and the Fort Rucker Project in 2006, Jones Lang became "suspect of the enhancement . . . and what it cost. . . . So [Jones Lang] was always questioning – I think as we were too – is there any opportunity to get a deal."); id., Ex. 113 (Picerne Dep.) (Dkt. No. 914-13) at 205:7-207:4 (Corvias founder and chief executive officer describing a "moderate-size chorus of voices" at the Army and at Corvias (including himself) who believed that "as the market matured" the Projects "didn't need the enhancement")

In sum, Corvias – a financially sophisticated entity (see Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 390-404) – was aware (1) that the Corvias Projects were being charged fees for credit enhancement; (2) of the amounts being charged for credit enhancement; (3) that Ambac was being paid fees for providing credit enhancement; (4) that the Corvias Projects had not contracted with Ambac for this service; and (5) that the Lenders had been asked to use competitive bidding for credit enhancement, but had refused to conduct such competitive bidding. Moreover, at least by 2006, Corvias suspected that the fees it was being charged for credit enhancement were excessive and that credit enhancement had become unnecessary. Given these facts and circumstances, there were sufficient "storm warnings" by 2006 to trigger a duty of inquiry on Corvias's part regarding its alleged credit enhancement injury. See, e.g., In re Integrated Res., 851 F. Supp. at 568-69 (finding that sophisticated investors were on inquiry notice of "excessive fees . . . [and] profits" where the relevant agreements disclosed the allegedly excessive fees). Because Corvias did not conduct such an inquiry within the limitations period, the statute of limitations began running in 2006, and any RICO claim premised on the Corvias Projects' alleged credit enhancement injury is time-barred.

**Balfour:** The facts and circumstances as to Balfour and the associated Balfour Plaintiff Projects are the same. As discussed above, prior to the 2005 Fort Bliss Project, GMAC disclosed that it was using Ambac for credit enhancement and that it was not seeking competitive bids for this service. (See Epstein Decl., Ex. 542 (Dkt. No. 925-46) at 2 (Ray informing Balfour in 2003 that "[o]n credit enhancement we have a specific program set up with Ambac and the terms of our commitment are based on the GMAC/Ambac structure")) And by 2004, Balfour was aware that competing companies were offering lower fees for credit enhancement. (See id., Ex. 33 (Robinson Dep.) (Dkt. No. 912-35) at 149:25-150:5 (Balfour senior executive deposition testimony: "Q. But in 2004, you were aware that other bond insurers were offering lower prices in the market, right. . . ? A. That's correct."); id. at 150:17-21 (testifying that Balfour knew "we could be getting a better rate on the bond insurance . . . but it doesn't appear that we did anything definitive with regards to that."); id., Ex. 750 (Dkt. No. 930-50) at 2 (Balfour Senior Vice President of Operations and Finance informing a Balfour senior executive in 2004 that "[XL Insurance] and MBIA are doing a new wrap at .15bps" but "[w]e are getting .35 from AMBAC")[47]; id., Ex. 877 (Robinson Dep.) (Dkt. No. 975-90) (Balfour senior executive testifying that Balfour knew "we could be getting a better rate on the bond insurance . . . but it doesn't appear that we did anything definitive with regards to that."); see also Epstein Decl., Ex. 40 (Dkt. No. 892-45) (Jones Lang spreadsheet summarizing, inter alia, the rates for credit enhancement paid by 45 MHPI projects)) Accordingly, there is no genuine issue of material fact as to whether the Corvias Fort Bliss Project and subsequent Corvias Projects had notice of their alleged credit enhancement injury.

---

[47] XL Insurance and MBIA competed with Ambac to provide credit enhancement for MHPI projects. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 765)

As to all of these projects, Balfour knew – at least by 2008 – that Ambac was continuing to provide credit enhancement. Balfour was also aware (1) of the rates Ambac was charging; (2) that credit enhancement was not being bid out – despite the Balfour Projects' bidding mandate; and (3) that the Balfour Projects had not contracted for the credit enhancement services Ambac was providing. (See, e.g., Epstein Decl., Ex. 761 (Dkt. No. 932-11) (November 17, 2008 email chain in which Lenders' counsel sent Balfour copies of credit enhancement agreements between the Lenders and Ambac for the Vandenberg, AMC West, and AETC Projects, which disclose Ambac's fees); see also id., Ex. 586 (Dkt. No. 903-37) at 48 (report to Balfour Fort Bliss Project disclosing a $75,963.33 "AMBAC-enhancement fee"); id., Ex. 755 (Dkt. No. 932-5) at 4 (report to Balfour AETC Project stating that "[i]f [credit enhancement] insurance is purchased, the premium will be paid out of the interest rate on the Senior Loan and will be allocated to the credit spread").

Accordingly, as with the Corvias Projects, the Balfour Projects were aware (1) that they were being charged fees for credit enhancement; (2) of the amounts they were being charged for credit enhancement; (3) that Ambac was being paid for providing credit enhancement; (4) that the Balfour Projects had not contracted with Ambac to provide this service; and (5) that although Jones Lang had asked the Lenders to use competitive bidding for credit enhancement, no competitive bidding was taking place. Given Balfour's financial sophistication (see Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 445-58) and its knowledge that the Balfour Projects were being charged excessive fees for the credit enhancement services Ambac was providing (see Epstein Decl., Ex. 33 (Robinson Dep.) (Dkt. No. 912-35) at 149:25-150:5); id., Ex. 750 (Dkt. No. 930-50) at 2; id., Ex. 877 (Robinson Dep.) (Dkt. No. 973-677); id., Ex. 40 (Dkt. No. 892-45), there were sufficient "storm warnings" by 2008 to trigger Balfour's duty of

inquiry regarding its alleged credit enhancement injury. See, e.g., In re Integrated Res., 851 F. Supp. at 568-69 (sophisticated investors were on inquiry notice of "excessive fees . . . [and] profits" where the relevant agreements disclosed the allegedly excessive fees). Because there is no evidence that Balfour conducted any such inquiry within the limitations period, the statute of limitations began running in 2008, and any RICO claim premised on the Balfour Projects' alleged credit enhancement injury is time-barred.

**Clark:** As discussed above, Clark was the developer for the 2003 Monterey Bay Project. As such, Clark was aware that the Monterey Bay Project had signed an agreement with Ambac on October 1, 2003, for credit enhancement services, and was aware of the terms and rate provided for in that agreement. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶¶ 878-79) Moreover, in a November 17, 2006 Clark internal email, Clark employee Fran Coen reported that "Ambac has a[] . . . fat[] insurance spread" on the Monterey Bay Project. (Epstein Decl., Ex. 354 (Dkt. No. 889-4) at 2) Clark's awareness in 2003 of the terms and conditions of its credit enhancement agreement with Ambac, and its awareness by 2006 of the magnitude of the fees Ambac was charging for the credit enhancement it was providing in connection with the Monterey Bay Project, constitute sufficient "storm warnings" triggering a duty of inquiry regarding Clark's alleged credit enhancement injury. See, e.g., In re Integrated Res., 851 F. Supp. at 568-69 (sophisticated investors on inquiry notice of "excessive fees . . . [and] profits" where the relevant agreements disclosed the allegedly excessive fees). Because there is no evidence that Clark conducted any such inquiry within the limitations period, the statute of limitations began running in 2006, and any RICO claim premised on the Monterey Bay Projects' alleged credit enhancement injury is time-barred.

**Michaels:** Michaels was the developer for the 2006 Fort Leavenworth Project. It was aware at the time of the closing that Ambac was providing credit enhancement for the project. (See Epstein Decl., Ex. 22 (Michaels Rule 30(b)(6) Dep.) (Dkt. No. 912-24) at 303:5-23 (Michaels Rule 30(b)(6) witness testifying as follows: "[Q.] [W]ould you agree that GMAC is informing Leavenworth that Ambac Assurance Corporation has issued a financial-guaranty policy? . . . A. That is what appears to be written in this paragraph. . . . [Q.] I think we already established this is the same date that the loan closed, right? A. Yes.")) And by October 2006 – shortly after the closing – Michaels began receiving monthly reports from GMAC stating that Ambac was providing credit enhancement and disclosing the precise payments Ambac was receiving for that service. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 1448 (citing Epstein Decl., Ex. 512 (Dkt. No. 902-12) at 37)) Accordingly, Michaels was well aware (1) of Ambac's involvement in the Fort Leavenworth Project; (2) of the fees Ambac was receiving in exchange for providing credit enhancement services; and (3) that the cost of this service was being passed on to the Fort Leavenworth Project even though the Project had no contract with Ambac.

And by July 2008, Michaels was aware that Capmark had engaged in deceptive transactions regarding credit enhancement. On July 28, 2008, a Michaels employee sent an email to Ronald Hansen – a senior vice president at Michaels (Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶¶ 583-84) – discussing whether a financing deal should be entered into with Capmark or with another firm. (Epstein Decl., Ex. 728 (Dkt. No. 930-28) at 2) The Michaels employee advised Hansen not to select Capmark for the transaction, in part because, at closing, "Capmark cannot do a real uninsured deal." (Id.) Rather, Capmark "can make it look like its uninsured, however they turn around, almost like an Uninsured-to-Insured trailer and add Insurance (simultaneously at closing)." (Id.)

65

Given (1) Michaels' awareness of Ambac's role in providing credit enhancement, the cost of these services, and the fact that the cost was being passed on to the Fort Leavenworth Project; (2) Jones Lang's knowledge of the rates charged for credit enhancement at other MHPI projects (see Epstein Decl., Ex. 40 (Dkt. No. 892-45)); and (3) Michaels' understanding that Capmark's handling of credit enhancement was deceptive, there were sufficient "storm warnings" to put the Monterey Bay Project on inquiry notice that the credit enhancement fee was above-market. See, e.g., In re Integrated Res., 851 F. Supp. at 568-69 (sophisticated investors on inquiry notice of "excessive fees . . . [and] profits" where the relevant agreements disclosed the allegedly excessive fees). Because there is no evidence that Michaels initiated any such inquiry within the limitations period, the statute of limitations started running by 2008 at the latest, and any RICO claim premised on the Fort Leavenworth Project's alleged credit enhancement injury is time-barred.

### (b)     The Alleged "Excessive Servicing Fees" Injury

In opposing Defendants' summary judgment motion, Plaintiffs argue that they did not have actual notice of, and were not on inquiry notice of, their alleged "excessive servicing fees" injury. (Pltf. Opp. (Dkt. No. 952) at 96) In their briefing, Plaintiffs assert that Ray and the Lenders "charged the Projects unnecessary servicing fees by falsely representing to the Projects that Ambac would not sell credit-enhancement insurance absent the Project's retention of a third-party servicer to monitor the construction and management of the Project[.]" (Id. at 38)

The SAC does not plead any injury related to "excessive servicing fees," however. Indeed, the term "servicing fee" only appears once in the SAC, and then only in connection with a 2003 loan commitment letter sent by Ray to "Clark representatives." (SAC (Dkt. No. 256) ¶ 108 ("In an August 20, 2003 loan commitment letter to Clark representatives, including Fran Coen, Greg Day, and Tad Guleserian, Ray again reinforced this position of trust as an agent and

66

financial advisor, representing that GMAC 'agrees to use its best efforts to negotiate the most favorable rates for the following terms,' which included . . . [a] servicing fee.")) This 2003 letter has no bearing on any claim Plaintiffs are now asserting for "excessive servicing fees."

And while the SAC refers to "inflated deal expenses" (see id. ¶ 20), that term relates to instances in which Ray and the Lenders allegedly "charged the Projects inflated expenses that exceeded their actual expenses" – i.e., instances in which Ray and the Lenders would "'fudge' the expenses in the MHPI deals." (Id.) By contrast, the excessive servicing fees that Plaintiffs reference in their summary judgment briefing involve "non-market terms" that Defendants extracted through fraudulent inducement. (Pltf. Opp. (Dkt. No. 952) at 36-39 (citations omitted).

In sum, Plaintiffs did not plead any "excessive servicing fee" injuries in the SAC. Accordingly, no RICO claim can be premised on this alleged injury. Scott v. City of N.Y. Dep't of Corr., 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) ("[C]ase law holds that it is inappropriate to consider claims not pleaded in the complaint in opposition to summary judgment." (internal quotation omitted) (collecting cases)), aff'd, 445 F. App'x 389 (2d Cir. 2011).[48]

---

[48] In any event, Plaintiffs were put on inquiry notice of any "excessive servicing fees" by December 2010 at the latest, when the Jones Lang spreadsheet summarizing the loan rates, fees, and expenses associated with 45 MHPI projects was created. (See Epstein Decl., Ex. 40 (Dkt. No. 892-45). That spreadsheet makes clear that other lenders, such as Goldman Sachs and Merrill Lynch, did not charge other MHPI projects servicing fees in connection with loans. (Id.; see also Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶ 2470 ("In military housing project financings originated by financing firms other than GMAC, Capmark, or Jefferies, there was no third-party servicer used and Ambac performed many of the activities typically performed by a third-party servicer and did not charge a separate fee to provide these services.")) And the Plaintiff Projects here would have been aware of the third-party servicing fees they were paying, because those fees are reflected in the underlying loan agreements. (See, e.g., Epstein Decl., Ex. 294 (Dkt. No. 897-44) (servicing and lockbox agreement between the Fort Stewart Project – a Balfour Project – and GMAC); id., Ex. 284 (Dkt. No. 897-34) (same, for Fort Bragg Project – a Corvias Project); id., Ex. 289 (Dkt. No. 897-39) (same, for Fort Leavenworth Project – a Michaels Project); id.,

### (c)    Injury Related to Lenders' Use of Surety Bonds Rather than a Liquidity Facility

In the SAC, Plaintiffs allege that "GMAC convinced the Projects to purchase a Liquidity Facility from GMAC in lieu of a surety bond, representing [that the liquidity facility] was substantially cheaper." (SAC (Dkt. No. 256) ¶ 24)  According to Plaintiffs, however, GMAC substituted surety bonds from Ambac for a liquidity facility. (Id. ¶ 291)  The surety bonds that GMAC obtained had a lesser cost than what the Projects had paid for the promised GMAC liquidity facility. (Id. ¶ 24)  According to Plaintiffs, GMAC split the savings with Ambac.[49] (Id. ¶¶ 24, 291)  Plaintiffs further allege that Ambac, GMAC, Ray, and Marfatia concealed this conduct "from the MHPI Projects and the Army/[Jones Lang] in order to charge excessive fees to the Projects and to hide Ambac's involvement prior to closing." (Id. ¶ 291)[50]

Defendants contend that Plaintiffs were on inquiry notice of their liquidity facility injury by 2008, citing documents that Balfour had received in 2008 showing, inter alia, that GMAC had substituted Ambac surety bonds for a liquidity facility. (See Marfatia Br. (Dkt. No. 911) at 41-42 (citing Epstein Decl., Ex. 759 (Dkt. No. 932-9) at 2-3; id., Ex. 760 (Dkt. No. 907-10) at 5-90; id., Ex. 741 (Dkt. No. 930-41) at 2; id., Ex. 445 (Dkt. No. 921-60) at 24; id., Ex. 724

---

Ex. 291 (Dkt. No. 897-41) (same, for Monterey Bay Project – a Clark project); see also Pltf. Opp. (Dkt. No. 952) at 96 (not disputing Defendants' assertions that Plaintiffs knew of the servicing fees)) Accordingly, if the Projects were being charged excessive servicing fees, Plaintiffs were on inquiry notice of this fact no later than December 2010.

[49] The parties refer to this conduct as "improper fee-splitting." (See, e.g., Pltf. Opp. (Dkt. No. 952) at 40-41)

[50] Liquidity facility injuries are claimed by the five Balfour Projects (Fort Stewart, Fort Bliss, Carlisle, AETC, and Vandenberg AFB), the Michaels Project (Fort Leavenworth), and three Corvias Projects (Fort Rucker, Fort Riley, and the 2007 Fort Bragg refinancing). (Pltf. Add'l R. 56.1 Stmt. (Dkt. No. 953) ¶¶ 3033-37) The Monterey Bay Project – the only Clark Project that is a Plaintiff here – does not allege liquidity facility damages. (See id. ¶¶ 3033-37)

68

(Dkt. No. 906-25) at 32-33))[51]  Plaintiffs respond that the Balfour Projects "could not have been on notice" because "[t]he assignment documents cited by Marfatia do not include the price of the Ambac surety bond." (See Pltf. Opp. (Dkt. No. 956) at 97)  Plaintiffs do not address whether the Michaels or Corvias Projects were on inquiry notice of their liquidity injury.  (See id.)

The evidence shows that the Projects were on notice of GMAC's substitution of Ambac surety bonds for a GMAC liquidity facility no later than 2010.

For example, Balfour learned in 2008 that GMAC had substituted Ambac surety bonds for a GMAC liquidity facility.  (See Epstein Decl., Ex. 759 (Dkt. No. 932-9) at 2-3; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 2210)  Balfour received at that time the assignments and replacement Ambac surety bonds for the Fort Bliss, Carlisle, AETC, and Vandenberg Projects and the refinancing of the Fort Stewart Project.  These documents disclosed not only that GMAC had substituted Ambac surety bonds for the promised liquidity facility, but had also paid less in fees for the Ambac surety bond than the Projects had paid for the promised liquidity facilities.  (Epstein Decl., Ex. 760 (Dkt. No. 907-10) at 5-90 (surety bonds and assignments))  Indeed, after receiving the assignments and replacement Ambac surety bonds, a senior Balfour executive contemporaneously described GMAC's conduct as "underhanded." (Id., Ex. 759 (Dkt. No. 932-9) at 2; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 2211)

Corvias had similar knowledge by 2008.  In a June 27, 2008 email, GMAC informed Corvias that "Capmark has sold all of [GMAC's] Surety Policy/Liquidity facilities to Ambac including Rucker's and Riley's." (Epstein Decl., Ex. 741 (Dkt. No. 930-41) at 2; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 2183)  And in 2010, Corvias received the credit

---

[51] As noted above, although Marfatia is no longer a defendant in this case, Ray and the Jefferies Defendants joined in arguments made by their co-defendants.  (See, e.g., Ray Sum. J. Reply (Dkt. No. 882) at 11 n.2; Jefferies Sum. J. Reply (Dkt. No. 865) at 7 n.3)

enhancement agreement for the Fort Riley Project, which reflected the precise fee that Ambac

had charged GMAC for issuing the surety policy. (Epstein Decl., Ex. 745 (Dkt. No. 930-45) at

24; see also Pltf. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶ 2191))

As to Michaels, on September 30, 2010, Michaels received the Grantor Trust

Agreement and Credit Enhancement Agreement for the Fort Leavenworth Project. (Pltf. R. 56.1

Cntrstmt. (Dkt. No. 954) ¶ 2170) That agreement makes clear that Ambac had provided a surety

bond to replace the liquidity facility that GMAC had issued. (Epstein Decl., Ex. 731 (Dkt. No.

930-31) at 11 (stating that the "'Liquidity Facility Agreement' [referenced in the Grantor Trust

Agreement and Credit Enhancement Agreement for the Fort Leavenworth Project] means the

Surety Bond, dated March 1, 2006, issued by the Credit Enhancer relating to the Loan, which

replaces in its entirety the Liquidity Facility Agreement dated March 1, 2006 issued by GMAC

Commercial Mortgage Corporation, as amended, restated and/or replaced from time to time");

see also Pltfs. R. 56.1 Cntrstmt. (Dkt. No. 954) ¶¶ 2170-71))

Given that Corvias, Balfour, and Michaels were all aware – no later than 2010 –

that GMAC had substituted Ambac surety bonds for the promised GMAC liquidity facility, and

given that Corvias and Balfour were aware by 2010 of what GMAC had paid Ambac for the

substitute surety bonds,[52] the Court concludes that Plaintiffs had "knowledge of facts that would

suggest to a reasonably intelligent person the probability that [they had] been injured" by the

---

[52] Defendants have not cited any direct evidence suggesting that Michaels was aware of the price differential between the GMAC liquidity facility and the Ambac surety bond. (See Marfatia Br. (Dkt. No. 910) at 42 n.53) The Court nonetheless concludes that Michaels was on inquiry notice as of September 30, 2010. Because the Ambac surety bond was substituted for the GMAC liquidity facility on the same day that the Fort Leavenworth Project transaction was executed (see Epstein Decl., Ex. 731 (Dkt. No. 930-31), the change would have made economic sense for GMAC only if the price of the surety bond was less than what the Fort Leavenworth Project was paying to GMAC for the liquidity facility.

substitution of the surety bonds for the promised GMAC liquidity facility and the resulting fee-splitting arrangement, and that Plaintiffs were aware of these facts outside of the limitations period. Koch, 699 F.3d at 153. Because Plaintiffs did not initiate any inquiry into the substitution of the Ambac surety bonds for the GMAC liquidity facility and the resulting cost-savings and alleged improper fee splitting – the statute of limitations began to run no later than 2010, and expired outside of the limitations period.[53]

### (d)    Alleged "Rate Lock" Injury

The SAC alleges that Defendants induced Plaintiffs to pay "unnecessary and inflated rate lock fees" in conjunction with the underlying loan agreements. (See SAC (Dkt. No. 256) ¶¶ 185-191, 205-12; see also Pltfs. Opp. (Dkt. No. 952) at 39, 97-98)[54] According to Plaintiffs, Defendants "misrepresented the market risk and/or the credit spread generated by the sale of bonds allowing GMAC, and later Jefferies, . . . to justify unnecessary and inflated rate lock fees and thus to reap millions in undisclosed profits." (See, e.g., SAC (Dkt. No. 256) ¶¶ 185-90) For example, the SAC alleges that "[o]n September 15, 2003, Ray and GMAC induced Clark to authorize payment via interstate wires of a $950,000 rate-lock fee to GMAC to guarantee this purported market interest rate through closing." (Id. ¶ 186) According to the SAC, "[t]his fee was paid in consideration for GMAC appearing to bear the risk of market

---

[53] In their opposition brief, Plaintiffs assert that Ray, the Lenders, and Ambac conspired to provide the Fort Leavenworth, Fort Rucker, Fort Riley, and AETC Projects with an interest-rate swap that was "artificially inflated" by 15 basis points, "which enabled [these Defendants] to once again split the resulting excess fees without the Projects' awareness." (Pltf. Opp. (Dkt. No. 956) at 41-42, 97) Because this injury is not alleged in the SAC, it provides no basis for Plaintiffs to oppose Defendants' summary judgment motion. See Scott, 641 F. Supp. 2d at 229.

[54] Five Projects were charged a rate lock fee: the Corvias Fort Bragg and Fort Polk Projects; the Balfour Fort Stewart and AETC Projects; and the Clark Monterey Bay Project. (Def. Jt. R. 56.1 Stmt. (Dkt. No. 891) ¶ 727)

71

fluctuation on the interest rate between then and the time of the bond sale, which Ray represented to Clark was a significant risk that justified the rate-lock fee charged." (Id.)

Plaintiffs were contemporaneously aware, of course, of the precise fees that they were paying for locking-in the interest rate at the time they entered into the relevant loan agreements. (See Epstein Decl., Ex. 271 (Dkt. No. 897-21) at 12 (Fort Bragg Project loan origination agreement disclosing rate lock fee); id., Ex. 272 (Dkt. No. 897-22) at 4 (same, for Monterey Bay Project); id., Ex. 273 (Dkt. No. 897-23) at 4 (same, for Fort Stewart Project); id., Ex. 274 (Dkt. No. 897-24) at 14 (same, for Fort Polk Project); id., Ex. 275 (Dkt. No. 897-25) at 7 (same, for AETC Project); see also Pltfs. Opp. (Dkt. No. 952) at 97 ("The Projects do not dispute that they were aware of the rate lock fee."))

Although it is undisputed that Plaintiffs were aware of the rate lock fee they were paying, Plaintiffs contend that they "were not aware . . . that the certificates were pre-sold immediately after the Financing Firms locked the interest rate, negating the need for any rate lock fee." (Pltfs. Opp. (Dkt. No. 952) at 97-98)

But the rate lock fee is just another aspect of Plaintiffs' alleged inflated interest rate injury, of which Plaintiffs were on inquiry notice. Given that Plaintiffs were on inquiry notice that they were paying an inflated rate of interest, then clearly they were on inquiry notice regarding a rate lock for that same inflated rate of interest.

In light of Plaintiffs undisputed contemporaneous knowledge of the rate lock fees and the close relationship between the rate lock and the alleged inflated interest rate injury, see Wen, 695 F. Supp. 3d at 540, the Court finds that Plaintiffs were on inquiry notice of their alleged rate lock injury outside of the statute of limitations period. See also Broccoli v. Ashworth, No. 21-CV-6931 (KMK), 2024 WL 1199549, at *5 (S.D.N.Y. Mar. 20, 2024) (refusing to consider

72

alleged injuries that were "simply 'derivative of the core injury sustained'" (quoting Tech. Opportunity Grp., Ltd. v. BCN Telecom, Inc., No. 16-CV-9576 (KMK), 2019 WL 4688628, at *6 (S.D.N.Y. Sept. 25, 2019))).

### (e)    Original Issue Discount

In the SAC, Plaintiffs assert that they were injured by Defendants' unorthodox use of Original Issue Discounts ("OIDs").[55] Ordinarily "an OID occurs when a financial instrument sells for a price less than its stated redemption price at maturity." (SAC (Dkt. No. 256) ¶ 192) Here, however, "Ray used the OID as a tool to conceal that he was selling the bonds prior to closing at a substantial and secret profit." (Id. ¶ 194)

"In or around 2006, Ray and GMAC began to request that the Projects accept . . . an [OID] on the loan." (Id. ¶ 192) According to the SAC, Ray falsely represented to the Projects that he used the OID to "sell the bonds after close at a discount to premium." (Id. ¶ 194) This representation "caused the Projects to believe that GMAC and later Jefferies were taking genuine market risk." (Id.) In reality, Ray "pre-sold the bonds prior to the loan closing," and then "set the credit spread at an above market level." (Id.) At that point, Ray would "set[] the OID" to artificially reduce the interest rate. (Id.) After the OIDs were applied, "the eventual bondholders were in a net-neutral position." (Id. ¶ 195) According to Plaintiffs, as a result "[i]t was solely the Projects who bore the harm of inflated interest rates and/or inflated principal balances attributable to the OIDs." (Id.)

According to the SAC, GMAC used an OID in connection with the Fort Leavenworth Project, even though "the bonds were sold well in advance of the closing, such that

---

[55] According to the SAC, an OID was used on five Balfour Projects (AETC, Vandenberg AFB, AMC West, Lackland AFB, Carlisle), a Michaels Project (Fort Leavenworth), and two Corvias Projects (Fort Rucker, Fort Sill). (SAC (Dkt. No. 256) ¶ 192)

there was no economic purpose for an OID." (Id. ¶ 196) Nevertheless, at closing, "Ray and GMAC charged a 0.7%-1.0% OID on the Leavenworth bonds." (Id.) "[T]his lowered the premium above par at which the bonds sold, and allowed Ray and GMAC to make millions of dollars in profits on the pre-closing sale of bonds on the Leavenworth loan, none of which was disclosed or passed on as savings to the Leavenworth Project." (Id.)

As described in the SAC, Ray used the OID as a mechanism to effectuate and conceal Plaintiffs' alleged inflated interest rate injury. Accordingly, Defendants' use of OIDs does not amount to a distinct injury. Because this Court has already found that Plaintiffs were on inquiry notice of their alleged inflated interest rate injury outside of the statute of limitations period, Plaintiffs were similarly on inquiry notice of their purported OID injury outside the limitations period. See Broccoli, 2024 WL 1199549, at *5 (refusing to consider alleged injuries that were "simply 'derivative of the core injury sustained'" (quoting Tech. Opportunity Grp., 2019 WL 4688628, at *6)).

*     *     *     *

Because each Plaintiff Project had notice of their RICO injuries outside of the four-year statute of limitations period, Defendants' motions for summary judgment on Plaintiffs' RICO claims will be granted.

### 3.    Whether Plaintiffs' State Law Claims are Time-Barred

Defendants contend that Plaintiffs' state law claims for breach of fiduciary duty (Count III), aiding and abetting a breach of fiduciary duty (Count IV), fraud by intentional misrepresentation (Count V), fraud by fraudulent concealment (Count VI), and conspiracy to commit fraud (Count VII) are time-barred. (See Ray Br. (Dkt. No. 879) at 15-20; Jefferies Br. (Dkt. No. 864) at 33-35; Marfatia Br. (Dkt. No. 911) at 29 n.31)

74

a.    **Applicable Law**

New York law applies to Plaintiffs' state law claims. (See Mem. Op. & Order (Dkt. No. 311) at 37 & nn.34-36; SAC (Dkt. No. 256) ¶¶ 274-307) "Under New York law, the time within which an action based upon fraud must be commenced is 'the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it.'" Koch, 699 F.3d at 154 (omission in original) (quoting N.Y. C.P.L.R. § 213(8)). "[T]he statute of limitations for breach of fiduciary duty claims is either three or six years, depending on the nature of the relief sought by the plaintiff." Cohen, 711 F.3d at 361 n.3 (citing IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y. 3d 132, 139 (2009)). Where "the remedy sought is purely monetary in nature," there is generally a "three-year limitations period." IDT Corp, 12 N.Y.3d at 139 (citation omitted). However, where – as here – "an allegation of fraud is essential to a breach of fiduciary duty claim," New York courts apply the fraud statute of limitations set forth in N.Y. C.P.L.R. § 213(8). Id. (citation omitted).

New York's "borrowing statute" "provides that claims arising in another state are governed by that state's statute of limitations if it is shorter than New York's." Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98, 110 (2d Cir. 2016) (citing N.Y. C.P.L.R. § 202). "[A] claim for common-law fraud . . . arises 'where its economic impact is felt, [which is] normally the plaintiffs' residence.'" Id. (quoting Sack v. Low, 478 F.2d 360, 366 (2d Cir. 1973)); see also Glob. Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 529 (1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." (internal citations omitted)).

New York law claims based on fraud or a fraudulent breach of fiduciary duty are subject to inquiry notice and discovery accrual rules that are materially similar to the inquiry and

discovery accrual rules governing RICO and federal securities fraud claims. See Koch, 699 F.3d at 154-56 (holding that the inquiry notice rules governing RICO claims are generally applicable to New York fraud claims); Cohen, 711 F.3d at 362-64 (applying federal inquiry notice rules to breach of fiduciary duty claims under New York law); id. at 361 ("The New York [discovery accrual] rule is similar as to fraud and fraudulent breach of fiduciary duty." (citing Sargiss v. Magarelli, 12 N.Y.3d 527, 532 (2009) and Kaufman v. Cohen, 307 A.D.2d 113, 122-23 (1st Dept. 2003))).[56]

### b.    **Analysis**

As to nearly all of Plaintiffs' claims, it is unnecessary for this Court to consider New York's "borrowing statute," because Plaintiffs' New York law claims are time-barred under New York's statute of limitations. See, e.g., Soward v. Deutsche Bank AG, 814 F. Supp. 2d 272, 282 (S.D.N.Y 2011) ("Pursuant to the borrowing statute, this Court will apply the shorter of either New York's or California's statute of limitations. Because [plaintiff]'s claims are time-barred under New York law, they are time-barred regardless of their status under California law.").

This Court has concluded that the four developers associated with the Plaintiff Projects were all on inquiry notice of Plaintiffs' injuries by March 2011 at the latest. Given that the Complaint in this action was not filed until August 28, 2017 (see Dkt. No. 1), Plaintiffs' claims are time-barred under both New York's six-year statute of limitations and under RICO's four-year statute of limitations.

There is one exception to this finding, although no party in this action has raised this point. The Fort Bliss Project (a Balfour Project) took out an additional loan on November

---

[56] Plaintiffs do not argue that there is any material difference between the statute of limitations analysis for their RICO claims and the statute of limitations analysis for their state law claims. (See Pltf. Opp. (Dkt. No. 952) at 83-98)

21, 2012 (see Jefferies R. 56.1 Stmt. (Dkt. No. 860) ¶ 127), and Plaintiffs claim that they suffered an inflated interest rate injury in connection with this transaction. (Pltf. Opp. (Dkt. No. 952) at 49-50) If New York's six-year statute of limitations is applied, Plaintiff Fort Bliss/White Sands Missile Range Housing LP's New York law claims could be timely, as fewer than six years passed between November 21, 2012 – the date of the injury – and August 28, 2017, when the Complaint was filed. Accordingly, as to the Fort Bliss Project, it is necessary for this Court to consider New York's borrowing statute.

Fort Bliss/White Sands Missile Range Housing LP is a Delaware entity that operates a privatized military housing project located in Fort Bliss, Texas, and at the White Sands Missile Range in New Mexico. (SAC (Dkt. No. 256) ¶ 39) Delaware, Texas, and New Mexico all have shorter statutes of limitations for fraud than New York. See Kirchner v. Wyndham Vacation Resorts, Inc., 580 F. Supp. 3d 57, 63 (D. Del. 2022) ("The Delaware statute of limitations for claims that sound in fraud is three years." (citing Del. Code Ann. tit. 10, § 8106(a))); Smallwood v. Bank of Am., No. 3:11-CV-1283-D, 2012 WL 32654, at *2 (N.D. Tex. Jan. 6, 2012) ("Under Texas law, the statute of limitations for a fraud claim is four years." (citing Tex. Civ. Prac. & Rem. Code § 16.004 (West 2002)); Anderson Living Tr. v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1213 (D.N.M. 2014) ("The statute of limitations for fraud, under New Mexico law, is four years." (citing N.M. Stat. Ann. § 37–1–4)). The same is true for breaches of fiduciary duty. See In re AMC Invs., LLC, 524 B.R. 62, 80 (Bankr. D. Del. 2015) ("Delaware law sets a three-year statute of limitations for breach of fiduciary duty." (citations omitted)); Jones v. Wells Fargo Bank, N.A., 858 F.3d 927, 934 (5th Cir. 2017) ("In Texas, the limitations period for breach-of-fiduciary-duty claims is four years." (citing Tex. Civ. Prac. & Rem. Code § 16.004(a)(5)); Durham v. Sw. Devs. Joint Venture, 996 P.2d 911, 921 n.3 (N.M. Ct. App. 1999)

77

("[T]he statute of limitations for bringing an action for damages based upon allegations of . . . breach of fiduciary duty is four years.").[57]

Because all of these limitations periods are shorter than New York's six-year statute of limitations, the Court must apply New York's borrowing statute, N.Y. C.P.L.R. § 202, to Fort Bliss/White Sands Missile Range Housing LP's New York law claims. Under Delaware, Texas, and New Mexico's statutes of limitations, the Fort Bliss Project's claims arising from the 2012 loan agreement are untimely because (1) Balfour was on inquiry notice of its injuries at the time of the 2012 agreement; (2) the longest possible limitations period is four years; and (3) more than four years elapsed between November 21, 2012, and August 28, 2017 (the date the Complaint was filed).

In sum, all Plaintiffs other than Fort Bliss/White Sands Missile Range Housing LP had notice of their New York law claims outside of New York's six-year statute of limitations, and Fort Bliss/White Sands Missile Range Housing LP had notice of its New York law claims outside the statute of limitations period, whether the Delaware, Texas, or New Mexico statute of limitations is applied. Accordingly, all of Plaintiffs' New York law claims are time-barred.

---

[57] Delaware, Texas, and New Mexico apply inquiry notice rules materially similar to those applicable to Plaintiffs' RICO claims. See, e.g., Lebanon Cnty. Employees' Ret. Fund v. Collis, 287 A.3d 1160, 1212 (Del. Ch. 2022) ("Under Delaware law, inquiry notice universally limits tolling doctrines."); Cook-Bell v. Mortg. Elec. Registration Sys., Inc., 868 F. Supp. 2d 585, 589-90 (N.D. Tex. 2012) ("'Knowledge of facts which would have excited inquiry into the mind of a reasonable prudent person, which, if pursued by him with reasonable diligence, would lead to the discovery of the fraud, is equivalent to knowledge of the fraud as a matter of law.'" (quoting McMeens v. Pease, 878 S.W.2d 185, 188 (Tex. App. 1994))); Sandel v. Sandel, 463 P.3d 510, 519 (N.M. Ct. App. 2020) ("If a reasonable person in the plaintiff's position would have made an inquiry leading to the discovery of the fraud, then the plaintiff is said to be on 'inquiry notice' and deemed to have discovered the cause of action for purposes of the rule.").

**B.**     **Plaintiffs' Motion for Partial Summary Judgment**

Plaintiffs have moved for summary judgment on Defendants' unclean hands defense.  (See Pltf. Mot. (Dkt. No. 867); see also Jefferies Ans. (Dkt. No. 325) at 145 (asserting unclean hands defense); Ray Ans. (Dkt. No. 326) at 50 (same))  Because this Court has determined that Defendants are entitled to summary judgment on all of Plaintiffs' claims, Plaintiffs' motion is denied as moot.  EBIN New York, Inc. v. SIC Enter., Inc., No. 19CV1017PKCTAM, 2023 WL 6141275, at *12 (E.D.N.Y. Sept. 20, 2023) ("Because the Court grants summary judgment in favor of Defendant, Plaintiff's cross-motion on Defendant's affirmative defenses is denied as moot.").

## CONCLUSION

For the reasons stated above, the motions for summary judgment filed by the Jefferies Defendants and Defendant Ray (Dkt. Nos. 858, 874) are granted.  Plaintiffs' motion for partial summary judgment (Dkt. No. 867) is denied as moot.  The Clerk of Court is directed to terminate the motions (Dkt. Nos. 858, 867, 874), to enter judgment in favor of the Jefferies Defendants and Defendant Ray, and to close this case.

Dated:  New York, New York
        March 31, 2026

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

79